UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLEEN O'DONNELL, | ) |
| | ) |
| Plaintiff, | ) |
| | )    Civil Action No: 04-40190-FDS |
| v. | ) |
| | ) |
| ALBERTO R. GONZALES, ATTORNEY | ) |
| GENERAL, U.S. DEPARTMENT | ) |
| OF JUSTICE, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**HIS MOTION FOR SUMMARY JUDGMENT**

Defendant, Alberto R. Gonzales, the Attorney General for the United States of America, by his attorney, Michael J. Sullivan, the United States Attorney for the District of Massachusetts, hereby submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment dismissing Plaintiff Colleen O'Donnell's Complaint in its entirety.

**I.    INTRODUCTION**

The Plaintiff's claims arise essentially from an off-duty incident between she and her former boyfriend, Officer David Reynoso, which occurred on April 8, 2002.  At the time, Plaintiff and Officer Reynoso were employees of the Federal Bureau of Prisons ("BOP") at the Federal Medical Center in Devens, Massachusetts ("FMC Devens").  As a result of her long term, and purportedly abusive, relationship with Officer Reynoso, Plaintiff claims that she developed Post Traumatic Stress Disorder ("PTSD").

By her Complaint, Plaintiff alleges that the BOP's response to the April 8, 2002 off-duty incident was insufficient and constituted (i) disability discrimination in violation of the Rehabilitation Act of 1973, and (ii) retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16, *et seq.*, and 42 U.S.C. 1981a.[1]  Specifically, Plaintiff alleges that the BOP failed to accommodate her alleged disability of PTSD by refusing to terminate Officer Reynoso's employment. Further, Plaintiff alleges the BOP retaliated against her for engaging in protected activity by recording her unapproved absences as Absences Without Leave ("AWOL") and disciplining her.

As shown below, Plaintiff's claims are inadequate both legally and factually and the Court must dismiss them as a matter of law.  Plaintiff cannot establish a prima facie case for her failure to accommodate claim because she is not a qualified disabled person under the Rehabilitation Act.  Nevertheless, the BOP provided her with reasonable accommodations, including the very accommodation her doctor recommended.  Finally, Plaintiff cannot make of a prima facie claim of retaliation nor can she show that the BOP's reasons for certain employment decisions are pretexts for discrimination.  Accordingly, the Court should grant summary judgment dismissing the Complaint.

---

[1] On October 24, 2005, Plaintiff voluntarily withdrew Count 1 of the Complaint, alleging gender discrimination in violation of Title VII.  <u>See</u> Docket Entry Number 13.

## II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY

Defendant respectfully refers the Court to his Concise Statement of Material Facts to Which There Is No Genuine Issue to Be Tried ("SOF") for a complete statement of the facts supporting this Motion.

### A.  PLAINTIFF'S BOP EMPLOYMENT

On August 31, 1998, Plaintiff began her employment with the Federal Bureau of Prisons ("BOP") as a correctional officer in the Custody Department at the Federal Medical Center in Devens, Massachusetts ("FMC Devens").  See Deposition of Colleen O'Donnell ("O'Donnell Dep."), p. 22, relevant pages attached to SOF as Exhibit 1.  At some point, Plaintiff's position changed to Inmate Systems Officer ("ISO") in the Inmate Systems Management Department ("ISM") at FMC Devens.  Id., p. 42-43.

### B.  INCIDENT AT MIRROR LAKE ON APRIL 8, 2002

During their duty-free lunch on April 8, 2002, Plaintiff and her then-boyfriend, David Reynoso, left work and the FMC Devens property for the purpose of having a discussion about their relationship.[2]  Id., pp. 63, 127-128.  Plaintiff and Reynoso drove together to nearby Mirror Lake and got into an argument.  Id., pp. 65-66.  During the argument, Plaintiff alleges that

---

[2]    Reynoso worked in the Special Investigative Supervisor Office ("SIS") at FMC Devens.  O'Donnell Dep., p. 63.  The SIS offices are located in the main building.  See Deposition of Warden David Winn ("Winn Dep."), p. 145, relevant pages attached to SOF as Exhibit 4.

- 3 -

Reynoso kicked her in the thigh with his steel toed boot.  <u>Id.</u>,
p. 66.

Following this incident, Plaintiff reported the incident to
BOP management, including Warden David Winn.  <u>Id.</u>, pp. 75, 78;
Deposition of Warden David Winn ("Winn Dep."), pp. 39-41,
relevant pages attached to SOF as Exhibit 4.  She also filed
criminal charges against Reynoso in Ayer District Court and
obtained a restraining order against him in Malden District
Court.  O'Donnell Dep., pp. 77-82.  Specifically, the Malden
District Court ordered Reynoso, *inter alia,* not to abuse
Plaintiff, not to contact Plaintiff, and to stay at least 50
yards from Plaintiff.  <u>See</u> Abuse Prevention Order, attached to
SOF as Exhibit 5.  The Court specifically allowed Reynoso to
attend work, but ordered that he stay away from Plaintiff while
at work.  <u>Id.</u>

 C. <u>BOP TAKES PROMPT CORRECTIVE ACTION ON APRIL 8, 2002</u>

On April 9, 2002, Warden Winn received the Malden District
Court's restraining order, allowing Reynoso to attend work.  Winn
Dep., p. 129-131.  Because (i) the BOP had not yet investigated
the incident between Reynoso and Plaintiff to determine what had
happened and what discipline for Reynoso was warranted, and (ii)
the restraining order allowed Reynoso to attend work if Reynoso
followed the order's restrictions, Warden Winn decided to change
Reynoso and Plaintiff's schedules so that the two would not come

into contact together while at work.  Id., pp. 49-51, 131-132;
O'Donnell Dep., pp. 110-111.

Specifically, effective Monday, April 15, 2002, Warden Winn
reassigned Plaintiff to perform her duties in the Mail Room
during the hours 6:00 a.m. to 2:30 p.m., Monday through Friday.
O'Donnell Dep., pp. 99-101; Winn Dep., pp. 122-125, 127; see also
Memorandum from Warden Winn to Plaintiff, dated April 12, 2002,
attached to SOF as Exhibit 9.  Plaintiff did not experience any
negative or adverse effect to her title, grade, compensation, or
benefits as a result of this scheduling and assignment change.[3]
O'Donnell Dep., pp. 118-119.

