UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COLLEEN O'DONNELL,                )
                                  )
            Plaintiff,            )
                                  )   Civil Action No: 04-40190-FDS
            v.                    )
                                  )
ALBERTO R. GONZALES, ATTORNEY )
GENERAL, U.S. DEPARTMENT          )
OF JUSTICE,                       )
                                  )
            Defendant.            )

**DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

A.   <u>PLAINTIFF'S BOP EMPLOYMENT AND TRAINING</u>

1.   On August 31, 1998, Plaintiff Colleen O'Donnell began her
     employment with the Federal Bureau of Prisons ("BOP") as a
     correctional officer in the Custody Department at the
     Federal Medical Center in Devens, Massachusetts ("FMC
     Devens"). <u>See</u> Deposition of Colleen O'Donnell ("O'Donnell
     Dep."), p. 22, relevant pages attached hereto as Exhibit 1.

2.   Through her employment, the BOP trained Plaintiff
     extensively on its Equal Employment Opportunities ("EEO")
     policies. <u>Id.</u> at 23, 26, 28-40. Indeed, each year of her
     employment, except for one, the BOP had Plaintiff attend an
     annual refresher course, which includes training on the
     BOP's EEO policies. <u>Id.</u>, pp. 28-40.

3.   Further, at all relevant times, the BOP, by policy, has been
     in compliance with notice postings of the EEO time lines.
     <u>See</u> Deposition of Cindy Lord ("Lord Dep."), p. 105, relevant
     pages attached hereto as Exhibit 2.

4.   At some point, Plaintiff's position changed to Inmate
     Systems Officer ("ISO") in the Inmate Systems Management
     Department ("ISM") at FMC Devens. O'Donnell Dep., p. 42-43.

5.   Initially, Plaintiff reported to the Assistant Inmate
     Systems Manager, Fernando Messer. <u>Id.</u>, p. 46. Anthony
     Amico later replaced Messer. <u>Id.</u>, p. 47. Plaintiff's
     second-line supervisor in the ISM was always Stephen Gagnon,
     the Inmate Systems Manager. <u>Id.</u>, p. 46.

6.   Plaintiff's job as an ISO required her to rotate between

Receiving and Discharge and the Mail Room. _Id.,_ pp. 47-48,
54; _see_ _also_ ISO Position Statement, attached hereto as
Exhibit 3.

7.   In Receiving and Discharge, Plaintiff processed inmates
     coming and going at FMC Devens. O'Donnell Dep., p. 47. The
     Receiving and Discharge office is located in the main
     building at FMC Devens. _Id.,_ p. 49. Plaintiff could
     perform her Receiving and Discharge functions only from the
     office located in the main building. _Id.,_ p. 55.

8.   In the Mail Room, Plaintiff sorted and screened inmates'
     mail. _Id.,_ pp. 46-47. After September 11, 2001, the Mail
     Room has been located in a separate facility away from the
     main building. _Id.,_ pp. 49-50, 53.

     B.   PLAINTIFF'S RELATIONSHIP WITH DAVID REYNOSO

9.   Plaintiff and co-worker David Reynoso began dating
     exclusively in October of 1998. _Id.,_ p. 56. They lived
     together in Devens, Massachusetts, from October 1999 to at
     least October 2000. _Id._ Their relationship was "on and
     off" for a couple more years and finally ended in April
     2002. _Id.,_ p. 58.

10.  Plaintiff claims that Reynoso physically abused her
     throughout their relationship. _Id.,_ p. 69.

11.  Reynoso worked in the Special Investigation Services ("SIS")
     Department at FMC Devens. _Id.,_ p. 63.

12.  The SIS offices are located in the main building. _See_
     Deposition of Warden David Winn ("Winn Dep."), p. 145,
     relevant pages attached hereto as Exhibit 4.

     C.   INCIDENT AT MIRROR LAKE ON APRIL 8, 2002

13.  During their duty-free lunch on April 8, 2002, Plaintiff and
     Reynoso left work and the FMC Devens property for the
     purpose of having a discussion about their relationship.
     O'Donnell Dep., pp. 63, 127-128.

14.  Plaintiff and Reynoso drove together to nearby Mirror Lake
     and got into an argument. _Id.,_ pp. 65-66.

15.  During the argument, Plaintiff alleges that Reynoso kicked
     her in the thigh with his steel toed boot. _Id.,_ p. 66.

16. Following the argument, a state trooper, who was patrolling Mirror Lake, asked Plaintiff if she was well and, eventually, asked her if she needed a ride back to FMC Devens, which she declined. Id., p. 69.

17. Plaintiff then walked to the training center facility on the FMC Devens compound and called a co-worker for a ride back to the Mail Room. Id., p. 70.

D.   PLAINTIFF INFORMS BOP ABOUT THE INCIDENT

18. When Plaintiff returned to the Main Room, she eventually called her immediate supervisor, Fernando Messer, to the Mail Room and told him about the incident at Mirror Lake. Id., p. 71. Messer instructed Plaintiff to report the incident immediately to Captain Bollinger. Id., p. 72.

19. A co-worker then drove Plaintiff to the main building to speak with Captain Bollinger and Dennis Duffy, the Special Investigative Agent. Id., pp. 73-74. Plaintiff testified that she told Captain Bollinger about the incident and that she feared for her safety. Id., p. 129. Captain Bollinger instructed Plaintiff to file a criminal complaint with the state police. Id., p. 74. He then asked Plaintiff's co-worker to drive Plaintiff to the state police barracks. Id., p. 74.

20. While at the state police barracks, Plaintiff filed a complaint against Reynoso. Id., pp. 77. The co-worker then drove Plaintiff back to the main building at FMC Devens. Id., p. 77-78.

21. When Plaintiff returned to the main building that afternoon, she met with Warden David Winn and Cindy Lord, the Human Resource Manager, in the Warden's office to inform them of the incident with Reynoso. Id., p. 75, 78; Winn Dep., pp. 39-41.

22. Plaintiff testified that she told Lord that she feared for her safety. O'Donnell Dep., p. 129.

23. Warden Winn placed Plaintiff on administrative leave and instructed her to apply for a restraining order. Id., p. 76. Warden Winn had another co-worker drive Plaintiff back to the state police barracks to pursue the restraining order against Reynoso. Id., p. 78.

- 3 -

E.    <u>PLAINTIFF SEEKS A RESTRAINING ORDER</u>

24.    Plaintiff went with a state trooper to Ayer District Court,
       which denied her request for a restraining order because she
       did not live in the district.  <u>Id.</u>, pp. 78-79.

