# EXHIBIT 1

1

Vol I
1 - 222

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


COLLEEN O'DONNELL,              )
                               )
           Plaintiff,          )
-v-                            )  CIVIL ACTION NO.
                               )  04-40190-FDS
ALBERTO R. GONZALES,           )
Attorney General,              )
U.S. Department of Justice,    )
                               )
           Defendant.          )


          THE ORAL DEPOSITION OF COLLEEN O'DONNELL LAVORATO,

held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before Marilyn

Franklin, a Court Reporter and Notary Public, within and for

the Commonwealth of Massachusetts, at FMC Devens,

Ayer, Massachusetts, Massachusetts, on Wednesday,

August 24, 2005, commencing at 10:05 a.m.

**PRESENT:**

On Behalf of the Plaintiff:

      DAWN D. McDONALD, ESQ.
      Cooley, Shrair P.C.
      1380 Main Street, Fifth Floor
      Springfield, MA  01103
      (413) 735-0750

On Behalf of the Defendant:

      DAMIAN W. WILMOT, Assistant U.S. Attorney
      U.S. Attorney's Office
      1 Courthouse Way, Suite 9200
      Boston, MA  02210
      (617) 748-3100

Also Present:

      ERIKA TURNER, Office of General Counsel

**Page 21**

[1] Q Do you recognize that document?
[2] A Yes.
[3] Q Can you identify it for me please?
[4] A It's when I first applied for the Bureau.
[5] Q Okay. Is that submitted with the application, [6] this form?
[7] A I don't remember.
[8] Q Okay. Can you turn to the second page there. [9] Does your signature appear on that page?
[10] A Yes.
[11] Q It's there how many times?
[12] A Three.
[13] Q Can you read the dates of your signature?
[14] A June 24, 1998. May 1, 1998 and August 31, 1998.
[15] Q Do you know why you would have signed this on
[16] three different occasions?
[17] A No.
[18] Q Okay. Anything in that document that is [19] inaccurate?
[20] A No, not that I am aware of.
[21] MR. WILMOT: Okay. I am going to show you what [22] has been marked as Exhibit No. 5.
[23] (DOJ Exhibit No. 5 was marked for [24] identification.)
[25] BY MR. WILMOT:

**Page 22**

[1] Q Do you recognize that document?
[2] A No I don't.
[3] Q Okay. Is that your signature of this document?
[4] A Yes.
[5] Q And is your signature dated?
[6] A Yes. They typed in or somebody typed in the date.
[7] Q You say you don't recognize that document?
[8] A No I don't.
[9] Q If you could turn to paragraph 6 of your [10] complaint. It says that on or about August 30, 1998, you [11] began your career at the DOP. Would you have filled out [12] this document perhaps on your first day of employment?
[13] A Yes I could have. I just don't remember it.
[14] Q Okay. What position were you hired for?
[15] A Correctional officer.
[16] Q Okay. Was that in a particular division or [17] department?
[18] A Under custody.
[19] Q And where were you located or situated when you [20] first started?
[21] A FMC Devens.
[22] Q Here in Devens?
[23] A Yes.
[24] Q Were you located in this main building or were you [25] located at a different site on the campus?

**Page 23**

[1] A Actually we were located, the prison wasn't built [2] yet, and we were located in a warehouse down the street.
[3] Q Okay. Do you remember who you reported to at that [4] time?
[5] A No I don't.
[6] Q Okay. Do you remember if you received any [7] training when you first began as a corrections officer?
[8] A Yes.
[9] Q What training did you receive?
[10] A I received three weeks of in-house training, which
[11] included CPR and firearms and self defense. And then I did,
[12] I'm sorry, it was two weeks training, in-house training.
[13] Q Two weeks, okay.
[14] A Two weeks. And then three weeks training in [15] Glynco, Georgia at the Federal Law Enforcement Training [16] Center.
[17] Q Okay. During the two week training, in-house
[18] training that you had here at FMC Devens, were you trained
[19] on the agency's EEO policies?
[20] A I don't remember.
[21] MR. WILMOT: Okay. I am going to show you what's
[22] been marked as I am going to give you the next few
[23] actually. Maybe just those two. I am going to show you
[24] what has been marked as Exhibit No. 6. [25] //

**Page 24**

[1] (DOJ Exhibit No. 6 was marked for [2] identification.)
[3] BY MR. WILMOT:
[4] Q Do you recognize that document?
[5] A No I don't.
[6] Q Okay. There's handwriting on what appears to be a
[7] form. Is that your handwriting?
[8] A It is, yes.
[9] Q And is that your signature there?
[10] A Yes.
[11] Q And where does your signature appear on the
[12] document?
[13] A Where it says received.
[14] Q Okay. And is it dated?
[15] A Yes.
[16] Q And what is the date?
[17] A August 31, 1998.
[18] Q And what does it say that you received on August
[19] 31, 1998?
[20] A I received a copy of the program's statement
[21] 3420.08CN-01 dated 4-23-1997, Standards of Employee
Conduct [22] on August 31, 1998.
[23] Q Okay. Do you remember if in that document, this
[24] Employee Standard of Conduct, whether or not there was any
[25] language in there about EEO policies, anti-discrimination,

---

**Page 25**

[1]  etc.?
[2]  A I don't remember.
[3]  MR. WILMOT: Okay, I am going to show you what [4] has been marked as Exhibit No. 7.
[5]  (DOJ Exhibit No. 7 was marked for [6] identification.)
[7]  BY MR. WILMOT:
[8]  Q Do you recognize that document?
[9]  A No.
[10]  Q There appears to be a form and there's handwriting
[11]  on it. Do you recognize the handwriting?
[12]  A Yes.
[13]  Q And whose is it?
[14]  A Mine.
[15]  Q There is a signature as well, is that your [16] signature?
[17]  A Yes it is.
[18]  Q And is it dated?
[19]  A Yes it is.
[20]  Q By signing this document, what did you
[21]  acknowledge?
[22]  A That I received a copy of Chapter 11 of program
[23]  statement 3713.13 dated October 22, 1990, Sexual
Harassment [24] Prevention Program.
[25]  Q Does that refresh your memory that you received

---

**Page 26**

[1]  some material on sexual harassment?
[2]  A No.
[3]  Q Okay.
[4]  A I don't recall.
[5]  MR. WILMOT: All right. I am going to show you [6] what has been marked as Exhibit No. 8.
[7]  (DOJ Exhibit No. 8 was marked for [8] identification.)
[9]  BY MR. WILMOT:
[10]  Q Do you recognize that document?
[11]  A No.
[12]  Q There's handwriting and what also appears to be a
[13]  form, do you recognize the handwriting?
[14]  A Yes.
[15]  Q And whose handwriting is that?
[16]  A Mine.
[17]  Q And does your signature appear on this document?
[18]  A Yes it does.
[19]  Q And what is the date of your signature?
[20]  A August 31, 1998.
[21]  Q And what are you acknowledging by signing this
[22]  document?
[23]  A I received a copy of the Master Agreement on the
[24]  Standard of Employee Conduct.
[25]  Q Okay. Are you familiar with the Master Agreement?

---

**Page 27**

[1]  A Somewhat.
[2]  Q Do you recall if there is language contained in [3] the
Master Agreement on EEO policies or sexual harassment,
[4]  anything to that nature?
[5]  A I don't recall.
[6]  Q Okay. Do you remember what the dates were of the
[7]  training that you first received when you started your
[8]  employment?
[9]  A My first date of work was August 31, 1998, so I [10] believe
that was the date of the training, actually, I know [11] that was the
date the training started.
[12]  Q Okay. Do you remember when it ended?
[13]  A No I don't.
[14]  MR. WILMOT: All right. I am going to show you [15] what
has been marked as Exhibit No. 9.
[16]  (DOJ Exhibit No. 9 was marked for [17] identification.)
[18]  MR. WILMOT: You might want to share that with [19] your
counsel.
[20]  THE WITNESS: Okay.
[21]  BY MR. WILMOT:
[22]  Q Do you recognize this document?
[23]  A This document?
[24]  Q Yes. That's been marked as Exhibit No. 9?
[25]  A No.

---

**Page 28**

[1]  Q Have you seen a document like this before?
[2]  A No.
[3]  Q Okay. Well it shows here, your name appears on [4] this
document. It shows, there's a column that says [5] training dates,
do you see that?
[6]  A I do, yes.
[7]  Q And it shows August 31, 1998 through September 11,
[8]  1998 and it says institution familiarization. Do you see [9] that?
[10]  A I do, yes.
[11]  Q Is that the training that you've been - the [12] initial
training that you received when you began at DOP?
[13]  A Yes.
[14]  Q Okay. If you could go down to April 12, 1999. On
[15]  that line that says correctional training, annual-DOP. Do
[16]  you see that?
[17]  A Yes.
[18]  Q What is correctional training or annual [19] correctional
training?
[20]  A That is, they refer to it as annual refresher [21] training to
go over different parts of the job, computer [22] security, things
like that.
[23]  Q Do they cover EEO policies during that training?
[24]  A Yes, they do.
[25]  Q They do. Okay. And this training that says

---

Page 29

[1] annual on it, is it fair to say that you get this refresher
[2] training every year?
[3]     A Yes. ............................................
[4]     Q Is there anytime that you did not receive that [5] annual
training during your employment to the present?
[6]     A Yes.
[7]     Q Which period is that?
[8]     A I believe it was in 2003. But I don't know the [9] exact
dates.
[10]    Q That you did not have the refresher training?
[11]    A Correct. Yes.
[12]    Q If you go to the bottom of the page, November 21,
[13] 2003?
[14]    A Yes.
[15]    Q On that line, it says correctional training
[16] annual-DOP, would that be the refresher training that's
[17] cited there?
[18]    A I don't know.
[19]    Q Does seeing that, that you had some training in
[20] November of 2003 refresh your memory that you had annual
[21] refresher training?
[22]    A Annual I remember the firearms in November 2003
[23] because I was taken out by myself or with a couple of other
[24] people. But I don't remember the annual, I don't recall.
[25]    MR. WILMOT: Okay. Let's see. Mark this 11. Do

Page 31

[1]    BY MR. WILMOT:
[2]    Q Can you identify that document?
[3]    A That's the annual refresher training schedule.
[4]    Q Do you recognize it?
[5]    A Yes.
[6]    Q Okay. If you look at Tuesday on that schedule [7] from
9:30 to 10:00, it says "EEO Sexual Harassment [8] Prevention", do
you see that?
[9]    A I do. Yes.
[10]   Q Does that refresh your memory that you had Sexual
[11] Harassment Prevention training?
[12]   A No.
[13]   MR. WILMOT: It does not. Okay.
[14] I am showing you what has been marked as Exhibit [15] No.
15. Take a moment to look at that.
[16]   (DOJ Exhibit No. 15 was marked for [17] identification.)
[18]   MR. WILMOT: If it helps, I'm not going to quiz [19] you on
it.
[20]   THE WITNESS: Oh.
[21]   BY MR. WILMOT:
[22]   Q I'm not going to ask you details on it. I just [23] want to
see if that refreshes your memory that you had [24] sexual
harassment training, refresher training in 2001?
[25]   A No it doesn't.

Page 30

[1] I have eleven?
[2]    (Off the Record.)
[3]    MR. WILMOT: They get a little out of order before [4] we get
to ten and eleven. Let me show you what has been [5] marked as
Exhibit these are Exhibits 13 and 14 together.
[6]    (DOJ Exhibits No. 13 and 14 were [7] marked for
identification.)
[8]    BY MR. WILMOT:
[9]    Q Can you identify that document?
[10]   A That's annual refresher training for 2001.
[11]   Q If you flip to the second page there. Do you see [12] your
name on that page?
[13]   A Yes I do.
[14]   Q And is your signature on that page?
[15]   A Yes.
[16]   Q And what is the date of that?
[17]   A January 9, 2001.
[18]   Q Okay. Do you remember during that annual
[19] refresher training, you received training on sexual
[20] harassment prevention?
[21]   A I don't remember.
[22]   MR. WILMOT: Okay. Let me show you what has been
[23] marked as Exhibit 12.
[24]   (DOJ Exhibit No. 12 was marked for [25] identification.)

Page 32

[1]    Q Okay. Do you remember if you received any [2] training
on workplace violence at the annual refresher [3] training in 2001?
[4]    A 2001?
[5]    Q Yeah.
[6]    A I don't recall.
[7]    Q Okay. Take a look back at the training schedule. [8] If you
look at Friday, 12 p.m. to 1:30 p.m. It says there
[9] "ethics/standard of conduct" and underneath that it says
[10] "staff conduct responsibility and workplace violence." Do
[11] you see that?
[12]   A Yes I do.
[13]   Q Does that refresh your memory that you had [14] training
on workplace violence?
[15]   A No.
[16]   MR. WILMOT: Okay. Let me show you what has been
[17] marked as Exhibit No. 16.
[18]   (DOJ Exhibit No. 16 was marked for [19] identification.)
[20]   BY MR. WILMOT:
[21]   Q And I ask you the same question, if seeing that
[22] document refreshes your memory that you had training on the
[23] agency's workplace violence policies in 2001?
[24]   A It doesn't refresh my memory at all.
[25]   Q Okay. Now we saw your signature on the sign-in

## Page 33

[1] sheet there earlier. Do you have reason to believe that you
[2] were not at that training?
[3]    A No I was. I believe I was.
[4]    MR. WILMOT: All right. Let me show you what is [5] marked
as Exhibit No. 17.
[6]    (DOJ Exhibit No. 17 was marked for [7] identification.)
[8]    BY MR. WILMOT:
[9]    Q Do you recognize that document?
[10]    A Yes.
[11]    Q Can you identify what it is?
[12]    A Annual refresher training schedule.
[13]    Q For what year?
[14]    A 2002.
[15]    Q Do you have memory of being present at this
[16] training?
[17]    A No. I mean, I'm sure I was. I just don't [18] remember.
[19]    MR. WILMOT: Okay. I am going to show you what [20] has
been marked as Exhibit No. 18.
[21]    (DOJ Exhibit No. 18 was marked for [22] identification.)
[23]    BY MR. WILMOT:
[24]    Q Do you recognize that document?
[25]    A Yes.

## Page 34

[1]    Q Can you identify what it is?
[2]    A It's a sign-in sheet for annual refresher [3] training.
[4]    Q And does your name appear on that sheet?
[5]    A Yes it does.
[6]    Q And did you sign next to your name on that sheet?
[7]    A Yes I did.
[8]    Q And what's the date of your signature?
[9]    A February 8, 2002.
[10]    Q If you turn to the next page of that document. [11] Can
you identify that page of the document?
[12]    A The sign-in sheet for the annual refresher [13] training
2002.
[14]    Q Okay. And does your name appear on that document,
[15] on that page?
[16]    A Yes it does.
[17]    Q And did you sign next to your name?
[18]    A Yes.
[19]    Q And what is the date of your signature?
[20]    A February 7, 2002.
[21]    Q Okay. Can you turn back to the refresher training
[22] schedule for 2002?
[23] Do you have a memory of whether you received [24] training
on those dates that you read off to me? Sexual [25] harassment
prevention or any anti-discrimination policies

## Page 35

[1] that the Bureau has?
[2]    A Can you rephrase that question?
[3]    Q Do you have a memory of having been training [4] during
the two days that you just read off on the sign-in [5] sheet of being
trained on sexual harassment prevention or [6] any
anti-discrimination policies that the agency has?
[7]    A I don't remember.
[8]    Q Okay. Looking at the annual refresh training [9] schedule
for 2002 which is marked as Exhibit No. 17.
[10]    A Okay.
[11]    Q It says for day one, 7:30 to 8:15 Ethics/Standard [12] of
Conduct, Sexual Harassment Prevention, do you see that?
[13]    A Yes I do.
[14]    Q Does that refresh your memory that you had [15] training
on sexual harassment prevention on January, or on [16] the date
of this training in 2002?
[17]    A No.
[18]    Q Underneath that 9:00, it says Sexual abuse/ [19] Assault
Prevention Intervention, do you see that?
[20]    A Yes I do.
[21]    Q Do you remember receiving training on that [22] subject?
[23]    A No.
[24]    Q In 2002?
[25]    A No.

## Page 36

[1]    MR. WILMOT: I am showing you what has been marked
[2] as Exhibit No. 19.
[3]    (DOJ Exhibit No. 19 was marked for [4] identification.)
[5]    BY MR. WILMOT:
[6]    Q Can you identify what that document is?
[7]    A A lesson plan for sexual harassment prevention.
[8]    Q Does that refresh your memory?
[9]    A (No verbal response.)
[10]    Q If you want to take a look at that, and the [11] question is:
does that refresh your memory of whether you [12] received sexual
harassment prevention training in 2002?
[13]    A No it doesn't. I don't remember.
[14]    MR. WILMOT: Okay. I am going to show you what [15] has
been marked as Exhibit No. 20.
[16]    (DOJ Exhibit No. 20 was marked for [17] identification.)
[18]    BY MR. WILMOT:
[19]    Q And if you can take a look at that, and the [20] question
is: does that - well first, can you identify that [21] document as
Exhibit 20?
[22]    A Annual Training Lesson Plan for 2002 for Sexual
[23] Abuse/Assault Prevention and Intervention Program.
[24]    Q Okay. Can you take a look at that document and [25] let
me know if that refreshes your memory whether you

Page 37

[1] received training on that subject in 2002?
[2]    A I don't remember the training.
[3]    Q Okay. Do you remember attending an annual [4] refresher training class in 2004?
[5]    A 2004. Yes I do.
[6]    Q Okay. Do you know the dates of that training [7] was?
[8]    A No I don't.
[9]    MR. WILMOT: I am going to show you what has been [10] marked as Exhibit No. 21.
[11]    (DOJ Exhibit No. 21 was marked for [12] identification.)
[13]    BY MR. WILMOT:
[14]    Q Do you recognize that document?
[15]    A Yes I do.
[16]    Q Can you identify it for me please?
[17]    A Annual Refresher Training Schedule for 2004.
[18]    Q And what are the dates of that training?
[19]    A January 6 through February 27, 2004.
[20]    Q Does reading that refresh your memory as to the [21] dates you attended the training in 2004?
[22]    A No.
[23]    Q It does not?
[24]    A Not the dates, no.
[25]    Q Take a look at this document here. Exhibit No. 9.

Page 39

[1]    Q Do you have a memory of Janice Johnson conducting [2] a training class on sexual harassment and EEO policies?
[3]    A I don't.
[4]    Q Okay.
[5]    A I don't remember.
[6]    MR. WILMOT: That's all right. I am going to show [7] you what has been marked as Exhibit 22.
[8]    (DOJ Exhibit No. 22 was marked for [9] identification.)
[10]    BY MR. WILMOT:
[11]    Q Can you identify that document?
[12]    A Annual training for 2004 for sexual harassment [13] prevention and EEO.
[14]    Q Okay. Can you look at that document and let me [15] know in reviewing it if it refreshes your memory that you [16] received training on sexual harassment and EEO policies?
[17]    A Actually, yes I do.
[18]    Q It does. Okay.
[19]    A It does. I just don't remember if Janice Johnson [20] was the one who did it.
[21]    Q Okay.
[22]    A But I do remember.
[23]    Q Okay. Do you remember receiving training on [24] sexual abuse/assault prevention?
[25]    A No, I don't recall.

Page 38

[1] If you turn to the second page of Exhibit 9.
[2] The dates there say March 2, 2004 to March 5, 2004 [3] for the Correctional Training/Annual which you said earlier [4] was the annual refresh training. And looking at that does [5] that refresh your memory as to when the training could have [6] been?
[7]    A No.
[8]    Q Do you remember if the training was in January at [9] the beginning of the year or March?
[10]    A I honestly don't remember.
[11]    Q Okay. But you do have a memory of attending?
[12]    A Yes I do.
[13]    Q Do you remember whether or not you received [14] training on sexual harassment prevention and EEO policies?
[15]    A I sort of do, I kind of do, but not really.
[16]    Q Okay. Well, looking at Exhibit 21, it shows that [17] on Wednesday at 7:30, it says sexual harassment prevention [18] and EEO, does that refresh your memory that you sat through [19] that training?
[20]    A A little, it does.
[21]    Q Okay. It has a name there, J. Johnson. Do you [22] know who J. Johnson is?
[23]    A Yes I do.
[24]    Q Who is that?
[25]    A Janice Johnson.

Page 40

[1]    Q Okay. And looking at Exhibit 21, its shows that [2] there was a class at 7:30 on sexual abuse and assault [3] prevention and intervention.
[4] Does that refresh your memory that there was such [5] a class that you sat in on?
[6]    A I believe there was such a class that I sat in on [7] but I don't remember and I don't remember the warden being [8] there and that's why I'm confused at that.
[9]    MR. WILMOT: I am going to show you was has been [10] marked as Exhibit 23.
[11]    (DOJ Exhibit No. 23 was marked for [12] identification.)
[13]    BY MR. WILMOT:
[14]    Q And can you identify that document?
[15]    A That is the lesson plan for the annual training [16] 2004 for sexual abuse/assault prevention and intervention [17] program.
[18]    Q Can you look through that and see if that [19] refreshes your memory that you received training on that [20] subject in 2004?
[21]    A Yes, I did received training on it.
[22]    MR. WILMOT: Okay. I am going to show you what [23] has been marked as Exhibit 10. Catching up with our numbers [24] here.
[25] (DOJ Exhibit No. 10 was marked for

Page 41

[1] identification.)

[2] BY MR. WILMOT:

[3] Q Do you recognize that document?

[4] A Yes.

[5] Q Can you identify it for me please?

[6] A That is I acknowledged that I received the [7] standards of employee conduct.

[8] Q Okay. And there's handwriting on this form. Is [9] that your handwriting?

[10] A Yes it is.

[11] Q And does your signature appear on this page?

[12] A Yes.

[13] Q And what is the date of your signature?

[14] A March 5, 1999.

[15] Q Do you have a memory of receiving the standards of [16] employee conduct in 1999?

[17] A No.

[18] Q Okay. Do you remember signing the document?

[19] A No.

[20] MR. WILMOT: Okay. I am going to show you what [21] has been marked as Exhibit 11.

[22] (DOJ Exhibit No. 11 was marked for [23] identification.)

[24] BY MR. WILMOT:

[25] Q Do you recognize that document?

Page 42

[1] A Yes.

[2] Q Can you identify what it is?

[3] A That is employee conduct, standards of employee [4] conduct.

[5] Q Do you have a memory of ever receiving that [6] document?

[7] A Receiving it, no.

[8] Q You do not. You said you had seen it before?

[9] A Yes.

[10] Q Do you know how you came to see that document?

[11] A I believe this was sent to me while I was out. [12] This I know was sent to me and I don't remember where I saw [13] this.

[14] Q Do you know by whom it was sent to you by?

[15] A I believe HR. Human Resources.

[16] Q Okay. Do you have a memory as to when HR sent it [17] to you?

[18] A I don't. I know it was, no, I don't.

[19] Q Okay. But you do remember HR sending it to you?

[20] A Yes I do.

[21] Q Okay. Now, you testified earlier that you were [22] hired as a corrections officer. And at some point, did your [23] title change or your station change?

[24] A Actually both.

[25] Q Why don't you take me through from when you

Page 43

[1] started until today the different positions that you've been [2] through here at the agency?

[3] A Okay. I started off as a corrections officer and [4] I'm not sure of the dates but then I was a senior officer.

[5] Q And what department were you a senior officer?

[6] A In custody.

[7] Q Okay.

[8] A My duties were basically the same. And then I was [9] hired on as an inmate systems officer.

[10] Q And what department is that position in?

[11] A Inmate Systems Management.

[12] Q Is that your current position?

[13] A Yes.

[14] Q Okay. Starting back when you were hired as a [15] corrections officer in custody, do you remember who you [16] reported during the timeframe of when you were hired until [17] you became a senior officer?

[18] A It was the shift lieutenant. I don't - whoever [19] was on.

[20] Q That would be your immediate supervisor?

[21] A Yes.

[22] Q Do you have a second line supervisor after the [23] shift lieutenant?

[24] A Yes, actually it's called an activities [25] lieutenant.

Page 44

[1] Q Is the activities lieutenant above the shift [2] lieutenant?

[3] A No. Actually the shift lieutenant is, the shift [4] lieutenant runs the shift and the activities lieutenant [5] assists the shift lieutenant in running the shift.

[6] Q Okay. So who did you report to?

[7] A The shift lieutenant or it depends on who is [8] behind the desk. It could have sometimes the activities [9] lieutenant.

[10] Q And who did the shift lieutenant report to?

[11] A The captain.

[12] Q And who did the activities lieutenant report to?

[13] A The captain.

[14] Q And who was the captain in 1998?

[15] A Michael Bollinger.

[16] Q Okay. And has that changed in your employment?

[17] A No.

[18] Q Okay. He has been a captain for that entire time [19] of your employment?

[20] A Yes.

[21] Q Okay. You said you became a senior officer. Do [22] you remember when that happened?

[23] A No I don't.

[24] Q Is that a position you apply for or is that an [25] automatic promotion?

Page 45

[1]    A It's an automatic promotion.
[2]    Q Okay. Do you know what triggers the automatic
[3]  promotion to senior officer?
[4]    A Yes.
[5]    Q And what is that?
[6]    A It's your GS level. Once you're a GS 7 you're
[7]  considered a senior officer.
[8]    Q And how did you become a GS 7?
[9]    A I just stayed here. I believe I started off as a GS [10] 5 so it
had to take me two years to make a GS 7. It goes [11] on years,
the steps.
[12]    Q Okay. So you became a GS 7 based on the length of
[13]  your employment?
[14]    A Yes.
[15]    Q And do you remember when you became an inmate
[16]  systems officer?
[17]    A I don't remember the exact date, no.
[18]    Q Okay. Do you remember who you reported to when
[19]  you became an inmate systems officer?
[20]    A Yes.
[21]    Q And who was that?
[22]    A There was two. Steve Gagnon and Fernando Messer.
[23]    Q Can you spell Steven Gagnon's last name?
[24]    A G-A-G-N-O-N.
[25]    Q You said Fernando Messer?

