**EXHIBIT 2**

1

1 - 132

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

```
COLLEEN O'DONNELL,              )
                                )
         Plaintiff,             )
-v-                             ) CIVIL ACTION NO.
                                ) 04-40190-FDS
ALBERTO R. GONZALES,            )
Attorney General,               )
U.S. Department of Justice,     )
                                )
         Defendant.             )
```

THE ORAL DEPOSITION OF CYNTHIA LORD,

held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before Marilyn

Franklin, a Court Reporter and Notary Public, within and for

the Commonwealth of Massachusetts, at FMC Devens,

Ayer, Massachusetts, Massachusetts, on Friday, September 16,

2005, commencing at 10:39 a.m.



APEX Reporting
(617) 426-3077

**PRESENT:**

On Behalf of the Plaintiff:

    DAWN D. McDONALD, ESQ.
    Cooley, Shrair P.C.
    1380 Main Street, Fifth Floor
    Springfield, MA  01103
    (413) 735-0750

On Behalf of the Defendant:

    DAMIAN W. WILMOT, ESQ.
    Assistant U.S. Attorney
    U.S. Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA  02210
    (617) 748-3100

    KELLY L. McDONALD, ESQ.
    Assistant General Counsel
    Federal Bureau of Prisons

Page 49

[1] Mr. Reynoso be arrested, he be placed on immediate home duty [2] status.
[3] Q And was Mr. Reynoso placed on immediate home duty [4] status?
[5] A No.
[6] Q Were there any other recommendations of the [7] Committee?
[8] A To reconvene on Tuesday, April 9th at 9:00 a.m. to [9] further consider the incident based on how Mass State Police [10] respond?
[11] Q And did you convene on April 9th at 9:00 a.m.? [12] Reconvene, I should say?
[13] A Yes.
[14] Q And can you now take a look at Exhibit 4 and tell [15] me what the Committee, actually, strike that.
[16] Between the first Committee meeting and the second [17] Committee meeting, did the Committee find out that Officer [18] Reynoso had been arrested?
[19] A I don't remember.
[20] Q Can you read this paragraph here for the record?
[21] A Committee reconvened on Tuesday, April 9th and was [22] informed that Mr. Reynoso was arrested on Monday, April 8th.
[23] Q Does that refresh your memory as to whether the [24] Committee learned that Officer Reynoso had been arrested -
[25] A Yes.

Page 50

[1] Q On April 8th? That was a yes.
[2] A Yes.
[3] Q Okay. Thank you. And can you tell me what the [4] Committee recommendations were following this meeting?
[5] A The Committee advised that since the charge [6] against Mr. Reynoso is a state felony, he would have to be [7] placed on indefinite suspension until the charges were [8] resolved. [9] The Committee recommending Ms. O'Donnell be [10] referred to the Employee's Assistance Program and the [11] Committee recommending Mr. Reynoso be referred to the [12] Employee's Assistance Program should he return to work.
[13] Q And what is indefinite suspension?
[14] A Indefinite suspension is when an employee is [15] placed on suspension for an indefinite period of time due to [16] criminal proceedings.
[17] Q Is that the same as home duty status?
[18] A No.
[19] Q And is the employee paid when he is on indefinite [20] suspension?
[21] A No.
[22] Q And was Officer Reynoso placed on indefinite [23] suspension?
[24] A No.
[25] Q Do you recall that there was a Court hearing

Page 51

[1] wherein Officer Reynoso pled to sufficient facts for a [2] finding of guilty and received a continued without a [3] finding?
[4] A No.
[5] Q Okay. Do you know whether, do you know whether [6] there was a Court hearing?
[7] A No.
[8] MS. MCDONALD: Okay. I'm going to show you the [9] document that has been marked as Exhibit 5.
[10] (Exhibit No. 5 marked for [11] identification.)
[12] BY MS. MCDONALD:
[13] Q I'll ask you to take a look at that and I will ask [14] you whether you recognize that document?
[15] Have you seen that document before?
[16] A I've seen this first page.
[17] Q Not the other two pages?
[18] A I don't remember the other two pages.
[19] Q Okay. And does that first page refresh your [20] memory as to whether there was a Court hearing regarding [21] Officer Reynoso on January 3, 2003?
[22] A Yes.
[23] Q Now following that Court hearing in January of [24] 2003, was the matter referred for investigation, strike [25] that. Let me rephrase that.

