**EXHIBIT 4**

1

1 - 170

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLLEEN O'DONNELL, | ) |
| | ) |
| Plaintiff, | ) |
| -v- | ) CIVIL ACTION NO. |
| | ) 04-40190-FDS |
| ALBERTO R. GONZALES, | ) |
| Attorney General, | ) |
| U.S. Department of Justice, | ) |
| | ) |
| Defendant. | ) |

THE ORAL DEPOSITION OF DAVID L. WINN,

held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before Marilyn

Franklin, a Court Reporter and Notary Public, within and for

the Commonwealth of Massachusetts, at FMC Devens,

Ayer, Massachusetts, Massachusetts, on Thursday, September

14, 2005, commencing at 10:04 a.m.

*APEX Reporting*
(617) 426-3077

2

**PRESENT:**

On Behalf of the Plaintiff:

    DAWN D. McDONALD, ESQ.
    Cooley, Shrair P.C.
    1380 Main Street, Fifth Floor
    Springfield, MA   01103
    (413) 735-0750

On Behalf of the Defendant:

    DAMIAN W. WILMOT, ESQ.
    Assistant U.S. Attorney
    U.S. Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston, MA   02210
    (617) 748-3100

    KELLY L. McDONALD, ESQ.
    Assistant General Counsel
    Federal Bureau of Prisons

ALSO PRESENT:

    Colleen O'Donnell

Page 33

[1] conducted on David Reynoso?
[2]  A Yes I have.
[3]  Q And do you recall what his background check
[4] revealed?
[5]  A I think there was an issue of just debts.
[6]  Q Anything else?
[7]  A Not that I recall.
[8]  Q Did it reveal an arrest for assault and battery [9] with a dangerous weapon?
[10]  A Not that I recall.
[11]  Q Have you ever seen David Reynoso's application for
[12] employment?
[13]  A At one time, I reviewed it. The date of review, I
[14] couldn't tell you.
[15]  (Exhibit No. 1 marked for [16] identification.)
[17]  BY MS. MCDONALD:
[18]  Q Okay. I am going to show you this document? Do
[19] you recognize this document?
[20]  A Do I recognize it?
[21]  Q Yes.
[22]  A No I don't.
[23]  Q You've never seen that document before?
[24]  A I may have but I don't remember it.
[25]  Q Do you know what this document is?

Page 34

[1]  A It's a document from my understanding, I'm not an
[2] expert at it, would give me information either that the
[3] investigation has been cleared or not cleared.
[4]  Q Okay. And do you see the date on the bottom. [5] Would that represent when you received that document.
[6]  MR. WILMOT: Objection.
[7]  THE WITNESS: I wasn't here at that time.
[8]  (Exhibit No. 2 marked for [9] identification.)
[10]  BY MS. MCDONALD:
[11]  Q Okay. I am going to show you another document.
[12] Can you describe that document?
[13]  A It's a reinvestigation and it closed out the
[14] investigation on 7-30-04.
[15]  Q And what is the date on that document?
[16]  A March 31, 2005.
[17]  Q Do you know what investigation –?
[18]  A Excuse me, I can't tell if it's March 3rd or March [19] 31st.
[20]  Q Okay. Do you know what investigation that
[21] document is referring to?
[22]  A No.
[23]  Q What would be a reason that another, an additional
[24] background check would be conducted on an employee once he's [25] already hired?

Page 35

[1]  A They do a five year background check.
[2]  Q And that's standard for all employees?
[3]  A That's correct.
[4]  Q So it's possible that was the five year background
[5] check that you don't recall?
[6]  A That's possible.
[7]  (Exhibit No. 3 marked for [8] identification.)
[9]  BY MS. MCDONALD:
[10]  Q Okay. I am going to show you another document and
[11] ask if you can take a look at that and state for the record
[12] what that document is?
[13]  A I have no idea.
[14]  Q You don't know what this document is?
[15]  A No.
[16]  Q Now you testified a few moments ago that you had
[17] reviewed Mr. Reynoso's application for employment at some
[18] point in time, I believe, was your testimony.
[19] Is this not his application for employment?
[20]  MR. WILMOT: Objection. You can answer.
[21]  THE WITNESS: Well, I reviewed his, you're asking [22] me if I know what that form is and the answer is no, I don't [23] know what that form is.
[24] Is it part of the background, it could be, but I'm [25] not certain.

Page 36

[1]  BY MS. MCDONALD:
[2]  Q Okay. You've never seen this form before?
[3]  A Not that I recall.
[4]  Q I am going to refer you to paragraph 8. If you [5] could read what paragraph states for the record.
[6]  A Paragraph 8?
[7]  Q Yes.
[8]  A "During the last ten years have you ever been
[9] convicted, imprisoned, been on probation or been on parole?
[10] Includes felonies, firearms, explosive violations,
[11] misdemeanors and all other offenses. If you answered yes to
[12] Item 15, you need to provide the date, explanation of the
[13] violation and place of occurrence, and names and addresses
[14] of the police department or court involved."
[15]  MR. WILMOT: For the record, I just want to state [16] the right side of this document is support copy, I guess. [17] So, it's hard to read anything in the right margin of the [18] document.
[19]  MS. MCDONALD: Yeah. And I won't ask him anything
[20] about the right margin.
[21]  MR. WILMOT: All right.
[22]  MS. MCDONALD: That's how the copy was that I got.
[23]  BY MS. MCDONALD:
[24]  Q So this is, paragraph 8 states that any yes [25] answers should be explained in Item 15. So I am going to

Page 37

[1] refer you to Item 15 on the second page and first let me ask
[2] you, does that document if I represent to you that document
[3] is the declaration for federal employment for David Reynoso,
[4] would you agree with that?
[5]   A  Repeat the question.
[6]   Q  If I represent to you that document is the [7] declaration for federal employment filled out by Mr. David [8] Reynoso, would you agree with that statement?
[9]   A  Yes.
[10]  Q  And under Item 15, does he explain a situation [11] which was asked about in paragraph 8?
[12]  MR. WILMOT: Objection. You can answer.
[13]  THE WITNESS: YES.
[14]  BY MS. MCDONALD:
[15]  Q  And what does it state there?
[16]  A  Arrested for assault and battery on May 3, 1991. [17] Case was brought before a judge on October of 1991. He [18] continued the case without a finding for one year. I was [19] ordered to report to probation, probation officer, where she [20] instructed me to report to her once a month. I was also [21] instructed to attend emergency, or I think it's emergency [22] classes, merge classes. When I went before the judge, he [23] later dropped all charges from the case and was dismissed. [24] The court was Lynn District Court, Essex County.
[25]  Q  Were you ever aware of these facts as are stated

Page 38

[1] in this document?
[2]   A  Was I aware of those?
[3]   Q  Yes.
[4]   A  Not that I recall. No.
[5]   Q  Okay. Now I understand that in May of 1998, you [6] were not the Warden at this facility? Is that correct?
[7]   A  Correct.
[8]   Q  But let me ask you a hypothetical question. Were [9] an individual to apply for employment, and state these facts [10] as they are stated in this document, is this an individual [11] that you would hire for employment at this facility?
[12]  A  Well, number one, I don't know the rules or [13] guidelines on a continuation without a finding. From my [14] understanding continuation without a finding doesn't mean [15] that he was found guilty or innocent.
[16] That's a hypothetical question. I don't know what [17] the guidelines are, I would have to refer -
[18]  Q  So you would make a phone call on something like [19] this?
[20]  A  I would refer back to my Human Resource manager [21] for advice.
[22]  Q  Okay. And you testified earlier that there may be [23] circumstances where you would request a waiver from I [24] believe you said, the Central Office.
[25]  A  Region Director.