Warden Winn also reassigned Reynoso, whose previous work
hours were 8:00 a.m. to 4:00 p.m, to work only in the main
facility 4:00 p.m. to 12:00 a.m., Monday through Friday.  Id., p.
108; Winn Dep., pp. 125-127; see also Memorandum from Warden Winn
to Reynoso, dated April 12, 2002, attached to SOF as Exhibit 10.
Plaintiff and Reynoso both worked at FMC Devens on separate

---

[3]     Plaintiff testified during her deposition that this
scheduling and assignment change constituted a change to her
duties as an ISO.  O'Donnell Dep., pp. 111-112.  Specifically,
Plaintiff testified that the BOP precluded her from working
overtime hours and restricted her ability to respond to
emergencies and institution disturbances on the FMC Devens
compound.  Id., p. 111-113.  Upon further examination, however,
Plaintiff admitted that working overtime hours was not included
as a duty or responsibility in the ISO position description.
Id., p. 112-113.  Also, Plaintiff admitted that the BOP did not
restrict her from working overtime or from responding to
emergencies or institution disturbances.  Id., p. 114-115, 123.

- 5 -

shifts without incident from April 2002 until January 2003.  Winn Dep., p. 34-35.

Warden Winn also reported Reynoso's alleged off-duty misconduct to the BOP's Office of Internal Affairs to conduct an investigation.  Winn Dep., pp. 47-48.  Pursuant to Bureau policy, however, the Office of Internal Affairs could not begin its investigation of Reynoso until the Ayer District Court adjudicated Reynoso for the criminal charges against him.  Id., pp. 131-132.  The reason for this policy is so that the BOP, based on allegations, does not act prematurely by disciplining an employee whom a court may later find innocent of those allegations.  Id.

    D.    AYER DISTRICT COURT PLACES REYNOSO ON PROBATION

On January 3, 2003, the Ayer District Court held a hearing on the charges filed against Reynoso.  O'Donnell Dep., p. 156-157.  The court entered a finding of sufficient facts for a conviction of assault and battery with a dangerous weapon under M.G.L.A. 265 §15A(b), but continued the matter without a guilty finding until April 2, 2004.  See relevant pages of Hearing Transcript, Docket Sheet, and Probation form, dated April 3, 2003, attached to SOF as Exhibit 15.  The court ordered that Reynoso, as part of his probation, had to abide by all terms of the previously-entered restraining order and avoid contact with

Plaintiff and her family.  <u>Id.</u>[4]

E.    <u>WINN CONTINUES TO ENFORCE RESTRAINING ORDER IN THE
      WORKPLACE</u>

On January 8, 2003, Warden Winn maintained Plaintiff's

assignment to the Mail Room, but with duty hours of 9:30 a.m. to

6:00 p.m., Monday through Friday.  <u>See</u> Letter from Warden Winn to

Plaintiff, dated January 8, 2003, attached to SOF as Exhibit 19.

At the same time, Warden Winn changed Reynoso's work hours to

12:00 a.m. to 8:00 a.m., Sunday through Thursday.  <u>See</u> Letter

from Warden Winn to Reynoso, dated January 8, 2003, attached to

SOF as Exhibit 20.

F.    <u>PLAINTIFF'S FIRST REQUEST FOR ACCOMMODATIONS</u>

On January 8, 2003, Plaintiff called her psychiatrist,

George Milowe, M.D., and went to see him the following day.  <u>Id.</u>,

pp. 182-183.  Plaintiff had begun seeing Dr. Milowe in February,

2002, for depression before the April 8, 2002 incident with

Reynoso.  <u>Id.</u>, p. 178.

On or about January 8, 2003, Plaintiff provided the BOP with

---

[4]    Immediately after receiving notice that the Ayer
District Court had placed Reynoso on probation and continued his
case without a finding, the BOP began its internal investigation
of Reynoso's off-duty misconduct.  <u>See</u> OIA Investigation Report,
dated March 31, 2003, attached to SOF as Exhibit 17.  On March 3,
2003, the BOP concluded its investigation of Reynoso's off-duty
misconduct.  Winn Dep., p. 55.  The BOP found the allegations
off-duty misconduct to be true and, thus, suspended Reynoso
without pay from July 27, 2003, through August 16, 2003.  <u>Id.</u>,
64; <u>see also</u> Letter from Warden Winn to Reynoso, dated July 8,
2003, attached to SOF as Exhibit 18.

a note from Dr. Milowe, stating that: "This patient suffers from Post-Traumatic Stress Disorder [and] is now totally disabled [and] unable to work at her current job in the current circumstances.  If the patient's assailant was not on her work premises at all, Ms. O'Donnell would be able to work full-time without restrictions."  See Note from Dr. Milowe, dated January 8, 2003, attached to SOF as Exhibit 21.[5]

Warden Winn forwarded Dr. Milowe's January 8, 2003 letter to James Fletcher, M.D., the Chief Psychiatrist at FMC Devens for review.  Winn Dep., p. 82-83, 138-139.  On January 21, 2003, Dr. Fletcher opined that Dr. Milowe's letter contained insufficient "information to support any of the facts alleged in the letter and the conclusion that such a total disability is completely reversible owing to environmental factors is inconsistent with the practice of psychiatry."  See Letter from Dr. Fletcher to Warden Winn, dated January 21, 2003, attached to SOF as Exhibit 22.  Dr. Fletcher suggested a formal review of Plaintiff's medical records and an independent evaluation of Plaintiff by an independent psychiatrist for the purpose of determining Plaintiff's fitness for duty.  Id.

---

[5]     Plaintiff, however, testified that there was no accommodation BOP could have provided her at that time which would have enable her to return to work.  O'Donnell Dep., p. 207.