25.    The co-worker drove Plaintiff back to FMC Devens and
       Plaintiff then drove to her relatives' home in Malden,
       Massachusetts, in her own vehicle.  <u>Id.</u>, p. 80.

26.    Plaintiff did not seek any medical treatment for her leg.
       <u>Id.</u>

27.    That night, while at her relatives' home, the Malden police
       department assisted Plaintiff in obtaining a 24-hour
       emergency restraining order from the Malden District Court.
       <u>Id.</u>, p. 82.  Specifically, the Malden District Court ordered
       Reynoso, *inter alia,* not to abuse Plaintiff, not to contact
       Plaintiff, and to stay at least 50 yards from Plaintiff.
       <u>See</u> Abuse Prevention Order, attached hereto as Exhibit 5.
       The Court specifically allowed Reynoso to attend work, but
       ordered that he stay away from Plaintiff while at work.  <u>Id.</u>

F.    <u>BOP TAKES PROMPT CORRECTIVE ACTION ON APRIL 8, 2002</u>

28.    Immediately after meeting with Plaintiff, Warden Winn
       notified his Regional Director of the incident and discussed
       with him what actions the BOP should take.  Winn Dep., p.
       41.  Warden Winn requested whether he could place both
       Plaintiff and Reynoso on home duty status until the BOP
       determined what to do.  <u>Id.</u>

29.    The Regional Director informed Warden Winn that at that
       time, without more information, home duty status was not
       appropriate.  <u>Id.</u>

30.    Also on April 8, 2002, Warden Winn, in accordance with BOP's
       workplace violence policy, convened a Workplace Violence
       Committee.  Winn Dep., p. 42; <u>see also</u> BOP Program Statement
       3730.04, "Workplace Violence," attached hereto as Exhibit 6.

31.    The Committee consisted of BOP staff members.  Winn Dep., p.
       42.  The Committee's responsibility was to examine the
       allegations of the incident, determine whether it
       constituted workplace violence, and provide Warden Winn with
       recommendations on how to proceed.  <u>Id.</u>

32.    The Workplace Violence Committee first met on the afternoon

of April 8, 2002.  <u>See</u> Memorandum from Porter to Warden
Winn, dated April 8, 2002, attached hereto as Exhibit 7.

33.  The Committee concluded that the incident between Plaintiff
and Reynoso did not meet the definition of workplace
violence, but that it had the "definite ability to result in
workplace violence."  <u>Id.</u>  The Committee decided to
reconvene the following day to discuss the incident further
based on how the state police responded to the incident.
<u>Id.</u>

34.  Thereafter, the state police arrested Reynoso for Domestic
Assault and Battery with a Dangerous Weapon (shod foot).
<u>See</u> O'Donnell Dep., p. 127; Lord Dep., p. 49.

35.  The next morning, the Workplace Violence Committee
reconvened and learned that the state police had arrested
Reynoso.  <u>See</u> Modified Memorandum from Porter to Warden
Winn, attached hereto as Exhibit 8.

36.  The Committee recommended to Warden Winn that the BOP refer
Plaintiff to the Employee Assistance Program ("EAP"), and
place Reynoso upon indefinite suspension until resolution of
the charges.  <u>Id.</u>  The Committee gave its recommendations to
Warden Winn in writing that same day.  Winn Dep., p. 129-
131.

37.  That same day, after receiving the Committee's
recommendation, Warden Winn then received the Malden
District Court's restraining order, allowing Reynoso to
attend work.  <u>Id.</u>

38.  Because (i) the BOP had not yet investigated the incident
between Reynoso and Plaintiff to determine what had happened
and what discipline for Reynoso was warranted, and (ii) the
restraining order allowed Reynoso to attend work if Reynoso
followed the order's restrictions, Warden Winn decided to
change Reynoso and Plaintiff's schedules so that the two
would not come into contact together while at work.  <u>Id.</u>,
pp. 49-51, 131-132; O'Donnell Dep., pp. 110-111.

39.  Also on April 9, 2002, Warden Winn reported Reynoso's
alleged off-duty misconduct to the BOP's Office of Internal
Affairs to conduct an investigation.  Winn Dep., pp. 47-48.

40.  Pursuant to Bureau policy, however, the Office of Internal
Affairs could not begin its investigation of Reynoso until
the Ayer District Court adjudicated Reynoso for the criminal

- 5 -

charges against him. <u>Id.</u>, pp. 131-132.

41. The reason for this policy is so that the BOP, based on allegations, does not act prematurely by disciplining an employee whom a court may later find innocent of those allegations. <u>Id.</u>

G.   <u>MALDEN COURT EXTENDS THE RESTRAINING ORDER</u>

42. On April 9, 2002, Plaintiff went to Malden District Court to obtain a longer restraining order against Reynoso. O'Donnell Dep., pp. 86-87.

43. The Malden District Court extended the restraining order against Reynoso to April 23, 2002. <u>Id.</u>, p. 90-91.

44. Because Plaintiff stated that she was not ready to return to work on April 10, 2002, Warden Winn extended Plaintiff's Administrative Leave for the rest of the week. <u>Id.</u>, pp. 95-98.

H.   <u>WINN CHANGES PLAINTIFF'S AND REYNOSO'S WORK SCHEDULES</u>

45. On April 12, 2002, Warden Winn assigned Plaintiff, effective Monday, April 15, 2002, to perform her regular duties in the Mail Room, Monday through Friday, 6:00 a.m. to 2:30 p.m. <u>Id.</u>, pp. 99-101; Winn Dep., pp. 122-125; 127; <u>see also</u> Memorandum from Warden Winn to Plaintiff, dated April 12, 2002, attached hereto as Exhibit 9. Warden Winn instructed Plaintiff to leave the institution no later than 3:00 p.m. and to notify her supervisor prior to working any overtime. O'Donnell Dep., p. 99-101.

46. Plaintiff did not experience any negative or adverse effect to her title, grade, compensation, or benefits as a result of this scheduling and assignment change. <u>Id.</u>, p. 118-119. Indeed, at some point thereafter, Plaintiff received a grade increase. <u>Id.</u>

47. Plaintiff testified during her deposition that this scheduling and assignment change constituted a change to her duties as an ISO. <u>Id.</u>, pp. 111-112. Specifically, Plaintiff testified that the BOP precluded her from working overtime hours and restricted her ability to respond to emergencies and institution disturbances on the FMC Devens compound. <u>Id.</u>, p. 111-113. Upon further examination, however, Plaintiff admitted that working overtime hours was not included as a duty or responsibility in the ISO position

- 6 -

description.  <u>Id.</u>, p. 112-113.  Also, Plaintiff admitted that the BOP did not restrict her from working overtime or from responding to emergencies or institution disturbances. <u>Id.</u>, p. 114-115, 123.