Page 46

[1]    A Yes.
[2]    Q Can you spell Fernando Messer's last name?
[3]    A M-E-S-S-E-R.
[4]    Q So you reported to both of these persons?
[5]    A Yes I did.
[6]    Q In any order?
[7]    A Yes, it depended on who I saw first.
[8]    Q What is Fernando Messer's title?
[9]    A I don't know his title now.
[10]    Q Okay. What was his title at the time you became [11] an
ISO?
[12]    A An Assistant Inmate Systems Manager.
[13]    Q And what was Steve Gagnon's title at the time you
[14]  became an ISO?
[15]    A Inmate Systems Manager.
[16]    Q So is it fair to say that Mr. Messer reported to [17] Steve
Gagnon?
[18]    A Yes.
[19]    Q Okay. And you reported to Mr. Messer?
[20]    A Or Steve Gagnon. Both of them.
[21]    Q Okay. Now you said at some point your reports
[22]  changed. When did that happen? The persons you reported
to [23] at the time you became an ISO was Steve Gagnon and
Fernando [24] Messer. Is that the case today?
[25]    A No, no.

Page 47

[1]    Q Who do you report to now?
[2]    A Anthony Amico.
[3]    Q And who else?
[4]    A Steve Gagnon.
[5]    Q Okay. And what is Anthony Amico's title?
[6]    A Assistant Inmate Systems Manager.
[7]    Q Okay. So he at some point took over Fernando
[8] Messer's position?
[9]    A Correct, yes.
[10]    Q Okay. And did he take that after Fernando Messer
[11]  left or was this someone in the interim?
[12]    A It was after he left.
[13]    Q Okay. And Mr. Amico reports to Mr. Gagnon?
[14]    A Yes.
[15]    Q And can you describe what your duties and
[16]  responsibilities are as an inmate systems officer?
[17]    A Okay. Well, there's actually two parts. We work [18] in
receiving and discharge. We process inmates in. And we
[19] process inmates out. We take identifying them and printing
[20] them and taking their picture. Calling the appropriate [21] staff
down. You talk to them. Medical counselors, [22] psychologists.
Property given out, property given to [23] inmates.
[24] And on the other hand, I am also working the, [25] we're in
charge of the mail room of our department and then

Page 48

[1] the mailroom; it's going through, looking up inmates, seeing
[2] where their housing units are. Going through mail to make
[3] sure there's no contraband and putting inmates aside.
[4] Certain inmates aside for SIS.
[5]    Q And what is SIS?
[6]    A Special Investigation Services.
[7]    Q So in the mailroom, if you're screening the mail [8] as you
described and you found something, you put that aside [9] for
SIS?
[10]    A Correct, yes.
[11]    Q Okay.
[12]    A Well, actually, depending on what it is. It could [13] be
just nuisance contraband, then no. But if it's hard [14] contraband,
then we put it aside or gang related stuff for [15] SIS.
[16]    Q What would be nuisance contraband?
[17]    A Excess newspapers, clippings, that's considered
[18] nuisance.
[19]    Q Okay. Are there regulations as to what is [20] nuisance
and what is hard contraband as you described it?
[21]    A No. I mean, yes. Hard contraband is drugs, gang
[22] related stuff. If you read something in a letter that you
[23] think they might be trying to escape or things like that.
[24]    Q Okay.
[25]    A We consider that to put away for SIS.

### Page 49

[1]    Q Now when you became an inmate systems officer, I
[2]  am going to start calling you an ISO.
[3]    A Okay.
[4]    Q When you became an ISO, where was the receiving
[5]  and discharge activities performed?
[6]    A In the office. We have an area right past control [7] center
that is a pretty big office that everything I [8] performed in there for
receiving and discharge.
[9]    Q In relation to, well let's call this main building [10] that
we're sitting in, I guess the main building compound.
[11]  Is the receiving and discharge office located in [12] this main
building?
[13]    A Yes it is.
[14]    Q Okay. And the mail room functions you described,
[15]  where are those performed?
[16]    A When I first started down here, it was in the main
[17]  building and then after 9/11, it was an outside building.
[18]    Q Okay. So when you first started, when you say you
[19]  first started, do you mean when you first started as an ISO?
[20]    A Yes.
[21]    Q Okay. So there was a period of time where you
[22]  performed the mail functions it was done in this main
[23]  building?
[24]    A Yes.
[25]    Q Okay. And you said it was moved to another

### Page 50

[1]  location?
[2]    A Correct. Yes.
[3]    Q Where is that?
[4]    A That is, it's outside, like down this little [5] pathway from
the institution. It's not attached to the [6] institution at all.
[7]    Q Do you know how far away it's from the institution [8] or
this main building?
[9]    A About a five minute walk, if that.
[10]    Q Do you know in terms of distance, how far away it [11] is?
[12]    A Maybe a hundred feet. I'm just guessing though.
[13]    Q One hundred feet?
[14]    A Yeah, I'm guessing.
[15]    Q And you said it's down a pathway?
[16]    A Well, down this road leading into the institution. [17] You
would take that road and then you would take a left and [18] it's
right over there.
[19]    Q Okay. Is there anything in between the main
[20]  institution and the mail room?
[21]    A Yes.
[22]    Q What?
[23]    A The landscape building.
[24]    Q The landscape building?
[25]    A Yes.

### Page 51

[1]    Q Anything else?
[2]    A No.
[3]    Q If you were walking from the main institution to [4] the mail
room, and think about that walk in your mind, what [5] do you
pass on the way?
[6]    A The parking lot.
[7]    Q So you have to walk through the parking lot?
[8]    A Yes.
[9]    Q Okay.
[10]    A There's actually two ways to get there so.
[11]    Q Well, why don't you tell me one way?
[12]    A Okay.
[13]    Q And then we'll get to the second one?
[14]    A You go straight down where you drive in. You [15] would
walk straight down. The parking lot would be on your [16] right.
[17]    Q You have to be as descriptive as possible because
[18]  this is being written down.
[19]    A Oh, okay.
[20]    Q Okay, so say you're doing hand gestures, take any
[21]  of that out.
[22]    A Okay. Walk out of the main building. Go straight
[23]  pass the parking lot. When you're at the end of the parking
[24]  lot, you take a left and then the building is maybe ten,
[25]  fifteen feet, maybe a little bit more on the left.

### Page 52

[1]    Q Okay. And you said there's a second way to get [2] there?
[3]    A Yes. You walk out the main building. You walk by [4] the
parking lot and there's a set of woods on the left. [5] There's a little
pathway that you can walk through and will [6] end up right in the
mail room.
[7]    Q Okay. Now the beginning of that pathway you just
[8]  described, is that in relation to the parking lot, is that [9] on the
end closest to the institution or is that near the [10] end of the
parking lot?
[11]    A I've never walked that way so I don't really know.
[12]    A Oh, okay.
[13]    A I've never done that.
[14]    Q How would you normally go back and forth between
[15]  the main institution and the mail room?
[16]    A It's depending on what my schedule is. If I'm the
[17]  only person, I have an inmate orderly pick me up here at the
[18]  institution and drive me to the mail room with the outgoing
[19]  mail, or if I'm at a different position where I'm just going
[20]  into the mailroom to help, I just drive right from home. I
[21]  go right into the mailroom.
[22]    Q Okay. And is that how you got back and forth
[23]  between the institution and the mailroom back when you first
[24]  started as an ISO?
[25]    A Well, no. Because the mailroom was inside when I

### Page 53

[1] first started.

[2]    Q Okay. Well, when it moved to this new location, [3] was that how you were getting back and forth between the [4] main institution and the mailroom?

[5]    A Yes.

[6]    Q Okay. As you testified, the parking lot from the [7] main institution to the mailroom, is a hundred feet long?

[8]    A That's a guess, I don't know approximate or [9] anything too good.

[10]    Q Okay. I am going to show you - mark this as [11] let's see here. This is going to seem like a slate [12] question, have you ever been to a football game before?

[13]    A Yes, one.

[14]    Q With the parking lot in mind and your memory of a [15] length of a football field, could you fit a football field [16] in that parking lot?

[17]    A I think so, I don't know.

[18]    Q Do you know a football field is a hundred yards?

[19]    A No.

[20]    MR. WILMOT: Okay. Let me show you what is marked [21] as Exhibit 24.

[22]    (DOJ Exhibit No. 24 was marked for [23] identification.)

[24]    THE WITNESS: Okay.

[25]    BY MR. WILMOT:

### Page 54

[1]    Q Do you recognize that document?

[2]    A Yes.

[3]    Q Can you identify what it is?

[4]    A It's my job description for inmate systems [5] officer, GS 7.

[6]    Q Okay. Can you take a moment to look through that?

[7]    A Sure.

[8]    Q And what we're going to ask is whether or not that [9] document accurately describes what your duties and [10] responsibilities are?

[11]    A Okay.

[12]    (Witness reviews document.)

[13]    BY MR. WILMOT:

[14]    Q Do you remember my question?

[15]    A No.

[16]    Q My question was: does this position description [17] accurately describe what your duties and responsibilities [18] are as an ISO?

[19]    A Yes.

[20]    Q Are there things in here that you disagree with?

[21]    A No. I would say not that I can see. Everything [22] in here I've believed I've done.

[23]    Q Okay. Is there anything that you would add to [24] this that it does not include?

[25]    A No, not that I can think of.

### Page 55

[1]    Q You described earlier that you performed the [2] receiving and discharge functions in the receiving and [3] discharge office here in the main institution, the main [4] facility.

[5]    Are you aware whether or not you could perform the [6] receiving and discharge functions elsewhere in the compound? [7] Is that possible?

[8]    A Elsewhere in the compound?

[9]    Q Let's say you wanted to perform your functions in [10] receiving and discharge but you didn't want to do it in that [11] office, is that a possibility?

[12]    A No, it's not.

[13]    Q And let's say you wanted to perform the mailroom [14] functions. Could you do that somewhere else in the compound [15] other than in the mailroom office?

[16]    A No.

[17]    Q You could not?

[18]    A No.

[19]    Q Okay. Bringing your attention back to your [20] complaint marked as Exhibit No. 2. Paragraph 7 says David [21] Reynoso is also an employee of the BOP and was a coworker of [22] the plaintiff. The plaintiff and David Reynoso also engaged [23] in a dating relationship. Do you see that?

[24]    A Yes.

[25]    Q When did you begin dating David Reynoso?

### Page 56

[1]    A I believe it was October of 1998.

[2]    Q October of 1998?

[3]    A Yes. September or October of 1998.

[4]    Q And that was your boyfriend? You were seeing each [5] other exclusively?

[6]    A Yes.

[7]    Q Did you live with each other at any point?

[8]    A Yes.

[9]    Q When did you live with Mr. Reynoso?

[10]    A I believed we moved in together October of 1999.

[11]    Q Okay. And when did or - obviously you're married [12] now, he's not living with you anymore.

[13] When did you move out or he moved out? When did [14] you separate from living with each other?

[15]    A I don't remember.

[16]    Q Do you remember if you lived together over a year?

[17]    A Yes I believe so.

[18]    Q Do you believe it was as long as two years that [19] you lived together?

[20]    A No. It definitely wasn't two years.

[21]    Q But more than a year?

[22]    A Yes.

[23]    Q So you moved in with each other in October 1999 [24] and you at least lived with each other as October of 2000?

[25]    A I believe so, yes.

Page 57

[1]    Q Were you still living with him at any point in [2] time in 2001?

[3]    A No, I think he moved out but I don't know. I [4] don't remember.

[5]    Q And what was your address at that time?

[6]    A 93 Sherman Avenue, Devens, I forget the apartment [7] number.

[8]    Q And how long did you live at that address?

[9]    A Under two years. I know that.

[10]    Q Do you remember whose name the apartment was [11] under?

[12]    A Mine.

[13]    Q And why did Mr. Reynoso move out?

[14]    A We were having problems and he was living there [15] part-time I would say.

[16]    Q Okay.

[17]    A Maybe three or four nights a week.

[18]    Q Okay.

[19]    A He had half his stuff at his mother's and half his [20] stuff at mine, at our place. But then once they gave an [21] eviction notice, because they were turning them into condos; [22] everyone had to leave.

[23]    Q Oh, I see. So did he leave at that time or did he [24] leave when you left?

[25]    A He was living part-time there. He had two

Page 58

[1] addresses I would say.

[2]    Q Okay. Up until the date that you had to leave, [3] would he still stay there?

[4]    A Oh yes.

[5]    Q You continued dating past that point?

[6]    A Yes.

[7]    Q Was there a point where your relationship ended [8] with Mr. Reynoso?

[9]    A It was on and off for a couple, a few years when I [10] was with him.

[11]    Q Okay. And when was it off? When was the last [12] time it was off?

[13]    A The last time was April 2002. I believe that's [14] the date.

[15]    Q And is that the instant you described in your [16] complaint as to when Mr. Reynoso pushed you and kicked you?

[17]    A Yes.

[18]    MR. WILMOT: Okay, we'll get to that.

[19]    I am going to show you what has been marked as [20] Exhibit 25. It's a document that I received in the course [21] of discovery.

[22]    (DOJ Exhibit No. 25 was marked for [23] identification.)

[24]    BY MR. WILMOT:

[25]    Q Do you recognize that document?

Page 59

[1]    A Yes.

[2]    Q Can you identify it for me please?

[3]    A That was a message he left on my machine.

[4]    Q A message that Mr. Reynoso left on your machine?

[5]    A Yes.

[6]    Q And where was this machine located?

[7]    A At my mother's house.

[8]    Q And so this is a message, this is an answering [9] machine at your mother's house?

[10]    A Yes. It was my answering machine. I had my own [11] phone number there.

[12]    Q Okay. And what is the date of that document?

[13]    A March 23, 2002.

[14]    Q Okay. So were you still together with Mr. Reynoso [15] at this point?

[16]    A Yes.

[17]    Q Okay. Was there a reason why you saved or you [18] transcribed that message from March 2002?

[19]    A Well I use to save those messages. Just tried to, [20] tried to get away from him, like I would play them, trying [21] to get away from him. I don't know why, I just put it down.

[22]    Q Okay. Now you said that you had saved other [23] messages?

[24]    A Yes.

[25]    Q Did you transcribe any of those?

Page 60

[1]    A No. I used them for my own personal, to try to [2] get enough strength to break up with him so I would, for [3] myself.

[4]    Q All right. When you transcribed that message, [5] what did you do with it?

[6]    A This message?

[7]    Q Yes.

[8]    A I believe, I believe I gave it to the warden. I'm [9] not a hundred percent. I believe the warden, I know I [10] showed the warden but I don't remember exactly who I gave it [11] to and what I did with it.

[12]    Q Do you remember when you transcribed that message?

[13]    A It was definitely after the incident. I don't [14] remember what date though.

[15]    Q Okay. So at some point in 2003, you transcribed [16] this message from March 2002?

[17]    A No. It was actually sometime after April 2002.

[18]    Q I'm sorry. So after April 2002, you transcribed [19] this message?

[20]    A Yes.

[21]    Q But yet, you had saved the message from the date [22] of March 22, 2002 until the point when you transcribed it?

[23]    A March 23, I saved it. No. Because I transcribed [24] it and I still had it on my machine because my machine [25] allowed for thirty days to hold on, to save my message for

**Page 61**

[1] thirty days. So I had it for those thirty days.

[2]    Q Okay. All right. So, I'm a little confused.

[3]    Do you know when you listened to that message and

[4]    transcribed it on paper?

[5]    A I don't remember the exact date but it was [6] definitely after the April 8 incident.

[7]    Q And you memory is that you're the one who [8] transcribed it?

[9]    A Yes.

[10]    Q Okay. And are you, is your testimony that you [11] were able to transcribe it after the April 8 event because [12] your machine saved messages for thirty days?

[13]    A Yes.

[14]    Q Okay. So is it fair to say you probably [15] transcribed it some point in April of 2002?

[16]    A Definitely yes.

[17]    Q Okay. And you said you gave that to the warden?

[18]    A I did.

[19]    Q Do you know when you did that?

[20]    A No.

[21]    Q Was it in April of 2002?

[22]    A I don't remember.

[23]    Q Okay. Well to bring back to you your compliant.

[24]    In paragraph 8, it says that starting with the [25] second sentence, on April 8, 2002 plaintiff and David

**Page 62**

[1] Reynoso left FMC Devens property and went off site to

[2] discuss their relationship problems.

[3]    Do you remember what time you and Mr. Reynoso left [4] the property?

[5]    A No I don't.

[6]    Q Okay. Do you remember if it was in the morning or [7] in the afternoon?

[8]    A I believe it was in the morning.

[9]    Q What shift were you working that day?

[10]    A 6:30 to 3:00.

[11]    Q Okay. Do you remember if it was in the early [12] morning?

[13]    A I don't remember.

[14]    Q Okay.

[15]    A I remember like, it wasn't at the beginning of my [16] shift but I don't remember the exact time.

[17]    Q Okay. Where were you working that day?

[18]    A Mirror.

[19]    Q In the Mirror office that's located outside the [20] main building?

[21]    A Yes.

[22]    Q Do you remember where Mr. Reynoso was working that [23] day?

[24]    A Yes.

[25]    Q And where was he working?

**Page 63**

[1]    A SIS office.

[2]    Q Do you remember what his shift was that day?

[3]    A Yes.

[4]    Q What was it?

[5]    A 8:00 to 4:00.

[6]    Q Okay. Do you remember when you met with Mr.

[7] Reynoso and walked off the property if it was before his [8] duty day started or after?

[9]    A Oh, definitely after.

[10]    Q Okay. And do you remember when you and Mr.

[11] Reynoso left the property if it was during your duty day or [12] after?

[13]    A It was during.

[14]    Q Okay. Can you describe what happened? How did [15] you come to decide to both leave the property together? Can [16] you describe those events?

[17]    A Sure. I had called him to discuss – I found out [18] that he had been cheating on me. And I called him and he [19] said – and he denied it, and he suggested that we go for [20] coffee to talk. And he picked me up. He came to the [21] mailroom because my car wasn't there. He picked me up.

[22]    Q And before you move on to the next point, when you [23] were leaving the mailroom, did you let anyone know that you [24] were leaving?

[25]    A Yes.

**Page 64**

[1]    Q Who did you let know?

[2]    A My coworkers that were in the mailroom with me.

[3]    Q And who are they or were they?

[4]    A Brian Padula, Keith MacDonald, Holly Glover. [5] That's all that I can recall that was there.

[6]    Q Okay.

[7]    A There could have been more but I don't recall.

[8]    Q Do you remember telling them why you were leaving?

[9]    A No, I don't remember.

[10]    Q Okay. Do you typically have to carry keys to get [11] into the mailroom?

[12]    A Yes.

[13]    Q Did you have your keys with you that day?

[14]    A I don't remember.

[15]    Q Do you remember before you left, if you took your [16] keys with you or did you give them to someone?

[17]    A I don't remember.

[18]    Q Okay. All right. So you said Mr. Reynoso picked [19] you up?

[20]    A Yes.

[21]    Q And he was driving what, his car?

[22]    A Yes.

[23]    Q What happened next?

[24]    A He actually came into the mailroom.

[25]    Q Okay.

Page 65

[1]    A And then we walked out onto the deck. They have a
[2] deck off the mailroom.
[3]    Q Okay.
[4]    A And his car was there and he said let's go get a [5] coffee
and talk about it. We were arguing though. We were [6] arguing.
[7]    Q Do you remember what you were saying and what he
[8] was saying?
[9]    A I told him I didn't believe him anymore. That he [10] was
cheating on me.
[11]    Q Was there any physical touching at that point?
[12]    A No, no.
[13]    Q Okay.
[14]    A We got in his car and we started to drive and we
[15] were arguing about him cheating.
[16]    Q And was the interaction still verbal at this [17] point?
[18]    A Yes.
[19]    Q Did he hit you in the car?
[20]    A No.
[21]    Q Did you hit him?
[22]    A No.
[23]    Q Okay.
[24]    A We went down - he said, he started getting angry. [25] So
he pulled off to the right of the road, a place called

Page 66

[1] Mirror Lake which is right down the street from the prison.
[2]    Q Okay.
[3]    A And he got out and started pacing. And then I got [4] out
and started arguing with him. And then I don't remember [5] the
exact, how it - but he assaulted me.
[6]    Q Can you describe, he's pacing and you're arguing.
[7] What happened?
[8]    A I don't remember the exact order. I know he [9] kicked me
and he grabbed me. He was grabbing me. And then [10] I started
to walk away and he held on tight and I got loose. [11] I don't
know how with arms to get loose and I got loose and [12] I started
to take off on foot, and...
[13]    Q Well let's back up a little. He was pacing and [14] you
said he kicked you and you were arguing. How close were
[15] you to him when he was pacing and you were arguing.
[16]    A A few feet.
[17]    Q Okay. So he stopped pacing and walked over to you
[18] and kicked you.
[19]    A No. He stopped pacing and walked over to me and
[20] started arguing with me.
[21]    Q Okay.
[22]    A And I don't remember if he grabbed me first or [23] what.
I just remember he kicked me.
[24]    Q And where did he kick you?
[25]    A In my left thigh.

Page 67

[1]    Q Okay. In your upper thigh?
[2]    A Yes.
[3]    Q Okay. Now during Mr. Reynoso's duty day, that day [4] in
particular, was he wearing a uniform of any kind?
[5]    A Yes.
[6]    Q And can you describe the uniform?
[7]    A White shirt with an emblem with the Bureau of [8] Prisons.
And grey pants, black boots. And I don't know if [9] he had his
jacket on or not. I don't remember.
[10]    Q Were you wearing a uniform of any kind?
[11]    A Yes.
[12]    Q And can you describe your uniform at that time?
[13]    A Grey pants, black boots, white shirt with the [14] emblem
of the Bureau on the side. Oh, and it says FMC [15] Devens above
the front pocket.
[16]    Q On the left side? The right side?
[17]    A I believe it's the left side.
[18]    Q Okay. So you said that he kicked you and then
[19] grabbed you and you said you broke loose. What did you do
[20] after you broke loose?
[21]    A I started walking really fast towards the road.
[22]    Q The road that led to the lake?
[23]    A Yes.
[24]    Q Okay. And what happened next.
[25]    A He pulled up next to me and tried to tell me to.

Page 68

[1] get into his car. And I said no. You know, arguing. He [2] just
sped off.
[3]    Q Now, when he asked you to get into the car, what [4] did
he say to you?
[5]    A I don't remember the exact words. I don't [6] remember
the words.
[7]    Q And why didn't you get into the car at that point?
[8]    A He had hit me and I was upset. I was really upset [9] and I
just wanted him to leave me alone at that point.
[10]    Q When you were upset - after he kicked you, did [11] you
continue to argue with him at all, or did you...
[12]    A Not really, just leave me - yeah. Just leave me [13] alone
type of stuff.
[14]    Q I'll ask more specifically, your arguing about [15] your
relationship was prior to the kick; correct?
[16]    A Yes.
[17]    Q Did you begin to argue about that again after he
[18] kicked you?
[19]    A You know, I don't remember. I don't remember the
[20] exact words. I was so upset that I don't remember.
[21]    Q And what were you upset about?
[22]    A Because I didn't believe him. He was cheating on
[23] me.
[24]    Q And so you said you didn't get in the car with him
[25] because you were upset. Is that what you were upset about?

Page 69

[1] Because he was cheating?
[2]   A And because he hit me again after he promised me [3] he
wouldn't.
[4]   Q Okay. So he had hit you before?
[5]   A Several times, yes.
[6]   Q What happened next after he sped off?
[7]   A Okay. A state trooper was driving down the street [8] and
pulled over and asked me if everything was all right. I [9] don't
remember what I said to him. I really don't. But at [10] that point,
Reynoso came back around. I don't know if he [11] turned, he
must have turned his car around and the state [12] trooper went
over to him. And I don't know what was said [13] there I was far
away. And he asked me if I wanted a ride, [14] the trooper did.
[15]   Q Okay.
[16]   A And the trooper asked me if I wanted a ride back [17] to
the institution and I said no, I needed to walk.
[18]   Q And why did you turn down the ride back to the
[19] institution?
[20]   A I was so upset. I don't remember why. I just
[21] remember I was so upset.
[22]   Q How long of a walk back to the mailroom is it from
[23] Mirror Lake?
[24]   A I actually made it to the training center.
[25]   Q Okay.

Page 71

[1] I just needed, I needed for someone to pick me up at the
[2] training center.
[3]   Q Okay.
[4]   A And she answered the phone.
[5]   Q And what happened next?
[6]   A She picked me up. I was hysterically crying. I [7] told her
what happened. She brought me back to the [8] mailroom. We
went into the ladies room and she - to see [9] the bruise, to see if
there was a bruise and there was.
[10]   Q Okay.
[11]   A And Brian Padula, how did it go? Brian Padula [12] asked
what had happened and I told him what had happened, [13] and
he called - who did he call? SIS, Al Colon.
[14]   Q And who is Al Colon.
[15]   A He was at the time, he was - I forget his title, [16] a tech
for SIS.
[17]   Q Okay.
[18]   A I don't remember the exact title though. And then [19] I
called Fernando Messer who was the Assistant Inmate
[20] Systems Manager.
[21]   Q Okay.
[22]   A And he came out to the mailroom.
[23]   Q And do you have a memory as to what time it was, [24] at
this point, when all this activity is going on?
[25]   A I have no idea.

Page 70

[1]   A Which isn't that far of a walk.
[2]   Q So you walked to the training center?
[3]   A Yes.
[4]   Q Before we get to that point, when the officer was
[5] asking you questions, did he ask you if you needed any help
[6] or assistance of any kind?
[7]   A Yes he did.
[8]   Q And what was your response to that?
[9]   A No.
[10]   Q Okay. Do you remember what type of assistance or
[11] help did he offer?
[12]   A I don't. I just remember him asking me if I [13] needed a
ride back to the institution.
[14]   Q Okay. And so when you got back to the training
[15] center, what did you do there?
[16]   A I called the mailroom.
[17]   Q Okay.
[18]   A For a ride.
[19]   Q And someone from the mailroom picked you up?
[20]   A Yes.
[21]   Q And who was that?
[22]   A Holly Glover.
[23]   Q Okay. Did you call Holly specifically or did you [24] just
ask for anyone to pick you up?
[25]   A I just asked for anyone. She answered but I said

Page 72

[1]   Q And where was Fernando Messer that day?
[2]   A He was in his office in the main building.
[3]   Q Okay. So you called him and he somehow got to the
[4] mailroom?
[5]   A Yes.
[6]   Q And you spoke to him there?
[7]   A Yes.
[8]   Q What did you say to him?
[9]   A I don't recall everything that I said. I just [10] know I
told him that I was hit or kicked.
[11]   Q Do you remember what he said to you in response?
[12]   A I don't. I just know that he said to me to see [13] the
captain.
[14]   Q Okay. And that's Mr. Bollinger?
[15]   A Yes. In the main building.
[16]   Q And how did you get to the main building from the
[17] mailroom?
[18]   A Brian Padula.
[19]   Q Now did you speak with the captain before coming
[20] to the mailroom, the main institution, when you were still
[21] in the mailroom?
[22]   A No.
[23]   Q Did you speak to anyone who is located in the main
[24] institution before leaving the mailroom on your way to see
[25] the captain?