Page 52

[1] Was the matter concerning April 2002 incident [2] referred for investigation?
[3] MR. WILMOT: Objection.
[4] THE WITNESS: I don't know.
[5] BY MS. MCDONALD:
[6] Q Do you know whether the investigation was [7] conducted regarding Officer Reynoso's conduct?
[8] A Yes.
[9] Q And who conducted that investigation?
[10] A I don't know.
[11] Q I am showing you two documents that were marked as [12] Winn Exhibit 6 and 7 and ask you if you could first review [13] them and let me know if you have, if you recognize either [14] one of those documents?
[15] (Pause)
[16] Do you recognize those documents?
[17] A I recognize this one.
[18] Q Okay. And which, when you say this one?
[19] A The OIA Investigative Report.
[20] Q And that is marked Winn Exhibit No. 7, is that [21] right?
[22] A Yes.
[23] Q Can you tell me what the results of the [24] investigation were?
[25] A The charge was sustained.

### Page 61

[1] THE WITNESS: Yes.
[2] BY MS. MCDONALD:
[3]   Q Do you recall what that suspension was for?
[4]   A DUI.
[5]   Q Did Ms.O'Donnell ever express her concerns for [6] her safety regarding Officer Reynoso to you?
[7]   A No.
[8]   Q Do you know whether she expressed them to [9] supervisors or officials at FMC Devens?
[10]   A Yes.
[11]   Q I'm showing you what has been marked Exhibits 15 [12] and 16 of Warden Winn's deposition and I ask you take a look [13] at those documents and let me know if you recognize them?
[14]   (Pause)
[15]   A Yes I have seen these before.
[16]   Q And what are those documents?
[17]   A Look's like memos from Colleen O'Donnell.
[18]   Q And what are those memos regarding?
[19]   A Safety concerns and safety issues.
[20]   Q And can you summarize the substance of those [21] memos?
[22]   (Pause)
[23]   A In the May 13th, that's my summarization, feels [24] that we've done enough to protect her as she states here and [25] her safety issues in the June 10th are that either she or

### Page 62

[1] Reynoso be placed on administrative leave.
[2]   Q Were any actions taken in response to those memos [3] that you are aware of?
[4]   A I really don't remember.
[5]   MS. MCDONALD: Can we go off for one second?
[6]   (Off the record at 12:25 p.m.)
[7]   (On the record at 12:27 p.m.)
[8]   BY MS. MCDONALD:
[9]   Q I am going to show you what has been marked as [10] Exhibit 39 in Colleen O'Donnell's deposition and ask if you [11] recognize that document?
[12]   A Yes.
[13]   Q And is, Exhibit 39 is dated January 8, 2003 and [14] that is assigning Ms.O'Donnell to her regular ISN duties, [15] right?
[16]   A That is correct.
[17]   Q And what are the hours of her new duties?
[18]   A 9:30 a.m. to 6:00 p.m.
[19]   Q And you testified that Ms.Swiderski was in your [20] department at that time, is that right?
[21]   A Yes.
[22]   Q And do you recall whether Ms.Swiderski told you [23] about a meeting with Ms.O'Donnell where she refused to sign [24] that document?
[25]   A No, I don't recall.

### Page 63

[1]   Q Okay. Did you become aware that Colleen had sent [2] a doctor's note indicating that she could not work in [3] January of 2003?
[4]   A Yes.
[5]   Q I am showing you what has been marked Exhibit 27 [6] in Warden Winn's deposition and ask you whether that's the [7] note that was received from Ms.O'Donnell from her doctor [8] indicating her inability to work?
[9]   A Yes.
[10]   Q Can you tell me in substance what that note says?
[11]   A That she is totally disabled, unable to work her [12] current job under the current circumstances. If her [13] assailant was removed from the work premises, she would be [14] able to work full-time without restrictions.
[15]   Q And does that note state that she was diagnosed [16] with post traumatic stress disorder?
[17]   A Yes ma'am.
[18]   Q And does that note state that Ms.O'Donnell's [19] condition is reversible?
[20]   A It doesn't say those words.
[21]   Q Well, it says she would be able to return to work [22] without restrictions if Officer Reynoso was not on the [23] premises, right?
[24]   A That is correct.
[25]   Q But it does not state that her post traumatic