Page 39

[1]   Q  Regional Director. Is this possibly a [2] circumstance that you would have requested a waiver?
[3]   MR. WILMOT: Objection. You can answer.
[4]   THE WITNESS: I don't know. I've never had that [5] brought before me as a warden on something like that.
[6]   BY MS. MCDONALD:
[7]   Q  Okay. In your many number of years as a warden [8] and thirty-two years working for the Bureau of Prisons, can [9] you state whether this is something that you may call for a [10] waiver on?
[11]  A  If it wasn't, if it was a continuation of finding, [12] and there wasn't, he wasn't, that person wasn't found guilty [13] or innocent, to be honest with you, I don't know if I would [14] or I wouldn't.
[15]  Q  Okay.
[16]  A  I may have. I mean, I may -
[17]  Q  You would have to look into the facts and [18] circumstances?
[19]  A  Pretty much, yes.
[20]  Q  Okay. When did you first become aware of the [21] April 8, 2002 incident?
[22]  A  On that particular day, I was sitting in my [23] office. Approximately 11 a.m. or 11, between 11 a.m. and [24] 11:30, I received a call from Steve Gagnon indicated that [25] there had been an incident involving two staff members down

Page 40

[1] at Mirror Lake and that Ms. O'Donnell was coming to my [2] office.
[3]   Q  And when she got to your office what did she say [4] to you?
[5]   A  As she was coming up to my office, I called [6] Ms. Lord, Human Resource Manager, to come in and when [7] Ms. O'Donnell got there she advised me of an alleged assault [8] that involved another staff person. And I asked who that [9] staff person was, and she mentioned Mr. Reynoso.
[10] She said she didn't know what to do. I asked her [11] if she needed medical attention and she stated no, I don't [12] need medical attention. I asked her what occurred and she [13] advised me that her and Mr. Reynoso got in an argument and [14] that Mr. Reynoso allegedly assaulted her.
[15] She also mentioned and I'm sure I asked a couple [16] questions but I don't recall what I asked, I asked her, well [17] she advised me that there was a policeman in their proximity [18] and I, I would also bet my money, that I asked her if she [19] went to that police officer for assistance and she didn't [20] request assistance from that police officer.
[21] I know I asked her on a couple of occasions, are [22] you set you don't want to go down to the medical to get [23] assessed of any injuries and she said no.
[24] And then I advised her, she asked me what to do. [25] I said, well, you need to file a police report. You need to

### Page 41

[1] go down to the State Police and file a police report because
[2] the subject came up whether it was on duty, whether it was
[3] on government property or not. I don't know if I brought it
[4] up, I can't remember if Ms.O'Donnell brought it up. But it
[5] came up that it was off government property and it was
[6] during both individual's lunch break.
[7] So at that time, I said, I think I gave her admin [8] leave for the day. I had a staff member, I asked her if she [9] wanted a staff member to go with her to report it and I [10] don't know if she said yes or no, I can't remember that on [11] that day.
[12] Later on, I found that a staff member did go with [13] her. She did report it.
[14] I notified my Regional Director of the incident [15] because it dealt with an alleged assault. Staff on staff. [16] I gave him the information that was provided to me by [17] Ms.O'Donnell.
[18] I did request that both staff persons be placed on [19] home duty status.
[20]    Q Okay. Go ahead.
[21]    A The Regional Director at that time stated no, this
[22] would not qualify for home duty status case.
[23]    Q Can you, let me interrupt you. Can you explain [24] what home duty status is?
[25]    A Home duty status would be that they would be

### Page 42

[1] placed at home during their scheduled shift with pay or
[2] without pay and that would be their duty station.
[3]    Q So that's different than admin leave?
[4]    A Yes.
[5]    Q Okay. Go ahead, you can continue.
[6]    A Okay. After I notified my Regional Director, then [7] I conducted a work place violence committee-
[8]    Q You conducted it or you asked somebody to-?
[9]    A Well, I didn't conduct it. I gathered a committee [10] up
[11]    Q Okay.
[12]    A By policy in accordance with Bureau policy to [13] advise me whether workplace violence existed or not. I [14] gathered the staff that was outlined by policy and I may [15] have added a staff member or two to that policy.
[16] I presented the chairperson, who was David Porter [17] and the people in the committee, the committee members, what [18] I was told by Ms.O'Donnell and that's all I did and I told [19] them to report back to me when they come up for some
[20] recommendations or their review.
[21] I mean, that day and then I guess they met the [22] next morning. They reviewed the information they had that [23] was provided by me, by Ms.O'Donnell and they provided me a
[24] report.
[25]    Q Okay. Did you, actually let me find that report.

### Page 43

[1]    (Pause)
[2]    MS. MCDONALD: Let me show you this document. [3] Take a look at that.
[4]    (Exhibit No. 4 marked for [5] identification.)
[6]    THE WITNESS: Okay.
[7]    BY MS. MCDONALD:
[8]    Q Do you recognize that document?
[9]    A Yes I do.
[10]   Q And what it is?
[11]   A It's the Workplace Violence Committee Meeting
[12] Report to me.
[13]   Q And I think you mentioned they met a couple of
[14] times. Do you know whether this is the first report or the
[15] second report?
[16]   MR. WILMOT: Objection. You can answer.
[17]   THE WITNESS: I'm not sure if it was the first or [18] second time they met. They met in the afternoon and the [19] morning.
[20]   BY MS. MCDONALD:
[21] Okay. And down towards the bottom of the page, [22] the Committee Recommendations.
[23]   A Yes.
[24]   Q It states that the committee decided to reconvene [25] on Tuesday, April 9th, at 9 a.m. to further consider the

### Page 44

[1] incident based on how the Mass State Police responded.
[2] Do you see where it says that?
[3]    A Yes.
[4]    Q Is that the second meeting to which you were [5] referring to?
[6]    A This document, I don't know if they wrote them up [7] the same day, this must be the first time they met at.
[8]    Q Would it be safe to say that based on that [9] committee recommendations in this document, that at this [10] point in time, Mr.Reynoso had not yet been arrested?
[11]   MR. WILMOT: Objection. You can answer.
[12]   THE WITNESS: I don't know if he had been arrested [13] or not at that time.
[14]   (Exhibit No. 5 marked for [15] identification.)
[16]   BY MS. MCDONALD:
[17]   Q Okay. Let me show you this one.
[18]   A Okay.
[19]   Q Do you recognize that document?
[20]   A Yes I do.
[21]   Q And what is that document?
[22]   A Again, it is a Workplace Violence Committee [23] Meeting Minutes to me.
[24]   Q And what is the date?
[25]   A April 8th.

Page 45

[1] Q 2002?
[2] A Correct.
[3] Q And that's the same date as the previous report,
[4] Exhibit 4 is it? Yeah.
[5] Both those documents are dated the same?
[6] A Correct.
[7] Q They are a little bit different though. Let me [8] call your attention to the second paragraph of Exhibit 5. [9] Where it says the committee reconvenes.
[10] MR. WILMOT: You mean Exhibit 4?
[11] MS. MCDONALD: I think it's 5.
[12] MR. WILMOT: We have it as 4.
[13] MS. MCDONALD: Right here. Oh, Okay. Sorry.
[14] MR. WILMOT: That's all right.
[15] THE WITNESS: I'm sorry. What was the question?
[16] BY MS. MCDONALD:
[17] Q The second paragraph states that the committee
[18] reconvened on Tuesday, April 2nd [sic] and they were
[19] informed that Mr.Reynoso was arrested on April 8th.
[20] Do you see that?
[21] A Yes.
[22] Q And down on committee findings, it states that the
[23] committee does not believe this met the definition of
[24] workplace violence.
[25] Do you see that?