G.    <u>BOP ENGAGES IN THE INTERACTIVE PROCESS</u>

After receiving Dr. Milowe's January 8, 2003 note, Steve
Gagnon, the ISM Manager, called the Plaintiff on January 9, 2003,
and informed her that Warden Winn needed a written release from
her to discuss her medical condition in detail with her
physician.  O'Donnell Dep., pp. 189-190; <u>see also</u> Memorandum from
Gagnon to Warden Winn, dated January 9, 2003, attached to SOF as
Exhibit 23.  Gagnon also informed Plaintiff that her annual and
sick leave were almost exhausted and she needed to apply for some
sort of advance leave.  <u>See</u> Exhibit 23.  Cynthia Lord, the Human
Resource Manager, sent Plaintiff an authorization to provide Dr.
Milowe allowing him to release information to the BOP.  <u>See</u>
Letter from Lord to Plaintiff, dated January 9, 2003, attached to
SOF as Exhibit 24.  After receiving no response to her January 9,
2003 letter from Plaintiff, on January 14, 2003, Lord called
Plaintiff and spoke with her about providing the BOP with
additional information concerning her medical condition and
supporting her absence from work.  O'Donnell Dep., p. 192; Lord
Dep., p. 64.  During that conversation, Plaintiff informed Lord
that she would sign the medical release.  O'Donnell Dep., p. 192.
Lord also informed Plaintiff about the procedures for applying
for leave without pay, advanced leave, and the BOP's Voluntary
Leave   Program.  O'Donnell Dep., p. 193.

H.    <u>PLAINTIFF GOES AWOL FOR THE FIRST TIME</u>

On January 21, 2003, Plaintiff sent Warden Winn an email requesting advance leave with pay "due to [her] medical condition." <u>See</u> Email from Plaintiff to Warden Winn, dated January 21, 2003, attached to SOF as Exhibit 25; O'Donnell Dep., p. 194.  At that time, Plaintiff did not provide the BOP with any further documentation other than Dr. Milowe's January 9, 2003 note, nor did Plaintiff grant Dr. Milowe permission to speak with the BOP about her condition.  O'Donnell Dep., pp. 194-195.

In response to Plaintiff's email, on January 23, 2003, Gagnon advised Plaintiff that the BOP was granting her 24 hours of advanced sick leave to allow her to obtain the necessary medical information to support Dr. Milowe's January 8, 2003 letter.  <u>See</u> Letter from Gagnon to Plaintiff, dated January 23, 2003, attached to SOF as Exhibit 26.  Gagnon advised Plaintiff that Warden Winn would reconsider Plaintiff's request for advance sick leave if she provided her physician's assessment of her current clinical status and an estimate of her expected date of full or partial recovery.  <u>Id.</u>  Plaintiff was further advised that she needed to submit the proper form to request advanced sick leave by January 31, 2003, or she would be placed on AWOL status beginning February 3, 2003.  <u>Id.</u>  Gagnon attached this form to his letter. <u>Id.</u>; <u>see also</u> O'Donnell Dep., pp. 198-199.  Because Plaintiff failed to submit the proper form to BOP to request advanced sick

leave by January 31, 2003, the BOP placed Plaintiff on AWOL status beginning February 3, 2003.  Lord Dep., pp. 85-87.

Plaintiff did not submit a proper request for advance sick leave until February 11, 2003.  See Request for Leave or Approved Absence, faxed on February 11, 2003, attached to SOF as Exhibit 27.  Plaintiff sought 216 hours of advance sick leave.  Id.  On February 19, 2003, Warden Winn disapproved Plaintiff's request for advanced sick leave.  See Exhibit 27; see also Letter from Warden Winn to Plaintiff, dated February 19, 2003, attached to SOF as Exhibit 28.  Based on documentation provided by Plaintiff indicating that she was "totally disabled" and may not be returning to work, Warden Winn informed Plaintiff that she was not eligible for advance sick leave under guidance from the Department of Justice.  Id.

I.    PLAINTIFF APPLIES TO THE VOLUNTARY LEAVE TRANSFER PROGRAM

On January 27, 2003, Plaintiff submitted an application for the BOP's Voluntary Leave Transfer Program.  O'Donnell Dep., p. 204; see also Voluntary Leave Transfer Program Application, dated January 27, 2003, attached to SOF as Exhibit 29.  Plaintiff's application included a note from Dr. Milowe, stating that Plaintiff had "work related" PTSD, severe anxiety, depression, recurrent nightmares, intrusive thoughts, flashbacks and one to two full blown panic attacks daily.  See Exhibit 29.  Dr. Milowe opined that Plaintiff's condition would be lengthy, and

- 11 -

indefinite and "many many years as long as [Plaintiff] is forced

to work with Mr. David Reynoso." Id.[6]

On February 10, 2003, the FMC Devens Voluntary Leave

Program Screening Committee denied Plaintiff's application, and

explained to Plaintiff its reasons:

> Your medical emergency is based on another
> staff member's employment with the Bureau of
> Prisons, and you would be able to work if the
> other individual was no longer employed.
> Accommodation of your work site has been
> afforded so that you may return to work.  In
> addition, on January 21, 2003, you contacted
> Ned LaClair, Safety Manager, for the forms
> necessary to file a stress related claim, you
> requested these form[s] again on February 10,
> 2003.

See Memorandum to Plaintiff from Rick Harnes, dated February 10,

2003, attached to SOF as Exhibit 30.

    J.   PLAINTIFF'S SECOND REQUEST FOR ACCOMMODATIONS

On January, 21, 2003, Attorney Samuel Rizzitelli wrote to

Warden Winn and Lord, stating that he represented the Plaintiff

and asking that Plaintiff be given a "reasonable accommodation

for post traumatic stress disorder," or, alternatively, that

Plaintiff be placed "on administrative leave or authorized to

receive donated leave until she could return to work." See

Letter from Attorney Rizzitelli to Warden Winn and Lord, dated

---

    [6]    During her deposition, Plaintiff admitted that under
the work conditions prescribed by Warden Winn for Plaintiff and
Reynoso, Plaintiff never had to work with Reynoso.  O'Donnell
Dep., pp. 217-218.

January 21, 2003, attached to SOF as Exhibit 31.  Before Attorney

Rizzitelli sent the January 21, 2003 letter, Plaintiff had failed

to notify her supervisors or human resources that Attorney

Rizzitelli was her counsel.  O'Donnell Dep., p. 195; Winn Dep.,

pp. 146-147.

On January 21, 2003, Plaintiff called Gagnon at Attorney

Rizzitellli's instruction.  O'Donnell Dep., p. 196.  Gagnon asked

Plaintiff what would the BOP have to do to get her to return to

work.  Id.  Plaintiff responded that the BOP would have to remove

Reynoso.  Id., p. 196-197, 200; see also Memorandum from Gagnon

to Warden Winn, dated January 21, 2003, attached to SOF as

Exhibit 32.  On January 27, 2003, Warden Winn wrote to Plaintiff

explaining to her that he cannot "grant [her] accommodation

request that another staff member be removed."  See Letter from

Warden Winn to Plaintiff, dated January 27, 2003, attached to SOF

as Exhibit 33.  Warden Winn also stated that he had been trying

to accommodate Plaintiff by placing her and Reynoso on different

shifts.  Id.  Warden Winn inquired whether Plaintiff also wanted

him to restrict Reynoso to the "camp" area, which is a quarter of

a mile from the main facility.  Id.