48. Warden Winn also reassigned Reynoso to work Monday through Friday, 4:00 p.m. to 12:00 a.m.  Winn Dep., pp. 125-127; <u>see also</u> Memorandum from Warden Winn to Reynoso, dated April 12, 2002, attached hereto as Exhibit 10.  His previous schedule was 8:00 a.m. to 4:00 p.m.  O'Donnell Dep., p. 108.  Warden Winn instructed Reynoso not to enter the institution prior to 3:30 p.m., and not to work an armed post.  Winn Dep., p. 126.  Warden Winn also instructed Reynoso to notify his supervisor prior to working any overtime and not to contact Plaintiff.  <u>Id.</u>

I.  <u>MALDEN COURT EXTENDS THE RESTRAINING ORDER FOR A SECOND TIME</u>

49. On April 23, 2002, after a hearing, the Malden District Court extended its Abuse Prevention Order to April 23, 2003. <u>See</u> Abuse Prevention Order, attached hereto as Exhibit 11.

50. However, despite the Abuse Prevention Order and Warden Winn's efforts to separate Plaintiff and Reynoso at work, Plaintiff and Reynoso continued to call one another to discuss their relationship.  O'Donnell Dep., pp. 120, 157-162.

J.  <u>PLAINTIFF SEEKS FURTHER ACTION FROM BOP</u>

51. On April 24, 2002, Plaintiff met with Jerry Martinez, the Associate Warden, Lois Swiderski, then Assistant Human Resources Manager, and a union representative and told them that she feared for her safety.  <u>Id.</u>, pp. 131-133.

52. Specifically, Plaintiff told them that she was concerned about Reynoso's access to her work schedule and emergency contact information.  <u>Id.</u>, p. 133.  She was also concerned that Reynoso had the ability to watch her move about the compound via security cameras.  <u>Id.</u>, p. 134.

53. Reynoso, however, who had dated Plaintiff for a number of years, presumably already knew her personal information. Also, Reynoso never threatened or harassed Plaintiff in any way after the Malden District Court issued the Abuse Prevention Order.  <u>Id.</u>, pp. 124, 126, 134.  Further, Plaintiff did not know whether Reynoso was in fact using the

security cameras to monitor her movement on the compound. <u>Id.</u>, p. 134. Moreover, Reynoso worked the night shift whereas Plaintiff worked the day shift. Winn Dep., pp. 122-127.

54. On May 13, 2002, Plaintiff informed Warden Winn by memorandum that police had arrested Reynoso on April 8, 2002. O'Donnell Dep., p. 127; <u>see also</u> Memorandum from Plaintiff to Warden Winn, dated May 13, 2002, attached hereto as Exhibit 12. Plaintiff complained that while her schedule was adjusted, Reynoso was able to work without restriction. Exhibit 12. Plaintiff alleged that Reynoso's continued employment caused her to fear for her safety. <u>Id.</u>

55. Plaintiff testified during her deposition that she sent Warden Winn the May 13, 2002 memorandum because she wanted him to return her to her normal work hours, allow her to "roam free" on the premises, and prevent Plaintiff and Reynoso from being on the premises at the same time. O'Donnell Dep., pp. 135-136. Plaintiff admitted during her deposition, however, that if Plaintiff and Reynoso adhered to Warden Winn's adjustment to their schedules they would not have contact with each other on the premises. <u>Id.</u>, pp. 136-137.

56. On June 10, 2002, by memorandum, Plaintiff asked Steve Gagnon, the Inmate Systems Manager, to have the BOP conduct another workplace violence assessment. <u>See</u> Memorandum from Plaintiff to Steve Gagnon, dated June 10, 2002, attached hereto as Exhibit 13. Plaintiff alleged that Reynoso had been abusive to her while they were dating. <u>Id.</u> Plaintiff further alleged that Reynoso was abusive to another woman before his relationship with Plaintiff. <u>Id.</u> This was the first time Plaintiff made the BOP aware of these allegations. O'Donnell Dep., p. 144.

57. On June 12, 2002, Plaintiff re-submitted this memorandum to Warden Winn. <u>See</u> Memorandum from Plaintiff to Warden Winn, dated June 12, 2002, attached hereto as Exhibit 14. The memorandum, identical in content to Plaintiff's June 10, 2002 memorandum, recounted Plaintiff's history with Reynoso and requested that Reynoso or herself "be put on Administrative Leave until the trial is over." <u>Id.</u>

58. In response to Plaintiff's June 12, 2002 memorandum, Associate Warden Randy Meeks met with Plaintiff to discuss her concerns. O'Donnell Dep., p. 144. Meeks informed Plaintiff that the BOP had already conducted a workplace

- 8 -

violence assessment and was not going to conduct another. <u>Id.</u>, p. 145.

59. Thereafter, Plaintiff and Reynoso both worked at FMC Devens on separate shifts without incident from April 2002 until January 2003. Winn Dep., p. 34-35.

K.    <u>AYER DISTRICT COURT PLACES REYNOSO ON PROBATION</u>

60. Before January 3, 2003, Plaintiff told Reynoso that she did not want to pursue the assault and battery charge that she filed against him. O'Donnell Dep., p. 161.

61. On January 3, 2003, the Ayer District Court held a hearing on the charges filed against Reynoso. <u>Id.</u>, p. 156-157.

62. By the time of the hearing, Plaintiff had changed her position concerning the charge against Reynoso and decided to pursue it. <u>Id.</u>, p. 163.

63. Plaintiff, who was still in love with Reynoso at the time of the hearing, was particularly hurt when Reynoso brought a former girlfriend with him to the hearing. <u>Id.</u>, pp. 164-166.