Page 73

[1]   A Not that I can recall. Not that I remember.
[2]   Q All right. So Padula drives you to the main [3] building. What happens next?
[4]   A He takes me up to see the captain.
[5]   Q Okay.
[6]   A His office is located in this main building but [7] off the compound.
[8]   Q Okay. And did you get to meet with the captain?
[9]   A Yes.
[10]  Q Can you describe that meeting to me please?
[11]  A I told him what happened. I don't remember my
[12] exact words. At that point, he called on the radio the
[13] special investigation agent, Dennis Duffy, and he came to
[14] the office.
[15]  Q When you say called on the radio, what type of [16] radio was that?
[17]  A A radio we communicate with. Like a walkie- [18] talkie.
[19]  Q A walkie-talkie?
[20]  A Yeah.
[21]  Q Okay. So he called Dennis, what's the last name
[22] again?
[23]  A Duffy. D-U-F-F-Y.
[24]  Q Okay. And what did he say to Dennis Duffy?
[25]  A That he had to come to his office.

Page 74

[1]   Q That what?
[2]   A The captain told Duffy that he needed to come to [3] the captain's office. That he needed to come to the [4] captain's office.
[5]   Q And what happened next?
[6]   A He came to the office, and I don't remember if I'm [7] the one who told Duffy or the captain told him, but they [8] told him what happened and he just said, Huh. He just told [9] me he had to leave because he has a family emergency. [10] Reynoso just told me he had to leave because he has a family [11] emergency.
[12]  Q Okay.
[13]  A And then the captain said that I should go to the
[14] state police and file a complaint, and they sent Brian
[15] Padula with me so I didn't have to go alone.
[16]  Q Now how much time had passed between the
[17] incident at Mirror Lake to when your meeting with the
[18] captain started?
[19]  A I don't remember.
[20]  Q Okay. Do you remember what time of day it was
[21] when you went to the state police?
[22]  A I don't remember.
[23]  Q Okay. Do you remember if it was near the end of
[24] your shift by this point?
[25]  A I don't remember.

Page 75

[1]   Q Okay. So your memory is that Padula came and [2] drove with you to the state police?
[3]   A Yes.
[4]   Q And did he drive?
[5]   A Yes he did.
[6]   Q Before you left with Padula, did you meet with [7] anyone else?
[8]   A I know I met with the warden that day but I don't [9] know if it was before or after. I don't remember.
[10]  Q Okay. You have a memory of meeting with the
[11] warden?
[12]  A Yes.
[13]  Q Can you describe that meeting for me?
[14]  A I know Cindy Lord was in there. And I don't know
[15] who else was in there. And I just, I was crying a lot. I
[16] don't - I was hysterical so I don't remember everything
[17] that was said.
[18]  Q Do you remember what it was you said to the
[19] warden?
[20]  A No.
[21]  Q Okay. Do you have any memory of anything that you
[22] said to the warden on that day?
[23]  A He's going to kill me, go to the police that's [24] what I thought, that he's going to kill me.
[25]  Q You said that?

Page 76

[1]   A Yes.
[2]   Q And do you remember what the warden's response was
[3] to that?
[4]   A No. I just can only remember telling everyone [5] he's going to kill me. I don't remember his response. No.
[6]   Q Did the warden offer you any assistance at all?
[7]   A Yes.
[8]   Q What did he offer you?
[9]   A To take some time off on admin leave and he [10] offered, he offered to send somebody with me to apply for a
[11] restraining order because that was after the state trooper
[12] suggested that I do that.
[13]  Q Okay. Did he offer to call a hospital for you or
[14] anything like that?
[15]  A I don't remember. I don't recall.
[16]  Q Okay. You were saying just now that he offered to
[17] send someone with you to apply for a restraining order, and
[18] I think you said that a state officer gave you that same
[19] advice to apply for a restraining order?
[20]  A Yes.
[21]  Q Does that refresh your memory as to when you met
[22] the warden that day? If it was before or after you went to
[23] the state police?
[24]  A I believe it was - I went to the state police [25] twice. So I think it was after the first time.

## Page 77

[1]  Q Okay. So why don't you describe to me the first [2] time
you went to the state police?

[3]  A The first time I went with Brian Padula. He took [4] me to
tell them what happened.

[5]  Q Okay.

[6]  A And, you know, and then he drove me back to the
[7] institution.

[8]  Q Let's back up a little bit. When you went to the [9] state
police, what did you tell the state police?

[10]  A What had happened at Mirror Lake.

[11]  Q Okay. Did they take a statement from you? What
[12] happened there after you told them what happened?

[13]  A He did take a statement from me.

[14]  Q All right. Is that a written statement?

[15]  A I believe so but I don't remember.

[16]  Q Okay. Do you remember signing anything there?
[17] Your first trip to the state police?

[18]  A I don't remember.

[19]  Q Do you remember who you spoke to there?

[20]  A I know it was a male. I forget his name. It was [21] Sean. I
forget his name.

[22]  Q You said Padula then drove you back to the
[23] institution?

[24]  A Yes.

[25]  Q And that's the main building that you're talking

## Page 78

[1] about?

[2]  A Yes.

[3]  Q What happened when you came back here?

[4]  A I believe that's when I met with the warden. [5] After the
first trip to the state police.

[6]  Q And where did that meeting take place?

[7]  A In the warden's office.

[8]  Q And you said after meeting the warden, you went [9] back
to the state police?

[10]  A Yes.

[11]  Q How did you get back there the second time?

[12]  A The warden actually called the mailroom and spoke
[13] with Holly Glover. And asked if she could come over to his
[14] office and pick me up and take me to the state police.

[15]  Q Do you have a memory as to what time of day it was
[16] when Holly drove with you back to the state police?

[17]  A I don't remember.

[18]  Q Okay. And what happened after you went back to
[19] the state police the second time?

[20]  A We met with the trooper who took my statement. [21] And
we followed to Ayer District Court to take out a [22] restraining
order.

[23]  Q Okay.

[24]  A And I was denied.

[25]  Q Before we get to that point, do you have a memory

## Page 79

[1] of anyone telling you why you had to go the state police to
[2] report this?

[3]  A No. I just remember, you know, to go to the state
[4] police. I don't remember the exact words, no.

[5]  Q Do you remember anyone telling you that you needed
[6] to go to the state police because the incident happened off
[7] the premises of the BOP?

[8]  A I don't remember.

[9]  Q Okay. So you said that you followed a state [10] trooper to
Ayer District Court is that what you said?

[11]  A Ayer District Court, yes.

[12]  Q And what happened at the Ayer District Court?

[13]  A The clerk told us we couldn't take out a [14] restraining
order because I did not live in the area.

[15]  Q Okay. And what happened next?

[16]  A I don't remember. I know I came back here. But I
[17] don't know if I came back inside or just went home. I don't
[18] remember.

[19]  Q Now, after you were denied by Ayer District Court,
[20] do you remember speaking to anyone here at the facility?

[21]  A I don't remember.

[22]  Q But your memory is that you drove out to Ayer
[23] District Court. They said you couldn't get one there. Was
[24] Holly with you at that point?

[25]  A Yes she was.

## Page 80

[1]  Q She was. So she drove you back here to Devens and
[2] you left from here?

[3]  A Yes.

[4]  Q Did you leave in your own vehicle or did someone [5] pick
you up?

[6]  A I took my own vehicle.

[7]  Q And where were you living at that time?

[8]  A In Malden. On Chester Street.

[9]  Q Okay. How long a commute is it from here to [10] Malden?

[11]  A About an hour. Fifty-three miles, something like [12] that.

[13]  Q Did you go the hospital at all?

[14]  A No.

[15]  Q Okay. Did you seek any treatment at all for the
[16] bruise you described on your leg?

[17]  A No.

[18]  Q Did you ever take any pictures of the bruise?

[19]  A The state police did.

[20]  Q They did. And when did that happen?

[21]  A It was a couple of days later but I don't know how
[22] many days. It wasn't that day.

[23]  Q So it wasn't that day?

[24]  A No.

[25]  Q Okay. Can you describe what happened next at

---

### Page 81

[1] least with regards to this incident?

[2]    A Well I drove to my aunt and uncle's house from [3] here, and they had called the Malden Police to find out what [4] we needed to do to get a restraining order.

[5]    Q Your aunt and uncle did?

[6]    A Yes they did.

[7]    Q Okay. What are your aunt and uncle's names?

[8]    A Catherine and Eddie Sweeney.

[9]    Q Okay. And where do they live?

[10]    A They live on Adams – 180 Adams Street, Malden. [11] 28 Adams Street.

[12]    Q Okay. So they called the Malden Police you said?

[13]    A Yes they did.

[14]    Q Okay. And did they relay to you what the Malden [15] Police told them?

[16]    A Actually, a police officer came by the house.

[17]    Q Okay. And what happened?

[18]    A The police officer came by and I had described [19] what happened. And he called the Massachusetts State Police [20] and spoke to the trooper that was involved, that I gave a [21] statement to.

[22]    Q So he made that call from your aunt and uncle's [23] home?

[24]    A On his cell phone.

[25]    Q On his cell phone?

---

### Page 82

[1]    A Yes.

[2]    Q And how did he get the trooper's name who was at [3] Mirror Lake?

[4]    A I told him.

[5]    Q Okay.

[6]    A I just don't remember it now. But I remembered it [7] then.

[8]    Q Do you remember how you remembered the trooper's [9] name from Mirror Lake from the time you saw him that morning [10] to later on that evening with this Malden police officer?

[11]    A No I don't. I don't remember how I remembered it.

[12]    Q Did the trooper give you his name at Mirror Lake?

[13]    A I don't remember.

[14]    Q Okay. All right. So this officer makes a call to [15] the state trooper and what happens next?

[16]    A That's the thing. I know he called the state [17] trooper but I don't know if they had to call a judge or not [18] to get an emergency restraining order for twenty-four hours. [19] But I believed that's what happened.

[20]    Q Okay.

[21]    A But I'm not sure. But I was granted a twenty-four [22] hour emergency restraining order.

[23]    Q Do you remember what the order was?

[24]    A I don't understand the question.

[25]    Q What were the restrictions on the order?

---

### Page 83

[1]    A Oh. He had to stay so many feet away from me but [2] I don't remember the exact---

[3]    Q He being?

[4]    A ---David Reynoso had to stay a certain amount of [5] feet away from me. I don't remember the feet.

[6]    Q Okay.

[7]    A No contact. I don't remember. That's all I [8] remember.

[9]    Q Between the time that you saw Mr. Reynoso at the [10] lake up to this point, had you had any contact with him?

[11]    A From?

[12]    Q From when he left the lake until this point where [13] you are at your aunt and uncle's home the same day?

[14]    A No, no I didn't.

[15]    Q Did you attempt to contact him at all in that [16] timeframe?

[17]    A Not that I can remember. No.

[18]    Q So you didn't try to call him on his cell phone or [19] anything like that?

[20]    A No. I didn't know he had a cell phone at the [21] time.

[22]    Q Did you try to call him at his mother's phone or [23] anywhere?

[24]    A No.

[25]    Q Do you know if he tried to contact you in that

---

### Page 84

[1] timeframe?

[2]    A No he didn't.

[3]    Q All right. So after, who told you that you [4] received this emergency restraining order?

[5]    A The officer who was at my aunt and uncle's house [6] explained to me what an emergency restraining order was.

[7]    Q Okay.

[8]    A So he told me.

[9]    Q Okay. So what happened next after that?

[10]    A They called my cousin to talk to me and she [11] brought me over my sister's house and let them know what was [12] going on.

[13]    Q What's your cousin's name?

[14]    A Linda Sweeney. She's Director of Victim Advocate [15] at Billerica Prison.

[16]    Q And so Linda Sweeney drove you to your sister's [17] house?

[18]    A Yes. I left my car at my aunt and uncle's.

[19]    Q Okay. And what is your sister's name.

[20]    A Kerri Glinner.

[21]    Q And how do you spell her last name?

[22]    A G-L-I-N-N-E-R.

[23]    Q Kerri?

[24]    A Yes. K-E-R-R-I.

[25]    Q And where does Kerri Glinner live?

---

## Page 85

[1]    A At the time she lived in Everett on Chatham Road.

[2]    Q Okay. And what happened next?

[3]    A I just, there was a lot of people there talking to me about what was going on. My family. And when I calmed down a little, I don't know what time it was when I calmed [6] down, I know my cousin drove me back to get my car so I [7] could drive home to my house.

[8]    Q When you say your cousin, you mean Linda?

[9]    A Yes. Linda Sweeney.

[10]    Q You said there were a lot of people at Kerri's [11] house at that time?

[12]    A Yes.

[13]    Q Who else was there besides you, Kerri and Linda?

[14]    A Her husband, David Glinner.

[15]    Q Okay.

[16]    A Her daughter, Delaney. Her son, Kyle. Both her [17] mother and father-in-law, Eileen and Mark Glinner. That's [18] all that I can remember.

[19]    Q How old was Delaney at that time? Do you [20] remember?

[21]    A Delaney probably about five or six.

[22]    Q And how old was Kyle at that time?

[23]    A I don't even think he was a year old yet.

[24]    Q So after Linda drove you back to your aunt and [25] uncle's house to get your car, what did you do next?

## Page 86

[1]    A I drove to my house where my parents live.

[2]    Q And what are your parents' names?

[3]    A John and Dotty O'Donnell. Dorothy.

[4]    Q And what happened next?

[5]    A My mother was at work. My dad was home and I told [6] him what had happened. And then I, I don't know. I told [7] him what happened and sat with him until it was time for my [8] mother to be picked up from work. My dad usually drives and [9] picks my mother up because he's retired. And I picked my [10] mother up at work and told her what happened.

[11]    Q Do you remember what time that was?

[12]    A She worked 3 to 11 so it was about 11.

[13]    Q Eleven at night?

[14]    A Yes.

[15]    Q Okay. And what happened next?

[16]    A I went home and talked to my parents for a little [17] while and went to bed.

[18]    Q Okay. Do you remember what happened the next day [19] now? On April 9, 2002? Did you do anything with regards to [20] your employment here at Devens or this incident with Mr. [21] Reynoso?

[22]    A I think I went to I think I had to go to court [23] that day.

[24]    Q Okay.

[25]    A For the ten day restraining order.

## Page 87

[1]    Q And what court did you go to?

[2]    A The Malden District Court. I'm not sure if it was [3] that day or the day after.

[4]    Q Okay. And when you got to Malden District Court, [5] what did you do?

[6]    A I told the judge what had happened.

[7]    Q Okay. So there was a hearing?

[8]    A Yes.

[9]    Q Did you have anyone representing you at the [10] hearing?

[11]    A At that time, I had my cousin stand with me while [12] I told the judge what had happened.

[13]    Q Your cousin?

[14]    A Linda Sweeney.

[15]    Q And what did you tell the judge?

[16]    A Just that he had assaulted me on April 8.

[17]    Q Was Reynoso there at the hearing?

[18]    A At that hearing, no.

[19]    Q Okay. And what did the judge tell you?

[20]    A She or was it a he? I don't remember if it was a [21] he or she. The judge granted me a ten day restraining [22] order.

[23]    Q Did you have to fill out any paperwork when you [24] went to the District Court that day?

[25]    A I don't recall.

## Page 88

[1]    MR. WILMOT: I'm going to show you this document [2] that is marked as Exhibit 26.

[3]    (DOJ Exhibit No. 26 was marked for [4] identification.)

[5]    BY MR. WILMOT:

[6]    Q Do you recognize that document?

[7]    A Yes I do.

[8]    Q Can you identify what it is for me please?

[9]    A It's a protection from abuse, a restraining order [10] against David Reynoso.

[11]    Q It's a what, I'm sorry?

[12]    A A restraining order against David Reynoso.

[13]    Q Let me just take a look at that.

[14]    Now this appears, there's handwriting on this [15] document, is that your handwriting?

[16]    A Yes it is.

[17]    Q And this is your signature at the bottom here?

[18]    A Yes it is.

[19]    Q And it's dated, what's the date on there?

[20]    A April 9, 2002.

[21]    Q On the top of this it says complaint for [22] protection from abuse, do you see that?

[23]    A Yes.

[24]    Q Do you remember filling out a document like this [25] with the information requesting that this order be issued?

### Page 89

[1]    A I don't remember that.
[2]    Q Okay. And your memory is that the judge in that
[3] hearing granted a ten day restraining order?
[4]    A Yes.
[5]    Q What happened after that hearing?
[6]    A I don't remember. That day, you mean?
[7]    Q Yes.
[8]    A I know I called work and let them know but I don't
[9] know what my actions were.
[10]    MR. WILMOT: Okay. I'm going to show you this
[11] document which is marked as 27.
[12]    (DOJ Exhibit No. 27 was marked for [13] identification.)
[14]    BY MR. WILMOT:
[15]    Q Do you recognize that document?
[16]    A Yes.
[17]    Q And what is that?
[18]    A Abuse Prevention Order.
[19]    Q And do you see any date on that document?
[20]    A No I don't.
[21]    Q Take a look at the second page.
[22]    A Okay. I recognize it.
[23]    Q Is there a date on that document?
[24]    A Yes.
[25]    Q And what is the date?

### Page 90

[1]    A April 9, 2002 and April 23, 2002.
[2]    Q Okay. So April 9, as you just described, is the [3] day that
you had a hearing, correct?
[4]    A Yes.
[5]    Q And you said that on that day the judge issued you [6] a
ten day restraining order?
[7]    A Yes.
[8]    Q The document we are looking at which is marked
[9] Exhibit 27, I think. Could this be the restraining order [10] that
you were referring to?
[11]    A Yes.
[12]    Q Okay. So does that change your testimony then [13] that
the document marked as No. 26 is the restraining order?
[14]    A I thought they were the same thing but I guess [15] not.
[16]    Q Well looking at Exhibit 26 for a moment. At the [17] top it
says, I don't know if it's cut out or what it is, it [18] says page 2.
[19] Do you believe that there was another document [20] that
accompanied this document marked as Exhibit 26?
[21]    A I don't know.
[22]    Q Okay. If you could turn to the second page of 27. [23] If
you look at where it say date of order 4/9/02.
[24]    A Okay.
[25]    Q And it says time of order 10:20 a.m. Does that

### Page 91

[1] sound about right that your hearing was in the morning
[2] around or about 10:20 in the morning?
[3]    A Yes.
[4]    Q Okay. Do you see where it says expiration date of
[5] order 4/23/02?
[6]    A Yes.
[7]    Q Is that your understanding that the restraining [8] order
was for that timeframe from the 9th of April to April [9] 23, 2002?
[10]    A That's my understanding, yes.
[11]    Q Okay. So it was a little longer than ten days?
[12]    A Yes.
[13]    Q Okay. Now did you you said you called or you [14] think
you may have called the Bureau to let them know that a
[15] restraining order was issued?
[16]    A I think, yes.
[17]    Q Do you have a memory as to who you spoke with?
[18]    A No.
[19]    Q Okay. You just have a memory of letting them know
[20] that there was a restraining order?
[21]    A Yes.
[22]    Q Did you send the restraining order to the Bureau [23] at
that time?
[24]    A I don't remember.
[25]    Q Do you remember if that was on the 9th as well,

### Page 92

[1] the same that you, that the order was issued?
[2]    A I believe, no, I definitely spoke to somebody on [3] the 9th,
but I don't know if I sent out the restraining [4] order on the 9th.
[5]    Q Okay.
[6]    A The ten day restraining order.
[7]    Q Do you have a memory of speaking with Steve Gagnon
[8] at some point?
[9]    A No. Fernando Messer.
[10]    Q Your remember speaking with Fernando Messer?
[11]    A Yes.
[12]    Q Do you remember when you first spoke with him?
[13]    A April 9th, the day after.
[14]    Q The day after. Can you describe your conversation
[15] with Fernando Messer?
[16]    A I think he said that the warden approved admin [17] leave
for me, a few more days or something, but I don't [18] remember
the exact, it wasn't a long conversation.
[19]    Q Okay. And did you speak with anyone else, other
[20] than Fernando?
[21]    A I don't remember.
[22]    MR. WILMOT: Okay. I'm going to show you what is
[23] marked as Exhibit 28.
[24]    (DOJ Exhibit No. 28 was marked for [25] identification.)

Page 93

[1] BY MR. WILMOT:

[2] Q Do you recognize that document?

[3] A Yes I do.

[4] Q Can you identify what it is?

[5] A It is a referral to an Employees Assistance [6] Program from my supervisor Steve Gagnon.

[7] Q And what's the date of this document?

[8] A April 10, 2002.

[9] Q Do you remember when you received this?

[10] A I don't.

[11] Q Do you remember how you received it?

[12] A I don't.

[13] Q Do you remember if it was given to you in person [14] or by mail?

[15] A I don't remember.

[16] Q Do you remember having any discussions at all with [17] Steve, is it Gannon or Gagnon?

[18] A Gagnon.

[19] Q Gagnon. Do you remember having a conversation [20] with him about the Employees Assistance Program?

[21] A No.

[22] Q No. At any point?

[23] A I remember the letter I got, but I just don't know [24] how I received it or when I received it.

[25] Q Do you remember talking about the Employees

Page 94

[1] Assistance Program with Steve Gagnon?

[2] A No.

[3] Q Okay. Not at any point?

[4] A I don't remember.

[5] Q Okay.

[6] THE WITNESS: Could I take a break to use the [7] lady's room?

[8] MR. WILMOT: Absolutely.

[9] MS. MCDONALD: Actually are we going to break for [10] lunch?

[11] Mr. WILMOT: What time is it?

[12] MS. MCDONALD: It's 12:30.

[13] (Whereupon, at 12:30 p.m., a luncheon recess was [14] held.)

Page 95

[1] A F T E R N O O N S E S S I O N

[2] (1:20 p.m.)

[3] BY MR. WILMOT:

[4] Q You testified earlier that you were on admin leave [5] following the incident April 8, 2002?

[6] A Yes.

[7] Q How long were you on admin leave for?

[8] A I think it was from when I left on Monday and [9] Tuesday, Wednesday, Thursday and Friday.

[10] Q So the remainder of that week?

[11] A Yes.

[12] Q Okay. And when did you return back to work?

[13] A That following Monday.

[14] Q Before returning to work the following Monday, did [15] you speak with your supervisor or anyone else within BOP [16] concerning your return?

[17] A I believe so, yes.

[18] Q Do you remember who?

[19] A Fernando Messer is the only one I remember talking [20] to that week.

[21] Q And what did you talk about with Fernando?

[22] A At first, I was granted two days admin leave.

[23] Q Okay.

[24] A And then when I spoke with him, he told me I was [25] approved for the rest of the week. I remember him telling

Page 96

[1] me that.

[2] Q Did you ask for that leave?

[3] A No.

[4] Q So you were told by Fernando that you would be put [5] on leave for the rest of the week?

[6] A Yes.

[7] Q When were you told that?

[8] A I don't remember. It was during that week. I [9] just don't remember which day.

[10] Q You said you were initially put on two days [11] administrative leave, correct?

[12] A Correct.

[13] Q So that would take you to Wednesday, correct?

[14] A No I think Tuesday. The remainder of Monday was [15] admin leave.

[16] Q Okay.

[17] A And then that Tuesday.

[18] Q All right. So not two in addition to that Monday [19] but to Monday until Tuesday?

[20] A I believe so, yes.

[21] Q Okay. So you were planning to come back to work [22] on Wednesday?

[23] A Yes I was.

[24] Q And you were ready to return to work on Wednesday?

[25] A No I wasn't.

## Page 97

[1]    Q And why weren't you?

[2]    A I was a mess.

[3]    Q Okay.

[4]    A I was in a fog.

[5]    Q Did you express that to Fernando?

[6]    A Yes I did. Because I was crying on the phone to [7] him, so yes.

[8]    Q Do you remember when that conversation was?

[9]    A I don't. I want to say it was that Tuesday, the [10] day that I got the ten day restraining order. I know I [11] spoke to him that day but I'm not positive that was.

[12]    Q So if you were to return to work on Wednesday, do [13] you have a memory of calling Fernando the day of that you [14] were going to come to work and telling him that you were a [15] mess, or do you think you had that conversation before [16] Wednesday?

[17]    A Had that conversation before Wednesday.

[18]    Q So. That conversation with him was either [19] Monday or Tuesday?

[20]    A Yes.

[21]    Q Okay. And during that conversation was when he [22] told you that he put you on admin leave for the rest of the [23] week?

[24]    A Yes.

[25]    Q Did you object to that?

## Page 98

[1]    A No.

[2]    Q Were you pleased with being on leave for the rest [3] of the week?

[4]    A Yes.

[5]    Q And other than that conversation with Fernando, [6] did you have any other contact with any of your supervisors [7] or HR here at BOP?

[8]    A I don't remember.

[9]    Q Okay. So you were planning to return the [10] following Monday?

[11]    A Yes.

[12]    Q Which would have been April 15th?

[13]    A 16th is it? April 15th, yes.

[14]    Q 15th. Okay. Prior to your returning on the 15th, [15] did you speak with anyone that led them to inquire as to [16] what the BOP was doing?

[17]    A Yes.

[18]    Q You did. And who did you speak to?

[19]    A Fernando Messer.

[20]    Q Okay. So you had a conversation with him either [21] Monday or Tuesday and then you had another conversation with [22] him or just the same conversation?

[23]    A I had another conversation with him on that [24] Friday.

[25]    Q Okay. And do you remember what you said to him?

## Page 99

[1]    A I don't remember the whole - I just remember him [2] telling me I had to be in work Monday from 6:00 to 2:30.

[3]    Q Okay.

[4]    A In the mailroom.

[5]    Q And what were your hours before he told you that?

[6]    A 6:30 to 3:00 that month.

[7]    Q Okay. Now you say that month, did your schedule [8] change—

[9]    A Mondays our schedule changes.

[10]    Q –from time to time?

[11]    Okay. Remember to wait for me to finish my [12] question before you begin to answer.

[13]    A Okay.

[14]    Q So you're saying that monthly your schedule would [15] change?

[16]    A Yes.

[17]    Q And how did it change month to month?