### Page 64

[1] stress disorder is reversible, is that right?
[2]   A That is correct.
[3]   Q Does it say that Officer Reynoso should be [4] terminated?
[5]   A No.
[6]   Q What actions were taken as a result of the receipt [7] of that doctor's note?
[8]   A Warden Winn wanted further clarification on her [9] medical status.
[10]   Q And did he direct you to do anything in that [11] regard?
[12]   A Yes. I prepared a letter to Ms.O'Donnell to [13] request information from her physician.
[14]   Q I am showing you what has been marked Exhibit 42 [15] in Colleen O'Donnell's deposition and ask you to review that [16] and let me know if that is the letter that you prepared to [17] Ms.O'Donnell?
[18]   A Yes it is.
[19]   Q And what is page 2 of that document?
[20]   A It's a release from Ms.O'Donnell to her physician [21] for her physician to speak with one of our or to provide
[22] information to one of our agency reps.
[23]   Q Okay. And doesn't that release also ask her [24] physician to provide any information concerning her medical [25] history?

Page 85

[1] MR. WILMOT: Objection. You can answer.
[2] THE WITNESS: She was not granted administrative
[3] leave.
[4] BY MS. MCDONALD:
[5] Q Okay. And she had been denied voluntary leave or
[6] found not eligible for the Voluntary Leave Transfer Program,
[7] right?
[8] A Correct.
[9] Q And we, you testified earlier that she had been [10] denied leave without pay.
[11] Correct?
[12] A Correct.
[13] Q And she had exhausted her annual and sick leave.
[14] Is that right?
[15] A I believe so. It states here, yes.
[16] Q Is there any other leave that I am missing that [17] she could have applied for?
[18] A She could have applied for them again with proper
[19] documentation.
[20] Q Okay. So Ms.O'Donnell was placed on AWOL status
[21] on February 3, 2003. Do you -- if I represent that to you,
[22] does that purport with your memory?
[23] A I don't remember the exact date.
[24] Q Okay. Now this whole timeframe that we've
[25] discussing, is this the first time that Ms.O'Donnell was

Page 86

[1] AWOL?
[2] A I don't know.
[3] Q Do you know whether she was absent without leave [4] on two occasions?
[5] A I have, I have no recollection.
[6] MS. MCDONALD: Okay. Can we go off the record?
[7] (Whereupon, a luncheon recess was taken at 1:14 p.m.)

Page 87

[1] A F T E R N O O N  S E S S I O N
[2] (2:03 p.m.)
[3] BY MS. MCDONALD:
[4] Q At some point, did the BLP receive notice that [5] Colleen wanted to return to work?
[6] MR. WILMOT: Objection. You can answer.
[7] MS. MCDONALD: Do you need some context to that
[8] question?
[9] THE WITNESS: Yes, please.
[10] BY MS. MCDONALD:
[11] Q I'm sorry. It made sense if we hadn't stopped. [12] Okay, prior to the lunch break, we were discussing [13] Ms.O'Donnell's absence from work and the fact that she was [14] AWOL.
[15] Do you recall that?
[16] A Yes.
[17] Q And after some period of time which I will [18] represent to you was February 3, 2003 through June 10 of [19] 2003, do you recall that Ms.O'Donnell wanted to return to [20] work?
[21] A Yes.
[22] Q And did she provide a doctor's notice in order to
[23] facilitate her return?
[24] A I don't remember.
[25] (Exhibits No. 12 and 13 marked for

Page 88

[1] identification.)
[2] BY MS. MCDONALD:
[3] Q I am going to show you two documents which have
[4] been marked Exhibits 12 and 13 and ask you take a look at
[5] them.
[6] Do you recognize those documents?
[7] A Yes.
[8] Q Can you describe them please?
[9] A There's a letter from Sam Rizzitelli indicating [10] that there's correspondence Colleen's treating physician
[11] authorizing her to return to work and then him requesting
[12] pertinent information regarding Mr.Reynoso and a copy of
[13] the restraining order which is renewed and awaiting the
[14] reply.
[15] Q Which exhibit were you just describing?
[16] A 13.
[17] Q And can you describe Exhibit 12 please?
[18] A It's from Dr.Milowe, George Milowe, M.D. re: [19] Colleen O'Donnell. Saw this patient today in the office. [20] She is now able to resume her job duties, including [21] overtime.
[22] Q Do you know if anyone responded to Attorney
[23] Rizzitelli's June 4, 2003 letter?
[24] A I don't remember.
[25] MS. MCDONALD: Let me show you what has been