Page 46

[1] A Yes.
[2] Q Do you know why they came to that conclusion?
[3] A No.
[4] Q And under committee recommendations, can you read
[5] paragraph one?
[6] A Which document?
[7] Q Exhibit 4.
[8] A Can I read it?
[9] Q Yes. For the record.
[10] A Committee was advised that since the charge
[11] against Mr.Reynoso is a state felony, he would have to be
[12] placed on indefinite suspension until the charges are
[13] resolved.
[14] Q Did you accept that recommendation?
[15] A No.
[16] Q Why?
[17] A Because prior to this, I had already talked to the
[18] Regional Director and advised him of the incident and he
[19] advised me that he, Mr.Reynoso could not be placed on home [20] duty status.
[21] Q Okay. But that doesn't say home duty status, does [22] it?
[23] A No it doesn't.
[24] Q It says indefinite suspension.
[25] A Indefinite suspension in my opinion, means the

Page 47

[1] same thing as home duty status. I could not put him at
[2] home. That's my definition of both of them. They're the
[3] same.
[4] Q After the Workplace Violence, did they have any [5] further functions? The Workplace Violence Committee. Did [6] they do, have any other responsibilities, once they gave you [7] that report?
[8] A No.
[9] Q They just gave you the recommendations and that's
[10] the end of their job duties, I will call it?
[11] A Correct.
[12] Q Okay. And what else did you with regard to this
[13] incident?
[14] Did you order an investigation?
[15] A Yes I did.
[16] Q And why don't you explain to me the process you
[17] took?
[18] A Either that day or the next day, I reported the
[19] incident to Central Office to open up an investigation of an
[20] alleged assault on staff.
[21] I think it was the next day that I also late in [22] the afternoon, got a restraining order which was included as [23] part of the investigation.
[24] Q Who did you get the restraining order from?
[25] A I don't recall.

Page 48

[1] Q Okay. And who was conducting the investigation?
[2] A At that time?
[3] Q Yes.
[4] A There was no investigation being conducted.
[5] Q Oh, okay.
[6] A It was referred for investigation.
[7] Q Okay.
[8] A To Central Office, Office of Internal Affairs.
[9] Q So nobody approached Mr.Reynoso and asked him for
[10] his side of the story at this point in time?
[11] A No.
[12] Q And that's standard procedure?
[13] A It's standard procedures, I follow that procedure [14] until an investigator would discuss the case and take [15] affidavits and an investigation would actually be initiated.
[16] Q So do you recall when the investigation was [17] actually initiated?
[18] A That, to the best of my recollection, it would be [19] after the disposition of the court case was finalized in [20] January of 2003.
[21] Q So until that happened, until the beginning of the
[22] investigation which I understand you don't recall, but it
[23] could have been months before that investigation was begun?
[24] A That's correct.
[25] Q Okay. And so between April 8 of 2002 and the

Page 49

[1] beginning of the investigation, you don't really have to,
[2] you're not obligated or required to do anything about
[3] Ms.O'Donnell's allegations?
[4]     MR. WILMOT: Objection. You can answer.
[5]     THE WITNESS: I did several things to her [6] allegations. I held a Workplace Violence Committee. I [7] referred it by policy in a bureaucratic policy to the Office [8] of Internal Affairs.
[9] Once I referred that case to the Office of [10] Internal Affairs, it's not in my hands, to do an [11] investigation. It's in the Office of Internal Affairs to do [12] the investigation.
[13]     BY MS. MCDONALD:
[14]     Q Did you, correct me if I'm wrong? Did you testify
[15] earlier that Darren Brown was in the Office of Internal
[16] Affairs?
[17]     A He's, he's in the Office, he's a special [18] investigation, special investigation agent. He's not in the [19] Office of Internal Affairs. Office of Internal Affairs is a [20] central office.
[21]     Q Okay. Okay. When you received the restraining
[22] order, what did you do about that?
[23]     A That, once I received the restraining order [24] obviously I had to act on the restraining order which [25] indicated to me that Mr.Reynoso could continue working.

Page 50

[1] However, there would have to be fifty yard difference
[2] between Ms.O'Donnell and Mr.Reynoso.
[3] So at that time, I think Mr.Reynoso was on leave [4] and Ms.O'Donnell, if I remember correctly, gave her admin [5] leave for a period of time.
[6] Then I decided to ensure staff safety not only for
[7] Ms.O'Donnell and for Mr.Reynoso, and still make it as
[8] minimum disruptive to both employees. I changed schedules
[9] when they returned to work.
[10]     Q And you said Mr.Reynoso was on leave also?
[11]     A He could have been on days off or leave, I'm not
[12] certain?
[13]     Q You don't recall whether you granted him
[14] administrative leave?
[15]     A I may have granted both of them administrative
[16] leave.
[17]     Q How did you change their schedules?
[18]     A Well based upon the restraining order, my concern
[19] was to make sure both employees, to the best of my ability,
[20] to make both employees separate working areas to ensure
that [21] they did not run into each other and that I could abide by
[22] the restraining order.
[23] Again, at that time, prior to that, the Union had [24] come to me and requested to me that if any employee would [25] get some kind of disciplinary action while on Workman's

Page 51

[1] Comp, that I would try to maintain their schedules as best I
[2] could.
[3] Okay, keeping that in mind, the best I could do, [4] they're both bargaining unit employees, or excuse me one is,
[5] Ms.O'Donnell, Mr.Reynoso is not a bargaining unit
[6] employee, the best I could do was to change a half hour of
[7] her schedule.
[8] And I changed MR. Reynoso's shift from day shift [9] to night shift and I stipulated in my letter that they would [10] have to once their shift ended, they could, they would have [11] to leave within the thirty minutes period of time so they [12] wouldn't run into one another.
[13]     Q And did you make these changes right away after
[14] the incident or was there some lapse in period of time?
[15]     A There may have been three or four or five days. [16] It all depends on—
[17]     Q Okay. But just a few days?
[18]     A I would say yes.
[19]     MS. MCDONALD: Okay. Unfortunately, I've got all [20] my exhibits out of order.
[21]     (Exhibit No. 8 marked for [22] identification.)
[23]     BY MS. MCDONALD:
[24]     Q But let me show you Exhibit 8. Do you recognize [25] that document?

Page 52

[1]     A Yes, yes, I do.
[2]     Q And what is that document?
[3]     A It's a restraining order issued by Malden District [4] Court.
[5]     Q And was that the order obtained by Ms.O'Donnell [6] for protection from David Reynoso?
[7]     A That I don't know. I don't know. My, I don't [8] know if she got it or she gave it to me. I don't know.
[9]     Q But this document is concerning Ms.O'Donnell and
[10] David Reynoso?
[11]     A Correct.
[12]     Q Correct?
[13]     A Correct.
[14]     Q And you already mentioned that they had to stay, I
[15] believe it was fifty yards from each other or Mr.Reynoso
[16] had to stay fifty yards away from Ms.O'Donnell, correct?
[17]     A That is correct.
[18]     Q And were there any other restrictions placed on
[19] Mr.Reynoso?
[20]     A There was a restriction that he couldn't carry a
[21] firearm.
[22]     Q And what is the date on that document? I believe [23] it's on the second page.
[24]     A Date of order was April 9, 2002.
[25]     Q And was there a date that the order expires?

Page 53

[1] A Expiration date of order was April 23, 2002. If [2] I'm reading it correctly.
[3] Q Does it state on there that the order was extended [4] at any point?
[5] A Next hearing date was April 23, 2002. Date of, [6] yeah, there was an expiration date. They extended it, April [7] 23, 2003. With a hearing date of April 23, 2003. If I'm [8] reading this correctly, okay.
[9] Q And without looking at that document, do you [10] recall whether the order was extended beyond April 23, 2003?
[11] A I extended their separation until, I can't [12] remember if the date was April 23, April 27, I extended it [13] until the probation period ended for Mr.Reynoso.
[14] Q The probation period set by the Court?
[15] A Right.
[16] Q Okay.
[17] A Because I think that restraining order was still [18] in effect. In fact, there were many restraining orders that [19] I received. But I can't recall every one of them.
[20] Q I understand. You can't recall the dates, but [21] you–
[22] A That's pretty much
[23] Q You recollect the order was extended a couple of [24] times?
[25] A Correct.