        K.    DR. MILOWE EXPANDS UPON HIS RECOMMENDED ACCOMMODATIONS

On or about February 10, 2003, Plaintiff faxed to Warden

Winn a letter from Dr. Milowe, stating that Plaintiff had Post

Traumatic Stress Disorder as a result of being brutally assaulted

by Reynoso.  <u>See</u> Letter from Dr. Milowe to Gagnon, dated January 31, 2003, attached to SOF as Exhibit 39.  Dr. Milowe further opined that Plaintiff suffered from Major Depression and Panic Disorder.  <u>Id.</u>  Dr. Milowe indicated that Plaintiff would remain "totally disabled" until separated from Mr. Reynoso, stating:

> Working in the same environment as her assailant merely intensifies her symptoms and does not give her a chance to heal.  Common sense and good will would dictate that <u>Ms. O'Donnell not be required to work in the same facility at the same time as Mr. Reynoso.</u> She receives pharmacotherapy from me and sees a psychotherapist as well.  However, recovery is unlikely until the two are separated and Ms. O'Donnell is allowed to go through a healing process.  Until then she will remain totally disabled.

<u>Id.</u> (emphasis added).  No treatment notes or diagnostic test results were provided to support Dr. Milowe's opinion.  <u>Id.</u> During her deposition, Plaintiff admitted that under the work conditions prescribed by Warden Winn for Plaintiff and Reynoso, the BOP had already been providing Plaintiff the very accommodation Dr. Milowe requested in his January 31, 2003 letter.  O'Donnell Dep., pp. 212-213.

    L.   <u>PLAINTIFF RETURNS TO WORK ON JUNE 11, 2003</u>

On June 4, 2003, the BOP received a handwritten note from Dr. Milowe, stating "I saw this patient today in the office.  She is now able to resume her job duties, including overtime."  <u>See</u> Note by Dr. Milowe, dated May 28, 2003, attached to SOF as Exhibit 43.  Accordingly, Warden Winn contacted Attorney

- 14 -

Rizzitelli and informed him that Plaintiff could return to work on June 11, 2003.  See Letter from Warden Winn to Attorney Rizzitelli, attached to SOF as Exhibit 44.  When Plaintiff returned to work on June 11, 2003, she submitted to Warden Winn a request for two days of leave to attend a wedding on June 20, 2003.  See Plaintiff's Time Sheet for pay period June 1, 2003, to June 14, 2003, attached to SOF as Exhibit 45; Memorandum from Plaintiff to Warden Winn, dated June 10, 2003, attached to SOF as Exhibit 46.  Warden Winn promptly denied the request.  Exhibit 46.

　　　M.　JUNE 16, 2003 INCIDENT

On June 16, 2003, Officer J. Jacques, while performing security checks at the FMC Devens Mail Room at approximately 2 a.m., discovered threats and derogatory statements spray painted on the outside Mail Room walls directed at Plaintiff.  See Memorandum from Lieutenant James Diamond to Captain Bollinger, dated June 16, 2003, attached to SOF as Exhibit 47.  In response, the BOP immediately contacted its Office of Internal Affairs; the Department of Justice, Office of Inspector General; and the Massachusetts State Police to investigate the incident.  See Referral of Incident Report, attached to SOF as Exhibit 48.  Also on June 16, 2003, Warden Winn immediately convened a Workplace Violence Committee Meeting to discuss the vandalism.  See Memorandum from Meeks to Warden Winn, dated June 16, 2003,

attached to SOF as Exhibit 49.  While the Committee found that
the incident did not constitute workplace violence, it
recommended allowing Plaintiff to work somewhere other than the
Mail Room based upon Plaintiff's alleged fear.  <u>Id.</u>

    N.   <u>PLAINTIFF GOES AWOL FOR A SECOND TIME</u>

On June 18, 2003, Warden Winn authorized Plaintiff to take
Administrative Leave up through June 27, 2003, as a result of the
June 16, 2003 incident.  <u>See</u> Letter from Gagnon to Plaintiff,
dated June 18, 2003, attached to SOF as Exhibit 51.  Gagnon
informed Plaintiff that the BOP would grant Plaintiff the leave
on a daily basis; therefore, Plaintiff had to contact the BOP
each day she wanted to take leave.  <u>Id.</u>

On June 23, 2003, Plaintiff provided Warden Winn with a note
from Dr. Milowe, stating that "Due to retraumatization Monday 6-
16-03 at work, Ms. O'Donnell is now totally disabled again."
<u>See</u> Note by Dr. Milowe, dated June 18, 2003, attached to SOF as
Exhibit 52.  Again, Dr. Milowe's note was not accompanied by any
treatment notes or test results.  <u>Id.</u>

In response to Dr. Milowe's June 23, 2003 note, Gagnon
informed Plaintiff that Warden Winn would continue to grant
Plaintiff Administrative Leave through June 27, 2004, and advised
her to apply for Leave Without Pay before her expected return-to-
work date, June 30, 2003.  <u>See</u> Letter from Gagnon to Plaintiff,
dated June 23, 2003, attached to SOF as Exhibit 53.  Gagnon

informed Plaintiff that if she failed to submit a request for Leave Without Pay before her return-to-work date the BOP would place her on AWOL.  Id.

On June 26, 2003, Plaintiff submitted a request for Leave Without Pay, which Warden Winn granted through July 29, 2003. See Memorandum from Plaintiff to Warden Winn, dated June 26, 2003, attached to SOF as Exhibit 54.  On July 28, 2003, Plaintiff requested Leave Without Pay to start on July 29, 2003, to an unspecified date.  See Request for Leave or Approved Absence form, dated July 28, 2003, attached to SOF as Exhibit 55.  Warden Winn granted Plaintiff's request through August 11, 2003, on the condition that Plaintiff provide an updated physician note to the BOP on August 11, 2003.  Id.  On August 11, 2003, Plaintiff again requested Leave Without Pay to start on August 11, 2003, to an unspecified date.  See Request for Leave or Approved Absence form, dated August 11, 2003, attached to SOF as Exhibit 56. Plaintiff, however, did not provide Warden Winn with an updated doctor's note as Warden Winn had requested.  O'Donnell Dep., p. 276.  Warden Winn denied Plaintiff's request, stating that "Ms. O'Donnell failed to follow my instructions on July 7-29-03 by not providing an updated Dr's note."  Id.