64. The court entered a finding of sufficient facts for a conviction of assault and battery with a dangerous weapon under M.G.L.A. 265 §15A(b), but continued the matter without a guilty finding until April 2, 2004. <u>See</u> relevant pages of Hearing Transcript, Docket Sheet, and Probation form, dated January 3, 2003, attached hereto as Exhibit 15. The court ordered that Reynoso, as part of his probation, had to abide by all terms of the previously-entered restraining order and avoid contact with Plaintiff and her family. <u>Id.</u>

65. Immediately after the hearing, Plaintiff drove from the Ayer District Court to FMC Devens and informed Warden Winn and her supervisor that Reynoso had "pled guilty" to assault and battery. <u>Id.</u>, pp. 168-170. Plaintiff was not scheduled to work at FMC Devens that day. <u>Id.</u>, p. 170. Plaintiff reiterated this information to Warden Winn in a memorandum on January 6, 2003. <u>See</u> Memorandum from Plaintiff to Warden Winn, dated January 6, 2003, attached hereto as Exhibit 16.

66. Immediately after receiving notice that the Ayer District Court had placed Reynoso on probation and continued his case without a finding, the BOP began its internal investigation of Reynoso's off-duty misconduct. <u>See</u> OIA Investigation

Report, dated March 31, 2003, attached hereto as Exhibit 17.
On March 3, 2003, the BOP concluded its investigation of
Reynoso's off-duty misconduct.  Winn Dep., p. 55.  The BOP
found the allegations off-duty misconduct to be true and,
thus, suspended Reynoso from July 27, 2003, through August
16, 2003.  Id., 64; see also Letter from Warden Winn to
Reynoso, dated July 8, 2003, attached hereto as Exhibit 18.

L.    WINN CONTINUES TO ENFORCE RESTRAINING ORDER IN THE
      WORKPLACE

67.   On January 8, 2003, Warden Winn, who became aware of the
      Ayer District Court's actual order, assigned Plaintiff to
      her regular duties in the Mail Room, with duty hours of 9:30
      a.m. to 6:00 p.m.  See Letter from Warden Winn to Plaintiff,
      dated January 8, 2003, attached hereto as Exhibit 19.
      Warden Winn also required Plaintiff to notify her supervisor
      of any overtime work outside her schedule.  Id.

68.   Warden Winn also assigned Reynoso to his regular duties, but
      changed Reynoso's work hours to 12:00 a.m. to 8:00 a.m.
      Sunday through Thursday.  See Letter from Warden Winn to
      Reynoso, dated January 8, 2003, attached hereto as Exhibit
      20.  Warden Winn informed Reynoso that he could work
      overtime only after receiving permission.  Id.

69.   After receiving Warden Winn's January 8, 2003 letter,
      Plaintiff called Lois Swiderski, Assistant Human Resources
      Manager, from the Mail Room to inquire why Warden Winn was
      maintaining the restrictions to her assignment, which
      Plaintiff thought was unfair.  O'Donnell Dep., pp. 174-175.

70.   She had hoped that the BOP would return her to work in the
      Receiving and Discharge office located in the main building
      at FMC Devens.  Id., p. 175.

M.    PLAINTIFF'S FIRST REQUEST FOR ACCOMMODATIONS

70.   After Plaintiff left work on January 8, 2003, she called her
      psychiatrist, George Milowe, M.D., and went to see him the
      following day.  Id., pp. 182-183.

71.   Plaintiff had begun seeing Dr. Milowe in February, 2002, for
      depression before the April 8, 2002 incident with Reynoso.
      Id., p. 178.

72.   On or about January 8, 2003, Plaintiff provided the BOP with
      a note from Dr. Milowe, stating that: "This patient suffers

from Post-Traumatic Stress Disorder [and] is now totally disabled [and] unable to work at her current job in the current circumstances.  If the patient's assailant was not on her work premises at all, Ms. O'Donnell would be able to work full-time without restrictions."  See Note from Dr. Milowe, dated January 8, 2003, attached hereto as Exhibit 21.

73. Plaintiff, however, testified that there was no accommodation BOP could have provided her at that time which would have enabled her to return to work.  O'Donnell Dep., p. 207.

74. Warden Winn forwarded Dr. Milowe's January 8, 2003 letter to James Fletcher, M.D., the Chief Psychiatrist at FMC Devens for review.  Winn Dep., p. 82-83, 138-139.

75. On January 21, 2003, Dr. Fletcher opined that Dr. Milowe's letter contained insufficient "information to support any of the facts alleged in the letter and the conclusion that such a total disability is completely reversible owing to environmental factors is inconsistent with the practice of psychiatry."  See Letter from Dr. Fletcher to Warden Winn, dated January 21, 2003, attached hereto as Exhibit 22.  Dr. Fletcher suggested a formal review of Plaintiff's medical records and an independent evaluation of Plaintiff by an independent psychiatrist for the purpose of determining Plaintiff's fitness for duty.  Id.

   N.   BOP ENGAGES IN THE INTERACTIVE PROCESS

76. After receiving Dr. Milowe's January 8, 2003 note, Gagnon called the Plaintiff on January 9, 2003, and informed her that Warden Winn needed a written release from her to discuss her medical condition in detail with her physician.  O'Donnell Dep., pp. 189-190; see also Memorandum from Gagnon to Warden Winn, dated January 9, 2003, attached hereto as Exhibit 23.  Gagnon also informed Plaintiff that her annual and sick leave were almost exhausted and she needed to apply for some sort of advance leave.  See Exhibit 23.

77. Cynthia Lord, the Human Resource Manager, sent Plaintiff an authorization to provide Dr. Milowe allowing him to release information to the BOP.  See Letter from Lord to Plaintiff, dated January 9, 2003, attached hereto as Exhibit 24.

78. After receiving no response to her January 9, 2003 letter from Plaintiff, on January 14, 2003, Lord called Plaintiff

and spoke with her about providing the BOP with additional
information concerning her medical condition and supporting
her absence from work.  O'Donnell Dep., p. 192; Lord Dep.,
p. 64.  During that conversation, Plaintiff informed Lord
that she would sign the medical release.  O'Donnell Dep., p.
192.  Lord also informed Plaintiff about the procedures for
applying for leave without pay, advanced leave, and the
BOP's Voluntary Leave Program.  O'Donnell Dep., p. 193.

O.    PLAINTIFF GOES AWOL FOR THE FIRST TIME

79.  On January 21, 2003, Plaintiff sent Warden Winn an email
     requesting advance leave with pay "due to [her] medical
     condition."  See Email from Plaintiff to Warden Winn, dated
     January 21, 2003, attached hereto as Exhibit 25; O'Donnell
     Dep., p. 194.

80.  At that time, Plaintiff did not provide the BOP with any
     further documentation other than Dr. Milowe's January 9,
     2003 note, nor did Plaintiff grant Dr. Milowe permission to
     speak with the BOP about her condition.  O'Donnell Dep., pp.
     194-195.