[18]    A It would, the hours are 6:30 to 3:00. 7:30 to [19] 4:00 and I'm not sure there's a 9:30 to 6:00, but I'm not [20] sure when that started. You know, if it was during that [21] time or it started a year later. But I know there's a 9:30 [22] to 6:00.

[23]    Q And you said 7:30 to 4:00, is that 7:30 p.m. to [24] 4:00 p.m.?

[25]    A 7:30 a.m. to 4:30 p.m.

## Page 100

[1]    Q Okay. And the 9:30 to 6:00. That's 9:30 a.m. to [2] 6:00 p.m.?

[3]    A Yes.

[4]    Q Okay. In Systems Management, is that right? I'm [5] sorry, what's your department name?

[6]    A Inmate Systems Management.

[7]    Q Okay. In your department, you never had to work [8] overnight or anything like that?

[9]    A No.

[10]    Q So these three shifts that you described, are the [11] three shifts that you would have to work in your department?

[12]    A Yes.

[13]    Q Okay. And from month to month, you would shift [14] between these three different shifts that you just [15] described?

[16]    A Yes.

[17]    Q Okay. All right. So you were told by Fernando [18] that your hours would be 6:00 to 2:30?

[19]    A Yes.

[20]    Q Did he tell you anything else?

[21]    A Not that I can recall.

[22]    Q Did he tell you why he was doing that?

[23]    A Not that I can recall.

[24]    Q Did he tell you or did you ask him about Reynoso?

[25]    A Not that I remember.

**Page 101**

[1]    Q Do you remember if he told you that he was [2] changing Officer Reynoso's schedule as well?

[3]    A I don't remember.

[4]    Q Okay. And you said you don't remember if you [5] asked?

[6]    A No, I don't remember.

[7]    Q Do you remember if you asked him why your schedule [8] was being changed?

[9]    A I don't remember.

[10]    Q Did he object to your schedule being changed to [11] 6:00 a.m. to 2:30 p.m.?

[12]    A In reference to Fernando Messer?

[13]    Q Yes.

[14]    A I don't remember. I don't think so but I don't [15] remember.

[16]    Q Okay. So what happened next after your [17] conversation with Fernando? Your next contact with someone [18] here at the BOP?

[19]    A I was at work that following Monday.

[20]    Q Okay. And where did you report into that [21] following Monday?

[22]    A I honestly don't remember. I don't know if I came [23] in and got the mail and brought it out to the outside [24] mailroom—

[25]    Q When you say came in, is that the main building?

**Page 102**

[1]    A It's the main building, yes. But I don't remember [2] if that's what it was.

[3]    Q Okay. Would that be - how would you typically [4] start your day?

[5]    A I would come into the main institution. I would [6] collect inmate outgoing mail and stack outgoing mail and [7] gather it all up and meet our inmate orderly outside the [8] main institution, and then we would drive me to the [9] mailroom. The outside mailroom.

[10]    Q And that's how you would start each day typically?

[11]    A Yes. When I was the early person.

[12]    Q Okay. And when you say you were the early person, [13] you mean someone who was working in this 6:30 a.m. shift?

[14]    A Yes.

[15]    Q Okay. And from where would you gather the inmate [16] and staff outgoing mail?

[17]    A The inmate legal mail, outgoing legal mail, is [18] located all of the way down the other end of the compound, [19] near food service—

[20]    Q Okay.

[21]    A —which is about a quarter mile down. And the [22] regular inmate mail is located in the main building. And [23] the staff mail is located in the inside mailroom. And I [24] would gather that all up and go outside.

[25]    Q When you're in the main building, do you have to

**Page 103**

[1]    go through Control to get to those areas that you just [2] described in the building.

[3]    A Yes.

[4]    Q You did. Okay. So that morning, you remember [5] coming into the main building and picking up the inmate and [6] staff outgoing mail?

[7]    A I don't remember if I did that. That would be my [8] duties, but I don't remember.

[9]    Q Okay. And do you remember speaking with anyone [10] when you came in that morning? Any supervisors or anyone [11] from HR?

[12]    A No.

[13]    Q Did you speak with your supervisor? No?

[14]    A No. They're not in that early.

[15]    Q At some point during that day, did you speak to [16] one of your supervisors?

[17]    A I don't remember.

[18]    MR. WILMOT: Okay. I am going to show you this [19] document here, which is marked as Exhibit 29.

[20]    (DOJ Exhibit No 29 was marked for [21] identification.)

[22]    BY MR. WILMOT:

[23]    Q Do you recognize that document?

[24]    A Yes.

[25]    Q Can you identify it for me please?

**Page 104**

[1]    A It's a letter from the warden to me saying what my [2] hours are that I'm assigned to as of April 15th. If I have [3] any questions, to contact Human Resources Manager, Cindy [4] Lord.

[5]    Q Okay. At the bottom of that document is a [6] signature. Can you read that signature?

[7]    A Colleen O'Donnell.

[8]    Q Is that your signature?

[9]    A Yes.

[10]    Q Is it dated?

[11]    A Yes.

[12]    Q What's the date?

[13]    A April 15, 2002.

[14]    Q Do you have a memory signing that document?

[15]    A Yes.

[16]    Q Do you remember who presented the document to you?

[17]    A Yes.

[18]    Q Who gave you that document to sign?

[19]    A Lois Swiderski.

[20]    Q Lois Riderski?

[21]    A Swiderski, yes.

[22]    Q Swiderski. Can you spell her last name?

[23]    A I believe it's S-W-I-R-D-E-S-K-I.

[24]    Q And who is Lois Swiderski?

[25]    A She was the Assistant Human Resources Manager.

Page 105

[1]  Q Okay. And how did you know to meet with Ms.
[2]  Swiderski that day?
[3]  A She came over to the mailroom.
[4]  Q Okay. Do you know what time?
[5]  A No.
[6]  Q And when she came into the mailroom, where did you
[7]  discuss that letter?
[8]  A There's a little lunch area that you can shut the [9] door
and there's nobody in that area if you shut the door.
[10]  Q Okay. Was anyone else in that meeting with you [11] and
Lois?
[12]  A No.
[13]  Q Okay. And what did Lois tell you?
[14]  A She just actually handed me the letter and told me [15] to
read it and sign it.
[16]  Q Okay. Did you ask her any questions?
[17]  A Yes.
[18]  Q What did you ask her?
[19]  A I told her first that I didn't want to sign it [20] because I
didn't think that was appropriate.
[21]  Q And why was that?
[22]  A Because I didn't do anything wrong so I shouldn't
[23]  have to, I shouldn't have to sign it.
[24]  Q You told her that you didn't do anything wrong and
[25]  you shouldn't have to sign it?

Page 106

[1]  A Yes.
[2]  Q What did you believe this letter to be?
[3]  A Changing my hours.
[4]  Q Did you believe it was a form of discipline?
[5]  A Yes.
[6]  Q And why did you believe that?
[7]  A Because they changed my hours.
[8]  Q So because they changed your hours from 6:30 a.m.
[9]  starting time, to 6:00 a.m. starting time, you thought that
[10]  was a form of discipline?
[11]  A Yes.
[12]  Q Okay. Anything else that you're basing that
[13]  conclusion on other than the fact that your hours changed?
[14]  A That day, no. It was just because my hours
[15]  changing.
[16]  Q Okay. So because your hours changed, you felt [17] that
you were being disciplined?
[18]  A Yes.
[19]  Q And what was her response to that statement?
[20]  A I remember saying I don't want to sign and she [21] said
why not? And I explained and she said oh no, it's not [22] that, just
sign it or something, I don't remember the whole [23] conversation.
[24]  Q Okay.
[25]  A I just remember being a little startled by it.

Page 107

[1]  Q Now you said Fernando Messer told you that on
[2]  Friday, right? That your hours were being changed to these
[3]  hours?
[4]  A Yes.
[5]  Q So why were you startled come Monday?
[6]  A Seeing it in writing from Human Resources I felt [7] as
though it was a discipline instead of Fernando just [8] telling me
hey, you're coming in 6:00 on Monday. 6:00 to [9] 2:30.
[10]  Q Okay. Did the words discipline or anything like [11] that
appear in that letter?
[12]  A Yes.
[13]  Q Can you point that out to me?
[14]  A My schedule being changed. I feel as though it's
[15]  discipline.
[16]  Q Okay. Other than that, anything in that letter [17] that
indicates that you're being disciplined?
[18]  A Yes.
[19]  Q And what's that?
[20]  A The overtime.
[21]  Q Can you elaborate on that? What do you mean?
[22]  A In the letter it says if you plan to work outside [23] of
these hours for any reason, in parentheses overtime, you [24] must
notify your supervisor prior to working and that's [25] nobody else
in the institution has to do that, so I don't

Page 108

[1] understand why I had to do that.
[2]  Q Okay. Before the date of this letter or before [3] April 15,
2002, had you informed the Bureau that you had [4] obtained a
restraining order against David Reynoso?
[5]  A Yes.
[6]  Q And what were Officer Reynoso's hours or duty [7] hours
before your restraining order against him?
[8]  A I believe 8:00 a.m. to 4:00 p.m.
[9]  Q Okay. And he worked in the main building, [10] correct?
[11]  A Yes.
[12]  Q And did Lois explain at all why they were changing
[13]  your hours or not allowing as you're saying to do overtime?
[14]  A I don't recall.
[15]  Q Do you remember if she mentioned Officer Reynoso
[16]  at all in that conversation?
[17]  A I don't remember.
[18]  Q If you look at the third paragraph of this letter. [19] It says
there you are not to contact the plaintiff (in [20] person or
telephonically) or associate with David Reynoso, [21] Intelligence
Officer at any time. Do you see that?
[22]  A Yes.
[23]  Q Did you feel that was a form of discipline?
[24]  A I don't remember at that time if I did.
[25]  Q Okay. Looking at it now, do you feel that was a

### Page 109

[1] form of discipline?

[2]   A Yes.

[3]   Q To restrict you from contacting Officer Reynoso?

[4]   A Yes.

[5]   Q And why do you believe that?

[6]   A Because I didn't do anything wrong and so I [7] shouldn't have any type of restriction on me whatsoever.

[8]   Q Okay. But you did have a restraining order [9] against him, right?

[10]   A Yes.

[11]   Q So it's your belief that if he was restricted from [12] contacting you, you shouldn't be restricted from contacting [13] him?

[14]   A Yes.

[15]   Q Okay. And did Lois say anything else in that [16] meeting?

[17]   A I don't remember.

[18]   Q So you did ultimately sign the letter, correct?

[19]   A Correct, yes.

[20]   Q And did you do so in that meeting with Lois?

[21]   A Yes.

[22]   Q And why did you decide to finally sign the letter [23] but at first you didn't want to?

[24]   A I don't - I was in a fog. I don't know why I [25] signed it afterwards. I just signed it.

### Page 110

[1]   Q Okay. And you gave it back to Lois at that time?

[2]   A I believe so. She was right in front of me when I [3] signed it so.

[4]   Q Okay. And do you remember if she said to you this [5] isn't a form of discipline?

[6]   A I don't remember. No.

[7]   Q Okay. I think you said earlier that when you [8] first rejected to signing it, you said that because you [9] thought or you said that you didn't do anything wrong.

[10] I believe you said that her response was no, it's [11] nothing like that. What did you mean by that?

[12]   A That she was saying that it's not - this isn't a [13] discipline for me.

[14]   Q Okay. And were you aware at that time that [15] Officer Reynoso's schedule was changed?

[16]   A I don't remember.

[17]   Q Did you become aware of that at some point?

[18]   A Yes.

[19]   Q When did you become aware of that?

[20]   A I don't remember.

[21]   Q Was it before you filed this lawsuit?

[22]   A Yes.

[23]   Q And what is your understanding as to what happened [24] to Officer Reynoso's schedule?

[25]   A That he had to work 4:00 to midnight.

### Page 111

[1]   Q Okay.

[2]   A 4 p.m. to midnight.

[3]   Q And what is your understanding as to why his [4] schedule was changed?

[5]   A Why his schedule was changed?

[6]   Q Any understanding as to why the Bureau changed [7] Officer Reynoso's schedule from 4 p.m. to midnight?

[8]   A Because of the restraining order.

[9]   Q Okay. Let me bring your attention to your [10] Complaint again. Paragraph 11.

[11] There you say, "when plaintiff returned to work, [12] she learned that her hours and duties had been changed and [13] she was reassigned to the mailroom." Do you see that?

[14]   A Yes.

[15]   Q You, in fact, learned that your hours and duties, [16] your hours were changed on Friday from Fernando Messer, [17] correct?

[18]   A Correct, yes.

[19]   Q So this sentence here is inaccurate, isn't that [20] correct?

[21]   A Yes.

[22]   Q You also say here that your duties were changed. [23] Do you see that?

[24]   A Yes.

[25]   Q What duties did you have prior to April 15th that

### Page 112

[1] you longer had on the 15th or did not have before the 15th [2] and now had?

[3]   A I was allowed to go anywhere in the institution. [4] I was allowed to work overtime with my department when we [5] had buses come in and I no longer could do that.

[6]   Q Okay, but this says duties. Would those be [7] duties?

[8]   A Yes.

[9]   Q When we looked earlier at your position statement.

[10] Do you remember that?

[11]   A Yes.

[12]   MR. WILMOT: Want to pull that out for me please?

[13]   MS. MCDONALD: Do you mean her job description?

[14]   MR. WILMOT: Yes. Her job description.

[15]   MS. MCDONALD: Is it over there?

[16]   MR. WILMOT: I think you just have to go a little [17] bit further.

[18]   MS. MCDONALD: Towards the back.

[19]   THE WITNESS: Oh, yes.

[20]   MR. WILMOT: Okay.

[21]   BY MR. WILMOT:

[22]   Q When you reviewed Exhibit No. 24, you told me that [23] encompassed your duties and responsibilities as an ISO. Do [24] you remember that testimony?

[25]   A Yes I remember it.

### Page 113

[1]    Q In that document, does that describe that working
[2] overtime as one of your duties and responsibilities as an
[3] ISO?
[4]    (Witness reviews document.)
[5]    A No.
[6]    Q It does not?
[7]    A No. Oh, I'm sorry. I didn't realize the last [8] page.
[9]    Q Okay.
[10]    A No.
[11]    Q And did you see anywhere in that document it
[12] stating that one of your duties and responsibilities as an
[13] ISO is to go anywhere on the compound as you just
described?
[14]    A Yes.
[15]    Q And where is that?
[16]    A Responding to emergencies.
[17]    Q And what page is that?
[18]    A The second page.
[19]    Q Okay. And where on the second page are you
[20] looking?
[21]    A The last paragraph.
[22]    Q Okay. Can you read that section that you're [23] talking
about?
[24]    A Yes.
[25]    Q Or a portion of this document that you're talking

### Page 114

[1] about?
[2]    A "Specific correctional responsibilities include [3] custody
and supervision of inmates, responding to [4] emergencies and
institution disturbances, participating in [5] fog and escape patrols
and assuming correctional officer [6] post when necessary."
[7]    Q Okay. So it's your testimony that this sentence [8] is
saying that one of your duties and responsibilities is to [9] go at
various locations on the compound?
[10]    A Yes.
[11]    Q Okay. From when your hours changed on the 15th,
[12] have any of these scenarios as described in that sentence
[13] occurred?
[14]    A Yes.
[15]    Q So there have been emergencies or disturbances at
[16] the institution where someone from your department was
[17] needed and you were not able to respond?
[18]    A Fog watch. No emergency. But fog watch.
[19]    Q So there was a fog watch. What's a fog watch?
[20]    A The institution gets really foggy and the inmates [21] are
not allowed outside their, out of their cells or [22] whatever unless
there are people surrounding the perimeter [23] of the prison to
watch them go back and forth.
[24]    Q And so you were unable to participate in that?
[25]    A Actually I did. I did participate in that.

### Page 115

[1]    Q Okay.
[2]    A I was the only person. So I was ordered on fog [3] watch.
[4]    Q Okay. Other than the fog watch, is there anything [5] else
in this sentence that you were precluded from doing [6] after April
15, 2002?
[7]    A Not that I'm aware of, no.
[8]    Q Okay. So is it fair to say that your duties you [9] described
to me that the duties you felt were changed were [10] one, the
ability to go to different places in the compound. [11] And I believe
the second one was working overtime.
[12] Is it fair to say first that overtime is not a [13] duty or
responsibility of an ISO?
[14]    A No it is not fair to say.
[15]    Q Didn't you just read this document and told me it [16] is
no where listed in here as a duty and responsibility?
[17]    A Yes. It's not written in here but it's required.
[18]    Q Working overtime is required of an ISO?
[19]    A Yes.
[20]    Q Okay.
[21]    A When special buses come in.
[22]    Q Okay. All right. Are you familiar with the [23] disciplinary
procedures within the agency?
[24]    A I'm familiar with them, yes.
[25]    Q What are typically the steps before you are given

### Page 116

[1] discipline?
[2]    A I believe there is a warning. You sit down with [3] your
supervisor and you talk, is a warning. There is a [4] written warning
after that. And I don't know if there is an [5] investigation after that,
or exactly what that is.
[6]    Q And then what, after the investigation, what [7] happens, if
there is one?
[8]    A The investigator would report his findings to the
[9] warden. And the warden would make a decision on what
[10] disciplinary, you know, what discipline should be given.
[11]    Q Are there circumstances where those steps would
[12] be, the initial steps would be skipped and the warden could
[13] go right to disciplining an employee?
[14]    A I don't know.
[15]    Q Did any of those steps you described occur prior [16] to
your receiving a letter you signed on April 15, 2002?
[17]    A (No verbal response.)
[18]    Q Were you received a warning, an investigation, [19] etc.,
as you described?
[20]    A Before?
[21]    Q Before you received the letter that you signed on
[22] April 15, 2002. The letter that you had stated was a form
[23] of discipline. Did any of the steps that you just described
[24] happen before you received that letter on April 15, 2002?
[25]    A No.

### Page 117

[1]    Q Okay. Turning back to your Complaint. Paragraph [2] No.
11. That second sentence says Reynoso's duties and
[3] assignment remain the same. Do you see that?
[4]    A Yes.
[5]    Q Is that a true statement?
[6]    A Yes.
[7]    Q So his assignment did not change?
[8]    A No.
[9]    Q And his duties did not change?
[10]    A Not that I know of.
[11]    Q Okay. His hours did change though, correct?
[12]    A Yes.
[13]    Q Okay. Your next sentence in 12 says "in addition [14] to
changes in hours and assignment, plaintiff was otherwise
[15] objected to unequal terms and conditions of employment
based [16] upon her gender." Do you see that?
[17]    A Yes I do.
[18]    Q How did your assignment change?
[19]    A I wasn't allowed to stay for buses that came in [20] with
the rest of my coworkers.
[21]    Q So your assignment - well, explain to me what an
[22] assignment it is, maybe I'm not following you?
[23]    A It's basically our job, what we have to do. You [24] know,
like you're in the mailroom; you're working 6:00 to [25]  3:30 or
whatever, 6:00 to 2:30. You have a bus coming in so

### Page 118

[1] you do your job in the mailroom and you're assigned to go
[2] into receiving and discharge in the main building to help
[3] process inmates in.
[4] And so, I had to leave by 3:00 so I wasn't allowed [5] to
process inmates in with the rest of my coworkers.
[6]    Q Okay. Any other part of your assignment that was
[7] changed?
[8]    A Yes.
[9]    Q And what is that?
[10]    A I was told in January 2003 that I would be going
[11] back - I would be coming into R&D in the main building by
[12] the warden and then I was told a couple of days later that I
[13] had to stay out in the mailroom.
[14]    Q Okay.
[15]    A So it was changed. My rotation was supposed to be
[16] R&D in January 2003 and they wouldn't let me come back in.
[17]    Q Okay. Now your position at the time was still [18] ISO,
correct?
[19]    A Correct.
[20]    Q All right. And that has not changed at least, [21] correct?
[22]    A Correct.
[23]    Q Has you grade changed at all?
[24]    A Yes. I think I went from a 7-5 to a 7-6.
[25]    Q Okay.

### Page 119

[1]    A Like every couple of years you get a step [2] increase.
[3]    Q All right. So your grade has increased. Has [4] there been
a decrease in your grade?
[5]    A No.
[6]    Q When you returned on April 15, did your salary or [7] your
pay change?
[8]    A No.
[9]    Q Has there been any decrease in your pay?
[10]    A No.
[11]    Q Has there been any decrease in your benefits?
[12]    A No.
[13]    Q Okay. Did you know that Officer Reynoso's [14] overtime
was restricted as well?
[15]    A No I did not. I don't remember. I can't say for [16] sure.
[17]    Q All right. So when you returned on the 15th and [18] you
were working this new schedule, did you have any
[19] conversations or any discussions at all about Officer
[20] Reynoso or your new schedule with any supervisors or
anyone [21] from HR?
[22]    A I remember Lois Swiderski coming out to the
[23] mailroom to discuss my new hours and give me the letter. I
[24] don't remember who I spoke to or if I did or I didn't speak
[25] to anyone.

### Page 120

[1]    Q Okay. Did you have any interaction with Reynoso [2] after
April 15, 2002?
[3]    A At work?
[4]    Q At work or anywhere else?
[5]    A Yes.
[6]    Q Can you describe that?
[7]    A There was telephone conversations between the two [8] of
us.
[9]    Q When was the first one?
[10]    A The week that I was out on admin leave. After the
[11] incident happened.
[12]    Q The week?
[13]    A April 8.
[14]    Q Okay. When was that telephone conversation?
[15]    A It was either that Tuesday or Wednesday. I don't
[16] remember.
[17]    Q Okay. And do you remember if he called you or did
[18] you call him?
[19]    A A woman called me and he was with this woman.
[20]    Q Okay. And he was on the phone?
[21]    A Yes.
[22]    Q And what did he say?
[23]    A Don't listen to a word she's saying. Something [24] like
that. Because the woman was telling me that she had [25] been
dating Reynoso for awhile. He said don't listen to a

Page 121

[1] word she's saying.
[2]    Q She being who?
[3]    A The woman who called me, Danielle Weaver.
[4]    Q So Reynoso was saying to you don't listen to a [5] word Danielle Weaver was saying?
[6]    A Yes.
[7]    Q And what was Danielle Weaver telling you?
[8]    A That they were together since a long time; I don't
[9] remember the exact dates. But she was seeing him the whole
[10] time he was seeing me.
[11]    Q And he was telling you to disbelieve the woman?
[12]    A Yes.
[13]    Q And they're both on the phone together at that [14] time you said?
[15]    A He, I think he took the phone from her, they [16] weren't, they were on the same line.
[17]    Q Okay. And what was your response to that phone [18] call?
[19]    A I just cried a lot.
[20]    Q Did you speak again that week?
[21]    A That week, no.
[22]    Q Okay. When was the next time you spoke to Officer [23] Reynoso?
[24]    A Probably, I don't know the exact date, it was a [25] week or two later. I was already back at work.

Page 122

[1]    Q Okay. And do you remember what you spoke about
[2] then?
[3]    A Just he misses me and he's sorry that she called.
[4] That's all I really remember.
[5]    Q And did he call you?
[6]    A Yes, from a pay phone.
[7]    Q How do you know it's a pay phone?
[8]    A Because I have caller I.D. and it was like this [9] strange number, so I picked it up.
[10]    Q He called you at home?
[11]    A Yes.
[12]    Q And what did you say to him?
[13]    A I really don't remember. It was a lot of crying.
[14]    Q Was he trying to reconcile your relationship?
[15]    A I don't know.
[16]    Q After the 15th, did you ever talk to him about
[17] reconciling your relationship?
[18]    A I don't remember. We talked about our [19] relationship but I don't know if we talked about [20] reconciling.
[21]    Q Okay. After this phone call from the pay phone, [22] do you remember the next time you spoke with Reynoso?
[23]    A A couple of months had gone by. So I don't - I [24] want to say August, September but I'm not 100 percent sure. [25] I don't know.

Page 123

[1]    Q What do you remember about that conversation?
[2]    A I really don't - I don't know if I blocked, I [3] really don't remember a lot of the conversations.
[4]    Q Okay. Was that over the telephone?
[5]    A Yes. It was a lot of, like I said, crying.
[6]    Q Did you run into Reynoso at work?
[7]    A Yes.
[8]    Q Have a conversation with him at work?
[9]    A No I ran into him at work.
[10]    Q You did?
[11]    A Yes.
[12]    Q And when was that?
[13]    A I was working overtime and I was leaving the
[14] institution and he was coming in.
[15]    Q Where were you working the overtime?
[16]    A It was a Custody post. It was a midnight to 8:00
[17] overtime. 8 a.m. It was something in Custody; I just don't
[18] recall where it was.
[19]    Q Do you know when this was?
[20]    A No.
[21]    Q Was it in 2002?
[22]    A Yes, I believe so.
[23]    Q Okay. And this was, what day of the week was [24] this?
[25]    A It was a weekend. So Saturday or Sunday. I don't

Page 124

[1] know which day though.
[2]    Q Okay. Do you remember generally what month it was
[3] in 2002?
[4]    A No.
[5]    Q So you ran into him. You said you were leaving [6] and he was coming in. Where did this occur?
[7]    A In the staff parking lot.
[8]    Q Okay. So he was coming into the parking lot?
[9]    A No he was physically walking into the prison and I
[10] was physically walking out going to my car.
[11]    Q Okay. And what happened when you saw him and he
[12] saw you?
[13]    A Nothing. He just shook his head.
[14]    Q Did he continue, did he proceed to come inside the
[15] institution?
[16]    A Yes, that I saw. Yes.
[17]    Q And you walked out?
[18]    A I got in my car.
[19]    Q So did you physically pass each other?
[20]    A Yes.
[21]    Q Okay. Did you exchange any words or anything?
[22]    A No.
[23]    Q After April 15, 2002, did Reynoso ever threaten [24] you
[25] in any way?
[25]    A No.

## Page 125

[1]    Q Other than this incident in 2002, did you ever [2] come into contact, physical contact, with him on the [3] compound?

[4]    A After that incident, the compound? Not that I can [5] remember.

[6]    Q Okay.

[7]    A I mean, I don't remember. Can I run to the ladies [8] room again?

[9]    MR. WILMOT: Sure.

[10]    (Off the record from 2:04 to 2:07 p.m.)

[11]    BY MR. WILMOT:

[12]    Q You mentioned that after April 15, 2002, that [13] Reynoso didn't threaten you again. Did he threaten you [14] prior to that day?