### Page 105

[1] Q Are the BOP's policies posted within its [2] facilities?
[3] A Yes they are.
[4] Q what is posted?
[5] A There's a posting in the office of special [6] counsel. It's posted. And there is the EEO process on [7] filing complaints that is posted, as well as sexual [8] harassment posting.
[9] Q Okay. Now where are these policies posted?
[10] A They're on the affirmative action bulletin board [11] by ISM and the sallyport area there, the staff lounge and [12] medical.
[13] Do employees have access to these three areas that [14] you just identified?
[15] A Yes.
[16] Q Are the Bureau's policies, the ones you have [17] identified already, are they written any where?
[18] A Yes.
[19] Q Where could an employee find these policies in [20] written form?
[21] A On sallyport, from my office.
[22] Q When you say your office, the Employee Services?
[23] A The Employee Services Department, yes. And they [24] are provided during annual refresher training on a yearly [25] basis.

### Page 106

[1] Q What is annual refresher training?
[2] A Every year we have refresher training for a [3] variety of, well, we have forty hours of training that we [4] must attend which involves self-defense firearms, sexual [5] harassment training, EEO training, correctional services [6] training, disturbance control. And I'm sure I haven't - [7] inmate sentencing guidelines.
[8] Q We're focusing on the policies that we were [9] talking about?
[10] A Okay.
[11] Q Are those provided during the annual refresher [12] training?
[13] A Yes.
[14] Q Okay. But the refresher training generally covers [15] or updates on various policies of the Bureau.
[16] Is that correct?
[17] A Affirmative action, EEO, sexual harassment, and [18] the code of conduct, ethics.
[19] Q Now when you say EEO, are the guidelines [20] concerning when an employee must file an EEO complaint, are [21] those discussed during the annual refresher training?
[22] A Yes.
[23] Q Are the guidelines concerning filing an EEO [24] complaint provided to employees in written form?
[25] A Yes.

### Page 107

[1] Q Okay. And at what points are employees, [2] employment here at Devens, would those, the written form of [3] the covering EEO guidelines, when would that be provided?
[4] A They're provided initially at hire, during [5] institutional familiarization and then annually in ART. [6] Annual Refresher Training.
[7] Q Okay. Do you know whether the guidelines [8] concerning the filing of an EEO complaint were provided to [9] Ms.O'Donnell?
[10] A Yes.
[11] Q Okay. Yes they were?
[12] A Yes they were.
[13] MS. MCDONALD: Okay. Mark that please. I am going to [14] show you what is marked as Exhibit 25.
[15] (Exhibit No. 25 marked for [16] identification.)
[17] BY MS. MCDONALD:
[18] Q Can you identify that document?
[19] A It's an acknowledgement of receipt for program [20] statement entitled Sexual Harassment Prevention Program.
[21] Q And who is that document executed by?
[22] A Mr.Reynoso.
[23] Q And it shows that Mr.Reynoso also received this [24] program statement on what date?
[25] A September 28, 1998.

### Page 108

[1] Q Okay. Now at the onset of your deposition today, [2] you gave some testimony as to the background investigation [3] of Mr.Reynoso.
[4] Do you remember that testimony?
[5] A Yes.
[6] Q Okay. I believe Attorney McDonald asked you some [7] questions about whether it was possible that something [8] slipped past you concerning Mr.Reynoso's background.
[9] Do you remember that testimony?
[10] A Yes.
[11] Q If I can bring your attention to Exhibit, Winn [12] Exhibit No. 3. If you can turn to the second page of this [13] document. Second page. Winn Exhibit No. 3 is the [14] declaration for federal employment by Mr.Reynoso which you [15] identified earlier.
[16] And Ms.O'Donnell's question about whether [17] something could have slipped by concerned the arrest that [18] Mr.Reynoso identifies on this document.
[19] Do you see that?
[20] MS. MCDONALD: Ms.McDonald's question.
[21] THE WITNESS: McDonald.
[22] MR. WILMOT: I'm sorry. Let me strike the whole [23] thing. Let's start from the beginning. All right.
[24] BY MR. WILMOT:
[25] Q Exhibit 3 from Mr.Winn's deposition is the