Page 54

[1] Q And do you recall whether the order was extended [2] into 2004?
[3] A I, I don't know.
[4] Q Okay. Let's go back to the investigation.
[5] A Okay.
[6] MS. MCDONALD: Let me show you Exhibit 6. And I [7] would ask you to take a look at that.
[8] (Exhibit No. 6 marked for [9] identification.)
[10] (Pause)
[11] BY MS. MCDONALD:
[12] Q Do you recognize that document?
[13] A No this is an Office of Internal Affairs' [14] document.
[15] Q Have you ever seen that document?
[16] A Not that I recall.
[17] (Exhibit No. 7 marked for [18] identification.)
[19] MS. MCDONALD: Okay. Let me show you Exhibit 7.
[20] (Pause)
[21] THE WITNESS: Yes.
[22] BY MS. MCDONALD:
[23] Q Have you ever, first of all, what is that [24] document?
[25] A It's an OIA, Office of Internal Affairs

Page 55

[1] Investigative Report Executive Staff Summary that outlines [2] the case and provides information regarding the case.
[3] Q And is this the document that you received?
[4] A Yes I did.
[5] Q And did you review this document in determining [6] what discipline may be appropriate for Officer Reynoso?
[7] A Yes.
[8] Q And were the allegations of off duty misconduct [9] sustained?
[10] A Yes they were.
[11] Q I have a question. What is, for the record, what [12] is the date on this report?
[13] A The dated report is March 26, 2003. That doesn't [14] necessarily mean that I received it on that date but that is [15] the date of this report.
[16] Q So essentially the investigation was completed in [17] March of 2003?
[18] A Correct.
[19] MS. MCDONALD: I am going to show you Exhibit 9 [20] and ask you to look at that.
[21] (Exhibit No. 9 marked for [22] identification.)
[23] MS. MCDONALD: I'm all out of order.
[24] THE WITNESS: Okay.
[25] BY MS. MCDONALD:

Page 56

[1] Q Do you recognize that document?
[2] A Yes I do.
[3] Q And what is it?
[4] A It's a letter of proposal to Officer Reynoso for a [5] suspension of thirty days for off duty misconduct.
[6] Q And who drafted that this document?
[7] A It would be either done by the Captain or the [8] Human Resource Department.
[9] Q The document is signed by Michael Bollinger, [10] correct?
[11] A Correct.
[12] Q And it's also signed as being received by Officer [13] Reynoso?
[14] A Correct.
[15] Q And what is the date on the document?
[16] A That Mr.Reynoso signed or–?
[17] Q The date it was drafted?
[18] A June 4th.
[19] MR. WILMOT: Objection.
[20] BY MS. MCDONALD:
[21] Q And now did you meet with Officer Reynoso prior to [22] issuing him discipline?
[23] A I'm sure I met him on several occasions.
[24] Q In regard to this incident?
[25] A Correct.

Page 61

[1] A Do you want this back?
[2] Q No, you can hang on to it.
[3] A Okay. I've got a couple of them here. Okay, go ahead.
[5] Q Whether at the time that you met with Mr. Reynoso [6] and were considering what discipline you should give him, do [7] you recall whether he had any prior discipline?
[8] A At that time that I met with him while he was [9] giving me his response?
[10] Q Or anywhere in the time that you had received the [11] investigative report and you were trying to make a [12] determination as to what discipline was warranted in that [13] time period?
[14] A If I remember correctly, he had a DUI.
[15] Q And was that a recent occurrence close in time to [16] --?
[17] A To, I'm not certain.
[18] Q Okay. And I believed you testified earlier that [19] would be a Category Three --?
[20] A Correct.
[21] Q Offense?
[22] A Correct. A DUI.
[23] Q A DUI would be. And I believe you testified that [24] an assault between staff members, initially, this particular [25] assault was classified as a Category One or a Category Two?

Page 62

[1] A Actually, I don't know what Central Office [2] categorized it. I set it up and they categorized it.
[3] Did they categorize it as a one or two? I never [4] got a call back. I'm waiting on what they're categorizing [5] and who's going to do the investigation.
[6] Q Okay. So, was it ever downgraded to a Category [7] Three or the category never came up again?
[8] A Actually, the category never came up again but [9] they did authorize a local investigation.
[10] Q Okay. But they could do that even for a Category [11] One or a Category Two? They could authorize a local --?
[12] A They could.
[13] Q Okay.
[14] A They could.
[15] Q Let me refer you in Exhibit 10 to the second to [16] the last paragraph. Do you see where it says Warden Winn [17] told Mr. Reynoso he may have to make some decisions that [18] could affect him, such as changing his work hours?
[19] A Mm-hmm.
[20] Q What is the date on this document?
[21] A June 17, 2003.
[22] Q Hadn't you already changed Mr. Reynoso's work [23] hours by this point in time?
[24] A I changed work hours for both employees on [25] numerous occasions through this whole process.

Page 63

[1] Q Okay. So there wasn't just one, we're just [2] talking about Mr. Reynoso.
[3] A Okay.
[4] Q I believe you testified that you had changed his [5] work hours within five days of the incident or so?
[6] A Correct.
[7] Q And that was back in April, maybe the beginning of [8] May of 2003, correct? Sorry, 2002?
[9] A Yeah, correct.
[10] Q And now this document is saying, dated June 17, [11] 2003, states that you may have to change his work hours?
[12] A That is correct. Based upon, I don't know the [13] exact date I gave him his discipline of twenty-one days. [14] The meeting if I recall correctly, was regarding that [15] because he was still on probation, that I would have to [16] continue to change his hours. [17] And I think that's part of this memo why I [18] discussed it with him. That, even though you've had your [19] disciplinary process, even though it's over, it's not over. [20] That I'm going to continue with the restraining order of the [21] fifty feet, the fifty yards, excuse me, until the [22] probationary period ended.
[23] Because I think in his mind, it ended after the [24] Court hearing or whatever. I'm not certain. But I want to [25] make it clear to him that I would still keep him separated

Page 64

[1] from Ms. O'Donnell.
[2] MS. MCDONALD: Okay. I am going to show you [3] Exhibit 11.
[4] (Exhibit No. 11 marked for [5] identification.)
[6] THE WITNESS: Okay.
[7] BY MS. MCDONALD:
[8] Q Do you recognize that document?
[9] A Yes I do.
[10] Q And what does that, what is that document?
[11] A This is a proposal for suspension for thirty days [12] for off duty misconduct.
[13] Q Is this a proposal or is this his actual --?
[14] A Oh, I'm sorry.
[15] Q Discipline?
[16] A This is his actual discipline.
[17] Q But you just stated initially that it was proposed [18] that he be suspended for thirty days, correct?
[19] A Correct.
[20] Q And you decided that he, that he would be [21] suspended for twenty-one days?
[22] A That is correct.
[23] Q Now it says in the third paragraph. You discussed [24] what you considered in determining what discipline would be [25] appropriate.

Page 81

[1] Q Now that document appears to actually be a portion [2] of perhaps a larger document. And there are some numbers in [3] the upper right hand corner.
[4] Do you have any idea what document this may be a [5] part of?
[6] A No.
[7] Q Could it have been a request for some sort of [8] leave?
[9] A I don't know. Because I've never, I don't recall [10] seeing this particular document.
[11]     (Exhibit No. 19 marked for [12] identification.)
[13]     MS. MCDONALD: Okay. Let me show you this one.
[14]     THE WITNESS: Yeah, I – I know this document.
[15]     BY MS. MCDONALD:
[16]     Q Okay. You received that document?
[17]     A Yes.
[18]     Q And what is that document?
[19]     A It's a medical report of Colleen O'Donnell dated [20] January 31, 2003.
[21]     Q And is that from her doctor.
[22]     A It's from a doctor, yes.
[23]     Q Doctor George Milowe?
[24]     A Right.
[25]     Q And does this document indicate that Ms.O'Donnell

Page 82

[1] suffers from post traumatic stress disorder?
[2]     A Yes it does.
[3]     Q And does it related to what her symptoms are?
[4]     A Yes.
[5]     MR. WILMOT: Can we go off the record for a [6] moment?
[7]     MS. MCDONALD: Sure.
[8]     (Off the record at 1:11 p.m.)
[9]     (On the record at 1:13 p.m.)
[10]    BY MS. MCDONALD:
[11]    Q Okay. I believe the question was does this note [12] indicate to you what Ms.O'Donnell's symptoms, her post [13] traumatic stress disorder were?
[14]    A Yes.
[15]    Q And does the doctor indicate in this note, any [16] action that may be taken to alleviate Ms.O'Donnell's [17] symptoms?
[18]    A Yes.
[19]    Q And what does he recommend?
[20]    A Well, he recommends that Ms.O'Donnell not be [21] required to work in the same facility as Mr.Reynoso.
[22]    Q Did you take any action in response to this [23] letter?
[24]    A There were several doctor notes given to me around [25] this period of time, if I remember correctly. I think this