    O.   PLAINTIFF RETURNS TO WORK ON NOVEMBER 20, 2003

On November 11, 2003, after approximately three months of no contact with her supervisors - despite their attempts to reach

her, Plaintiff informed Warden Winn via facsimile that she wished to return to work "as soon as possible." See Facsimile and Attachment from Plaintiff to Warden Winn, dated November 11, 2003, attached here to as Exhibit 58. Plaintiff submitted with her facsimile a note from her new physician, Brian L. Ackerman, M.D., who stated that Plaintiff was "able to return to work full-time without any restrictions." Id.

Despite Dr. Ackerman's assessment that Plaintiff could work without restrictions, on November 18, 2003, pursuant to discussions with Plaintiff's new attorney, Warden Winn offered to allow Plaintiff to return to work at the satellite camp. Winn Dep., pp. 103-104, 113; see also Letter from Warden Winn to Plaintiff, dated November 18, 2003, attached here to as Exhibit 59. After further discussions with Plaintiff's attorney, Warden Winn agreed to reassign Reynoso to the satellite camp and to a different shift during the tenure of the restraining order. See Letter from BOP Counsel to Attorney Dawn McDonald, dated November 19, 2003, attached here to as Exhibit 60. During the discussions between Plaintiff's counsel and the BOP, Warden Winn granted Plaintiff Administrative Leave from November 12, 2003, through November 14, 2003, and again November 17, 2003, through November 19, 2003. See Plaintiff's Time Sheets for pay periods November 2, 2003, through November 29, 2003, attached to SOF as Exhibit 60. Plaintiff returned to work on November 20, 2003. Id.

P.    BOP INVESTIGATES PLAINTIFF FOR BEING AWOL

On December 10, 2003, during an official investigation into Plaintiff's AWOL for the period August 13, 2003, through November 11, 2003, Plaintiff gave a sworn statement indicating that even though she had received the BOP's requests for further medical information and messages from Gagnon to contact him, upon advice of her former attorney, she refused to provide the BOP with any further medical information or contact her supervisor. See Affidavit by Plaintiff, dated December 10, 2003, attached here to as Exhibit 62. Plaintiff also admitted that she was aware that she was AWOL from August 13, 2003, through November 11, 2003. Id. Plaintiff further admitted that for three months she did not call or correspond with the BOP because her former attorney had assured her that he would make all further contact. Id.

In order to determine what, if any, discipline to issue Plaintiff for her excessive unauthorized absence and failure to follow leave procedure, Warden Winn asked Plaintiff to provide him information about her condition. O'Donnell Dep., p. 293-294. In response, on December 18, 2003, Plaintiff provided Warden Winn with a memorandum from Dr. Ackerman, stating that Plaintiff suffers from PTSD and was currently taking medication for her condition. See Memorandum from Dr. Ackerman to Warden Winn, dated December 16, 2003, attached here to as Exhibit 63. Dr. Ackerman further stated that Plaintiff "was suffering with PTSD

- 19 -

at the time in question, July 2003 until present." Id.

On April 20, 2004, Gagnon gave Plaintiff notice that he was proposing to Warden Winn that the BOP suspend Plaintiff for thirty days due to her AWOL status for the period August 13, 2003, through November 11, 2003. See Letter from Gagnon to Plaintiff, dated April 20, 2004, attached to SOF as Exhibit 64. Gagnon informed Plaintiff that she had a right to contact Warden Winn in response to Gagnon's proposal within fifteen working days. Id. On May 12, 2004, Plaintiff responded to Gagnon's April 20, 2004 proposal of discipline, claiming that the proposed discipline, and the events surrounding them, were discriminatory and retaliatory. See Letter from Attorney McDonald to Warden Winn, dated May 12, 2004, attached to SOF as Exhibit 65.

On June 10, 2004, based upon the results of BOP's investigation, the medical documentation provided by Plaintiff, Plaintiff's May 12, 2004 letter, Plaintiff's employment history and the "extenuating circumstances in [Plaintiff's] personal life over the [previous] two years, Warden Winn did not suspend Plaintiff from work but issued her a letter of reprimand. See Letter from Warden Winn to Plaintiff, dated June 10, 2004, attached to SOF as Exhibit 66; Letter of Reprimand from Warden Winn to Plaintiff, dated June 10, 2004, attached to SOF as Exhibit 67.

## III. ARGUMENT

**A.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND PLAINTIFF HAS FAILED TO ADDUCE ADMISSIBLE EVIDENCE TO SUPPORT HER CLAIMS**

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Barbour v. Dynamics Research Corporation</u>, 63 F.3d 32, 36-37 (1st Cir. 1995)(quoting Fed. R. Civ. P. 56). In this respect, a "genuine" issue means that "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational fact finder to resolve the issue in favor or either side." <u>National Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995). Likewise, "'material' means that a contested issue of fact has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." <u>Smith v. F.W. Morse & Company, Inc.</u>, 76 F.3d 413, 428 (1st Cir. 1996).

Once the moving party makes a proper showing as to the "'absence of evidence to support the non-moving party's case,' the burden of production shifts to the non-movant." <u>Dow v.</u>

United Brotherhood of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993)(citation omitted).  "As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute."  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).  Moreover, a plaintiff cannot defeat a summary judgment motion through conclusory statements, mere speculation or conjecture.  J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996); see also Horta v. Sullivan 4 F.3d 2, 11 (1st Cir. 1993). Even in employment discrimination cases, summary judgment is appropriate where the non-movant relies "upon conclusory allegations, improbable inferences, and unsupported speculation." See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Because Plaintiff cannot meet that burden with respect to her claims, the Court must grant summary judgment, dismissing the Complaint in its entirety.