81.  In response to Plaintiff's email, on January 23, 2003,
     Gagnon advised Plaintiff that BOP was granting her 24 hours
     of advanced sick leave to allow her to obtain the necessary
     medical information to support Dr. Milowe's January 8, 2003
     letter, concluding Plaintiff was totally disabled based upon
     environmental factors.  See Letter from Gagnon to Plaintiff,
     dated January 23, 2003, attached hereto as Exhibit 26.
     Gagnon advised Plaintiff that Warden Winn would reconsider
     Plaintiff's request for advance sick leave if she provided
     her physician's assessment of her current clinical status
     and an estimate of her expected date of full or partial
     recovery.  Id.  He also advised Plaintiff that she needed to
     submit the proper form to request advanced sick leave by
     January 31, 2003, or she would be placed on AWOL status
     beginning February 3, 2003.  Id.  Gagnon attached this form
     to his letter.  Id.; see also O'Donnell Dep., pp. 198-199.

82.  Because Plaintiff failed to submit the proper form to BOP to
     request advanced sick leave by January 31, 2003, the BOP
     placed Plaintiff on AWOL status beginning February 3, 2003.
     Lord Dep., pp. 85-87.

83.  Plaintiff did not submit a proper request for advance sick
     leave until February 11, 2003.  See Request for Leave or
     Approved Absence, faxed on February 11, 2003, attached

hereto as Exhibit 27.  Plaintiff sought 216 hours of advance sick leave.  <u>Id.</u>

84.  On February 19, 2003, Warden Winn disapproved Plaintiff's request for advanced sick leave.  <u>See</u> Exhibit 27; <u>see also</u> Letter from Warden Winn to Plaintiff, dated February 19, 2003, attached hereto as Exhibit 28.  Based on documentation provided by Plaintiff indicating that she was "totally disabled" and may not be returning to work, Warden Winn informed Plaintiff that she was not eligible for advance sick leave under guidance from the Department of Justice. <u>Id.</u>

P.  <u>PLAINTIFF APPLIES TO THE VOLUNTARY LEAVE TRANSFER PROGRAM</u>

85.  On January 27, 2003, Plaintiff submitted an application for the BOP's Voluntary Leave Transfer Program.  O'Donnell Dep., p. 204; <u>see also</u> Voluntary Leave Transfer Program Application, dated January 27, 2003, attached hereto as Exhibit 29.

86.  Plaintiff's application included a note from Dr. Milowe, stating that Plaintiff had "work related" PTSD, severe anxiety, depression, recurrent nightmares, intrusive thoughts, flashbacks and one to two full blown panic attacks daily.  <u>See</u> Exhibit 29.  Dr. Milowe opined that Plaintiff's condition would be lengthy, and indefinite and "many many years as long as [Plaintiff] is forced to work with Mr. David Reynoso."  <u>Id.</u>

87.  During her deposition, Plaintiff admitted that under the work conditions prescribed by Warden Winn for Plaintiff and Reynoso, Plaintiff never had to work with Reynoso. O'Donnell Dep., pp. 217-218.

88.  On February 10, 2003, the FMC Devens Voluntary Leave Program Screening Committee met pursuant to BOP policy, to consider Plaintiff's application for participation in the voluntary leave program.  <u>See</u> Memorandum to Plaintiff from Rick Harnes, dated February 10, 2003, attached hereto as Exhibit 30.

89.  The Committee denied Plaintiff's application, and explained to Plaintiff its reasons:

> Your medical emergency is based on another
> staff member's employment with the Bureau of

Prisons, and you would be able to work if the
other individual was no longer employed.
Accommodation of your work site has been
afforded so that you may return to work.  In
addition, on January 21, 2003, you contacted
Ned LaClair, Safety Manager, for the forms
necessary to file a stress related claim, you
requested these form[s] again on February 10,
2003.

Id.

Q.   PLAINTIFF'S SECOND REQUEST FOR ACCOMMODATIONS

90.  On January, 21, 2003, Attorney Samuel Rizzitelli wrote to
     Warden Winn and Lord, stating that he represented the
     Plaintiff and asking that Plaintiff be given a "reasonable
     accommodation for post traumatic stress disorder," or,
     alternatively, that Plaintiff be placed "on administrative
     leave or authorized to receive donated leave until she could
     return to work." See Letter from Attorney Rizzitelli to
     Warden Winn and Lord, dated January 21, 2003, attached
     hereto as Exhibit 31.

91.  Before Attorney Rizzitelli sent the January 21, 2003 letter,
     Plaintiff had failed to notify her supervisors or human
     resources that Attorney Rizzitelli was her counsel.
     O'Donnell Dep., p. 195; Winn Dep., pp. 146-147.

92.  On January 21, 2003, Plaintiff called Gagnon at Attorney
     Rizzitellli's instruction.  O'Donnell Dep., p. 196.  Gagnon
     asked Plaintiff what would the BOP have to do to get her to
     return to work.  Id.  Plaintiff responded that the BOP would
     have to remove Reynoso.  Id., p. 196-197, 200; see also
     Memorandum from Gagnon to Warden Winn, dated January 21,
     2003, attached hereto as Exhibit 32.

93.  On January 27, 2003, Warden Winn wrote to Plaintiff
     explaining to her that he cannot "grant [her] accommodation
     request that another staff member be removed." See Letter
     from Warden Winn to Plaintiff, dated January 27, 2003,
     attached hereto as Exhibit 33.  Warden Winn also stated that
     he had been trying to accommodate Plaintiff by placing her
     and Reynoso on different shifts.  Id.  Warden Winn inquired
     whether Plaintiff also wanted him to restrict Reynoso to the
     "camp" area, which is a quarter of a mile from the main
     facility.  Id.

- 14 -

R.   <u>DR. MILOWE EXPANDS UPON HIS RECOMMENDED ACCOMMODATIONS</u>

94.  On or about February 10, 2003, Plaintiff faxed to Warden
     Winn a letter from Dr. Milowe, stating that Plaintiff had
     Post Traumatic Stress Disorder as a result of being brutally
     assaulted by Reynoso.  <u>See</u> Letter from Dr. Milowe to Gagnon,
     dated January 31, 2003, attached hereto as Exhibit 34.  Dr.
     Milowe further opined that Plaintiff suffered from Major
     Depression and Panic Disorder.  <u>Id.</u>  Dr. Milowe indicated
     that Plaintiff would remain "totally disabled" until
     separated from Mr. Reynoso, stating:

                    Working in the same environment as
                    her assailant merely intensifies
                    her symptoms and does not give her
                    a chance to heal.  Common sense and
                    good will would dictate that <u>Ms.
                    O'Donnell not be required to work
                    in the same facility at the same
                    time as Mr. Reynoso.</u>  She receives
                    pharmacotherapy from me and sees a
                    psychotherapist as well.  However,
                    recovery is unlikely until the two
                    are separated and Ms. O'Donnell is
                    allowed to go through a healing
                    process.  Until then she will
                    remain totally disabled.