[15]    A Yes.

[16]    Q Can you describe those threats to me?

[17]    A He'd just basically tell me that if I went to the [18] police he would kill me. Kill my family.

[19]    Q He said he would kill you for going to the police [20] about what?

[21]    A He used to hit me a lot and he would tell me that [22] he would kill me.

[23]    Q Now prior to April 15, 2002, when was the last [24] time that he made that type of statement to you?

[25]    A I don't remember.

## Page 126

[1]    Q Okay. Was it soon before your return back to [2] work?

[3]    A No.

[4]    Q Was it sometime before that?

[5]    A Yes.

[6]    Q How much time?

[7]    A I don't remember but I know it was maybe a month.

[8]    Q A month before you returned back to work?

[9]    A Yeah. Before April 15th, maybe, anywhere within [10] that month.

[11]    Q And what were the circumstances of that discussion [12] when he threatened you?

[13]    A I had gone out with some friends of mine and he [14] got mad and he left that message on my machine. And then I [15] saw him the next day, and it got a little physical. And I [16] threatened to go to the cops again and he said he would kill [17] me.

[18]    Q And so your memory is that occurred the day after [19] the message that you identified earlier?

[20]    A Yes.

[21]    Q What is the date on that message?

[22]    A March 23, 2002.

[23]    Q Okay. So your memory is March 24, 2002 the last [24] time he threatened you or threatened to kill you?

[25]    A Yes, that I can recall. Yes.

## Page 127

[1]    MR. WILMOT: Okay. I am going to show you what [2] has been marked as Exhibit 30.

[3]    (DOJ Exhibit No. 30 was marked for [4] identification.)

[5]    BY MR. WILMOT:

[6]    Q Do you recognize that document?

[7]    A Yes.

[8]    Q And what is it?

[9]    A It is a memorandum from me to the warden and I [10] carbon copied Steve Gagnon; Robert Lora, EEO counselor, [11] and Mark Shaughnessy who is a chief steward for the union.

[12]    Q Okay. Here it says that you were informed April [13] 8, 2002 David Reynoso was arrested by the Nashua State [14] Police following a violent attack. Do you remember [15] informing the warden that Reynoso was arrested?

[16]    A No.

[17]    Q Do you know whether or not the warden knew Reynoso [18] was arrested by the state police before the date of this [19] memorandum?

[20]    A I don't remember.

[21]    Q Okay. And what's the date on this memo?

[22]    A May 13, 2002.

[23]    Q All right. You also say in this sentence that the [24] attack occurred during your duty free lunch period. Do you [25] see that?

## Page 128

[1]    A Yes I do.

[2]    Q When do you typically take lunch when you are an [3] ISO working that shift back in April of 2002?

[4]    A Anywhere between say like 10:30 and twelve, [5] depending on when we had ahead of us.

[6]    Q And how long were you at lunch period?

[7]    A Thirty minutes.

[8]    Q Thirty minutes?

[9]    A Yes.

[10]    Q Were you out longer than thirty minutes with [11] Officer Reynoso that day of April 8, 2002?

[12]    A I don't know.

[13]    Q Okay.

[14]    A It happened so quickly that I don't know.

[15]    Q Now the second paragraph says that after this [16] incident you notified the following supervisors that you [17] were concerned with your safety, then you list first [18] Fernando Messer. Do you see that?

[19]    A Yes I do.

[20]    Q Do you remember what your discussion was with Mr. [21] Messer when you described you were concerned with your [22] safety?

[23]    A No I don't.

[24]    Q Do you remember when you had that conversation [25] with him?

## Page 129

[1]  A No I don't.
[2]  Q Do you have any general memory as to what you said
[3]  to him about your concern of your safety?
[4]  A I don't remember.
[5]  Q Do you have a memory of speaking to Captain
[6]  Bollinger about your concern with your safety?
[7]  A Yes.
[8]  Q And when did that occur?
[9]  A April 8, the day of the incident.
[10]  Q The day of the incident? Okay. And what is your
[11]  memory of what you told him about your concern for your
[12]  safety?
[13]  A I believe I told him that I think he's going to [14] kill me
for going to the police.
[15]  Q Okay.
[16]  A Or for telling on him. I don't know if it was [17] going to
the police or telling on him in general.
[18]  Q And you also list here Cynthia Lord, Human
[19]  Resources Manager. What is your memory you told Ms. Lord
[20]  about your concerns of your safety?
[21]  A It was the day of the incident also. She was in [22] the
meeting with the warden and me when the incident [23] occurred
and I told them I was scared.
[24]  Q Okay. Did you express to Fernando Messer, Captain
[25]  Bollinger or Cindy Lord other than on April 8, 2002 that you

## Page 130

[1]  were scared for your safety?
[2]  A I don't remember.
[3]  Q Okay. Next it says that following these [4] discussions,
you changed my hours to 7 a.m. to 4 p.m., to 6 [5] a.m. to 2:30
p.m. Do you see that?
[6]  A Yes.
[7]  Q Is that an accurate sentence?
[8]  A I don't believe so.
[9]  Q And what is inaccurate about this sentence?
[10]  A My hours when it occurred, I believe was 6:30 to
[11]  3:00.
[12]  Q Okay. And the next sentence says to date, this is [13] the
only action that you have authorized to. And you have [14] in
quotes "to protect" and then me. Do you see that?
[15]  A Yes.
[16]  Q Why did you put to protect in quotes?
[17]  A I don't know.
[18]  Q Did someone at some point tell you that your hours
[19]  were changed to keep you away from Officer Reynoso?
[20]  A I don't remember.
[21]  Q Do you remember someone at some point telling you
[22]  that the hours were changed to as you put it here, to
[23]  protect you from Officer Reynoso?
[24]  A I don't remember.
[25]  Q Okay. Just a quick question back on the threats

## Page 131

[1]  made by Officer Reynoso.
[2]  Did he ever threaten you here on the compound?
[3]  A Yes.
[4]  Q And did you ever complain to anyone about that?
[5]  A No.
[6]  Q Can you tell me about the times he threatened you
[7]  here on the premises?
[8]  A When he would see me talking to somebody, some
[9]  guy, he used to threaten me.
[10]  Q And what would he say to you?
[11]  A It's over if you continue to talk to him. He only [12] wants
to sleep with you. They talk bad about you Colleen. [13] Don't let
me catch you talking to another guy again. Things [14] like that.
[15]  Q Did he threaten you with any physical harm while
[16]  you were on the compound?
[17]  A I don't recall.
[18]  Q Now you describe a meeting in here with Jerry
[19]  Martinez and Lois Swiderski on April 24, 2002. Do you see
[20]  that there?
[21]  A Yes I do.
[22]  Q Can you describe for me that meeting?
[23]  A I know there was a union representative there. I [24] just
don't remember who it was. And we went in to discuss [25] what's
going on basically with my hours being changed. Him

## Page 132

[1]  still being allowed to have access around the institution
[2]  where I was restricted and they just got - I didn't get any
[3]  good responses from them.
[4]  Q Who called for that meeting?
[5]  A Maybe the union but I'm not a hundred percent. I
[6]  could have though the union called for it. I don't [7] remember.
[8]  Q And do you remember where you met?
[9]  A Yes.
[10]  Q Where was that?
[11]  A The warden's office.
[12]  Q And present at the meeting, do you remember Jerry
[13]  Martinez and Lois Swiderski but you're not sure if there's a
[14]  union person there or not?
[15]  A No. There was a union person.
[16]  Q There was?
[17]  A Yes.
[18]  Q Do you know who that was?
[19]  A No.
[20]  Q Okay. And what did you express to Mr. Martinez [21] and
Ms. Swiderski at that meeting?
[22]  A I don't remember the whole - I just remember
[23]  discussing like my hours. I don't remember.
[24]  Q And when you say you were discussing your hours,
[25]  did you object to the change in your hours?

**Page 133**

[1]  A Yes.

[2]  Q What was your objection?

[3]  A I wanted to work the normal, my normal shift. I [4] didn't want the special shift for me to work the 6:00 to [5] 2:30.

[6]  Q And why was that?

[7]  A Because I didn't think it was fair.

[8]  Q You didn't think what was fair?

[9]  A That they had to make up a special shift for me [10] and I didn't do anything wrong.

[11]  Q Okay. Did you know at that time that Officer [12] Reynoso's shift was changed?

[13]  A Most likely I did. But I don't remember when I [14] found out. I know his shift changed. I just don't know [15] when I found out.

[16]  Q Okay. Do you think that you knew his shift was [17] changed by the time of this meeting, April 24, 2002?

[18]  A I don't remember.

[19]  Q Okay. You say here that you explained to Mr. [20] Martinez and Ms. Swiderski that you felt that your safety [21] was in jeopardy because Reynoso had access to your work [22] schedule, emergency contact information. Do you see that [23] there?

[24]  A Yes I do.

[25]  Q What did you think he was going to do with that

**Page 134**

[1]  information?

[2]  A I don't remember.

[3]  Q Okay. Did Reynoso know where you lived at the [4] time?

[5]  A Yes.

[6]  Q You state in here also that in the past Mr. [7] Reynoso told you that he would watch you while you would [8] work through the surveillance cameras. Do you see that?

[9]  A Yes.

[10]  Q Did that occur after April 15, 2002?

[11]  A Not that I am aware of. I don't know.

[12]  Q Not that you're aware of?

[13]  A Yeah. I don't know.

[14]  Q Well you say here that he would then call you to [15] harass you about who you spoke with while you were walking. [16] Do you have any memory of him calling and doing that?

[17]  A Yes.

[18]  Q After April 15, 2002?

[19]  A Oh, no.

[20]  Q So when you say in the past that he would do that, [21] you meant before April 15, 2002?

[22]  A Yes.

[23]  Q Okay. Now you say here at the end that eighteen [24] days after your April 24, 2002 meeting with Martinez and [25] Swiderski, you were still awaiting a solution but you

**Page 135**

[1]  weren't getting one. What were you waiting for?

[2]  A Back then, I believe I was waiting for just to be [3] normal with my coworkers. Just to work normal hours. I [4] think that's what I was waiting for. I don't know what [5] else. I can't remember.

[6]  Q Okay. So you were at that point, you just wanted [7] to work your old shift?

[8]  A Yes.

[9]  Q Okay. Anything else that you were looking for at [10] that point?

[11]  A For him not to be around at all in the [12] institution.

[13]  Q What do you mean around at all?

[14]  A Well, I just wanted to be able to come and go like [15] a normal worker here. And for him not to be around when I'm [16] coming and going.

[17]  Q Okay. But wasn't that accomplished by changing [18] his hours? For his start time to occur after your duty day [19] ended?

[20]  A No.

[21]  Q That was not? He would still be around?

[22]  A Yes. That's why they changed my hours. So I [23] would not be around and I wanted to be able to roam free. [24] Like be able to come and go in my normal schedule and stuff [25] and I wasn't able to do that.

**Page 136**

[1]  Q Right. Well you just said that you wanted a [2] solution whereas he wouldn't be on the premises when you [3] were on the premises. Is that fair to say?

[4]  A Yes.

[5]  Q And wasn't that accomplished by changing your [6] hours to what they changed it to and changing his hours to [7] what they changed it to?

[8]  A No.

[9]  Q And why is that?

[10]  A Because they changed my hours at - they [11] completely changed my shift compared to what a normal shift [12] in the ISM department was.

[13]  Q Okay.

[14]  A So I had to come in earlier so I wouldn't have to [15] see him instead of allowing me to work my normal hours.

[16]  Q Would you agree that you had both, if both of you [17] stuck to your schedules, you would not be on the premises at [18] the same time?

[19]  MS. MCDONALD: Objection of form.

[20]  A I don't understand the question.

[21]  BY MR. WILMOT:

[22]  Q If you worked the scheduled that you were [23] reassigned to-

[24]  A Okay.

[25]  Q ---and Officer Reynoso worked the schedule that

## Page 137

[1] you understood they changed his schedule to after April 15,
[2] 2002, is it fair to say that you would not be on the [3] premises
at the same time during your duty work hours?
[4]    A Yes. It's fair to say that.
[5]    Q Okay. In the last paragraph you say here that it [6] is
perplexing to you that FMC continues to allow Mr. Reynoso [7] to
remain working at the same facility. Do you see that?
[8]    A Yes.
[9]    Q What did you mean by that? Did you - can you
[10] explain what you meant by that statement?
[11]    A I thought that if you could not carry a firearm, [12] you
could not work here.
[13]    Q So you thought he should have been terminated?
[14]    A Or transferred or removed to the camp.
[15]    Q At this time, May 13, 2002, you felt that when you
[16] said it was perplexing to you that he would be allowed to
[17] remain working at the same facility, you meant that he
[18] should be fired, transferred or removed to the camp? Is
[19] that your testimony?
[20]    A Yes.
[21]    Q Okay. The last sentence here says that you do not
[22] feel that your safety concerns were being seriously
[23] considered. Do you see that?
[24]    A Yes.
[25]    Q And why did you believe that?

## Page 138

[1]    A Again I just have to say to do with my hours. I [2] felt as
though I was treated differently because of it.
[3]    Q Okay.
[4]    A They changed my hours. So I felt, that's what I [5] meant
by that.
[6]    Q Okay. You felt that they should have done [7] something
more?
[8]    A Yes.
[9]    Q What else were you looking for?
[10]    A For him to go back to, go back to the camp or
[11] transferred to a different facility or just something so [12] that I
was able to perform my regular duty hours.
[13]    Q Okay. And did you feel if he were, if they were [14] to do
that, if they were to transfer him to the camp or [15] something like
that, your safety concerns would have been [16] addressed?
[17]    A Yes, in some ways, yes.
[18]    Q And what ways would it have addressed your safety
[19] concerns?
[20]    A Because I would be able to roam the institution
[21] without having to run into him and without him watching me
[22] on the camera and just do my normal daily functions.
[23]    MR. WILMOT: I am going to show you what has been
[24] marked Exhibit 31. [25] //

## Page 139

[1]    (DOJ Exhibit 31 was marked for [2] identification.)
[3]    BY MR. WILMOT:
[4]    Q Do you recognize that document?
[5]    A Yes.
[6]    Q Can you identify what it is?
[7]    A It's a letter to my supervisor, Steve Gagnon, [8] regarding
safety issues.
[9]    Q And do you remember talking to Steve Gagnon about
[10] these safety issues that you address in your memo before
[11] giving him this memo?
[12]    A I don't remember.
[13]    Q Okay. What's the date of this memo?
[14]    A June 10, 2002.
[15]    Q Okay. And how did you deliver it to Steve Gagnon?
[16]    A I don't remember.
[17]    Q Do you remember if you gave it to him by hand?
[18]    A I don't remember.
[19]    Q Do you remember some meeting with Steve Gagnon
[20] after you delivered this memo to him?
[21]    A I don't remember.
[22]    Q Okay. Do you want to take a read of the memo for
[23] the details there? And I'm asking you to read it because I
[24] just want to ask if it refreshes your memory of you speaking
[25] with Steve Gagnon about any of these details that are

## Page 140

[1] contained in your memo?
[2]    A Okay.
[3]    (Witness reviews document.)
[4]    THE WITNESS: I still don't remember if I spoke to [5] him.
[6]    MR. WILMOT: Okay. I'm going to show you what has
[7] been marked as Exhibit 32.
[8]    (DOJ Exhibit No. 32 was marked for [9] identification.)
[10]    BY MR. WILMOT:
[11]    Q Do you recognize that document?
[12]    A Yes, yes.
[13]    Q Can you identify it?
[14]    A It's a memorandum to the warden through Steve
[15] Gagnon from me regarding my safety issues.
[16]    Q And what is the date of that memo?
[17]    A June 12, 2002.
[18]    Q If you compare Exhibit No. 32 and 31 together,
[19] would you agree with me that the content of the memo is
[20] identical?
[21]    A Yes I would.
[22]    Q Any reason why you address the memo that you sent
[23] or you gave to Steve Gagnon on June 10, 2002, why you
would [24] have sent the same memo to the warden on June 12,
2002?
[25]    A I don't know.

Page 141

[1]  Q Do you remember if Steve Gagnon directed you to do
[2]  that?
[3]  A I don't know.
[4]  Q Okay. In that first sentence that says that the [5] purpose
of this memo is to request another assessment of [6] workplace
violence stemming from the situation that occurred [7] on April 8,
2002 between myself and David Reynoso.
[8]  Is it fair to say that there was a workplace [9] violence
assessment of that incident prior to the date of [10] your memo
dated June 12, 2002?
[11]  A Yes. I was told there was.
[12]  Q Who told you that?
[13]  A I talked to so many people. I don't know who told
[14] me. I don't remember.
[15]  Q Do you know who was involved in that assessment?
[16]  A No.
[17]  Q Were you ever spoken to in regards to that
[18] assessment?
[19]  A Can you rephrase that?
[20]  Q Was anyone who was involved in doing assessments;
[21] speak to you about the incident?
[22]  A Not that I'm aware of. I don't even know who was [23] on
the panel. I don't remember who was on the panel,
[24]  Q Do you know what that panel concluded when they
[25] assessed the April 8, 2002 incident?

Page 142

[1]  A That there was no, that it wasn't considered [2] workplace
violence.
[3]  Q Okay. So you were requesting here another
[4] assessment of that incident?
[5]  A Yes.
[6]  Q And why did you want them to conduct another
[7] assessment?
[8]  A Well I spoke to Dr. Susan Bates, EAP counselor, [9] and
she suggested that I write this memorandum.
[10]  Q And when was that conversation?
[11]  A I don't recall. It was prior to this memo, that's [12] all I
remember.
[13]  Q Do you remember how you came to meet with Dr.
[14] Bates?
[15]  A Yes.
[16]  Q How?
[17]  A Steve Gagnon wrote a memorandum suggesting that
[18] I – in light of the situation that happened, that I speak [19] to
an EAP counselor. So I made an appointment with Dr. [20] Bates.
[21]  Q Okay. And how many, how often did you meet with
[22] Dr. Bates?
[23]  A I met with her once and that was it.
[24]  Q So in that one meeting, she suggested that you [25] write
this memo?

Page 143

[1]  A Yes.
[2]  Q Your June 12, 2002 memo?
[3]  A I believe it was that day. I don't remember what [4] date
but she did suggest that I have another workplace [5] violence
committee – suggested that I have another [6] workplace violence
committee meeting.
[7]  Q Okay. And do you remember what you spoke to her
[8] about other than asking for another workplace violence
[9] committee assessment?
[10]  A I believe it was just about my past with David
[11] Reynoso. The abuse.
[12]  Q Okay.
[13]  A I believe that was it but I don't know everything [14] that I
said to her.
[15]  Q Okay. Now in the memo which is Exhibit 32. You
[16] describe in this memo the occasions when you were
[17] threatened with by Office Reynoso, or felt threatened by him.
[18] Prior to the dates of these two memos, the [19] identical
memos, June 10, 2002 and June 12, 2002, had you [20] brought
these threats to the attention of any supervisor [21] with the
department before?
[22]  A Prior to June 10?
[23]  Q Yes.
[24]  A Yes I did.
[25]  Q To who?

Page 144

[1]  A To Cindy Lord, the warden, Fernando Messer, I
[2] believe. I'm not a 100 percent with him.
[3]  Q And I think you testified earlier that you told [4] them that
you thought he would kill you, right?
[5]  A Yes.
[6]  Q Is it your testimony that you described the [7] incidences
that you described in this memo to those persons [8] during those
meetings on April 8, 2002?
[9]  A No. That is not my testimony.
[10]  Q Okay. Well my question was had you ever brought
[11] these incidences to the attention of any supervisor or HR
[12] person within the agency prior to June 10, 2002?
[13]  A Just that he would kill me. That's the only thing [14] that I
brought to their attention.
[15]  Q Okay. So this is the first time that you brought [16] any
specifics to anyone's attention within the agency?
[17]  A Yes I believe so.
[18]  Q Okay. And do you remember what the response was
[19] to this June 12, 2002 memo?
[20]  A Yes.
[21]  Q And what was it?
[22]  A Steve Gagnon asked me to come upstairs with him
[23] which meant to come up on the compound, the admin
building, [24] and he brought me in to see Mr. Meeks, who is the
associate [25] warden at the time.

## Page 145

[1] When I sat down with Mr. Meeks he said there will [2] be no
assessments of workplace violence. There was one and [3] there is
not going to be anymore and that's it.

[4]    Q Did Steve Gagnon say anything in that meeting?

[5]    A No.

[6]    Q Was anyone else present at that meeting?

[7]    A No.

[8]    Q And what did you say in response to what Mr. Meeks

[9] told you?

[10]    A I don't remember if I said anything at all. I [11] think I was
in – I don't remember. I just remember him [12] telling me that. I
don't think I said much.

[13]    Q Okay.

[14]    A It lasted all of five minutes, if that.

[15]    Q Okay. If you look at paragraph 14 of your [16] Complaint.
Paragraph 14 you state that plaintiff advised [17] her supervisors of
threats made against her by Reynoso. Do [18] you see that there?

[19]    A Yes I do.

[20]    Q Are you referring to your conversation with

[21] supervisors on April 8, 2002 in that paragraph?

[22]    A Yes I am.

[23]    Q Okay. In paragraph 15, it says that the [24] plaintiff's
supervisors did not believe her and instead [25] blamed her for the
assault committed upon her and otherwise

## Page 146

[1] made comments in support of Reynoso and against the

[2] plaintiff. Do you see that?

[3]    A Yes.

[4]    Q What comments were you referring to in that

[5] sentence?

[6]    A The warden, when I was discussing issues with [7] regard
to my hours changed, he told me I didn't cause this [8] problem,
you two caused this problem. And I had Brown say [9] to me
during the investigation regarding my AWOL and I don't [10] know
why you and Reynoso can't work this out. I like him, [11] he's a
cool cat.

[12] I also, Lois Swiderski told me that – she said [13] when I was
explaining how I felt my hours shouldn't be [14] changed and all
that, she said that at least when you know [15] he's at work, at
least - I don't remember - at least when [16] he's at work, you know
where he is.

[17] And then Steve Gagnon also said to me when you see

[18] him, when you see David Reynoso, just – it's your

[19] obligation to turn the other way, don't cause any problems.

[20] Even though I had the restraining order on him, against

[21] David Reynoso, he told me that. What else was said to me?

[22] Oh, the warden, when I was coming back in November

[23] 2003, the warden told me I was assigned to come back to

R&D, [24] Receiving and Discharge. And Reynoso was sent out to

the [25] camp. And the warden told the union that he felt bad for

## Page 147

[1] Reynoso. That he shouldn't go out to the camp and that's

[2] why he gave him a day of admin leave.

[3]    Q Any other comments that paragraph 15 is referring [4] to?

[5]    A I don't remember exactly who I was talking to [6] whether
it be Steve Gagnon or Fernando Messer, but I was [7] told that the
warden, when I was complaining about my hours [8] being
changed, I was told the warden said that he's not [9] guilty until
proven in a court of law or something to that [10] effect. I'm
paraphrasing it. I don't know the exact words.

[11]    Q In the next sentence in paragraph 15 it says that [12] the
plaintiff was told by supervisors that the warden [13] believed
Reynoso was innocent until proven guilty. Do you [14] see that
there?

[15]    A Yes.

[16]    Q Is that the comment you were just referring to?

[17]    A Yes. But I just don't know the exact wording to [18] it.

[19]    Q Okay. You say that the supervisors told you that [20] that
was the warden's belief. Who told you that?

[21]    A I don't remember.

[22]    Q Okay.

[23]    A It was probably one of the three, Fernando Messer,

[24] Lois Swiderski or Steve Gagnon.

[25]    Q Okay. And you believed that that comment showed

## Page 148

[1] that the warden did not believe your rendition of what

[2] happened on April 8, 2002?

[3]    A Yes.

[4]    Q Okay. You also described a comment you said the

[5] warden made in November of 2003. That he felt bad for

[6] Reynoso?

[7]    A Yes.

[8]    Q Who told you that?

[9]    A Mark Shaughnessy, the former union president.

[10]    Q And when did he tell you that?

[11]    A I believe it was upon returning to work.

[12]    Q Do you remember what your response was to that

[13] statement?

[14]    A No I don't.

[15]    Q Do you know what else he told you in this

[16] conversation?

[17]    A Just that Reynoso had received admin leave for one

[18] day. What else? I don't remember.

[19]    Q Do you remember when you were told that by Mark

[20] Shaughnessy?

[21]    A I know when it was when I returned to work. But I [22] just
don't remember when.

[23]    Q Okay. It was the day that you returned that you [24] had
that conversation with him?

[25]    A No. I don't remember.

## Page 153

[1] it difficult for you and Mr. Reynoso to come into contact [2] with one another?

[3]    A That does sound familiar, but I don't remember who [4] or when or what said that to me.

[5]    Q It goes on to say that you have expressed concern [6] over your safety and the fact that Mr. Reynoso is allowed to [7] walk in the facility. As I have discussed with you [8] previously, the abuse prevention order states that Mr. [9] Reynoso is lawfully allowed to work but should avoid contact [10] with you. Do you see that?

[11]    A Yes.

[12]    Q And it says here that he discussed this with you [13] previously. Do you have a memory of that? A discussion [14] with the warden before June 20, 2002 that because the [15] prevention order allows Mr. Reynoso to work but to avoid [16] contact with you that they were going to allow him to work [17] in the facility?

[18]    A I don't remember.

[19]    Q Okay. Now paragraph 21 of your Complaint says [20] that plaintiff was advised by supervisors that she could no [21] longer work overtime without seeking special permission so [22] that she would not come into contact with Reynoso. Reynoso [23] is free to work all overtime that he desires. Do you see [24] that there?

[25]    A Yes.

## Page 154

[1]    Q Do you know whether or not Reynoso received [2] special attention to work overtime hours?

[3]    A I don't understand the question.

[4]    Q You said in the previous sentence that you had to [5] seek special permission to work overtime hours. Do you see [6] that there?

[7]    A Yes.

[8]    Q Do you know whether Mr. Reynoso had to go through [9] that same procedure in order to work overtime hours?

[10]    A I don't know.

[11]    Q Okay. Well here you say that he was free to work [12] all the overtime he wanted. Did you ever believe that he [13] did not have to seek special permission?

[14]    A I believe he didn't.

[15]    Q He did not?

[16]    A He did not since I had to check with my supervisor [17] when I could work and when he wasn't going to be in the [18] institution.

[19]    Q Okay.

[20]    A And I happened to run into him and I later found [21] out that he never had to - he could just come and go [22] whenever he wanted to.