Page 83

[1] was the doctor note that I had a staff psychiatrist - I [2] wanted additional information.
[3] I'm not a doctor. I'm not a psychiatrist. What [4] the treatment in my – again, I'm not a psychiatrist, the [5] treatment plan was basically to remove Reynoso or they [6] couldn't work in the same environment. That's the treatment [7] plan.
[8] That didn't sound like a very good treatment plan [9] to me, even though I'm not a doctor or psychiatrist. I had [10] a psychiatrist read one of these doctor's note. I think it [11] was this doctor's note, to explain to me if that is a good [12] treatment plan or not. Or what his thoughts were.
[13] So if this is the doctor's note, I gave it to a [14] staff psychiatrist and the psychiatrist provided me that he [15] needed more information from the doctor which I requested to [16] get permission from Ms.O'Donnell to get that.
[17]    Q Okay, and -
[18]    A Before I made a decision.
[19]    Q A decision on?
[20]    A Any decision what to do with Ms.O'Donnell or [21] Mr.Reynoso, keeping them separated.
[22]    Q Okay. Was Ms.O'Donnell requesting some form of [23] leave at this time, in this time period?
[24]    A If she was running out of leave without pay, yes.
[25]    Q Do you recall whether you granted her

Page 84

[1] administrative leave?
[2]     A I don't recall if I granted her administrative [3] leave at this particular time. I did grant her [4] administrative leave throughout the situation.
[5] I could, I don't recall. I don't remember. At [6] the same time, I was getting two or three doctor's notes. [7] And I'm – one doctor's note, I granted an extension of [8] administrative leave or leave without pay to get more [9] information back.
[10]    Q Okay.
[11]    A From her doctor.
[12]    Q Now, also around this time, did you at some point, [13] become aware that Ms.O'Donnell had hired an attorney?
[14]    A I got a letter, I think, from Mr.Rizzitelli, if I [15] remember correctly, around the same time. Roughly around [16] the same time.
[17]    Q Okay. So you, who did you make a request of that [18] they obtain further medical information from Ms.O'Donnell [19] or her doctor?
[20]    A If I remember correctly, her supervisor, [21] Mr.Gagnon, made a phone call to Ms.O'Donnell. I can't [22] remember if it was a written request from myself for [23] additional information but I know a phone call was made to [24] get permission to get additional information.
[25]    Q And do you know whether an authorization or

Page 101

[1] A It was around then. It could have been March. It [2] could have been February when she was placed on AWOL. I [3] know she was placed on AWOL status.
[4] Q Okay.
[5] A I don't know the exact date.
[6] Q You know that Ms. O'Donnell was placed on AWOL [7] status twice?
[8] A Correct, yes.
[9] Q And we're talking about the first incident of [10] AWOL, correct?
[11] Right now?
[12] A Well, honestly, I don't remember the dates.
[13] Q Okay.
[14] A I don't remember the dates. I know she was placed [15] on AWOL status.
[16] MS. MCDONALD: Okay. Let me show you this [17] document.
[18] (Exhibit No. 25 marked for [19] identification.)
[20] (Pause)
[21] THE WITNESS: Okay.
[22] BY MS. MCDONALD:
[23] Q Do you recall that letter?
[24] A Yes.
[25] Q What is the date on that letter?

Page 102

[1] A March 24, 2003.
[2] Q And what is this letter?
[3] A Well he's claiming that I'm not responding, that [4] I'm not corresponding responsively.
[5] Q Who is he?
[6] A Mr. Rizzitelli.
[7] Q Does he again ask you to elaborate on restricting [8] Officer Reynoso to the camp?
[9] A Yes.
[10] MR. WILMOT: Objection to the question.
[11] Q And did you respond to this letter?
[12] A I don't recall.
[13] Q Do you recall ever responding or elaborating on [14] your proposal to restrict Officer Reynoso to the camp?
[15] A No, I never elaborated. Because I gave him my [16] plan of action to put Mr. Reynoso at the camp. I thought it [17] was self-explanatory.
[18] Q Even though you received about five letters asking [19] for elaboration?
[20] MR. WILMOT: Objection. You can answer.
[21] THE WITNESS: Five, I think three of the five [22] letters or four of the five letters I never had permission [23] to talk to him.
[24] BY MS. MCDONALD:
[25] Q Okay. You had permission to talk to Colleen

Page 103

[1] though?
[2] A Yeah, I did, I guess.
[3] Q At some point, did you receive notice from either [4] Ms. O'Donnell or her attorney that she wanted to return to [5] work?
[6] A I received either correspondence or the supervisor [7] advised me Colleen wanted to come back to work.
[8] Q Okay. And did you take any action in that regard?
[9] A I don't know if I put anything in writing. I did [10] have the supervisor call Colleen and I mentioned that she [11] would have to have a doctor's note saying she could return [12] to work full duty. And that because of, I think it was [13] around the time that he, Mr. Reynoso was still on probation; [14] I still had to keep them separated.
[15] And I think in one of the doctor's notes, I think [16] it was before or after or during, the doctor even said she [17] should be at a different facility and I had the supervisor, [18] I put it in writing, that I can't remember, but we contacted [19] Colleen, Ms. O'Donnell and offered to place her at the camp.
[20] And she agreed to it verbally.
[21] Q I we talking about in June of 2003 right now?
[22] A I'm, I'm-
[23] Q You're not sure?
[24] A I'm not sure of the timeframe. I do know she [25] didn't want to come back to work. I offered her the camp.

Page 104

[1] Verbally she agreed to the camp and then she rescinded.
[2] She did not want to go to the camp.
[3] Q Okay.
[4] A I don't know if it was in June. I don't know if [5] it was in July. The timeframe, I-
[6] Q Okay. Let me just say that for the following [7] questions okay?
[8] You already stated that Ms. O'Donnell was twice [9] AWOL, correct?
[10] A Yes.
[11] Q You testified to that already. And if I suggest [12] to you that her first AWOL was from February 3, 2003 through [13] June 10, 2003, would that comport with your recollection of [14] the event?
[15] Does that time line ring any bells for you?
[16] A Right around that given time, yes, based upon that [17] I was not receiving any medical updates.
[18] Q Okay. But those are the dates?
[19] A I don't know if they were the exact dates
[20] Q Okay.
[21] A But right around that timeframe, you're correct.
[22] Q Okay. And then you received some kind of notice [23] that she wants to return to work?
[24] A Correct.
[25] Q And if I suggest to you that Ms. O'Donnell

Page 113

[1] Is that correct?
[2]    A Yes.
[3]    Q And you assigned her to the camp. Is that right?
[4]    A That's correct.
[5]    Q And you state in approximately the middle of the
[6] second paragraph, in an effort to facilitate the orderly
[7] running of the institution while still allowing Mr.Reynoso [8] to
comply with the terms of the order of protection, per [9] your
agreement, you will be reassigned as camp officer upon [10] your
return.
[11] Do you see that?
[12]    A Yes.
[13]    Q But what agreement did Ms.O'Donnell make with you
[14] that she would be assigned to the camp?
[15]    A There was a phone call made by her supervisor,
[16] Mr.Gagnon asking her or requesting her however how he
[17] mentioned, again, I advised him that if she was willing to
[18] come back to work, you know, to have Mr.Gagnon call her
and [19] see if she would go to camp and at that particular time,
she [20] did agree to go to the camp.
[21]    Q And why did you want to assign her to the camp?
[22]    A I have, I don't know. It was a different [23] facility. She
was out of, well, when I say I don't know, my [24] recollection of
this event is Ms.O'Donnell had been out of [25] work for a period
of time.