**B.    THE UNDISPUTED FACTS ESTABLISH THAT DEFENDANT DID NOT FAIL TO PROVIDE PLAINTIFF WITH A REASONABLE ACCOMMODATION**

The Rehabilitation Act prohibits the BOP from discriminating against a qualified individual with a disability.  29 U.S.C. § 794 (a).  To succeed on her claim for failure to accommodate under the Rehabilitation Act, Plaintiff must show (1) that she

suffered from a disability within the meaning of the statute, (2)
that she was a qualified individual in that she was able to
perform the essential functions of her job, with or without
reasonable accommodation, and (3) that, despite its knowledge of
her disability, the BOP did not offer a reasonable accommodation
for the disability.  See Calero-Cerezo v. United States DOJ, 355
F.3d 6, 20 (1st Cir. 2004).  Plaintiff cannot meet this burden.

### 1.  Plaintiff Cannot Establish That She Suffered From A Disability Within The Meaning Of The Act

To qualify as disabled under the Rehabilitation Act,
Plaintiff must first prove that she had a physical or mental
impairment during the relevant time period.  See Toyota Motor
Mfg. v. Williams, 534 U.S. 184, 194 (2002).  Although Plaintiff
might arguably establish that she had an impairment (which
Defendant disputes),[7] the inquiry does not end there because
merely having an impairment does not make one disabled under the
Act.  Id. at 195.  She must also demonstrate that her impairment
(here PTSD) limits a major life activity.  A major life activity
under the Rehabilitation Act is an "activity of central

_____

[7]    At best, Plaintiff's medical records establish only
that Dr. Milowe diagnosed her with PTSD.  Indeed, Plaintiff's
medical expert, Dr. Victor Carbone, stated during his deposition
that he could not, based on Plaintiff's medical records, state to
a reasonable medical degree that Plaintiff met the criteria for
PTSD (as outlined in the Diagnostic and Statistical Manual of
psychiatry) during the relevant time period.  Deposition of
Victor Carbone ("Carbone Dep."), pp. 91-93, relevant pages
attached to SOF as Exhibit 68.

importance to people's daily lives," such as walking, seeing, hearing, and performing manual tasks. Calero-Cerezo, 355 F.3d at 21. Moreover, Plaintiff must show that the limitation on the major life activity is "substantial." Toyota Motor Mfg., 534 U.S. at 195. The Supreme Court has interpreted "substantially limits" to suggest "considerable or specified to a large degree." Sutton v. United Airlines, Inc., 527 U.S. 471, 491 (1999) (internal quotation marks omitted).[8] Plaintiff has the burden of proving these three elements. Calero-Cerezo, 355 F.3d at 20. She, however, cannot meet her burden.

The record evidence does not demonstrate that Plaintiff's alleged PTSD substantially limited a major life activity. Indeed, Plaintiff's medical records for the relevant time period describes only two arguably major life activities that were effected by her alleged PTSD. After diagnosing Plaintiff with PTSD (for the first time on July 15, 2002), Dr. Milowe notes in

---

[8]    According to the EEOC regulations, "substantially limited" means "unable to perform a major life activity that the average person in the general population can perform"; or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). In determining whether an individual is substantially limited in a major life activity, the regulations instruct that courts consider the following factors: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii).

- 24 -

Plaintiff's psychological records that she is "not sleeping very well" on April 8, 2003, but then notes at their meeting the following week that Plaintiff is sleeping better.  <u>See</u> Plaintiff's relevant medical records, attached hereto as Exhibit 69.  He also notes that she had a "poor appetite" on June 18, 2003.  <u>Id.</u>  The notes, however, do not support a conclusion that the effect of Plaintiff's purported stress on her sleeping and appetite was substantial.

Even if Plaintiff were to argue that her PTSD substantially limited her ability to work, such an argument fails.  Assuming for purposes of the instant motion that working can be a major life activity under the Rehabilitation Act,[9] it is not sufficient that Plaintiff is unable to perform a single, particular job, but rather, she must show, at a minimum, that the impairment significantly restricts her "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person with comparable training, skills and abilities."  <u>See</u> <u>Sutton</u>, 527 U.S. at 491 (<u>quoting</u> 29 C.F.R. § 1630.2 (j)(3)(i)); <u>see also</u> <u>Toyota Motor Mfg.</u>, 534 U.S. at 199-202.  Furthermore, in order to be substantially limited in the major life activity of working,

---

[9]     <u>Sullivan v. Neiman Marcus Group, Inc.</u>, 358 F.3d 110, 115 (1st Cir. 2004) ("We will, as we have done in the past, assume without deciding that work may constitute a major life activity.").

one must be precluded from more than one type of job, a
specialized job, or a particular job of choice. If jobs
utilizing an individual's skills (but perhaps not his
or her unique talents) are available, one is not
precluded from a substantial class of jobs. Similarly,
if a host of different types of jobs are available, one
is not precluded from a broad range of jobs.

527 U.S. at 492.

According to Dr. Milowe's description of the effect
Plaintiff's PTSD had on her ability to work (i.e., she could not
work at the BOP only when Reynoso was also working; see Exhibits
21, 29, 39), Plaintiff's alleged disability clearly did not
preclude her from performing a broad class of jobs.  Furthermore,
by January 8, 2003, the BOP had already separated Reynoso from
Plaintiff by changing his work hours and limiting his assignment
to another building from where Plaintiff worked, so according to
Dr. Milowe's notes to the BOP, Plaintiff was perfectly capable of
working.  See Exhibits 21, 29, 39; see also O'Donnell Dep., pp.
212-213.  Accordingly, Plaintiff cannot establish that she
suffered from a disability within the meaning of the Act.

### 2.    The BOP Provided Plaintiff With A Reasonable Accommodation

Assuming *arguendo* that the Court finds Plaintiff suffered
from a qualified disability, the BOP nevertheless provided her
with reasonable accommodations.  The record evidence establishes
that Plaintiff made only two requests for accommodation.
Plaintiff made her first request on January 8, 2003, via Dr.
Milowe, who stated: "If the patient's assailant was not on her

- 26 -

work premises at all, Ms. O'Donnell would be able to work full-time without restrictions." Exhibit 21. Later, on January 31, 2003, Dr. Milowe elaborated on his proposed accommodation, requesting "that [Plaintiff] not be required to work in the same facility at the same time as Mr. Reynoso." Exhibit 39. It is undisputed, however, that since April 12, 2002, the BOP had made changes to Plaintiff's and Reynoso's schedules that achieved the very work conditions Dr. Milowe was seeking for his patient, which, according to Dr. Milowe's assessment, would allow Plaintiff to work. Exhibits 21, 39; O'Donnell Dep., pp. 212-213.