     <u>Id.</u> (emphasis added).  No treatment notes or diagnostic test
     results were provided to support Dr. Milowe's opinion.  <u>Id.</u>

95.  During her deposition, Plaintiff admitted that under the
     work conditions prescribed by Warden Winn for Plaintiff and
     Reynoso, the BOP had already been providing Plaintiff the
     very accommodation Dr. Milowe requested in his January 31,
     2003 letter:

          Q.   Okay. Now here in the second sentence of this
               second paragraph, it says that Ms. O'Donnell
               should, I'm filling in some words for it to make
               sense, should not be required to work in the same
               facility at the same time as Mr. Reynoso.  Do you
               see that?

          A.   Yes I do.

          Q.   Did that happen during the period after the
               incident at Mirror Lake up to the time that you

                              - 15 -

went out on leave, where you would work at the
same facility as Mr. Reynoso at the same time?

A.   I know they scheduled us for training together but
I don't think there was a time that we worked at
the facility together after that incident at
Mirror Lake.  I don't ever, I don't recall an
incident where we worked.

Q.   Okay.  It also says in the second to last
[sentence], recovery is unlikely until the two are
separated.  Do you see that?

A.   Yes I do.

Q.   Isn't it true that after the incident at Mirror
Lake, that you and Mr. Reynoso were separated on
the premises?

A.   Yes.

Q.   Okay.  So when you sent this letter and [Dr.
Milowe is] requesting that you not work in the
same facility at the same time and that you be
separated, didn't the Bureau already provide that
situation to you?

A.   Yes they did.

O'Donnell Dep., pp. 212-213.

S.   BOP INTERACTS WITH PLAINTIFF'S FORMER COUNSEL

96.  On February 10, 2003, Attorney Rizzitelli wrote Warden Winn,
stating that Warden Winn's proposal of restricting Reynoso
to the camp "may be a responsive accommodation."  See Letter
from Attorney Rizzitelli to Warden Winn, dated February 10,
2003, attached hereto as Exhibit 35.  Attorney Rizzitelli, a
former BOP employee, disingenuously asked Warden Winn to
elaborate on his proposed resolution.  Id.  Alternatively,
Attorney Rizzitelli asked that the BOP place Plaintiff on
administrative leave or given donated leave.  Id.  Attorney
Rizzitelli re-sent this letter to Warden Winn on February
18, 2003, and March 3, 2003.

97.  Despite Attorney Rizzitelli's request for an elaboration on
Warden Winn's proposal of restricting Reynoso to the camp,
Plaintiff admitted that Warden Winn's proposal was clear and

- 16 -

needed no further explanation.  O'Donnell Dep., p. 214.

98. On March 4, 2003, Plaintiff finally submitted a memorandum to Warden Winn stating that Attorney Rizzitelli was her counsel and that the BOP should correspond with Plaintiff through him.  See Memorandum from Plaintiff to Warden Winn, dated March 4, 2003, attached hereto as Exhibit 36.

99. After receiving approval from Plaintiff to correspond with Attorney Rizzitelli, on March 6, 2003, Warden Winn wrote Attorney Rizzitelli.  Winn Dep., p. 147; see also Letter from Warden Winn to Attorney Rizzitelli, dated March 6, 2003, attached hereto as Exhibit 37.  Warden Winn stated in his letter that because Plaintiff was capable of working, she was not a qualified individual with a disability. Exhibit 37.  Warden Winn also informed Attorney Rizzitelli that, nevertheless, the BOP had placed Plaintiff and Reynoso on different shifts since 2002 to ensure that they did not come into contact with each other, and had offered to move Reynoso to the satellite camp a quarter of a mile away from the main building.  Id.  Warden Winn also advised Attorney Rizzitelli that the Voluntary Leave Transfer Program Committee had determined that Plaintiff was not eligible for the program and that her request had for participation in the program had been denied.  Id.  Finally, because Plaintiff had exhausted her sick and annual leave and failed to contact her supervisor regarding her pay/leave status, Warden Winn informed Attorney Rizzitelli that Plaintiff was not authorized for Administrative Leave.  Id.

100. Warden Winn again informed Attorney Rizzitelli on March 21, 2003, that Plaintiff had failed to indicate whether she was willing to accept the personal accommodation outlined in his March 6, 2003 letter.  See Letter from Warden Winn to Attorney Rizzitelli, dated March 21, 2003, attached hereto as Exhibit 38.  Warden Winn further requested an updated letter from Plaintiff's physician prior to any return to work. Id.

101. On March 24, 2003, Attorney Rizzitelli again wrote to Warden Winn asking whether the BOP would be willing to limit Officer Reynoso to the satellite camp at FMC Devens.  See Letter from Attorney Rizzitelli to Warden Winn, dated March 24, 2003, attached hereto as Exhibit 39.  Attorney Rizzitelli also asked that BOP place Plaintiff on Administrative Leave.  Id.

T.    <u>PLAINTIFF FILES AN EEO COMPLAINT</u>

102. Plaintiff received a Notice of Right to File a
     Discrimination Complaint from the EEO Counselor on March 27,
     2003.  O'Donnell Dep., p. 236.

103. On March 31, 2003, Plaintiff filed a formal complaint of
     discrimination with the BOP's EEO Office, alleging that the
     BOP discriminated against her based upon sex and mental
     disability by (i) restricting Plaintiff's hours and failing
     to take any restrictive action against Reynoso; (ii)
     refusing to provide Plaintiff with a reasonable
     accommodation for her PTSD; (iii) denying Plaintiff's
     requests for advance sick leave, administrative leave, and
     hours from the Voluntary Leave Transfer Program, and (iv)
     placing Plaintiff on AWOL status on February 6, 2003.  <u>See</u>
     Complaint of Discrimination, dated March 31, 2003, attached
     hereto as Exhibit 40.