[23]    Q Well concerning the overtime, how do you know that [24] he did not have to seek special permission to work overtime?

[25]    A Because when I was leaving the institution from my

## Page 155

[1] overtime, he was coming in at the same time so I believe, I [2] don't know if that was his, I believe that was his overtime, [3] that he was doing overtime too,

[4]    Q Okay.

[5]    A But I had to ask permission which I was granted [6] permission by Steve Gagnon and when I complained about it, [7] Steve Gagnon said that you're all set Colleen, you didn't [8] anything wrong, you can't come to me. They wouldn't have let him [9] work that overtime if they knew you were going to be there [10] or something to that effect.

[11]    Q So the fact that you ran into him is why you [12] believe he didn't seeks this special permission in order to [13] work overtime?

[14]    A Yes.

[15]    Q Okay. Now paragraph 22, you say that on or about [16] July 3, 2003, Reynoso pledges sufficient facts for finding [17] of guilty domestic assault and battery with a dangerous [18] weapon in Ayer District Court. Do you see that there?

[19]    A Yes.

[20]    MR. WILMOT: I am going to show you what has been [21] marked as Exhibit 36 and 37.

[22]    (DOJ Exhibits No. 36 and 37 were [23] marked for identification.)

[24]    BY MR. WILMOT:

[25]    Q Do you recognize Exhibit 36?

## Page 156

[1]    A Yes I do.

[2]    Q Can you identify what it is?

[3]    A It's conditions of his probation.

[4]    Q His being Mr. Reynoso?

[5]    A Yes.

[6]    Q Okay. Can you read what the conditions are?

[7]    A "Stay away from Colleen O'Donnell and her family [8] and abide by the restraining order."

[9]    Q Do you know when this probation order started?

[10]    A I assume that day, I don't know.

[11]    Q Okay. On the upper right hand corner it says the [12] probation start date. Do you see that?

[13]    A Oh, yes.

[14]    Q And what is the start date?

[15]    A January 3, 2003.

[16]    Q And does it have a probation end date?

[17]    A April 2, 2004.

[18]    Q Okay. And then the next document Exhibit 37, can [19] you identify what that document is?

[20]    A Criminal Docket.

[21]    Q And here it says midway through, deposition date [22] and judge. It says January 3, 2003. Do you have a memory [23] of a hearing in this matter on January 3, 2003?

[24]    A Yes.

[25]    Q Can you describe that hearing to me?

Page 157

[1]    A January 3, 2003. He pled guilty to sufficient [2] facts and I had to give a Victim Impact Statement. And then [3] it ended. I know there was a lot of behind the door, like [4] with the attorneys behind the door which I wasn't allowed to [5] do. But other than that, I don't remember anything else.

[6]    Q Now in the timeframe between April 15, 2002 when [7] you returned back to work after the incident, and the date [8] of this hearing July 3, 2003 (sic), did you have any [9] interaction with Mr. Reynoso?

[10]    A Yes.

[11]    Q Can you tell me about each time that you did?

[12]    A I can generalize it but I don't have–

[13]    Q That's fine.

[14]    A A lot of phone conversations.

[15]    Q Okay.

[16]    A Never physical. Like never seeing each other. A [17] lot of phone conversations.

[18]    Q Okay. Do you remember after April 15, 2002, what [19] was the first conversation that you had? I think you [20] described some of them to me.

[21]    A He called to apologize for that woman, D%

Page 158

[1] le Weaver calling.

[2]    Q Okay. And is that the one he made from the pay [3] phone?

[4]    A Yes, yes.

[5]    Q And you said before that it was a week or two [6] weeks after the phone call where he and Danielle Weaver were [7] on the phone?

[8]    A Yes, approximately a week or two.

[9]    Q Okay. And you said that the next phone call came [10] on August or September?

[11]    A Around there, yes. I don't have exact dates.

[12]    Q Okay. After that phone call, when was the next [13] one, do you remember?

[14]    A It was frequent. We called each other frequently.

[15]    Q So you would call him as well?

[16]    A Yes.

[17]    Q Would you call him at his home or would you call [18] him at work?

[19]    A At work mostly.

[20]    Q Okay. And what were you calling him to say?

[21]    A Just crying a lot. I don't remember a lot but I [22] just know that I cried a lot. And he cried a lot.

[23]    Q So you would call him. Would you call him to talk [24] about your relationship?

[25]    A I don't remember.

Page 159

[1]    Q Okay. You were saying that you would be crying a [2] lot. So would you call him crying?

[3]    A I don't know if I called him – I know I cried a [4] lot but I don't remember.

[5]    Q Do you have a general memory as to why you would [6] have called him? What you wanted to talk about?

[7]    A No. I was in such a fog, I don't remember.

[8]    MS. MCDONALD: Can I have a quick bathroom break.

[9]    MR. WILMOT: Sure.

[10]    (Off the record from 3:00 to 3:07 p.m.)

[11]    BY MR. WILMOT:

[12]    Q You were testifying that there were times when you [13] would call Officer Reynoso?

[14]    A Yes.

[15]    Q I think you said it would always be when he was at [16] work?

[17]    A No, because he would call me when he was at work [18] too.

[19]    Q I'm talking about the times when you called him. [20] Where would he be?

[21]    A Mostly at work.

[22]    Q Would you also be at work at those times?

[23]    A No.

[24]    Q And do you know what his shift was during this [25] timeframe between April 15, 2002 to January 3, 2003?

Page 160

[1]    A I don't remember. It could be 4:00 to midnight or [2] midnight to 8:00, most likely.

[3]    Q Okay.

[4]    A Because I was day watch.

[5]    Q Okay. Do you remember if your conversations [6] concerned your desire to maybe reconcile your relationship [7] with him?

[8]    A We had conversations about the upcoming trial. He [9] told me if he loses his job, like if he loses his job he's [10] not going to be able to pay the rent because he lives with [11] his mother and pays his mother's rent and she was really [12] sick and had medical bills.

[13] We talked about, I don't know if we talked about, [14] I know I didn't want to, I felt so bad, I thought I was I [15] still in love with him and didn't want to go through with [16] anything anymore. I couldn't deal with it.

[17] I'm not sure if it's exactly reconciling. I can't [18] remember for sure, but I know it was on the basis of you [19] know, if he goes to trial, he's going to lose his pay, his [20] mother's going to be out on the street, he's going to be out [21] on the street.

[22] Also, you know, he still loved me, I still loved [23] him. That type of conversation.

[24]    Q You said earlier that after April 15, 2002, he [25] never physically threatened or threatened you with physical

### Page 161

[1] harm again. Do you remember that?

[2]    A Yes I remember that.

[3]    Q During this timeframe that you're describing, your
[4] phone calls between April 15, 2002 and January 3, 2003, did
[5] you still feel that he was a danger to you?

[6]    A Yes. I was still scared of him.

[7]    Q Okay.

[8]    A I'll always be scared of him.

[9]    Q But you called him anyway?

[10]    A Yes.

[11]    Q Have you ever heard of a restaurant or bar in
[12] Chelsea called the Jug?

[13]    A The Brown Jug. Yes, I was a bartender there.

[14]    Q You were a bartender there?

[15]    A Yes.

[16]    Q Do you have a memory of calling Mr. Reynoso about
[17] 11:15 p.m. on November 29, 2002 where you expressed to
[18] him that you did not want to go with criminal charges filed
[19] against him?

[20]    A I don't remember. I remember having a [21] conversation
about I didn't want to go through with it but I [22] don't remember
when it was. But I do remember saying that I [23] didn't want to go
through with it.

[24]    Q Do you have a memory of telling him that you were
[25] hoping that he and you would get married during this

### Page 162

[1] timeframe April 2002 and January 3, 2003?

[2]    A I don't recall ever saying that. I don't [3] remember.

[4]    Q Okay.

[5]    A There was a lot of talk prior to that. But I [6] don't
remember.

[7]    Q Okay. Do you have a memory of talking to Reynoso [8] on
December 9, 2002 stating to him that you were being [9] forced to
do what you were doing in court?

[10]    A Again I don't remember that. No. I just remember
[11] that context of not wanting to go through with it and
[12] talking to him about it.

[13]    Q Do you remember what your testimony was at the
[14] hearing on January 3, 2003?

[15]    A Yes.

[16]    Q And what was that?

[17]    A It was a Victim Impact Statement. That's the only
[18] testimony I gave, I believe.

[19]    Q Okay.

[20]    A I think, you know, I don't remember. I think [21] that's the
only thing I did was the Victim Impact.

[22]    Q Okay. Do you have a memory of telling the judge
[23] that you did want Mr. Reynoso to receive probation but to be
[24] incarcerated?

[25]    A Yes.

### Page 163

[1]    Q What made you change your posture on what you
[2] wanted to happen at that hearing, from not going through
[3] with it to asking the judge to incarcerate Mr. Reynoso?

[4]    A It was the support. I was in a domestic violence
[5] support group and they're the ones that helped me write the
[6] victim impact statement and – I still felt bad that day but [7] I
think that's the reason. I think they helped me write the [8] victim
impact statement.

[9] Part of me felt I still really loved him and felt [10] really bad
about everything. And then part of me at that [11] time, couldn't
believe that he did this to me. I was in [12] pretty bad shape
mentally.

[13]    Q At that time, did you have any representation with
[14] you at the January 3, 2003 hearing?

[15]    A The assistant district attorney was there. I just [16] had
the director of a woman's group called Portal to Hope. [17] She
was there for support.

[18]    Q What is her name?

[19]    A Deborah Fallon.

[20]    Q Okay.

[21]    A My mother was there. My sister was there. My
[22] cousin, Linda Sweeney was there. And there were some
people [23] from work there.

[24]    Q Some people from work?

[25]    A Yes.

### Page 164

[1]    Q Who from work?

[2]    A Holly Glover. Brian Padula. Michael Mathon. [3] Stephanie
Powers. I feel like there were more but I can't [4] remember. I said
my sister and my mother. I don't [5] remember.

[6]    Q Okay. Do you remember what Stephanie Powers
[7] position was within the DOP at the time of that hearing?

[8]    A A Correctional officer.

[9]    Q Is she still employed by the department?

[10]    A Yes.

[11]    Q And you said there's a Michael Mathon?

[12]    A Yes.

[13]    Q What was his position during the time of the
[14] hearing?

[15]    A I believe a senior officer specialist.

[16]    Q And is he still employed by the Bureau?

[17]    A Yes.

[18]    Q Okay. It says your testimony that your statement
[19] during the hearing was a prepared statement?

[20]    A Yes.

[21]    Q Okay. And did Mr. Reynoso go to the hearing with
[22] anyone?

[23]    A Yes.

[24]    Q Do you remember who?

[25]    A His mother was there. And a woman was there with

Page 165

[1] him. And an attorney.
[2]    Q Do you know who the woman was?
[3]    A Yes. ████████████████████████████████
[4]    Q Who was she?
[5]    A Sarah Carpenter.
[6]    Q Do you know what her relationship was to Mr. [7] Reynoso at the time of that hearing?
[8]    A She's really good friends with his sister and he [9] used to date her so I wasn't too sure.
[10]    Q Okay. Were you surprised to see her there?
[11]    A Yes.
[12]    Q And why was that?
[13]    A Because the last time I spoke to his sister – he [14] used to beat Sarah up, and she was happy because she finally [15] got away from him. And that was probably two years prior to [16] that trial date that I talked to his sister about that [17] because his sister was still friends with her.
[18]    Q And how do you know what Sarah Carpenter looked [19] like?
[20]    A Pictures from - we went to Florida and his sister [21] has pictures of her in her house in frames.
[22]    Q Do you remember her from those pictures?
[23]    A Yes.
[24]    Q And on the date of the hearing, you saw that it [25] was her?

Page 166

[1]    A Yes. I wasn't 100 percent. I assumed it was her.
[2]    Q Okay. And did it anger you to see Sarah Carpenter [3] at the hearing?
[4]    A It hurt me more than anything.
[5]    Q And why were you hurt?
[6]    A I thought I was still in love with him at the [7] time. I guess, you know, even though I knew what he did was [8] wrong, I still...
[9]    Q I'm sorry?
[10]    A Even though I knew what he did was wrong, I was [11] still in love. My head wasn't straight.
[12]    MS. MCDONALD: Can we take a break for a minute?
[13]    MR. WILMOT: Sure.
[14]    (Off the record from 3:19 to 3:27 p.m.)
[15]    BY MR. WILMOT:
[16]    Q At the hearing on January 3, 2003, did you speak [17] with Mr. Reynoso at all?
[18]    A At the hearing?
[19]    Q At the hearing?
[20]    A No.
[21]    Q Okay. Did he speak to you at all?
[22]    A No.
[23]    Q Did he make any gesture towards you at the [24] hearing?
[25]    A He smiled at me when I first walked in.

Page 167

[1]    Q Did he do anything threatening towards you?
[2]    A No.
[3]    Q Okay. Did his family members say anything to you?
[4]    A No.
[5]    Q Okay.
[6]    A You know, what I did forget. That I believe – I [7] don't know if I told you that Al Colon, he was at the [8] hearing too.
[9]    Q Al Colon was there too?
[10]    A Yeah.
[11]    Q Okay.
[12]    A I believe so. I'm not a hundred - I believe [13] was at one of the hearings. I think that's the one.
[14]    Q To support you or Mr. Reynoso?
[15]    A To support me.
[16]    MR. WILMOT: Okay. I am going to show you what [17] has been marked as Exhibit 38.
[18]    (DOJ Exhibit No. 38 was marked for [19] identification.)
[20]    BY MR. WILMOT:
[21]    Q Do you recognize this document?
[22]    A Yes.
[23]    Q Can you tell me what that is?
[24]    A That's a memorandum from me to the warden
[25] regarding January 3rd, the trial, David Reynoso's trial.

Page 168

[1]    Q His plea?
[2]    A Yes, his plea.
[3]    Q Okay. Do you remember how you delivered this to [4] the warden?
[5]    A I know that when it was over with that day, I came [6] and I actually physically talked to the warden and Steve [7] Gagnon.
[8]    Q So the day of the hearing January 3, 2003, you [9] spoke to the warden and Steven Gagnon?
[10]    A Yes.
[11]    Q Do you remember what you told them?
[12]    A Basically what's in the memo. That he pled [13] guilty. He was on probation but I told him that it was [14] going to be off his record like if he doesn't do anything [15] wrong within the next fifteen months.
[16]    Q Okay. Did you provide them with any documents?
[17]    A January 3rd? I don't believe I did. I just [18] showed up, I didn't have an appointment.
[19]    Q Okay. If you just showed up, did you show up at [20] the warden's door?
[21]    A Actually I showed up - as I was walking through [22] the lobby, Steve Gagnon happened to be leaving the warden's
[23] office and he brought me up and I told him what happened.
[24] And he brought me up to the warden's office and the
[25] secretary talked to the warden and we were able to go on and



Page 169

[1] see him.
[2]    Q Okay. Do you remember what, if anything, the [3] warden
said to you when you gave him this information?
[4]    A He said give me 'til Monday. He said write a memo [5] and
give me 'til Monday or Tuesday, Monday or Tuesday, I [6] don't
remember the exact date, one of those days. And I'll [7] have you
back in R&D, because Steve Gagnon was saying, you [8] know,
she needs to get back to R&D. She needs to learn more [9] stuff in
R&D and he said give me 'til Monday or Tuesday, let [10] me
figure this all out and I'll have you back with your [11] normal
schedule.
[12]    Q Okay. Do you remember what else the warden said
[13] in that meeting?
[14]    A It was a very brief meeting. So, no I don't. I [15] just
remember that.
[16]    Q Okay. Do you know what else Steve Gagnon said in
[17] that meeting?
[18]    A I think - I just remember him saying that he [19] really
wants me to get back to the swing of things in R&D. [20] In
Receiving and Discharge.
[21]    Q Okay.
[22]    A That's all I remember.
[23]    Q Okay. Do you remember what time of day that was?
[24]    A It was in the after - I don't know, I don't [25] remember. It
was immediately after the guilty plea, but I

Page 170

[1] don't remember when it ended. I just came directly here.
[2]    Q Were you working that day?
[3]    A No, I had annual leave, vacation day.
[4]    Q So was your sole purpose coming in that day to [5] tell the
warden about the results of the hearing?
[6]    A And Steve Gagnon and my supervisor. Yes.
[7]    Q Okay. Did you and you said your supervisor? [8] Did you
have a chance to speak to your supervisor that day?
[9]    A Yes.
[10]    Q And what did you talk to him about?
[11]    A Just that he wanted, now that this is over, he [12] wanted
to get me back in the swing of things and work in R&D [13] so I
can familiarize myself with that part of the [14] department.
[15]    Q Okay. Are you still talking about Steve Gagnon at
[16] this point?
[17]    A Yes.
[18]    Q Okay. Other than the warden and Steve Gagnon, did
[19] you speak with anyone else about the results of the hearing
[20] on January 3, 2003?
[21]    A I don't remember.
[22]    Q Okay.
[23]    A I - no, I don't remember.
[24]    Q Okay. Now you said that during your January 3,
[25] 2003 meeting with the warden, he instructed you to write up

Page 171

[1] the results of the hearing in a memo. Is that the memo [2] there
that he instructed you to write that's marked as [3] Exhibit 38?
[4]    A Yes.
[5]    Q Okay. And do you remember how you delivered that [6] to
the warden?
[7]    A I don't remember.
[8]    Q Okay. Do you remember if you went back to work [9] the
next day after January 3, 2003?
[10]    A It was a Friday, so I went back that Monday.
[11]    Q So that would have been the 6th that you returned
[12] back to work?
[13]    A Yes.
[14]    MR. WILMOT: I am going to show you what has been
[15] marked as Exhibit 39.
[16]    (DOJ Exhibit No. 39 was marked for [17] identification.)
[18]    BY MR. WILMOT:
[19]    Q Do you recognize that document?
[20]    A Yes. I do. I recognize it.
[21]    Q Can you identify what this is?
[22]    A It's my regular duty hours at ISM beginning on
[23] January 13. Just saying what my hours would be and if I
[24] wanted to work overtime, I must notify my supervisor in
[25] advance.

Page 172

[1]    Q Okay. So your hours were going to be changed from
[2] 6:00 a.m. to 2:30 p.m. to 9:30 a.m. to 6:00 p.m. Is that
[3] correct?
[4]    A No.
[5]    Q Okay. So what was going to happen to your [6] schedule?
[7]    A I'm a little confused.
[8]    Q When you received this letter and it's dated [9] January 8,
2003. What were your scheduled hours at that [10] time?
[11]    A 7:30 to 4:00, I believe. 7:30 to 4:00.
[12]    Q Okay. Now you testified earlier that your hours [13] when
you returned back to work following this incident in [14] April 2002,
the hours were changed to 6:00 until 3:30. Is [15] that right?
[16]    A 6:00 to 2:30.
[17]    Q To 2:30?
[18]    A That's correct, yes.
[19]    Q So at the time that you received this letter dated
[20] January 8, 2003, your schedule was no longer 6:00 to 2:30?
[21]    A No it was not.
[22]    Q When was it changed?
[23]    A I hurt my back. A bunch of boxes fell on me so [24] they
changed me because nobody would be in at that time. So [25] I
don't know, I forget if they changed me from 6:30 to 3:00

## Page 173

[1] or 7:30 to 4:00. I'm not sure of the exact hours they
[2] changed me but I had to report directly to the mailroom.
[3]    Q Okay.
[4]    A Y, because when you hurt yourself, you can't come
[5] inside past Control because it's a safety issue.
[6]    Q When was that accident?
[7]    A I don't know. It was in the Summer of 2002. But [8] I don't
remember when.
[9]    Q Okay. So some point in the Summer of 2002, your
[10] schedule was changed to this either 6:30 or 7:30 a.m. to
[11] 3:00 or 4:00 p.m.?
[12]    A That is correct.
[13]    Q Okay. Did you stay on that same schedule until
[14] January 8, 2003?
[15]    A I believe I did.
[16]    Q Okay.
[17]    A Until January 7, 2003 I believe it was. Or maybe [18] - it
was either January 7 or January 8 because that's [19] when -- I
didn't come back after that day for awhile.
[20]    Q Okay. So in that interim between the Summer of
[21] 2002 where they changed your schedule because you injured
[22] your back until January 7 or so of 2003, were you still
[23] suffering from that back injury?
[24]    A Yes.
[25]    Q Okay. So I'm looking at this document that's

## Page 174

[1] marked as Exhibit 39. Do you remember how this was
[2] delivered to you?
[3]    A I believe it was FedEx.
[4]    Q To your home.
[5]    A To my home. Yes. In Malden.
[6]    Q So at some point, you did not return back to work?
[7]    A Correct.
[8]    Q And what date was that? Your last working date [9] prior
to this January 8, 2003 letter?
[10]    A I believe it was January 7, 2003.
[11]    Q Do you remember what day of the week January 7,
[12] 2003 was?
[13]    A I believe it was a Tuesday.
[14]    Q Okay. And you said that was your last working [15] day?
[16]    A It was either that Tuesday or Wednesday, January
[17] 7th or January 8th.
[18]    Q Okay. Now what prompted you not returning back to
[19] work at that time?
[20]    A I remember I called – both my supervisors were [21] not
there that day. Steve Gagnon or Fernando Messer were [22] not in
the institution that day. Nor was the warden. He [23] wasn't here.
[24] And I wanted the answers. I wanted to go in R&D [25] and
work the other shift and I called and I spoke with Lois

## Page 175

[1] Swiderski and she told me that Cindy Lord wasn't in that day
[2] either. I said I want to know. I said I want to go back to
[3] work. And she said -- well let me talk to, I believe it was [4] Rick
Harnes who was the associate warden at the time.
[5] She called me back and said, Colleen, you need [6] to
stay out in the mailroom. I don't know if it was 7:30 to [7] 4:00 or
6:30 to 3:00. I don't remember the hours but she's [8] saying you
need to stay out in the mailroom until further [9] notice.
[10] And I said that's not fair and I was told by the [11] warden he
would have a decision for me on Monday or Tuesday. [12] And I
really don't want to work in the mailroom or mail [13] department. I
want to go to my other department and she said [14] no, per Rick
Harnes you cannot come in the institution just [15] yet.
[16]    Q Now this conversation was with who?
[17]    A Lois Swiderski.
[18]    Q So you had two conversations with her? You first [19] just
called her? She said that she was going to speak with [20] Rick
Harnes and then she called you back?
[21]    A Correct, yes.
[22]    Q Okay. And do you remember when this conversation
[23] took place? What day?
[24]    A It was either January 7th or the 8th. The Tuesday [25] or
the Wednesday. I'm not too sure of the exact date. It

## Page 176

[1] was either those two days.
[2]    Q And the last conversation you had with the warden
[3] was the Friday before the weekend, correct?
[4]    A Yes.
[5]    Q And he said in that conversation, he said he would
[6] allow you to work back in Receiving and Discharge?
[7]    A Yes.
[8]    Q So between that conversation with the warden and [9] this
conversation with Lois Swiderski, did you learn that [10] you would
not be able to work in Receiving and Discharge [11] from
someone?
[12]    A Lois Swiderski.
[13]    Q In that first conversation?
[14]    A No. In that second conversation of that day. [15] She's
the one who told me that I cannot go to R&D. I have [16] to stay
out in the mailroom until further notice.
[17]    Q Okay. Now the day that you spoke to Lois, was [18] this
after your duty day or before?
[19]    A During.
[20]    Q But you were, were you in the mailroom at this [21] time,
when you had the conversation with Lois?
[22]    A Yes. I called her from the mailroom.
[23]    Q Okay. So you were working at the time?
[24]    A Yes.
[25]    Q Okay. Did you speak with anyone else that day

[11] saw your doctor?

[12]    A It was either January – I believe it was January [13] 8th or January 9th. It was within that week of January 6th [14] that the incident happened.

[15]    Q And why did you decide to see your doctor?

[16]    A Because I couldn't take it. I though I was being [17] discriminated against because I - I don't know, I just [18] couldn't handle it.

[19]    Q What was it that you couldn't handle?

[20]    A That I wasn't allowed to work in R&D. In [21] Receiving and Discharge when I was told I could.

[22]    Q And for that reason, you decided to call your [23] doctor?

[24]    A Well that's what triggered – I was having my [25] heart - I had a bad anxiety and physical symptoms. That's

---

[11]    Q Do you still use that medication?

[12]    A The Celexa?

[13]    Q Yes.

[14]    A No.

[15]    Q When did you stop using it?

[16]    A I don't remember.

[17]    Q Do you still take the Effxor?

[18]    A No.

[19]    Q When did you stop using that?

[20]    A A few months after I starting taking it. I just [21] know it wasn't effective for me.

[22]    Q Okay.

[23]    A The side effects weren't good I should say.

[24]    Q You said a few months. You were using it for two [25] or three months?

---

**Page 178**

[1] why I called my doctor.

[2]    Q Okay. And what's the name of your doctor that you [3] called?

[4]    A George Milowe.

[5]    Q What kind of doctor is George Milowe?

[6]    A He's a psychiatrist.

[7]    Q Were you seeing George Milowe prior to January 8, [8] 2003?

[9]    A Yes.

[10]    Q When did you begin seeing him?

[11]    A It was either February or March of 2002.

[12]    Q And why did you start seeing him in February or [13] March of 2002?

[14]    A Because I was really depressed. I was in an [15] abusive relationship and I didn't know why I kept staying in [16] there in the relationship. And I really needed help.

[17]    Q At any point between February or March of 2002 and [18] January 8, 2003, did Dr. Milowe prescribe you any [19] medication?

[20]    A Yes.

[21]    Q What did he prescribe you?

[22]    A Several medications. It was trial and error type [23] of medications. Celexa, Tobermax, Clonapin. There was [24] another medication for sleeping but I don't know the name of [25] it. Prozac, Effxor.

---

**Page 180**

[1]    A Maybe three or four.

[2]    Q Okay. You said Tobermax?

[3]    A Tobermax.

[4]    Q Do you know when you began taking that medication?

[5]    A No.

[6]    Q Do you remember when you stopped using that [7] medication?

[8]    A No.

[9]    Q Clona – What is it? Clonapin?

[10]    A Clonapin.

[11]    Q Clonapin.

[12]    A Clonapin.

[13]    Q Okay.

[14]    A I'm currently still taking that.

[15]    Q Do you remember when you started taking it?

[16]    A I believe it was February, March 2002. I've been [17] on and off with the medication.