Page 114

[1] Mr.Reynoso is on a job inside the institution, if [2] I remember
correctly.
[3]    Q On a job?
[4]    A Inside.
[5]    Q A specific assignment, do you mean?
[6]    A Well, he was working inside. Either the mailroom [7] or he
could have been working here at the time. I don't [8] recall where
his job assignment was.
[9] Fifty yards from this institution is the camp. [10] That's why I
offered her the camp.
[11] I couldn't offer her the mailroom. This is after [12] the incident
in the mailroom, if I'm not mistaken.
[13]    Q And when Ms.O'Donnell returned to work was she,
[14] in fact, placed at the camp?
[15]    A I don't recall. I don't remember that.
[16]    Q Okay. I think I already asked you this but do you
[17] have the authority to transfer a staff member to another
[18] institution?
[19]    A No.
[20]    Q Who has the authority to do that?
[21]    A That would have to go through the Regional [22] Director
for approval.
[23]    Q Okay. Did you put restrictions on Ms.O'Donnell [24] with
regards to signing up for overtime?
[25]    A At the beginning or the end?

Page 115

[1]    Q At any time.
[2]    A I put restrictions on both of them to start out [3] with. I
wouldn't say restrictions, I would say limitation [4] duties to make
sure that fifty yard restraining order was in [5] effect and then later
on, they were lifted.
[6]    Q Why did the restrictions have to be put on both of
[7] them?
[8] Why not just put the restrictions on Officer [9] Reynoso?
[10]    A I felt only, it was put on Reynoso, but I felt [11] that both
staff members had an obligation to keep that fifty [12] yard
distance.
[13] Both of them were aware of the restraining order. [14] I felt
you know, it was only fair that both of them should [15] abide by
that restraining order.
[16] It's both responsibility in my mind that if either [17] one came
into contact with one another within that fifty [18] yards, they
needed to report it.
[19]    Q So you believe that Colleen was responsible for
[20] ensuring that the restraining was enforced?
[21]    A No. I believe she had an obligation that she was
[22] aware of the restraining order. That if she did come in
[23] contact, I couldn't guarantee a fifty yard distance no
[24] matter if I put them in the mailroom, the camp or the
[25] institution.

Page 116

[1] I couldn't guarantee. I could just do the best [2] job I could of
implementing that restraining order. But I [3] couldn't stop one or
the other party from bumping into one [4] another for whatever
reason and I felt a staff person, each [5] staff person has an
obligation and that they both knew what [6] the restraining order
was.
[7] So in making decisions on jobs, my job is to make [8] sure
everybody is safe and that is what I felt most [9] comfortable with.
[10]    Q So you could never ensure that the restraining [11] order
would be complied with. You could only do the best [12] that you
could?
[13]    A That's correct. I couldn't stop one of them from
[14] bumping into one another. If they chose to do that.
[15]    (Exhibit No. 28 marked for [16] identification.)
[17]    MS. MCDONALD: Okay. Let me show you this.
[18]    THE WITNESS: Okay.
[19]    BY MS. MCDONALD:
[20]    Q Do you recall that document?
[21]    A Yes I do.
[22]    Q What is that document?
[23]    A The, it was a memo to Colleen and there was a memo
[24] to Reynoso. This memo is to Colleen, indicating that the
[25] Abuse and Prevention Order against David Reynoso was
vacated

Page 121

[1] A Yes.
[2] Q Document?
[3] A Yes.
[4] Q And what is that document?
[5] A This is just to notify her that my decision in, to [6] let her know what my decision was in writing and to close [7] out the case.
[8] Q And is this her actual letter of reprimand that [9] was placed in her personnel file?
[10] A Yeah, uh, I don't know.
[11] Q It says that a copy of this letter will remain in [12] her personnel file.
[13] A Is it there or not, I don't know. I'm sorry.
[14] Q Oh, that's okay. Maybe I wasn't clear. I just [15] wanted to know if this was the actual discipline letter?
[16] A This should be the actual discipline letter.
[17] Q So there was no suspension, there was simply this [18] letter placed in her file?
[19] A That's correct.
[20] MS. McDONALD: Okay. I'm done.
[21] EXAMINATION BY MR. WILMOT:
[22] Q Okay. I've just got a couple of questions. You [23] testified earlier begin as Warden in December of 2002, [24] correct?
[25] A No.

Page 122

[1] Q When did you begin as Warden, I'm sorry, of FMC [2] Devens?
[3] A December 2000.
[4] Q 2000, sorry. Did you actually hire Officer [5] Reynoso?
[6] A No.
[7] Q He was here before you began as Warden?
[8] A Yes.
[9] Q Jumping forward to the April 8, 2002 incident. [10] You testified that you changed Officer Reynoso and [11] Ms.O'Donnell's work schedules.
[12] Do you remember that testimony?
[13] A Yes.
[14] Q Can you state again why you changed their [15] schedules?
[16] A The reason I changed their schedules was when I [17] received the restraining order and the alleged assault, [18] that's when I decided I had to separate both parties from [19] different job areas or different job sites.
[20] Q Do you remember what you changed Ms.O'Donnell's [21] schedule to?
[22] A Ms.O'Donnell was working day shift and so I [23] changed her schedule by half an hour.
[24] Q Do you know to what times?
[25] A I think if I recall correctly she worked from 7:00

Page 123

[1] to 3:30 and I changed Mr.Reynoso's schedule, he was working [2] day shift. I moved him to day shift to night shift. Night [3] shift from 4:00 to 12:00.
[4] Q I am going to show you what has been previously [5] identified by Ms.O'Donnell in her deposition. This is [6] Exhibit No. 29.
[7] Do you recognize that document?
[8] A Yes I do.
[9] Q And can you identify what it is.
[10] A It's changing of the schedule. And actually I [11] changed it in accordance with this document.
[12] She was working Monday through Friday shift, but I [13] did change the time from 6:00 a.m. to 2:30 p.m.
[14] Q Okay. So based on this document, it shows that [15] Ms.O'Donnell's schedule was changed to that, 6:00 to, I'm [16] sorry?
[17] A 2:30 p.m.
[18] Q To 2:30. Okay. And does that document state [19] anything else as to limitations or changes with regard for [20] assignment you made?
[21] A Yes it does.
[22] Q What else does it say?
[23] A It states that if you plan to work outside these [24] hours for any reason, overtime, you must notify your [25] supervisor prior to working.

Page 124

[1] You are not to contact in person or telephonically [2] or associate with David Reynoso, Intelligence Officer at any [3] time. [4] The schedule will remain in effect until further [5] notice.
[6] Q Okay. So, anything else in this document that you [7] - any changes that you made to Ms.O'Donnell's assignment.
[8] A No.
[9] Q Okay. So based on that document, in your memory, [10] the only changes you made to Ms.O'Donnell's assignment here [11] at FMC Devens, was with regard to her schedule and her [12] requirement to notify supervisors that when she wanted to [13] perform overtime work.
[14] A That's correct.
[15] Q Do you also, did you also limit her to work in the [16] mailroom?
[17] A Yes.
[18] Q Does that letter state that?
[19] A Yes.
[20] Q Okay. So the changes you made with regard to [21] Ms.O'Donnell was that one, she had to continue to work in [22] the mailroom, the changes in her time as you said, the half [23] hour change and that she had to notify supervisors when she [24] wanted to work overtime?
[25] A That is correct.

Page 125

[1] Q Anything else, any other restrictions or [2] limitations that you - or changes that you placed on [3] Ms.O'Donnell's work here at FMC Devens?
[4] A No.
[5] Q Did her pay change in any way?
[6] A No.
[7] Q Did her access to certain benefits change in any [8] way?
[9] A No.
[10] MR. WILMOT: Okay. Could you mark this? I am [11] going to show you what has been marked as Winn Exhibit No. [12] 33.
[13] (Exhibit No. 33 marked for [14] identification.)
[15] BY MR. WILMOT:
[16] Q Do you recognize that document?
[17] A Yes.
[18] Q Can you identify what it is?
[19] A It's a letter to Mr.Reynoso regarding his [20] schedule and assignment.
[21] Q And does that document - any changes, if any, [22] that you made with regard to Mr.Reynoso's work here at FMC [23] Devens?
[24] A Yes.
[25] Q Can you identify for me what changes were made to