Plaintiff's second request for accommodation, made on January 21, 2003 - which exceeded the accommodations requested by Plaintiff's doctor - called for the BOP to remove or terminate Reynoso. O'Donnell Dep., pp. 196-197. Warden Winn informed Plaintiff on January 27, 2003, that the BOP could not grant such a request, but offered, instead, to place Reynoso in the satellite camp at FMC Devens. Exhibit 33. Warden Winn could not simply fire Reynoso because, pursuant to BOP policy, the Office of Internal Affairs had to first investigate the allegations against Reynoso before issuing him punishment.[10] Winn Dep., pp.

---

[10] As detailed above, BOP policy also required the Office of Internal Affairs to delay its investigation until the Ayer District Court adjudicated Reynoso for the criminal charges against him. Winn Dep., pp. 131-132. When the Office of Internal Affairs concluded its investigation, sustaining the allegations of off-duty misconduct, the BOP suspended Reynoso without pay. Id., p. 64.

131-132.

The record shows that Plaintiff's response to Warden Winn's proposed accommodation came through her former counsel, who, disingenuously asked Warden Winn several times to elaborate on his proposal instead of simply accepting the proposal as Plaintiff's current counsel did in November 2003.  As an initial matter, Plaintiff's former counsel was a former BOP employee and, therefore, likely understood Warden Winn's proposal.  Winn Dep., p. 89.  More importantly, Plaintiff admittedly understood Warden Winn's proposal and believed that Warden Winn did not need to explain his proposal any further.  O'Donnell Dep., p. 214.

From January 8, 2003, to November, 2003, Plaintiff admittedly failed to provide the BOP with sufficient information concerning her alleged disability at the direction of her former counsel.  O'Donnell Dep., p. 277.  Not until Plaintiff hired her current counsel in November 2003 did she finally provide the BOP with further documentation of her condition and, eventually, accept Warden Winn's initial offer to reassign Reynoso to the satellite camp as an additional accommodation.  Exhibit 59.

It is undeniable that the BOP provided Plaintiff the accommodation sought on her behalf by Dr. Milowe.  Admittedly, the BOP did not provide Plaintiff her request that the agency remove or fire Reynoso.  First, this latter request was not endorsed by Dr. Milowe, who requested a far lesser accommodation

for Plaintiff.  Furthermore, Plaintiff is not entitled to an accommodation of her choice.  See, e.g., Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 168-69 (D. Mass. 2004).  As stated above, the BOP could not grant this request without violating its own personnel policies.  Despite the fact that Plaintiff consistently (and admittedly) failed to provide the BOP with adequate medical documentation concerning her PTSD, the record evidence demonstrates that the BOP provided her with reasonable accommodations to enable her to work.

> **3.**  **Plaintiff Cannot Prove That The BOP Had Sufficient Knowledge Of Her Disability Because She Admittedly Refused To Engage In The Interactive Process**

The record evidence establishes that the only failures in the interactive process between Plaintiff and the BOP were caused by Plaintiff.  Her admission that she refused to cooperate with the BOP - although under the poor instruction of her former counsel - precludes her, as a mater of law, from recovering against the BOP under a failure to accommodation claim.  See Allen v. Pacific Bell, 348 F.3d 1113, 1115 (9th Cir. 2003) (Per Curiam) (employer had no duty to engage in further interactive process where employee was requested, but failed, to submit additional medical information that would serve to modify his doctor's prior report); Templeton v. Neodata Servs, Inc., 162 F.3d 617, 619 (10th Cir. 1998) (where employee failed to provide necessary medical information for interactive process, she was

precluded from claiming employer failed to accommodate her disability); Beck v. University of Wisc. Bd. of Regents, 75 F.3d 1130 (7th Cir. 1996) (same).  Her refusal to provide the documentation precludes her from establishing that the BOP had adequate knowledge of her disability, which is also fatal to her claim.  See Calero-Cerezo, 355 F.3d at 20.

### C.  **PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW**

Plaintiff alleges that the BOP retaliated against her for engaging in protected activity, but she never clearly identifies the protected activity for which she suffered reprisal.[11]  The earliest date Plaintiff can argue that she engaged in protected activity is January 8, 2003, when Plaintiff first sought accommodations for her alleged PTSD.

The only arguably adverse employment actions Plaintiff suffered after January 8, 2003, occurred on or about (1) February 2, 2003, when the BOP placed her on AWOL status for the first time; (2) February 10, 2003, when the BOP denied her application for the Voluntary Leave Transfer Program; (3) February 19, 2003, when the BOP denied her request for 216 hours of advance sick leave; (4) June 11, 2003, when the BOP denied her request for two days of leave; (5) August 11, 2003, when the BOP denied her request for an unspecified period of leave without pay; (6)

---

[11]    Arguably, Plaintiff engaged in two protected activities during the relevant period: (i) when she requested accommodations; and (ii) when she initiated the EEO process.

August 13, 2003, when the BOP placed her on AWOL status for the second time; and (7) June 10, 2004, when the BOP placed a letter of reprimand in her personnel file for being AWOL for the period August 13, 2003, through November 11, 2003.

### 1. Plaintiff's Claims Of Retaliation After March 31, 2003, Are Untimely

It is axiomatic that federal employees must first timely exhaust the EEOC's administrative remedies before bringing their claims to federal court. See, e.g., Roman-Martinez v. Runyon, 100 F.3d 213, 216-18 (1st Cir. 1996) (holding that a federal employee's failure to contact an EEOC counselor within the limitations period causes him to lose his right to pursue a later de novo action in court); Brown v. General Services Admin., 425 U.S. 820, 832-33 (1976). For a federal employee to exhaust administrative remedies, the plaintiff must contact an EEOC counselor within forty-five days of the allegedly discriminatory incident. 29 C.F.R. §§ 1614.105(a)(1); see also Velazquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000) (administrative remedies had not been exhausted since there had been no contact with an EEOC counselor within 45 days); Roman-Martinez, 100 F.3d at 216-18 (holding that a federal employee's failure to contact an EEOC counselor within the limitations period causes him to lose his right to pursue a later de novo action in court). Failure to do so bars a plaintiff from bringing a court action based on that incident. Jensen v. Frank, 912 F.2d 517, 520 (1st

Cir. 1990).