104. On July 7, 2003, the BOP's EEO Office notified Plaintiff
     that it was dismissing her sex discrimination claims as
     untimely.  <u>See</u> Notice from EEOC to Plaintiff, dated July 7,
     2003, attached hereto as Exhibit 41.  The BOP notified
     Plaintiff of the sole accepted issue, i.e., whether "the
     Bureau discriminated against [Plaintiff] when, on January 8,
     2003, [Plaintiff] was diagnosed with 'Post Traumatic Stress
     Disorder,' rendered unable to work, and management failed to
     provide a reasonable accommodation."  <u>Id.</u>

U.    <u>PLAINTIFF RETURNS TO WORK ON JUNE 11, 2003</u>

105. On April 23, 2003, the Malden District Court held another
     hearing concerning Plaintiff's restraining order against
     Reynoso, and extended the order to April 22, 2004.  <u>See</u>
     Abuse Prevention Order, dated April 23, 2003, attached
     hereto as Exhibit 42.

106. On June 4, 2003, the BOP received a handwritten note from
     Dr. Milowe, stating "I saw this patient today in the office.
     She is now able to resume her job duties, including
     overtime."  <u>See</u> Note by Dr. Milowe, dated May 28, 2003,
     attached hereto as Exhibit 43.

107. Accordingly, Warden Winn contacted Attorney Rizzitelli and
     informed him that Plaintiff could return to work on June 11,
     2003.  <u>See</u> Letter from Warden Winn to Attorney Rizzitelli,
     attached hereto as Exhibit 44.

108. When Plaintiff returned to work on June 11, 2003, she submitted to Warden Winn a request for two days of leave to attend a wedding on June 20, 2003. See Plaintiff's Time Sheet for pay period June 1, 2003, to June 14, 2003, attached hereto as Exhibit 45; Memorandum from Plaintiff to Warden Winn, dated June 10, 2003, attached hereto as Exhibit 46.

109. Warden Winn promptly denied the request. Exhibit 46.

V.   JUNE 16, 2003 INCIDENT

110. On June 16, 2003, Officer J. Jacques, while performing security checks at the FMC Devens Mail Room at approximately 2 a.m., discovered threats and derogatory statements spray painted on the outside Mail Room walls directed at Plaintiff. See Memorandum from Lieutenant James Diamond to Captain Bollinger, dated June 16, 2003, attached hereto as Exhibit 47.

111. In response, the BOP immediately contacted its Office of Internal Affairs; the Department of Justice, Office of Inspector General; and the Massachusetts State Police to investigate the incident. See Referral of Incident Report, attached hereto as Exhibit 48.

112. Also on June 16, 2003, Warden Winn immediately convened a Workplace Violence Committee Meeting to discuss the vandalism. See Memorandum from Meeks to Warden Winn, dated June 16, 2003, attached hereto as Exhibit 49.

113. While the Committee found that the incident did not constitute workplace violence, it recommended allowing Plaintiff to work somewhere other than the Mail Room based upon Plaintiff's alleged fear. Id.

114. Massachusetts State Police Officer Labrecque investigated the incident, but was unable to "draw enough evidence to make criminal charges upon any one particular suspect." See Report of Officer Labrecque, attached hereto as Exhibit 50.

115. She could not, however, clear Plaintiff as a suspect. Id. Trooper Labrecque noted, inter alia, that (1) Plaintiff could not account for her whereabouts on the evening in question; (2) Plaintiff had displayed habitual tardiness, and yet reported to work early on the day in question; (3) Plaintiff had recently been denied leave to attend a wedding which caused her to be visibly upset; (4) Plaintiff stated

during her interview "that she was aware that in a hypothetical situation, an incident such as vandalism would provide for 'administrative' days of leave to the offended party"; (5) Plaintiff had stated that if Officer Reynoso was involved he would certainly be terminated; (6) Plaintiff appeared nervous at the prospect fingerprint evidence; and (7) the handwriting on the wall was consistent with Plaintiff's own handwriting and spelling of her name.  Id.

116. Officer Labrecque cleared Reynoso, Officer Jacques, and other Mail Room staff as suspects.  Id.

W.  <u>PLAINTIFF GOES AWOL FOR A SECOND TIME</u>

117. On June 18, 2003, Warden Winn authorized Plaintiff to take Administrative Leave up through June 27, 2003, as a result of the June 16, 2003 incident.  <u>See</u> Letter from Gagnon to Plaintiff, dated June 18, 2003, attached hereto as Exhibit 51.

118. Gagnon informed Plaintiff that the BOP would grant Plaintiff the leave on a daily basis; therefore, Plaintiff had to contact the BOP each day she wanted to take leave.  Id.

119. On June 23, 2003, Plaintiff provided Warden Winn with a note from Dr. Milowe, stating that "Due to retraumatization Monday 6-16-03 at work, Ms. O'Donnell is now totally disabled again."  <u>See</u> Note by Dr. Milowe, dated June 18, 2003, attached hereto as Exhibit 52.  Again, Dr. Milowe's note was not accompanied by any treatment notes or test results.  Id.

120. In response to Dr. Milowe's June 23, 2003 note, Gagnon informed Plaintiff that Warden Winn would continue to grant Plaintiff Administrative Leave through June 27, 2004, and advised her to apply for Leave Without Pay before her expected return-to-work date, June 30, 2003.  <u>See</u> Letter from Gagnon to Plaintiff, dated June 23, 2003, attached hereto as Exhibit 53.  Gagnon informed Plaintiff that if she failed to submit a request for Leave Without Pay by her return-to-work date the BOP would place her on AWOL.  Id.

121. On June 26, 2003, Plaintiff submitted a request for Leave Without Pay, which Warden Winn granted through July 29, 2003.  <u>See</u> Memorandum from Plaintiff to Warden Winn, dated June 26, 2003, attached hereto as Exhibit 54.

122. On July 28, 2003, Plaintiff requested Leave Without Pay to

start on July 30, 2003, to an unspecified date.  <u>See</u> Request
for Leave or Approved Absence form, dated July 28, 2003,
attached hereto as Exhibit 55.

123. Warden Winn granted Plaintiff's request through August 11,
2003, on the condition that Plaintiff provide an updated
physician note to the BOP on August 11, 2003.  <u>Id.</u>

124. On August 11, 2003, Plaintiff again requested Leave Without
Pay to start on August 11, 2003, to an unspecified date.
<u>See</u> Request for Leave or Approved Absence form, dated August
11, 2003, attached hereto as Exhibit 56.