[18]    Q So has it been consistent from February or March [19] 2002 to present that you've been on the Clonapin?

[20]    A No. I don't believe so. I was off of it for [21] awhile.

[22]    Q What was that time period when you were not taking [23] it?

[24]    A Recently it was a few months. Probably like May [25] until last week or the week before.

Page 181

[1]    Q May of?

[2]    A 2005.

[3]    Q Okay. Until about a week—

[4]    A A week or two ago.

[5]    Q –okay.

[6]    A And actually, I didn't take it from maybe like [7] January 2004 until I don't remember the exact, I don't [8] remember. It was on and off so I don't remember the dates.

[9]    Q Okay. Was there something that happened recently [10] that you had to - why you had to start taking it again?

[11]    A I was actually taking it and I got pregnant and I [12] miscarried. Yeah.

[13]    Q So the doctor prescribed it again?

[14]    A Yeah, I wasn't taking it while I was pregnant.

[15]    Q Okay. You mentioned sleeping medication?

[16]    A Yes.

[17]    Q Do you remember when you started to take that [18] medication?

[19]    A Dr. Milowe prescribed it in February or March when [20] I started to see him, 2002. And I didn't like it. It made [21] me really groggy so he told me to stick with the Clonapin, [22] he said it relaxes you and so I really haven't been using [23] sleeping medication that much. I tried it but it didn't [24] work for me.

[25]    Q How long did you try it for?

Page 182

[1]    A Maybe a week.

[2]    Q Okay. And you said you were also prescribed [3] Prozac?

[4]    A Yes.

[5]    Q Do you remember when Dr. Milowe prescribed that?

[6]    A No. I don't remember. I'm currently on it now [7] from a different doctor but I don't remember.

[8]    Q Do you have a memory of Milowe prescribing the [9] Prozac?

[10]    A Yes I believe so.

[11]    Q Okay.

[12]    A I mean there might be some medications I'm [13] missing. But through trial and error there were a lot of [14] medications that I was on. So I don't know if I have the [15] exact list.

[16]    Q Before Dr. Milowe, had you ever been treated by [17] any other mental health prescriber?

[18]    A No.

[19]    Q So, he's the first psychiatrist that you've seen [20] in your lifetime?

[21]    A Yes.

[22]    Q Okay. So you said after you left work on the 8th, [23] you called Dr. Milowe?

[24]    A Yes.

[25]    Q And you went in to see him the following day?

Page 183

[1]    A Yes. I'm not sure if I left on the 7th or the [2] 8th.

[3]    Q Okay. And you testified that what prompted you to [4] call Dr. Milowe was being told that you wouldn't be allowed [5] to work back at R&D? Is that your testimony?

[6]    A No. It was more I thought I was having a [7] breakdown. A physical aspect. My heart was racing really [8] quick and I think it was caused by them telling me that I [9] still had to stay out in the mailroom. But I called Dr. [10] Milowe because I was nervous too. Physically.

[11]    MR. WILMOT: Okay. Can we go off the record for a [12] moment?

[13]    (Off the record from 3:54 to 3:55 p.m.)

[14]    BY MR. WILMOT:

[15]    Q What do you remember about your meeting with Dr. [16] Milowe the next day?

[17]    MS. MCDONALD: Can we go off the record for one [18] second?

[19]    MR. WILMOT: Sure.

[20]    (Off the record from 3:55 to 3:55 p.m.)

[21]    BY MR. WILMOT:

[22]    Q What do you remember about your conversation with [23] Dr. Milowe the next day?

[24]    A The following day? I just told him, I just [25] probably, I just couldn't handle it. I felt like work was

Page 184

[1] discriminating against me.

[2] I was, you know, my prior symptoms were, like, I [3] was nervous all the time and everything and they seemed to [4] be getting worst those past twenty-four hours. I just [5] couldn't handle it.

[6]    Q Did you tell Dr. Milowe in that meeting that you [7] were afraid that Reynoso was going to harm you?

[8]    A I don't know if I did in that meeting.

[9]    Q Okay.

[10]    A I don't remember.

[11]    Q Do you remember asking Dr. Milowe to write a note [12] for you so you could produce it to your employer?

[13]    A Yes.

[14]    Q What did you ask him?

[15]    A See, he was encouraging me to leave the Bureau you [16] know, throughout this whole thing. So I just think he said [17] it's not – mentally, you shouldn't go back because mentally [18] you're not ready to go back or go in because I was so upset. [19] I don't remember how the note came about but I [20] said you need to write me a note. I might have. But I [21] don't remember.

[22]    Q Did you have an attorney by this point?

[23]    A No.

[24]    MR. WILMOT: Okay. I'm going to show you what has [25] been marked as Exhibit 40.

Page 189

[1]    Q Have you ever seen this document before?

[2]    A It doesn't look familiar.

[3]    Q Well, can you identify what it is?

[4]    A It's a memorandum from Steve Gagnon to the warden.

[5]    Q And what's the date on this memo?

[6]    A January 9, 2003.

[7]    Q Okay. There it says that on Thursday, January 9, [8] 2002
at approximately 8:45 a.m. I spoke with Ms. Colleen [9] O'Donnell.
Now it's dated January 9, 2003 and likely [10] there's a typo in the
text of the memo, but do you remember [11] speaking with Steve

[25]    Q Okay. Do you remember at all speaking with Steve

Page 190

[1] Gagnon about having to provide additional information

[2] concerning your reasons for being out of work at that time?

[3]    A I remember, yeah, him requesting, telling me I [4] needed
more doctor's notes or things like that.

[5]    Q Okay.

[6]    A But I don't remember anything specific.

[7]    Q Do you remember what your response was to that

[8] request from Steve Gagnon?

[9]    A No I don't.

[10]    Q Okay. Is it your memory that Dr. Milowe provided

[11] you this note that's dated January 8, 2003 on the day that

[12] you met with him?

[13]    A Yes.

[14]    Q Okay. And do you remember if you went to work the

[15] same day that you met with the doctor?

[16]    A No, I did not.

[17]    Q You did not?

[18]    A No.

[19]    Q Okay. Do you know who you spoke with on January

[20] 8, 2003 to inform the BOP that you would not be coming in to

[21] work?

[22]    A No, I don't.

[23]    MR. WILMOT: Okay. I am going to show you what [24] has
been marked as Exhibit 42. [25] //

Page 191

[1]    (DOJ Exhibit No. 42 was marked for [2] identification.)

[3]    BY MR. WILMOT:

[4]    Q Do you recognize this document?

[5]    A Yes.

[6]    Q Can you identify what it is?

[7]    A It's from the Bureau of Prisons to me, asking me [8] to
release my medical information and wants me to sign [9] something
to send to my doctor to release my medical [10] information.

[11]    Q Okay. And do you remember how you received this

[25]    A I spoke with the union first regarding it and then

Page 192

[1] I contacted an attorney.

[2]    Q And that was all on which date?

[3]    A I don't know the exact date of it. I know after [4] receiving
this document but I don't know the exact date.

[5]    Q Did you speak to anyone in HR or any of your

[6] supervisors about this letter dated January 9, 2003 in that

[7] timeframe that we–

[8]    A I don't remember.

[9]    Q Okay. Do you have a memory of speaking with Cindy

[10] Lord on January 14, 2003 about providing additional

[11] documentation to support your being out of work at that

[12] time?

[13]    A I don't remember the date but I do remember

[14] speaking with her regarding additional documentation.

[15]    Q Okay.

[16]    A But I don't remember dates.

[17]    Q What do you remember about the conversation?

[18]    A She wanted me to resign the release. I don't

[19] remember. That's all I remember.

[20]    Q Do you remember telling her that you would sign [21] the
release?

[22]    A I was going to, yes. I think I did.

[23]    Q Do you remember if you called her or she called

[24] you?

[25]    A I don't remember.

## Page 193

[1]    Q Okay. Do you remember if you asked for more time [2] to provide the information?

[3]    A The documentation from my doctor?

[4]    Q Yes.

[5]    A I remember I was going to sign it because I [6] thought that was the right thing to do so I think I might [7] have asked for more time to talk to my attorney.

[8]    Q Okay. Do you remember anything you spoke about in [9] that conversation?

[10]    A No.

[11]    Q Do you remember if you discussed at all the [12] Voluntary Leave Program?

[13]    A I remember I discussed it. I just don't remember [14] when I discussed it.

[15]    Q Do you remember discussing the Leave Without Pay [16] procedures in that conversation?

[17]    A I do. I remember discussing that with her.

[18]    Q What did Ms. Lord say about those procedures?

[19]    A I remember the Voluntary Leave Program. Was there [20] a form I had to fill out? And I had to have medical [21] documentation, I don't remember exactly. But I know I had [22] to have medical documentation to back up why I was going for [23] this, and also Leave Without Pay or Advanced Leave is to be [24] written to the warden. He makes that decision with - and [25] to have documentation to back it up.

## Page 194

[1]    MR. WILMOT: Okay. I am showing you what has been [2] marked as Exhibit 43.

[3]    (DOJ Exhibit No. 43 was marked for [4] identification.)

[5]    BY MR. WILMOT:

[6]    Q Do you recognize that document?

[7]    A Yes I do.

[8]    Q Can you identify what is please?

[9]    A It's a memorandum from me to the warden requesting [10] Advanced Leave.

[11]    Q Do you remember if you provided any information [12] with this request?

[13]    A I don't remember if I did.

[14]    Q And what's the date of this memo?

[15]    A January 21, 2003.

[16]    Q Okay. Do you remember whether between the date of [17] Dr. Milowe's memo which is January 8, 2003 and January 21, [18] 2003, if you provided any additional medical documents to [19] the Bureau?

[20]    A I don't remember. I remember I provided them in [21] the past. I just don't remember the dates I provided them.

[22]    Q Do you remember during that same timeframe, that [23] you granted the Bureau permission to speak with Dr. Milowe?

[24]    A To speak with Dr. Milowe?

[25]    Q Abut your condition?

## Page 195

[1]    A No, because I remember I was going to sign the [2] waiver for them but I don't recall letting them speak, [3] saying oh yeah, go ahead and speak to them. I don't know [4] though. I don't remember.

[5]    Q Do you have a memory of ever signing the waiver [6] and delivering that to the Bureau?

[7]    A No I don't.

[8]    MR. WILMOT: Okay. I am going to show you a [9] document marked as Exhibit 44.

[10]    (DOJ Exhibit No. 44 was marked for [11] identification.)

[12]    BY MR. WILMOT:

[13]    Q Do you recognize that document?

[14]    A Yes I do.

[15]    Q Can you identify what it is please?

[16]    A It is a letter from my attorney Sam Rizzitelli, [17] Samuel Rizzitelli, to the warden and to Cynthia Lord.

[18]    Q What is the date of this letter?

[19]    A January 21, 2003.

[20]    Q Do you know whether before January 21, 2003, you [21] had notified the warden or any other supervisor or anyone in [22] HR, that Sam Rizzitelli was your counsel?

[23]    A No because there was some confusion on that so I [24] don't think I did. I'm not positive.

[25]    Q Do you remember when you retained Mr. Rizzitelli

## Page 196

[1]    as your counsel?

[2]    A I don't. It was in January but I just don't [3] remember when.

[4]    MR. WILMOT: Okay. I am going to show you what [5] has been marked as Exhibit 45.

[6]    (DOJ Exhibit No. 45 was marked for [7] identification.)

[8]    BY MR. WILMOT:

[9]    Q Can you identify what this document is?

[10]    A It's a memorandum from Steve Gagnon and the [11] assistant manager to Warden Winn.

[12]    Q And this document describes, Steve Gagnon [13] describes a conversation with you on Tuesday, January 21, [14] 2003 where he relayed to you that the warden received a [15] letter from your attorney. Do you remember this [16] conversation at all?

[17]    A Somewhat I do actually.

[18]    Q What do you remember about it?

[19]    A My attorney wanted me to call, my former attorney [20] wanted me to call Steve Gagnon to find my status out, what [21] was going on. He - I don't remember the whole - I just [22] remembered him what would it take to have me come back, [23] what do I need in able to come back. And I said Reynoso not [24] to be there.

[25]    Q For Reynoso not to be there?

Page 197

[1]  A Yes.
[2]  Q Do you remember what your exact words were?
[3]  A No, I'm paraphrasing.
[4]  Q Okay. Do you remember if you asked for Reynoso to
[5]  be terminated?
[6]  A I don't remember if I asked for that.
[7]  Q And what was Mr. Gagnon's response to your
[8]  statement concerning Mr. Reynoso?
[9]  A He asked me, I don't remember. I just remember [10]  that
part of the conversation where he said you know, what [11]  do you
need to come back to work. I remember that but I [12]  don't know
how the whole conversation went.
[13]  Q Do you remember if he discussed to you the
[14]  procedures for applying for Leave?
[15]  A I don't know if he discussed it with me.
[16]  Q Do you remember if he informed you that you were
[17]  running out of annual and sick leave?
[18]  A Yes he did. He did tell me that.
[19]  Q Okay. Do you think that in telling you that he [20]  would
also have told you that you should probably apply for [21]  some
kind of Leave so you continue to stay out of work?
[22]  A He might have. I just don't remember. I remember
[23]  him stating that I don't have much sick or vacation time
[24]  left.
[25]  Q Do you remember anything else about that

Page 198

[1]  conversation?
[2]  A No I don't.
[3]  Q Do you remember whether you provided any medical,
[4]  any additional medical information to the Bureau by January
[5]  21, 2003?
[6]  A No I don't remember the dates of my medical
[7]  information.
[8]  MR. WILMOT: I am going to show you what is marked [9]  as
Exhibit 46. It is a two page document.
[10]  (DOJ Exhibit No. 46 was marked for [11]  identification.)
[12]  BY MR. WILMOT:
[13]  Q Do you recognize that document?
[14]  A Yes.
[15]  Q Can you identify what it is please?
[16]  A It's a letter to me from Steve Gagnon and my
[17]  systems manager. It's in response to the request that I
[18]  requested for Advanced Sick Leave.
[19]  Q And when he says in response to your request for
[20]  Advanced Sick Leave, he is referring to the memo, referring
[21]  to this memo marked as Exhibit 43 dated January 21, 2003,
do [22]  you know?
[23]  A I don't. Maybe but I don't remember.
[24]  Q Okay. And attached to that is what?
[25]  A That's an SF71 which is a request for leave, for a

Page 199

[1]  vacation or sick time.
[2]  Q And did you fill out this form?
[3]  A I don't remember.
[4]  Q Do you remember if you spoke with Mr. Gagnon about
[5]  the content of this letter dated January 23, 2003?
[6]  A No I don't.
[7]  MR. WILMOT: Okay. I am going to show you what [8]  has
been marked as Exhibit 47.
[9]  (DOJ Exhibit No. 47 was marked for [10]  identification.)
[11]  BY MR. WILMOT:
[12]  Q Do you recognize that document?
[13]  A Yes I do.
[14]  Q Can you identify what it is please?
[15]  A It's a letter to me from the warden regarding [16]  that's he
unable to grant my accommodation request that [17]  another staff
member be removed.
[18]  Q Okay. Do you have a memory of speaking to the
[19]  warden or any supervisor or anyone in HR about this letter
[20]  or the content of this letter?
[21]  A No, just my attorney. I remember speaking to him
[22]  about it. Not anyone here.
[23]  Q Okay. Now here in the first sentence it says he [24]  is
unable to grant your accommodation request that another
[25]  staff member be removed. Do you see that?

Page 200

[1]  A I do. Yes.
[2]  Q Did you ask that another staff member be removed [3]  as
an accommodation?
[4]  A Yes.
[5]  Q And did you say the words you wanted Officer
[6]  Reynoso removed?
[7]  A I don't know the exact words I used.
[8]  Q At this point January 27, 2003, what accommodation
[9]  were you seeking at that time?
[10]  A At that point, I still needed to be out of work [11]  due to
my condition, my medical condition. I still needed [12]  to be out of
work. So that the accommodation I was looking [13]  for I think, I
believe, was basically you know, voluntary [14]  leave, transfer
program, that type of thing. That I would [15]  get paid while
recovering, while trying to recover from post [16]  traumatic stress
disorder.
[17]  Q Okay. When did Dr. Milowe diagnose you with post
[18]  traumatic stress disorder?
[19]  A The first time I ever heard him diagnose me with
[20]  anything for the most part was the date of that letter which
[21]  was January 8, 2003. Prior to that, I think it was that [22]  date
that he told me that I knew I was suffering from.
[23]  Q On January 8, 2003?
[24]  A Yes. On January 8, 2003.
[25]  Q He never told you you had post traumatic stress

Page 201

[1] disorder prior to that date?

[2]    A Not that I can recall.

[3]    Q Okay. Other than that diagnosis, did he ever [4] diagnose you with anything else during the time that you [5] were receiving the treatment from him?

[6]    A Yes actually. He told me I suffered from [7] depression.

[8]    Q And when did he tell you that?

[9]    A Throughout my treatment. From February 2002 until [10] January 8, before I heard about the post traumatic stress [11] disorder. He said depression, battered woman syndrome and [12] anxiety.

[13]    Q And when did he diagnose you with battered woman [14] syndrome?

[15]    A Throughout our conversations through the months. [16] I don't remember the exact months. This is what he would [17] tell me that you know, what I'm suffering from.

[18]    Q Do you know if it was early on in your treatment [19] that he told you that?

[20]    A Yes it was actually.

[21]    Q As early as February or March of 2002?

[22]    A It could have been.

[23]    Q And you said he also diagnosed you with anxiety [24] problems?

[25]    A Yes.

Page 202

[1]    Q When did he tell you that?

[2]    A In the beginning. All, the depression, the [3] anxiety, the battered woman, it was all in the beginning.

[4]    Q Okay.

[5]    A We discussed what he believed I was suffering from [6] and from then on, we discussed treatments.

[7]    Q Okay. Do you know whether there was any point [8] where he said that you were no longer suffering from [9] anxiety?

[10]    A He's never said that to me, no.

[11]    Q So you still suffer from anxiety issues today?

[12]    A Yes.

[13]    Q Has ever told you that you no longer suffer [14] from the battered woman syndrome?

[15]    A No.

[16]    Q Do you believe that you still suffer from that [17] today?

[18]    A No.

[19]    Q When do you think that you stopped suffering from [20] that syndrome?

[21]    A Within the last year, I've got myself together [22] with that. Within the last year.

[23]    Q Okay. When you say within the last year, do you [24] mean within 2005?

[25]    A 2005, yes.

Page 203

[1]    Q And you said that he had diagnosed you with [2] depression. Did he ever tell you that you were no longer [3] suffering from depression?

[4]    A No, he never did.

[5]    Q Okay. Are you still suffering from depression [6] today?

[7]    A Yes.

[8]    Q And did you see Dr. Milowe soon after the incident [9] at Mirror Lake in April of 2002?

[10]    A I don't remember when my next appointment was or [11] anything so I don't remember.

[12]    Q Do you remember discussing that incident with Dr. [13] Milowe?

[14]    A Yes.

[15]    Q Do you remember if you discussed it with him soon [16] after the incident occurred?

[17]    A I don't remember.

[18]    Q Okay.

[19]    A I believe I was seeing him every four to six [20] weeks. So I don't remember exactly when my appointment was [21] after that.

[22]    Q Do you remember if you did see Dr. Milowe in 2002, [23] following the incident in April 2002 at Mirror Lake?

[24]    A Yes I did.

[25]    Q Okay. But he did not diagnose you with post

Page 204

[1] traumatic stress disorder until January 8, 2003?

[2]    A As far as I knew he never said that to me. No. [3] So has never said that I suffered from that until January [4] 8th.

[5]    MR. WILMOT: Okay. I am going to show you what [6] has been marked as Exhibit 48.

[7]    `(DOJ Exhibit No. 48 was marked for [8] identification.)

[9]    BY MR. WILMOT:

[10]    Q Do you recognize that document?

[11]    A Yes I do.

[12]    Q Can you identify what it is?

[13]    A That is my application for a Voluntary Leave [14] Transfer Program.

[15]    Q Okay. If you can turn back to the previous [16] exhibit. It's when – point your attention to the last [17] paragraph. There it says additionally you verbally [18] requested information regarding the Voluntary Leave Transfer [19] Program. As stated in the Program Statement you must apply [20] to become a recipient. Do you see that?

[21]    A Yes I do.

[22]    Q Do you remember having a conversation with the [23] warden about the Voluntary Leave Transfer Program before the [24] date of this letter, January 27, 2003?

[25]    A No, I don't think I did.

Page 205

[1]    Q Do you remember having a conversation with him at
[2] any point about the Voluntary Leave Transfer Program?
[3]    A I don't remember.
[4]    Q Okay. Did you submit the application that is [5] marked as
Exhibit 48 after receiving this letter that is [6] marked as Exhibit 47?
[7]    A I don't - according to the dates, I did. But I [8] don't
remember. According to the dates, it seems I [9] submitted this
after the letter.
[10]    Q Okay. Looking at Exhibit 47, in the second
[11] paragraph it says I have provided accommodation for a
[12] situation since April 2002 and I have been willing to
[13] provide accommodation by assuring that you work different
[14] shifts. I can further restrict his work area to the camp if
[15] you believe this would be a viable accommodation.
[16] Do you see that there?
[17]    A Yes I do.
[18]    Q In reading that, did you believe that would
[19] accommodate your post traumatic stress disorder and allow
[20] you to return to work?
[21]    A Yes, actually that was one of the things that we
[22] discussed. Having him out of the camp so I could get back
[23] to normal so to speak.
[24]    Q When you say, we discussed, who is we?
[25]    A My former attorney, Sam Rizzitelli.

Page 206

[1]    MS. MCDONALD: You're not to testify about [2] anything
you discussed with any attorney that you ever had.
[3]    THE WITNESS: Oh, okay.
[4]    MR. WILMOT: That's okay.
[5]    THE WITNESS: I discussed with him on--
[6]    MR. WILMOT: You don't even want--
[7]    MS. MCDONALD: You don't even want to go there.
[8]    THE WITNESS: Okay. Sorry.
[9]    BY MR. WILMOT:
[10]    Q Did you believe this accommodation would
[11] accommodate – or this proposed accommodation from the
[12] warden would accommodate your situation? That being
having [13] post traumatic stress disorder?
[14]    A I believe that it would have accommodated it at [15] some
time, yes.
[16]    Q Would it accommodate the situation at this time in
[17] January?
[18]    A No.
[19]    Q In January 2003?
[20]    A No.
[21]    Q And why not?
[22]    A Mentally, I still was really, I was still having [23] bad
anxiety attacks three times a day and I was like, having [24] a hard
time sleeping and so it wouldn't be wise for me to [25] come back
at that time.

Page 207

[1]    Q So fair to say on January 27, 2003 around that
[2] timeframe, that there was no accommodation that would have
[3] allowed you to return to work?
[4]    A I would have to say, yeah, I couldn't return to [5] work by
doctor's orders. So I don't know if there was an
[6] accommodation that would let me go back to work. I don't
[7] know.
[8]    Q Well when I turn back to the doctor's note which [9] is
January 8, 2003 - in Dr. Milowe's letter dated January [10] 8, 2003
he says that if patient's assailant was not on her [11] work
premises at all, Ms. O'Donnell would be able to work [12] full-time
without restrictions. Do you see that?
[13]    A Yes I do.
[14]    Q So you were saying at that time, around January [15] 27,
2003, you don't think you would have been able to return [16] to
work at all?
[17]    A I don't think I would have been able, no.
[18]    Q Okay. So even if Mr. Reynoso was not on the
[19] premises at all, you still were not ready to come back to
[20] work at this time?
[21]    A On January 8, 2003?
[22]    Q Yeah.
[23]    A That is correct, I wouldn't be able to that day.
[24]    MS. MCDONALD: What date?
[25]    THE WITNESS: January 2003.

Page 208

[1]    MS. MCDONALD: 8th?
[2]    THE WITNESS: Yes.
[3]    BY MR. WILMOT:
[4]    Q Well this letter dated January 27, 2003. Would [5] you
have been able to return to work at that time even if [6] Officer
Reynoso was not on the premises?
[7]    A I might have been able to. I don't remember.
[8]    Q Okay.
[9]    A I don't remember exactly my mental state at that [10] time.
I know I was having really bad anxiety attacks but [11] you know, I
don't remember.
[12]    Q Okay.
[13]    A I just specifically remember the January 8th day,
[14] that's why I said that.
[15]    Q Okay. So when you received this letter dated
[16] January 27, 2003 and you read the proposed accommodation
of [17] the warden saying that he would continue to make sure you
[18] worked different shifts from Officer Reynoso and that he
[19] would restrict Reynoso from the camp, did you believe that
[20] proposed accommodation would allow you to return back to
[21] work without restrictions?
[22]    A Yes I think at that day, I think, I don't [23] remember, I
think that was something that they were going to [24] work out so
that I would be able to try to come back to [25] work.

## Page 209

[1]    Q Okay.

[2]    A Again, I just don't remember my mental state on

[3]    January 27th.

[4]    Q Okay. Did anyone discuss with you verbally this

[5]    proposed accommodation that of restricting Officer Reynoso

[6]    to camp?

[7]    A Yes.

[8]    Q And who was that, other than your attorney?

[9]    A No.

[10]    MR. WILMOT: Okay. I am going to show you what is

[11]    marked as Exhibit 49.

[12]    (DOJ Exhibit No. 49 was marked for [13] identification.)

[14]    BY MR. WILMOT:

[15]    Q Do you recognize that document?

[16]    A Yes I do.

[17]    Q Can you identify what it is for me please?

[18]    A It's a letter from Dr. George Milowe to Steve [19] Gagnon.

[20]    Q Do you remember how you delivered that or whether

[21]    you delivered this to the Bureau?

[22]    A I believe it was faxed.

[23]    Q Okay. Do you know who it was faxed to?

[24]    A No I don't.

[25]    Q Okay. Do you remember why you sent this letter at

## Page 210

[1]    this time?

[2]    A No I don't remember.

[3]    Q Do you remember when you faxed this letter?

[4]    A No.

[5]    Q Now in looking at this letter, what is the date on [6] this

letter?

[7]    A January 31, 2003.

[8]    Q Did you read this letter before you sent it to the

[9]    Bureau?

[10]    A I believe so, yes.

[11]    Q Did you agree with what the doctor was stating in

[12]    this letter?

[13]    A Yes I did.