Page 126

[1] Mr.Reynoso's work at FMC Devens that are documented in that [2] Exhibit No. 33?
[3] A At the time of the incident, he was working day [4] shift. So I changed him from day shift to evening shift.
[5] Q Until what time?
[6] A His day shift was, could have been 7:30 to 4:00 or [7] 8:00 to 4:00. His, I don't know what his days off were at [8] the time but I put him on a Monday through Friday schedule [9] from 4:00 p.m. to 12:00 p.m. and also not to arrive at the [10] institution prior to 3:30 p.m.
[11] He would not be permitted to work an armed post [12] until resolution of the pending criminal charges against [13] him.
[14] If he planned to work outside these hours of [15] overtime again, he would have to notify his supervisor prior [16] to the shift.
[17] He wasn't to contact in person or telephonically [18] or associate with Colleen O'Donnell at any time.
[19] Q Okay. Would it be a fair statement for me to make [20] that other than the limitations on their physical location [21] here at FMC Devens, that the changes that you made with [22] regard to Mr.Reynoso and Ms.O'Donnell's work here at FMC [23] Devens was identical?
[24] A Yes.
[25] Q Okay. And just to refer back to Colleen Exhibit

Page 127

[1] No. 29, anywhere in this letter does it say that [2] Ms.O'Donnell was prevented from working overtime?
[3] A No.
[4] Q Okay. What were the effective dates of or - [5] well, let me break them up.
[6] What was the effective date of Ms.O'Donnell's, [7] the changes to Ms.O'Donnell's work here at FMC Devens?
[8] A April 15, Monday, April 15, 2002.
[9] Q What was the effective date of the changes to [10] Mr.Reynoso's work here at FMC Devens?
[11] A Monday, April 15, 2002.
[12] Q Now the incident occurred on April 8, 2002. [13] Correct?
[14] A Correct.
[15] Q Why was there - what happened in between or [16] strike that.
[17] Why didn't the changes go into effect immediately, [18] I guess, after April 8, 2002 or it looks like there's about [19] a week lapse in time?
[20] A Both of them were given either annual leave or [21] administrative leave until that particular day of Monday, or [22] their days off coincided with the admin leave or regular [23] leave.
[24] Therefore, I knew both of them would not come to [25] the institution and the Workplace Violence Committee had met

Page 128

[1] and the investigation had been forwarded.
[2] The restraining order was received and I knew [3] basically the facts of the case and I knew I had some time [4] to devise a plan to make it safe for both individuals to [5] come into the institution and that was the date that they [6] came back to work.
[7] Q Okay. So just so I'm clear, is it your testimony [8] that after April 8, 2002, neither Mr.Reynoso or [9] Ms.O'Donnell returned to work that work week?
[10] A That is correct. That I'm aware of.
[11] Q And they both returned back to work, returned back [12] to duty on April 15, 2002?
[13] A That's correct.
[14] Q When they returned back to work on April 15, 2002, [15] is that the date that these changes to their work began?
[16] A That is correct.
[17] Q So when, for example, Mr.Reynoso returned back to [18] work on April 15, 2002, he returned to this new shift?
[19] A That is correct.
[20] Q Okay. When you made the decision to change [21] Ms.O'Donnell's work schedule by the half hour as you [22] testified, and to limit her to the mailroom and required her [23] to notify her supervisor if she wanted to work overtime, was [24] her sex or gender a factor in that decision?
[25] A No.

Page 129

[1] Q Okay. Now you gave some testimony before. I'll [2] just see those exhibits there. Thank you.
[3] You gave some testimony before about the Workplace
[4] Violence Committee.
[5] Do you remember that testimony?
[6] A Yes.
[7] Q And you said then that you received [8] recommendations from them and that thereafter, you received [9] the Protective Order.
[10] Do you remember that testimony?
[11] A Yes.
[12] Q Let me show you what you have already testified to
[13] and has been marked as Exhibit 4 and 5.
[14] Just bring your attention first to Exhibit 5 which [15] you identified earlier as the first recommendations from the
[16] Workplace Violence Committee that was convened after this
[17] April 8, 2002 incidence.
[18] Do you know when you received this memo?
[19] A This memo?
[20] Q Exhibit 5, yes?
[21] A That morning.
[22] Q That morning. Which morning would that be?
[23] A On April 9, 2002.
[24] Q And the second memo that you identified which has
[25] been marked as Exhibit 4 and it's the second memo from the

Page 130

[1] Workplace Violence Committee, do you know when you received [2] that memo?
[3] A April 9, 2002.
[4] Q So you received them both on the same day?
[5] A Right. Yes.
[6] Q Now do you know whether or not the Workplace
[7] Violence Committee had in its possession or was aware that
[8] there was a protective order entered with regard to
[9] Ms.O'Donnell and Mr.Reynoso?
[10] A At this time when I received these, no.
[11] Q Okay. So they did not have the restraining order?
[12] A No. But if I had them, they would have received; [13] the committee would have received the restraining order.
[14] Q So they made these recommendations to you not
[15] knowing there was a restraining order issued with regard to
[16] Ms.O'Donnell and Mr.Reynoso?
[17] A That's correct.
[18] Q Okay. All right. Let me show you that has been
[19] previously identified by Ms.O'Donnell and you identified
[20] the same document here today. In the O'Donnell deposition,
[21] it is Exhibit 27.
[22] And this is the restraining order that you [23] testified to that was issued on April 9, 2002.
[24] Were there, can you identify for me whether or not [25] on that order, the Court, strike that.

Page 131

[1] There's some handwritten language here on the [2] order.
[3] Do you see that?
[4] A Yes.
[5] Q What does that say?
[6] A You may lawfully attend work but must remain fifty
[7] yards from the plaintiff.
[8] Q Okay. So what was your understanding of that
[9] statement when you read it?
[10] A That Mr.Reynoso could return to work. But must
[11] remain fifty yards from Ms.O'Donnell.
[12] Q when you decided to change the schedules of
[13] Ms.O'Donnell and Mr.Reynoso in the way that you did make
[14] the changes, did you do that, did you make that decision
[15] before or after you received the restraining order from the
[16] Court?
[17] A I made that decision when I received that [18] restraining order.
[19] Q Okay. You also testified before as to, you stated
[20] before that an investigation of an incident like this would
[21] not occur until after adjudication.
[22] Why is that?
[23] A The investigation would be initiated until after [24] the adjudication based upon if the person was found [25] innocent, then we would have to – if he was found guilty

Page 132

[1] during the investigation but then found innocent at the
[2] Court hearing, we would have to go back and provide back
pay [3] and benefits to that employee.
[4] So the Bureau waits until after adjudication and [5] the final disposition in the Court hearing before initiating [6] an investigation.
[7] Q Okay. Now it wasn't until almost the following, [8] the beginning of the next year that the investigation [9] started.
[10] Is that correct?
[11] A That's correct.
[12] Q And you just stated as to why the Bureau waits [13] until after the adjudication.
[14] Was that delay in the beginning of the [15] investigation, did it have anything to do with the fact that [16] Ms.O'Donnell is a woman?
[17] A No.
[18] Q Okay. Now you identified previously some memos
[19] that you received from Ms.O'Donnell.
[20]  (Pause)
[21] And they're marked as Exhibits 15 and 16. Exhibit [22] 15 is the memo you identified from Ms.O'Donnell's that's [23] dated May 13, 2002 and Exhibit 16 is the memo you identified [24] from Ms.O'Donnell dated June 10, 2002. Both which you said [25] that at some point, you received as you became aware of.

### Page 137

[1] Q Now there's a blank line there for a signature. [2] Whose signature was that line made for?
[3] A For Ms.O'Donnell.
[4] Q I notice it's blank. Do you know if this letter [5] was communicated to Ms.O'Donnell, delivered to her, sorry?
[6] A I don't know if it was delivered or not. She [7] received this letter.
[8] Q Okay. If I told you that Ms.O'Donnell had [9] testified that after the hearing on January 3, 2003, she did [10] not return back to work.
[11] Would that comport to your memory or refresh your [12] memory as to what happened at that time?
[13] A On January, was it January 3rd?
[14] Q Mm-hmm.
[15] A I don't know if she reported back to work or not. [16] I don't recall.
[17] Q Okay. I am going to show you what has been [18] previously identified as Colleen Exhibit No. 40.
[19] It is an exhibit in your deposition today. I just [20] can't find it at this time. But Colleen's Exhibit No. 40 is [21] a - she previously identified as well as I believe you did, [22] a January 8, 2003 note from Dr.George Milowe?
[23] A Okay.
[24] Q Now does that refresh your memory whether or not [25] Colleen was working or was out of work early January 2003?