Plaintiff's March 31, 2003 EEO complaint alleges only sex
and disability discrimination, sexual harassment, and retaliation
based on the BOP's preceding denials of leave in February 2003
and placement of Plaintiff on AWOL status on February 2, 2003.
Exhibit 40.  It is undisputed that following her March 31, 2003
EEO complaint, Plaintiff received notice that BOP denied her
requests for leave on June 11, 2003, and August 11, 2003, and
placed her on AWOL status on August 13, 2003, but she never
sought counseling with an EEO counselor or filed an EEO complaint
claiming that these actions were retaliatory.  Similarly,
Plaintiff sought no administrative redress concerning the June
10, 2004 letter of reprimand.  Accordingly, Plaintiff is barred
from pursuing these retaliation claims as a matter of law.

> ### 2.    Plaintiff Cannot Establish That The BOP's Legitimate, Non-Discriminatory Reasons For Its Employment Actions Are Pretexts For Discrimination

Assuming _arguendo_ that Plaintiff's retaliation claims are
properly before this Court, the Court should still dismiss them.
Because Plaintiff cannot produce any direct evidence of
retaliatory intent, her claims are subject to the McDonnell
Douglas burden shifting analysis.[12]  See Colburn v. Parker

_____

[12]    "Under [the McDonnell Douglas] framework, a plaintiff
employee must carry the initial burden of coming forward with
sufficient evidence to establish a prima facie case of . . .
retaliation.  If he does so, then the burden shifts to the
employer 'to articulate some legitimate, nondiscriminatory reason

Hannifin/Nichols Portland Div., 429 F.3d 325, 335-336 (1st Cir. 2005).  Although Plaintiff might arguably establish a prima facie case of retaliation,[13] she cannot establish that the BOP's reasons for denying two out of her five requests for leave, denying her application for the Voluntary Leave Transfer Program, placing her on AWOL status, and disciplining her for being AWOL are pretexts for discrimination.

After Plaintiff informed the BOP that she had PTSD, the BOP generously provided her on several occasions hours of leave after she exhausted her accrued annual and sick leave.  Indeed, the BOP granted her 24 hours of advance sick leave on January 23, 2003; approximately one month of leave without pay (June 27, 2003, through July 29, 2003) on June 26, 2003; and approximately two weeks of leave without pay (July 29, 2003, through August 11,

_____

for the employee's [termination],' sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. . . . If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having [engaged in protected activity]."  Hodgens v. General Dynamics Corp., 144 F.3d 151, 160-61 (1st Cir. 1998) (citations omitted) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

[13]    "To make out a prima facie case, plaintiff must show (1) that he engaged in a protected action . . .; (2) that he suffered an adverse employment action . . .; and (3) that there was some possibility of a causal connection between the employee's protected activity and the employer's adverse employment action, in that the two were not wholly unrelated."  Colburn, 429 F.3d at 336 n.10.

2003) on July 28, 2003.  The BOP even provided Plaintiff, *sua sponte*, one week of administrative leave (June 18, 2003, through June 27, 2003) following the June 16, 2003 incident.  The record clearly establishes that Warden Winn appropriately denied Plaintiff's June 11, 2003 request for two days of leave to attend her friend's wedding because she had exhausted her accrued leave and had just returned back to work that same day after being AWOL since February 2003.  The record also demonstrates that Warden Winn denied Plaintiff's August 11, 2003 request for an indefinite period of time because she failed to provide Warden Winn with updated medical documentation as he had requested.  Exhibits 55, 56.  The record also establishes that the Voluntary Leave Program Screening Committee denied Plaintiff's application to the Voluntary Leave Program for non-discriminatory reasons.  Exhibit 30.

     The events that lead up to the BOP's decisions to place Plaintiff on AWOL status on February 2, 2003, and August 13, 2003, are also clear.  The BOP placed Plaintiff on AWOL status on February 2, 2003, because she failed to follow her supervisor's instructions and submit the proper form requesting advanced sick leave by the deadline he provided her.  Exhibit 26; Lord Dep., pp. 85-87.  Similarly, the BOP placed Plaintiff on AWOL status on August 13, 2003, because she failed to provide Warden Winn with

an updated note from her physician as he requested.[14]  Exhibits 55, 56.  Ultimately, the BOP disciplined Plaintiff on June 10, 2004, by placing a letter of reprimand in her personnel file for being AWOL for the period August 13, 2003, through November 11, 2003.  Exhibits 66, 67.  That fact that Plaintiff engaged in protected activity was not a factor in the BOP's decision to place a letter of reprimand in her personnel file.  Winn Dep., p. 161.

Plaintiff does not, and cannot, demonstrate that the foregoing reasons for the BOP's employment decisions are pretext for discrimination.  She fails to provide any evidence, for example, that (1) the BOP held other similarly situated employees, who did not engage in protected activity, to a different standard, (2) the BOP subjected other employees who engaged in similar protected activity to adverse employment actions, or (3) other instances of poor treatment towards her occurred.  See, e.g., McDonnell Douglas, 411 U.S. at 804; Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991).  The fact that Plaintiff may believe that the BOP was not sufficiently compassionate toward her does not prove its reasons are pretexts.  Indeed, "the courts may not sit as super personnel departments,

---

[14]    Before placing her on AWOL status for the second time, Plaintiff's supervisor left numerous messages on her home telephone requesting the updated medical information, but the Plaintiff admittedly refused to respond.  Exhibit 56; see also O'Donnell Dep., p. 279.

assessing the merits - or even the rationality - of employers'
nondiscriminatory business decisions." See Mesnick, 950 F.2d at
825.  In the absence of any "evidence from which a reasonable
jury could infer, without the most tenuous insinuation," that the
BOP's legitimate, non-discriminatory reasons for its employment
decisions are pretexts for discrimination, the BOP is entitled to
summary judgment on Plaintiff's retaliation claim.

**CONCLUSION**

Accordingly, for the reasons articulated above, the claims
the United States should be dismissed.

Dated: March 16, 2006                    ALBERTO R. GONZALES,
                                         Attorney General, U.S.
                                         Department of Justice

                                         By his attorney,

                                         MICHAEL J. SULLIVAN
                                         United States Attorney

                                         By: /s/ Damian W. Wilmot
                                             Damian W. Wilmot
                                             Assistant U.S. Attorney
                                             1 Courthouse Way., Ste 9200
                                             Boston, MA  02210
                                             (617) 748-3398