125. Plaintiff, however, did not provide Warden Winn with an
updated doctor's note as Warden Winn had requested.
O'Donnell Dep., p. 276.  In her leave request, Plaintiff
stated "Dr's note will follow when I have my next
appointment in September."  <u>See</u> Exhibit 56.

126. Warden Winn denied Plaintiff's request, stating that "Ms.
O'Donnell failed to follow my instructions on July 7-29-03
by not providing an updated Dr's note."  <u>Id.</u>

127. Steve Gagnon attempted to contact Plaintiff by telephone on
August 12, 2003, and August 13, 2003, and left her three
messages.  <u>See</u> Letter from Gagnon to Plaintiff, dated August
13, 2003, attached hereto as Exhibit 57.

128. Plaintiff did not respond to Gagnon's messages.  O'Donnell
Dep., p. 279.

129. Gagnon then wrote Plaintiff on August 13, 2003, requesting
that Plaintiff provide the BOP additional medical
information as Warden Winn had requested on July 29, 2003.
<u>See</u> Exhibit 57.  Gagnon also informed Plaintiff that the BOP
had placed her on AWOL status effective August 13, 2003, and
could lead to disciplinary action up to and including
removal.  <u>Id.</u>

130. Plaintiff testified during her deposition that she failed to
provide Warden Winn with the information he was seeking
under the advice of Attorney Rizzitelli.  O'Donnell Dep., p.
277.

X.    <u>PLAINTIFF RETURNS TO WORK ON NOVEMBER 20, 2003</u>

136. On November 11, 2003, after approximately three months of no
     contact with her supervisors, Plaintiff informed Warden Winn
     via facsimile that she wished to return to work "as soon as
     possible."  <u>See</u> Facsimile and Attachment from Plaintiff to
     Warden Winn, dated November 11, 2003, attached here to as
     Exhibit 58.

137. Plaintiff submitted with her facsimile a note from her new
     physician, Brian L. Ackerman, M.D., who stated that
     Plaintiff was "able to return to work full-time without any
     restrictions."  <u>Id.</u>

138. Despite Dr. Ackerman's assessment that Plaintiff could work
     without restrictions, on November 18, 2003, pursuant to
     discussions with Plaintiff's new attorney, Warden Winn
     offered to allow Plaintiff to return to work at the
     satellite camp.  Winn Dep., pp. 103-104, 113; <u>see also</u>
     Letter from Warden Winn to Plaintiff, dated November 18,
     2003, attached here to as Exhibit 59.

139. After further discussions with Plaintiff's counsel, Warden
     Winn reassigned Reynoso to the satellite camp and to a
     different shift during the tenure of the restraining order.
     <u>See</u>  Letter from BOP Counsel to Attorney Dawn McDonald,
     dated November 19, 2003, attached here to as Exhibit 60.

140. During the discussions between Plaintiff's counsel and the
     BOP, Warden Winn granted Plaintiff Administrative Leave from
     November 12, 2003, through November 14, 2003, and again
     November 17, 2003, through November 19, 2003.  <u>See</u>
     Plaintiff's Time Sheets for pay periods November 2, 2003,
     through November 29, 2003, attached hereto as Exhibit 61.
     Plaintiff returned to work on November 20, 2003.  <u>Id.</u>

Y.    <u>BOP INVESTIGATES PLAINTIFF FOR BEING AWOL</u>

136. On December 10, 2003, during an official investigation into
     Plaintiff's AWOL for the period August 13, 2003, through
     November 11, 2003, Plaintiff gave a sworn statement
     indicating that even though she had received the BOP's
     requests for further medical information and messages from
     Gagnon to contact him, upon advice of her former attorney,
     she refused to provide the BOP with any further medical
     information or contact her supervisor.  <u>See</u> Affidavit by
     Plaintiff, dated December 10, 2003, attached here to as
     Exhibit 62.  Plaintiff also admitted that she was aware that

she was AWOL from August 13, 2003, through November 11,
2003.  Id.  Plaintiff further admitted that for three months
she did not call or correspond with the BOP because her
former attorney had assured her that he would make all
further contact.  Id.

137. In order to determine what, if any, discipline to issue
Plaintiff for her excessive unauthorized absence and failure
to follow leave procedure, Warden Winn asked Plaintiff to
provide him information about her condition.  O'Donnell
Dep., p. 293-294.

138. In response, on December 18, 2003, Plaintiff provided Warden
Winn with a memorandum from Dr. Ackerman, stating that
Plaintiff suffers from PTSD and was currently taking
medication for her condition.  See Memorandum from Dr.
Ackerman to Warden Winn, dated December 16, 2003, attached
here to as Exhibit 63. Dr. Ackerman further stated that
Plaintiff "was suffering with PTSD at the time in question,
July 2003 until present."  Id.

139. On April 20, 2004, Gagnon gave Plaintiff notice that he was
proposing to Warden Winn that the BOP suspend Plaintiff for
thirty days due to her AWOL status for the period August 13,
2003, through November 11, 2003.  See Letter from Gagnon to
Plaintiff, dated April 20, 2004, attached hereto as Exhibit
64.  Gagnon informed Plaintiff that she had a right to
contact Warden Winn in response to Gagnon's proposal within
fifteen working days.  Id.

140. On May 12, 2004, Plaintiff responded to Gagnon's April 20,
2004 proposal of discipline, claiming that the proposed
discipline, and the events surrounding them, were
discriminatory and retaliatory.  See Letter from Attorney
McDonald to Warden Winn, dated May 12, 2004, attached hereto
as Exhibit 65.

141. On June 10, 2004, based upon the results of BOP's
investigation, the medical documentation provided by
Plaintiff, Plaintiff's May 12, 2004 letter, Plaintiff's
employment history and the "extenuating circumstances in
[Plaintiff's] personal life over the [previous] two years,
Warden Winn did not suspend Plaintiff from work but issued
her a letter of reprimand.  See Letter from Warden Winn to
Plaintiff, dated June 10, 2004, attached hereto as Exhibit
66; Letter of Reprimand from Warden Winn to Plaintiff, dated
June 10, 2004, attached hereto as Exhibit 67.

Dated: March 16, 2006                    ALBERTO R. GONZALES,
                                         Attorney General, U.S.
                                         Department of Justice

                                         By his attorney,

                                         MICHAEL J. SULLIVAN
                                         United States Attorney

                                         By: /s/ Damian W. Wilmot
                                             Damian W. Wilmot
                                             Assistant U.S. Attorney
                                             1 Courthouse Way., Ste 9200
                                             Boston, MA  02210
                                             (617) 748-3398