[14]    Q Let's bring your attention to the second [15] paragraph. It

says there working the same environment as [16] her assailant

merely intensifies her symptoms and does not [17] give her a

chance to heal. Common sense and goodwill would [18] dictate

that Ms. O'Donnell not be required to work in the [19] same facility

at the same time as Mr. Reynoso. Do you see [20] that there?

[21]    A Yes I do.

[22]    Q At this time, you were still at home at this time, [23] but

what were your restrictions, your work restrictions at [24] that time?

[25]    A I don't understand the question.

## Page 211

[1]    Q If you were back at work, under what conditions [2] would

you have been working?

[3]    A I would have been restricted to the mailroom, as [4] far as

I knew. That was the last, that January 7th or 8th, [5] was the last

day I was at work and I was restricted to the [6] mailroom.

[7]    Q Okay. Did Officer Reynoso work in the mailroom?

[8]    A No.

[9]    Q Did he ever have any reason to be at the mailroom [10] in

the normal course of his duties and functions?

[11]    A Yes.

[12]    Q And what would that be?

[13]    A To read the SIS mail that we put aside for them. [14] It

means they're on the hot list. That we have to put [15] aside. SIS is

required to come out once daily to read it [16] just to see if there is

anything that needs to be taken back [17] or whatever.

[18]    Q During the time that you were still working and

[19]    working in the mailroom, did you ever, was there ever an

[20]    occasion where Officer Reynoso went to the mailroom to

[21]    perform that function you just described while you were

[22]    there?

[23]    A No.

[24]    Q Okay. And if you still were working on January [25] 31,

2003, what would your hours have been at that time?

## Page 212

[1]    A I don't know.

[2]    Q Okay.

[3]    A Because I left. I think it was 7:30 to 4:00.

[4]    Q Okay.

[5]    A And I got the letter FedExed saying they were [6] going to

change me to 9:30 to 6:00.

[7]    Q Okay.

[8]    A But I don't know.

[9]    Q Okay. Now here in the second sentence of this

[10]    second paragraph, it says that Ms. O'Donnell should, I'm

[11]    filling in some words for it to make sense, should not be

[12]    required to work in the same facility at the same time as

[13]    Mr. Reynoso. Do you see that?

[14]    A Yes I do.

[15]    Q Did that happen during the period after the [16] incident

at Mirror Lake up to the time that you went out on [17] Leave?

Where you would work at the same facility as Mr. [18] Reynoso at

the same time?

[19]    A I know they scheduled us for training together but [20] I

don't think there was a time that we worked at the [21] facility

together after that incident at Mirror Lake. I [22] don't ever, I don't

recall an incident where we worked.

[23]    Q Okay. It also says in the second to last [24] paragraph,

recovery is unlikely until the two are separated. [25] Do you see

that?

Page 213

[1]    A Yes I do.

[2]    Q Isn't it true that after the incident at Mirror [3] Lake, that you and Mr. Reynoso were separated on the [4] premises?

[5]    A Yes.

[6]    Q Okay. So when you sent this letter and he's [7] requesting that you not work in the same facility at the [8] same time and that you be separated, didn't the Bureau [9] already provide that situation to you?

[10]    A Yes they did.

[11]    MR. WILMOT: Okay. I am going to show you what [12] has been marked as Exhibit 50.

[13]    (DOJ Exhibit No. 50 was marked for [14] identification.)

[15]    BY MR. WILMOT:

[16]    Q Do you recognize this document?

[17]    A Yes I do.

[18]    Q Can you identify what it is?

[19]    A It's a letter from my former attorney to the [20] warden.

[21]    Q And what is it stating in this letter?

[22]    A That he is now representing me and to correspond [23] with him directly. So to go through him for everything.

[24]    Q Now it says in the third paragraph starting with [25] the second sentence, you have advised Colleen that you would

Page 214

[1]    be willing to restrict Officer Reynoso to the camp. This

[2]    might be a responsive accommodation and we thank you for

[3]    such. Please elaborate on this proposed resolution so that

[4]    we may fully understand any impact on Colleen. Do you see

[5]    that there?

[6]    A Yes.

[7]    Q Were you confused at what the warden meant by

[8]    restricting Officer Reynoso to the camp?

[9]    A Was I confused?

[10]    Q Yes.

[11]    A No. I don't think so.

[12]    Q Did you understand what he meant by putting

[13]    Officer Reynoso at the camp and restricting him to that

[14]    area?

[15]    A Yes.

[16]    Q And what does that mean?

[17]    A That would be where he works. His duty hours [18] would be off the grounds and at the camps.

[19]    MR. WILMOT: Okay. I am going to show you what [20] has been marked as Exhibit 51.

[21]    (DOJ Exhibit No. 51 was marked for [22] identification.)

[23]    BY MR. WILMOT:

[24]    Q Do you recognize that document?

[25]    A Yes I do.

Page 215

[1]    Q Can you identify what it is please?

[2]    A That's a letter, memorandum to me from the [3] Associate Warden Rick Harnes, who is also the Voluntary [4] Leave Transfer Program Screening Chairperson. I got that [5] all out. Denying my request for Voluntary Leave.

[6]    Q Okay. So that was the prior, the application that [7] you identified earlier, Voluntary Leave Application?

[8]    A The application. Yes, that is the application I [9] filled out.

[10]    Q What is the Exhibit number on that application?

[11]    A 48.

[12]    Q Okay. How is this memo, the February 10, 2003

[13]    memo delivered to you?

[14]    A I don't recall. It could have been through FedEx. [15] I don't recall.

[16]    Q Okay. Did anyone notify you that your application

[17]    would be denied by telephone?

[18]    A I want to say someone from the union called me and

[19]    told me that it was denied.

[20]    Q Okay. Do you know who from the union called you?

[21]    A No I don't. No, I don't remember who called me [22] from the union.

[23]    Q Okay. Now the date on this memo is February 10,

[24]    2003. In the last paragraph there it says your medical

[25]    emergency is based on another staff member's employment with

Page 216

[1]    the Bureau Prisons and you would be able to return to work

[2]    if the other individual was no longer employed.

[3]    Do you see that there?

[4]    A Yes.

[5]    Q At this point February 10, 2003, if Officer [6] Reynoso was not working at the Bureau of Prisons, would you [7] have been able to return to work?

[8]    A I believe so. But again, I don't remember my [9] state of mind at that point. But I believe I would be able [10] to.

[11]    Q Do you have reason to doubt that you would not

[12] have been able to return to work at that time, February 10,

[13] 2003?

[14]    A I don't remember. Yes, because I don't remember

[15] how I was at that point.

[16]    Q Okay. So is it fair to say that it's possible [17] that you were not in the right state of mind to return back [18] to work at that time even if Officer Reynoso was not on the [19] premises?

[20]    A No, I would not say that.

[21]    Q Okay. Now the date of your Voluntary Leave

[22] Application is January 27, 2003.

[23]    A Okay.

[24]    Q And if you can just turn to the second page of [25] that. Is this your handwriting in this block, that's number

## Page 217

[1] 18?

[2]   A No.

[3]   Q Whose handwriting is that?

[4]   A That is Dr. Milowe.

[5]   Q Okay. So do you remember taking this document to

[6] Mr. Milowe or sending it to him in some way when you filled

[7] this out?

[8]   A Yes. I brought this to him.

[9]   Q Okay. Now at the end of this document it says

[10] severity of emergency severe. It is recurring with daily

[11] symptoms. Duration is likely to be lengthy, indefinite.

[12] Many, many years as long as patient is forced to work with

[13] David Reynoso. Do you see that there?

[14]   A Yes.

[15]   Q Now at this time as you described before, if you

[16] returned to work under the restrictions that you were under

[17] and Mr. Reynoso was still working the restrictions he was

[18] working, would you ever have to work together?

[19]   A Yes.

[20]   Q How?

[21]   A If there was an emergency. An institutional

[22] emergency.

[23]   Q Other than, how often do emergencies happen at the

[24] institution?

[25]   A Not very often. But there has been when we have

## Page 218

[1] to stay late. You know, when it was required that we had to

[2] stay late because of an emergency.

[3]   Q From the date of the incident at Mirror Lake to [4] the time

when you went out in January 2003, had such an [5] emergency

ever happened when you had to stay late?

[6]   A No.

[7]   Q Okay. So other than the possibility of an [8] emergency

that required you to stay late, would you ever [9] have to work with

Mr. Reynoso?

[10]   A Yes.

[11]   Q And how would that happen?

[12]   A If there was nobody over to screen the mail for [13] SIS.

He would have to come over and screen the mail. I [14] think that

would be it though.

[15]   Q After the incident at Mirror Lake in 2002 up to [16] the

time that you went out in January of 2003, did that ever

[17] happen?

[18]   A That never happened, no.

[19]   Q Okay. So other than those two circumstances you

[20] described, would you ever have to work with Mr. Reynoso if

[21] you were both working under the restrictions that you were

[22] put under up to the point that you went out on leave?

[23]   A No, not that I can think of.

[24]   MS MCDONALD: It's 5:00.

[25]   MR. WILMOT: Is it? It's probably a good point to

## Page 219

[1] take a break. Why don't we go off the record here, we will

[2] continue on Friday.

[3]   (Whereupon, at 5:00 p.m., the above proceedings [4] were

adjourned to continue on Friday, the 26th of August, [5] 2005, to

commence at 10:00 a.m.)

## Page 220

[1] C E R T I F I C A T E [2] COMMONWEALTH OF MASSACHUSETTS·)

) SS. [3] COUNTY OF SUFFOLK )

[4] I, Marilyn D. Franklin, a Court Reporter and [5] Notary Public,

within and for the Commonwealth of [6] Massachusetts, do hereby

certify that there came before me [7] on this 24th day of August,

2005, the person hereinbefore [8] named, who was by me duly

sworn to tell the truth, the whole [9] truth, and nothing but the

truth, concerning and touching [10] the matter in controversy in

this cause; that she was [11] thereupon examined upon her oath,

and her examination [12] reduced to typewriting, under my

direction, and that this [13] deposition transcript is a true and

accurate record of the [14] testimony given by the witness.

[15] I further certify that I am not related to any of [16] the parties

hereto or their counsel, and that I am in no way [17] interested in

the outcome of said cause.

[18] Dated at Boston, Massachusetts, this 8th day of

[19] September, 2005.

[21]

Marilyn D. Franklin

[22] NOTARY PUBLIC

My Commission Expires:

[23] August 18, 2011

Page 235

[1]    MR. WILMOT: Mark that please.

[2]    (Exhibit No. 55 was marked for [3] identification.)

[4]    BY MR. WILMOT:

[5]    Q I'm showing you what has been marked as Exhibit [6] 55. Will you take a second to read that document?

[7]    (Pause.)

[8]    BY MR. WILMOT:

[9]    Q Can you identify what that document is?

[10]    A That's a memorandum from Steve Gagnon, Inmate [11] Systems Manager, to the Warden regarding a phone call he [12] received from me on March 20th, 2003.

[13]    Q Do you remember speaking with Steve Gagnon on [14] March 20th, 2003?

[15]    A Yes.

[16]    Q What can you tell me about that conversation?

[17]    A I called him to ask him the status of my [18] employment here.

[19] I think he told me I was on AWOL, but I'm not a [20] 100 percent, and I know he said -- he asked when will I -- [21] when do I think I will be able to return to work.

[22]    Q And what did you say?

[23]    A I basically told him that I was hoping to return [24] soon. I don't remember giving him a date.

[25]    Q Here, his note says that you stated that you want

Page 236

[1] to return to work on the following Monday, March 24, 2003.

[2] Do you see that?

[3]    A Yes, I do.

[4]    Q Do you have a memory of telling Mr.Gagnon that?

[5]    A No, I don't.

[6]    MR. WILMOT: Mark this as Exhibit 56.

[7]    (Exhibit No. 56 was marked for [8] identification.)

[9]    MR. WILMOT: I'm showing you what has been marked [10] as Exhibit 56. Take a moment to review that and let me know [11] when you're finished.

[12] We can go off the record while she's reviewing it.

[13]    (Brief recess.)

[14]    BY MR. WILMOT:

[15]    Q Do you recognize that document?

[16]    A Yes.

[17]    Q Can you identify what it is, please?

[18]    A It's a memorandum from Ken Nichols, EEO Counselor, [19] regarding his contact with me; what my claims were.

[20]    Q Can you flip to the section of this document where [21] the title is, Request for EEO Counseling?

[22] Three pages in from there, you just flip two more. [23] One more.

[24] On the page, it says Bate Stamp BOP 5073.

[25] Is that your signature that appears on this page?

Page 237

[1]    A Yes.

[2]    Q What's the date of this -- of your signature?

[3]    A March 19th, 2003.

[4]    Q Okay. If you could flip back just one page, and [5] I'm going to ask you this question:

[6] Your signature, what were you signing this [7] document -- what were you attesting to by signing this [8] document?

[9]    A That I agreed with what he wrote down.

[10]    Q If you could look half-way through the page. [11] there is a paragraph that starts, During the period of April [12] 2002 through January 2003, do you see that?

[13]    A Yes.

[14]    Q It continues by saying, The complainant alleges [15] that Mr.Reynoso harassed her at work, at FMC Devens through [16] many different means including watching her on video cameras [17] and calling her on institutional telephones.

[18] Do you see that?

[19]    A Yes.

[20]    Q Is that statement correct?

[21]    A No.

[22]    Q And what is incorrect about that statement?

[23]    A The dates.

[24]    Q What should the dates read?

[25]    A Prior to April 2002.

Page 238

[1]    Q Okay. Now, if you flip back to the page where [2] your signature appears, you list there a number of persons [3] that have information in relation to your claim.

[4] Do you see that?

[5]    A Yes, I do.

[6]    Q And next to the names, there are statements.

[7] For example, the first one says, David Winn, [8] Warden, discriminated against me.

[9] Do you see that?

[10]    A Yes, I do.

[11]    Q Can you identify, for the record, the persons you [12] name on this page as being persons who discriminated against [13] you?

[14]    A Yes.

[15] David Winn, Warden; Cynthia Lord, Human Resource [16] Manager; Steve Gagnon, Inmate Systems Manager; David [17] Reynoso, Intelligence Officer; Harry Lappin, Director; [18] Michael Bollinger, Captain; Dennis Duffy, Special [19] Investigation Agent; Darren Brown, Special Investigative [20] Agent and Office of Internal Affairs.

[21]    Q Are there any names that, at this point, you wish [22] to add to that list, of persons that you believe [23] discriminated against you?

[24]    A No, not that I can think of.

[25]    Q If you flip two pages after that page, one more,

Page 275

[1]    Q Referring to the document that we just reviewed, [2] from
Steve Gagnon, I believe it's the June 23rd, 2003 [3] letter, Exhibit
No. 67?
[4]    A Yes.
[5]    Q There it says, You must request leave without pay [6] from
the Warden prior to June 30th, 2003.
[7] Do you see that?
[8]    A Yes.
[9]    Q Do you have a memory whether or not you requested
[10] leave without pay prior to June 30th, 2003?
[11]    A I don't have a memory of it, just what I see here. [12] But I
don't remember it.
[13]    Q Your memo, which is June 26th, 2003, Exhibit 68; [14] do
you remember having a conversation with anyone stating [15] that
you should fill out a proper request for leave form if [16] you're
going to request any form of leave?
[17]    A I don't remember if I spoke to anyone regarding [18] it.
[19]    Q Did anyone ever tell you that to request leave [20] that
you had to fill out a form in order to do that?
[23]    Q Prior to that date, sure.
[24]    A When I first started in the bureau, I was always [25] told
that we had to fill this out, request for leave – for

Page 276

[1] approved leave if we needed any time off.
[2]    Q Is there a reason why you didn't fill out a [3] request for
leave form, but instead submitted the memorandum [4] that's
marked as Exhibit 68?
[5]    A Not that I can recall. I don't know the reason.
[6]    Q Now, looking at Exhibit 69, was this request for [7] leave
approved?
[8]    A Yes, it was.
[9]    Q What dates were you approved for?
[10]    A Approved leave without pay, from 7/30/2003 to
[11] 8/11/2003.
[12]    Q Now underneath that sentence you just read, what
[13] does it say under there?
[14]    A Ms.O'Donnell must provide an updated doctor's [15] note
to me.
[16]    Q Do you know who wrote this note?
[17]    A I assume it was the Warden.
[18]    Q Do you have a memory of providing the Warden with
[19] a doctor's note following this request for leave form the
[20] day of its approval, which is July 29th, 2003?
[21]    A I don't think I did.
[22]    MR. WILMOT: Mark that, please.
[23]    (Exhibit No. 70 was marked for [24] identification.)
[25]    BY MR. WILMOT:

Page 277

[1]    Q Is there a reason why you did not provide the [2] Warden
with the information that he was requesting?
[3]    A Yes.
[4]    Q And what is that reason?
[5]    A Advice from a former attorney.
[6]    Q I'm showing you what has been marked as Exhibit [7] 70.
[8] Do you recognize that document?
[9]    A Yes.
[10]    Q Can you identify what it is for me, please?
[11]    A It's a request for leave – approved leave. I [12] requested
it – from me, leave without pay, 8/11, August [13] 11th, it doesn't
have till when.
[14] It says doctor's note will follow when I have my [15] next
appointment in September.
[16]    Q And was this request approved or denied?
[17]    A Denied.
[18]    Q Is there any indication in this form as to why it [19] was
denied?
[20]    A Yes.
[21]    Q What does it say?
[22]    A Ms.O'Donnell failed to follow my instructions on [23] July
29th, 2003, by not providing an updated doctor's note.
[24]    Q Okay. And you agree that you did fail to provide, [25] or
failed to follow the Warden's instructions to provide an

Page 278

[1] updated doctor's note?
[2]    A Yes, I agree to that, yes. I didn't do that.
[3]    (Exhibit No. 71 was marked for [4] identification.)
[5]    BY MR. WILMOT:
[6]    Q I'm showing you what has been marked as Exhibit [7] 71.
[8]    MR. WILMOT: I'm going to speed up from here.
[9]    MS. KELLY MCDONALD: Okay, I've got 15 minutes.
[10]    BY MR. WILMOT:
[11]    Q Do you recognize that document?
[12]    A I do.
[13]    Q Can you identify what it is for me, please?
[14]    A It's a memorandum to me from Steve Gagnon, saying
[15] that he has tried to contact me by telephone on Tuesday,
[16] August 12th, 2003 and Wednesday, August 13th, 2003.
[17] He said he left three messages for me to contact [18] him.
[19] And then, This is notice that your request for [20] additional
leave without pay has been denied as you failed [21] to provide
the required medical update as directed on July [22] 29th, 2003.
[23] Effective August 13th, 2003, you have been placed [24] on
AWOL status.
[25]    Q Do you have a memory of the three messages that

Page 279

[1] Steve Gagnon is referring to in this letter; that he says [2] that he left for you?

[3] A No, just one message.

[4] Q You only remember one?

[5] A Yes.

[6] Q Do you remember if you responded to this message?

[7] A No, I did not.

[8] Q And it says here that you were placed on AWOL [9] status because you had failed to provide the BOP with the [10] required medical update.

[11] Do you see that?

[12] A I do, yes.

[13] Q And again, you agree that you failed to provide [14] the required medical update as you were directed on July [15] 29th, '03?

[16] A I agree, I didn't do that.

[17] Q Do remember what your next contact with any of [18] your supervisors, or anyone in HR or BOP was?

[19] A Most contact was through my former attorney, so I [20] don't remember my contact with them – or his contact.

[21] (Exhibit No. 72 was marked for [22] identification.)

[23] BY MR. WILMOT:

[24] Q I'm going to show you what's been marked as [25] Exhibit 72.

Page 280

[1] Would you take a moment to review that document [2] for me, please?

[3] MR. WILMOT: We can go off the record while she's [4] reading it.

[5] (Off the record from 11:40 a.m. to 11:45 a.m.)

[6] BY MR. WILMOT:

[7] Q Have you had a chance to review this document?

[8] A Yes, I did.

[9] Q Can you turn to the last, or second to the last [10] page of this document?

[11] On page No. 9, there's a signature on that page. [12] Whose signature is that?

[13] A It's my signature.

[14] Q What's the date of your signature?

[15] A October 18th, 2003.

[16] Q After reviewing this document today, do you still [17] believe that it is still true and complete?

[18] A I have to take a minute again just to–

[19] Q Absolutely.

[20] (Pause.)

[21] A Yes, I do.

[22] Q Yes, you do? You believe it's true and complete?

[23] A Yes. Sorry.

[24] Q That's okay.

[25] Can you flip to page 6 of that document?

Page 281

[1] At the beginning of the second paragraph on that [2] page it says, FMC Devens administration supports Mr. Reynoso [3] even though he is a convicted, violent offender.

[4] Do you see that there?

[5] A Yes, I do.

[6] Q What was Officer Reynoso convicted of?

[7] A Domestic assault and battery with a dangerous [8] weapon.

[9] Q He's a convicted – and this is in your case?

[10] A Yes.

[11] Q So your testimony is that he was convicted of that [12] charge?

[13] A Yes. He pled guilty.

[14] Q Okay. I'm going to ask you to turn to page 7.

[15] MS. KELLY MCDONALD: Can we, just for the record, [16] there are two page numbers on there so–

[17] MR. WILMOT: I can refer to the Bates stamp [18] number.

[19] BY MR. WILMOT:

[20] Q Just for the record, the previous page we're [21] reading from was Bates stamped BOP5203.

[22] I'm now asking you to look at page BOP5204.

[23] The top of the page, under the question, Explain [24] your sex-based discrimination complaint in relation to [25] management failed to provide a reasonable accommodation.

Page 282

[1] The second paragraph of the answer, last sentence, [2] it says, I'm the only female in the Inmate Systems [3] Management Department.

[4] Do you see that there?

[5] A I think I'm looking at the wrong–

[6] Q This paragraph here, the last sentence.

[7] It says, I'm the only female in the Inmate Systems [8] Management Department.

[9] Is that true?

[10] A On my side on receiving the discharge.

[11] Q What do you mean–

[12] A I'm the only Inmate Systems officer, female Inmate [13] Systems Officer. Yes.

[14] Q On receiving the discharge–

[15] A In mail room, yes.

[16] Q Are there Inmate Systems Officers?

[17] A No – male officers, yes, not female ISOs.

[18] Q Okay. So there are no female ISOs at Devens.

[19] A No, there is none besides me.

[20] Q Now, before you described in your previous [21] testimony from Wednesday, I think you said there were a [22] number of people in the mail room when you came back from [23] Mirror Lake on April 8th, 2002.

[24] You said there were some people that were in the [25] mail room at that time?

Page 291

[1] you had with Darren Brown?

[2]    A No. I remember him asking questions regarding my

[3] AWOL, but I don't remember the conversation.

[4]    (Exhibit No. 75 was marked for [5] identification.)

[6]    Q I'm showing you what has been marked as Exhibit [7] 75.

[8] Would you take a moment to read through that [9] document,
please?

[10]    A Sure.

[11]    (Pause.)

[12] All right.

[13]    Q On the last page of this document, which is Bates

[14] stamp BOP0052, there's a signature there above the word, [15] affiant.

[16] Do you see that?

[17]    A Yes.

[18]    Q Whose signature is that?

[19]    A That's mine.

[20]    Q What's the date of your signature?

[21]    A December 10th, 2003.

[22]    Q You've had a moment to review this document,

[23] correct?

[24]    A Yes.

[25]    Q Do you remember if you reviewed this document at

Page 292

[1] the time that you signed it?

[2]    A Yes.

[3]    Q Is the content of this document true and accurate?

[4]    A To the best of my knowledge, yes.

[5]    Q If you could just turn to the page that's Bates [6] stamped
0051; if you look at the sentence that's No. 18, do [7] you see that
there?

[8]    A Yes, I do.

[9]    Q It says, Both my doctor and my attorney were aware

[10] of my relationship with each other.

[11] What does that sentence mean?

[12]    A I forget why – I mean, I forget what he asked me, [13] but
my doctor knew that at that point I had an attorney [14] working on
my behalf and my attorney knew that I was seeing [15] a doctor –
a psychiatrist.

[16]    Q Do you know whether – strike that.

[17]    MR. WILMOT: Mark that, please.

[18] Thank you.

[19]    (Exhibit No. 76 was marked for [20] identification.)

[21]    Q I'm showing you what has been marked as Exhibit

[22] 76.

[23] Do you recognize that document?

[24]    A Yes, I do.

[25]    Q Can you identify what it is for me, please?

Page 293

[1]    A It is from my former psychiatrist, Brian Ackerman, [2] to the
Warden regarding my current medical condition at the [3] time,
which was December 16th, 2003.

[4]    Q Do you remember why Dr. Ackerman prepared this [5] letter?

[6]    A Yes.

[7]    Q Why is that?

[8]    A They investigated my AWOL and the Warden wanted to

[9] talk to me. So I spoke with him and he asked me if I could

[10] provide any type of medication I'm on, or anything, and it

[11] would just be between me and him. He would be the only one

[12] that sees it.

[13] And that way he could make a determination on what [14] my
discipline would be on AWOL.

[15]    Q Did you meet with Dr. Ackerman prior to his

[16] preparation of this letter?

[17]    A Yes.

[18]    Q Do you remember when you met with him?

[19]    A I don't remember the date, but I remember when the

[20] Warden had the conversation with me.

[21] I actually had an appointment that day. It was [22] already
schedule, so I met with him then.

[23]    Q What do you remember about your meeting with

[24] Dr. Ackerman?

[25]    A I explained to him about being disciplined for

Page 294

[1] being on AWOL, and that the Warden wanted to know about

[2] my condition, the medications I was on, to make his

[3] determination on what discipline.

[4] That's what I remember.

[5]    (Exhibit No. 77 was marked for [6] identification.)

[7]    Q I'm showing you what has been marked as Exhibit [8] 77.

[9] Do you recognize that document?

[10]    A Yes, I do,

[11]    Q Can you identify what it is for me, please?

[12]    A It's a memorandum – a letter to me from the [13] Warden.
He CC'd my attorney, and it's regarding my return [14] to work.

[15]    Q What's the date of this document?

[16]    A November 18th, 2003.

[17]    Q Do you remember how you received this letter?

[18]    A I don't remember how I received it. I remember – [19] I
thing it might have come in to Human Resources, but I'm [20] not
100 percent sure.

[21]    Q Now, if you turn to the second page there, there's [22] a
note there that says, Refused to sign for receipt.

[23] I'm not sure what that says there, but it's dated [24] November
18th, 2003 by C. Lord.

[25] Were you asked to sign this document?