### Page 138

[1] A Well, according to this memo or according to this [2] doctor's note she was unable to work and it was dated [3] January 8, 2003. So given that period of time, she was not [4] able to work. So she couldn't have been at work.
[5] Q Okay. I found the exhibit that I wanted to refer [6] to that was introduced today. The one you just referred to [7] was Colleen Exhibit No. 40 which is the same as your Exhibit [8] No. 27.
[9] You also gave testimony as to Exhibit 19. There [10] was some confusion as to what was the first doctor's note [11] that you received concerning Ms.O'Donnell.
[12] On Exhibit No. 27, can you identify what the date [13] is of that note?
[14] A January 8, 2003.
[15] Q And what is the date on Exhibit No. 19?
[16] A January 31, 2003.
[17] Q Okay. Does that refresh your memory as to which [18] note you received first?
[19] A I received this one first. The Exhibit 27 first.
[20] Q Okay. And what did you with Exhibit No. 27 when [21] she received it?
[22] A What this note was given, if I'm not mistaken, to [23] a staff psychiatrist on January 8, 2003 for interpretation.
[24] Q And who is that psychiatrist that you gave it to?
[25] A Dr.Fletcher.

### Page 139

[1] Q Do you know if he responded to Colleen with [2] regards to that note?
[3] A Did he respond or did I?
[4] Q Did you or anyone at your direction respond to [5] Colleen with regards to that note dated January 8, 2003?
[6] A We responded requesting additional medical [7] information.
[8] Q When you say we, can you identify who?
[9] A I can't remember.
[10] Q Okay. I am going to show you what is marked as [11] Colleen Exhibit No. 41. I will present to you that Colleen [12] identified that in her deposition.
[13] It's a memo from Steve Gagnon to her dated January [14] 9, 2003.
[15] A That's correct.
[16] Q Can you read that or have you read it?
[17] A I've read it.
[18] Q Okay. And that memo refers to a phone [19] conversation with Ms.O'Donnell on January 9, 2003.
[20] A I, actually, well, Steve explained to her that I [21] wanted more written, I wanted a release from her doctor so [22] our doctor at the institution could speak to her doctor [23] regarding the medical documentation received which was the [24] January 8th one.
[25] The reason I wanted that, the reason was to

### Page 140

[1] adequately address her, any accommodation or whatever that [2] she requested.
[3] Q Okay. And what time does Steve Gagnon say that he [4] spoke with Colleen requesting that additional information?
[5] A Approximately 8:45 a.m.
[6] Q Okay. Do you know what time you received the note [7] from Ms.O'Donnell's doctor which was dated January 8, 2003?
[8] A I never received any note.
[9] Q The note that you identified as Exhibit 27?
[10] A Oh, when did I receive this note? January 8, [11] 2003.
[12] Q Do you remember what time of day you received [13] that?
[14] A No, I don't recall the time of day.
[15] Q At the top of there, there is a fax line. Do you [16] see that?
[17] A Yes.
[18] Q What is the time of the fax?
[19] A 18:20.
[20] Q What would that be in –
[21] A 18:20 has got to be around 6:20, is that right?
[22] Military time.
[23] Q 18:20 will be military time, right?
[24] MS. MCDONALD: Aren't you supposed to know that?
[25] THE WITNESS: This isn't military. Let's see.

Page 145

[1] initially. That I gave her initially.
[2]    Q Which was what?
[3]    A Working in the mailroom and Mr.Reynoso would have
[4] been working in an area in the institution or vis-a-versa. [5] It
could have changed but they both would have been working [6] in
the same facility.
[7]    Q If Ms.- you said Ms.O'Donnell would be in the
[8] mailroom. What times would she have been working?
[9]    A She would have been working 6:00 to 2:30.
[10]   Q And where would Mr.Reynoso have been working
[11] January 31, 2003?
[12]   A He would have been working in this facility on
[13] evening watch.
[14]   Q When you say this facility, what do you mean?
[15]   A The inside of the institution, away from the [16] mailroom.
[17]   Q What would his times have been?
[18]   A 4:00 to 12:00.
[19]   Q Okay. So if Ms.O'Donnell was working January 31,
[20] 2003, under the time and the locations which you just
[21] specified, would you agree with me that she would not have
[22] been working at the same facility at the same time as
[23] Mr.Reynoso?
[24]   A I would agree with that.
[25]   Q Okay.

Page 146

[1]    (Pause)
[2] Now you gave some testimony as to – these letters [3] here.
Winn Exhibit 21 is a letter from Mr.Rizzitelli to [4] you dated
February 10, 2003.
[5] Winn Exhibit 22, is the same letter but there's [6] the watermark
or whatever you want to call it stating that [7] no response
received, resent February 18, 2003.
[8] And the last Winn Exhibit 23, same letter again, [9] with the
exception of the watermark stating no response [10] received,
resent March 3, 2003.
[11] Why didn't you respond to, well strike that. [12] Between the
time of February 10, 2003 which is Exhibit 21 [13] and Exhibit 22
which states that it was resent February 18, [14] why didn't you
respond to Mr.Rizzitelli's February 10, 2003 [15] letter in that
timeframe?
[16]   A Because I didn't have, the reason I didn't respond
[17] was because I didn't have written permission from Colleen to
[18] pass to, to provide information to Rizzitelli.
[19]   Q Okay. And then in the last letter, Exhibit 23, [20] between
the timeframe of February 18, 2003, the date of [21] Exhibit 22,
why didn't you respond to Mr.Rizzitelli's in [22] that timeframe?
[23]   A I had yet to receive permission to provide [24] Mr.Rizzitelli
information regarding Ms.O'Donnell.
[25]   Q Do you remember when you received authorization

Page 147

[1] from Ms.O'Donnell that Mr.Rizzitelli was indeed her
[2] counsel?
[3]    A I don't remember the exact date. It was some time [4] in
March.
[5]    Q I am going to show you what was previously [6] identified
as Colleen Exhibit 53. I will represent to you [7] that Ms.O'Donnell
identified that document as the letter in [8] which she identifies
Mr.Rizzitelli as her lawyer.
[9] What is the date of that document?
[10]   A March 4, 2003.
[11]   Q Okay. And can you just repeat again the date of [12] the
last letter in the sequence that we just went through in [13] the last
three letters when that was sent?
[14]   A March 10, excuse me, February 10.
[15]   Q No, it would be the watermark date?
[16]   A March 3, 2003.
[17]   Q Okay. So you received the written notification [18] from
Ms.O'Donnell after Mr.Rizzitelli sent this last [19] letter which is
dated March 3, 2003?
[20]   A That is correct.
[21]   Q And once you received this letter from [22] Ms.O'Donnell
which is Exhibit 53, did you then respond to [23] Mr.Rizzitelli?
[24]   A Yes I did.
[25]   Q Okay. I'm just referring your attention back to

Page 148

[1] Exhibit 18. The document that you stated earlier that you
[2] had not seen before.
[3] I am going to show you what was marked as Exhibit [4] 48 in
Ms.O'Donnell's deposition.
[5] Do you recognize that document or can you identify [6] what it
is?
[7]    A It's a Request for Voluntary Leave Transfer.
[8]    Q If you flip to the second page of that document. [9] And
can you compare that page to what was marked as Exhibit [10] 18
in your deposition today.
[11]   A They're the exact same.
[12]   Q So Exhibit 18 of your deposition today is the [13] second
page of Colleen Exhibit No. 48?
[14]   A That is correct.
[15]   Q Okay. And you said that Exhibit No. 48 of [16] Colleen's
deposition is a Request for Voluntary Leave [17] Transfer.
[18] What involvement, if any, do you have in the [19] Voluntary
Leave Transfer application process or decision [20] with regard to
those applications?
[21]   A That's an independent committee that gathers to
[22] look at documents and approve or deny any kind of leave
[23] transfer program.
[24] I don't have any input on that.
[25]   Q Okay. Are you aware that the Voluntary Leave

