# EXHIBIT 65



LAW OFFICES

## COOLEY, SHRAIR P.C.

1380 MAIN STREET – FIFTH FLOOR
SPRINGFIELD, MASSACHUSETTS 01103-1616

TELEPHONE (413) 781-0750     TELECOPIER (413) 733-3042

WRITERS DIRECT DIAL
(413) 735-8045

EMAIL: dmcdonald@cooleyshrair.com

DAWN D. McDONALD•                                    •ALSO ADMITTED IN CONNECTICUT

FILE NO. 24763.1

May 12, 2004

*Via UPS Next Day Air  #1Z FA2 531 22 1001 582 0*

David L. Winn, Warden
FMC Devens
P.O. Box 880
Ayer, MA 01432

> RE:   *Colleen O'Donnell  v. Federal Bureau of Prisons*: re AWOL charges and proposed discipline

Dear Warden Winn:

Please consider this letter Ms. O'Donnell's opposition to her supervisor's proposal that she be suspended for a period of thirty calendar days from her position of Inmate Systems Officer based upon two charges:

1.     Excessive unauthorized absences; and
2.     Failure to follow leave procedures.

Please be advised that it is Ms. O'Donnell's position that both the charges themselves, and the events surrounding them, are discriminatory and retaliatory in nature and otherwise wholly without merit.   The basis for Ms. O'Donnell's position is more fully set forth as follows:

On August 30, 1998, Colleen O'Donnell began her career as a correctional officer with the Bureau of Prisons.  She has never been reprimanded or disciplined in any way and has had a very successful career thus far.  In January of 2001 she began a new position as an Inmate Systems Officer.

**BOP0008**

May 13, 2004
Page 2
David L. Winn, Warden

Unfortunately, Colleen began dating a co-worker Mr. David Reynoso. Throughout her relationship with Mr. Reynoso he abused her both physically and mentally. This abuse came to a head on April 8, 2002, during their lunch hour. Reynoso and Colleen left Devens and went to Mirror Lake to discuss their relationship problems. During this discussion, Reynoso assaulted Colleen, pushing her, kicking her, and otherwise inflicting bodily harm upon her. Colleen tried to get away from him, and Reynoso drove off. This same day Colleen reported this incident to her supervisor, Fernando Messer, Capt. Michael Bollinger, and the Massachusetts State Police. Following her meeting with the State Police Colleen spoke to you and Human Resource Manager, Cindy Lord. At this time, Colleen was granted administrative leave for two days. David Reynoso was subsequently arrested at his home on April 8, 2002 and Colleen obtained an emergency restraining order against David Reynoso. (Exhibit A).

On April 19, 2002, Colleen notified her supervisor, Steve Gagnon, that she had received a ten-day restraining order. He told her to take the remainder of the week off as administrative leave.

On April 12, 2002, Colleen was advised that she should return to work on Monday, April 15, 2002 and that her hours were changed to 6:00 a.m. to 2:30 p.m. Colleen was further advised that she was reassigned to the mailroom. When Colleen objected to the change to her duties and hours, she was advised that "Reynoso was innocent until proven guilty and the Warden wants it that way." Fernando Messer made the statement.

On April 23, 2002 Colleen obtained a one year restraining order on Reynoso. The restraining order was renewed upon expiration for an additional year and recently expired on April 23, 2004. (Exhibit B)

On April 24, 2002 Colleen met with former Associate Warden Jerry Martinez, former Assistant Human Resource Manager, Losi Swiderski, and Union Steward, Richard Stacey. Colleen expressed that she did not feel safe with Reynoso working on the premises, to which Ms. Swiderski responded that there was no difference between her safety at the workplace and her safety at home, and that at least when she was at work she knew where he was. When Colleen explained that Reynoso used to watch her on the cameras in the SIS department, Mr. Martinez responded "well that should have been your first sign." Colleen's fears for her safety in the workplace were clearly not taken seriously which exacerbated her fears further.

On June 11, 2002 Colleen met with Dr. Susan Bates who was involved with the Employee Assistance Program. She made this appointment at the recommendation of her supervisor. When she explained what had been going on since April 8, Dr. Bates expressed her opinion that she did not feel it was safe for Colleen to be at work and told her to write a memo requesting an assessment for workplace violence. Colleen followed her recommendations and sent a memo to Steve Gagnon on June 12, 2002. Associate Warden, Randy Meeks, in the presence of Steve Gagnon told Colleen that there would not be another assessment of workplace violence. Again, Colleen's fears were disregarded.

Sometime in July of 2002, Colleen met with you, Warden, Human Resource Manager, Cindy Lord, and Union President, Mark Shaughnessy to discuss safety issues in the workplace. At

BOP0009

May 13, 2004
Page 3
David L. Winn, Warden

this time, Warden, you expressed "what do you want me to do I didn't cause this problem, you two did." Again, Colleen's employer disregards Colleen's concerns for her safety in the workplace.

On January 3, 2003, David Reynoso pled to sufficient facts for a finding of guilty to domestic assault and battery with dangerous weapon charges in Ayer District Court. (Exhibit A) Colleen advised you of the proceedings that same day. You advised Colleen that she could return to work in her normal hours but that she should report, once again, to the mailroom on January 6, 2003.

On January 8, 2003 Dr. George Milowe, Colleen's psychiatrist wrote a letter indicating that Colleen had been diagnosed with post traumatic stress disorder and further indicated that she was totally disabled and unable to work at her current job in the presence of Reynoso, as it exacerbated her symptoms. (Exhibit C).

## CHARGE I: EXCESSIVE UNAUTHORIZED ABSENCES

Specification A.

Charge I of Mr. Gagnon's April 20, 2004 letter with regard to specification A leaves out a significant amount of detail which is relevant to a determination as to whether Colleen should be disciplined. Mr. Gagnon merely states that Colleen was carried in an Absent Without Leave status from February 3, 2003 to June 10, 2003, and further that on January 23, 2003 the warden granted her 24 hours of advance sick leave allowing her time to obtain updated medical documentation which Colleen failed to supply. What is not mentioned in Mr. Gagnon's letter as follows:

On January 9, 2003, Cindy Lord sent Colleen a letter indicating that she was required to sign an enclosed authorization to release medical information to the agency. (Exhibit D) Ms. Lord indicated that Colleen must sign and return the form by January 15, 2003. This medical release which is attached hereto as Exhibit D is overly broad and not in compliance with the privacy protections provided by both State and Federal Law. To condition the terms of Ms. O'Donnells's employment on her signing this release is illegal.

Furthermore, this is not the first time that you have heard this argument. Colleen's former attorney, Samuel Rizzitelli, advised you and Ms. Lord in a letter dated January 21, 2003 that the requests for medical authorization was a violation of law. (Exhibit E) Also, on this date, Attorney Rizzitelli requested that you provide Colleen with a reasonable accommodation based upon her disability; i.e. post traumatic stress disorder (PTSD).

Also on January 21, 2003, Collen sent a letter to you requesting advanced sick leave with pay due to a medical condition. Dr. Fletcher then reviewed Dr. Milowe's letter, indicating that in his opinion there was insufficient information with regard to Colleen's medical condition and suggested a formal review of medical records and an independent evaluation by an independent psychiatrist for a fitness for duty exam. Despite Dr. Fletcher's recommendations you did not require Colleen have a fitness for duty examination nor does it appear that the subject was broached with either Colleen or her attorney. In fact, as of January 21, 2003 the agency had failed to recognize that attorney Rizzitelli was representing Colleen.

BOP0010

May 13, 2004
Page 4
David L. Winn, Warden

On January 23, 2003 Colleen was granted 24 hours of advanced sick leave to obtain the requested medical information with regard to current clinical status and an estimated expected date of full or partial recovery. She was further informed that she must submit an application for leave by January 31.

On January 31, 2003 Colleen applied for the Voluntary Leave Transfer Program (VLTP) together with the required statement of her doctor, Dr. Milowe. Dr. Milowe's statement clearly addresses both an assessment of her current clinical status and further estimates when recovery might be anticipated. Both requirements, which Mr. Gagnon indicated, were required information to keep Colleen from being classified as AWOL. Dr. Milowe's statement which is attached hereto as Exhibit F clearly indicates that the nature of the emergency is Post Traumatic Stress Disorder, and that it is work related. He detailed her symptoms, the severity of the emergency, and further indicated that her symptoms are recurring and that the duration is likely to be "lengthy and indefinite" as long as Colleen was forced to work with Reynoso. If this statement was insufficient, Dr. Milowe wrote an additional statement to Mr. Gagnon on January 31, 2003 again reiterating her symptoms and the expected duration of those symptoms given the situation as it existed at FMC Devens on that date; i.e. that Colleens recovery was unlikely unless she was separated from Reynoso because being exposed to his presence exacerbated her symptoms. (Exhibit G) Because you failed to remove Reynoso from Colleen's work environment Dr. Milowe considered her to be totally disabled and unable to return to work. Following this statement, Colleen was classified as being AWOL.

Without further communication with either Colleen or her attorney, you placed Colleen on absent without leave status on February 3, 2003. On February 10, 2003, Attorney Rizzitelli sent you additional correspondence asking whether the unlawful medical authorization was retracted, and again further requested a reasonable accommodation and that Colleen be placed on administrative leave. This letter was not responded to and was re-sent to your attention on February 18, 2003 and March 3, 2003. (Exhibit H)

Following attorney Rizzitelli's demand that you retract the request that Colleen fill out that medical authorization form there was absolutely no communication from you to either Colleen or her attorney to indicate what specific medical information you needed that she may have been able to supply short of filling out the overbroad medical authorization form. Colleen was denied the VLTP for the reason that her medical emergency was "based on another staff member's employment with the bureau of prisons." (Exhibit I) At no time did Dr. Milowe indicate that Colleen's prognosis was dependent upon termination of Reynoso. Unfortunately, there were few if any attempts to even discuss what accommodation might be appropriate and acceptable to enable Colleen to feel safe in her work environment. At one point you indicate in correspondence to attorney Rizzitelli that there was a possibility that Reynoso could be removed to the camp. On a number of occasions, attorney Rizzitelli asked you for more detail with regard to that possible accommodation. Colleen twice applied for advance sick leave and twice was denied. There was absolutely no correspondence or activity between the parties during the months of April and May of 2003.

**BOP0011**

May 13, 2004
Page 5
David L. Winn, Warden

It is evident that Mr. Gagnon's allegations as specified under Charge I, Specification A, are inaccurate given the additional facts, which I have supplied. Mr. Gagnon states that Colleen was to respond by January 31, 2003 or she would be placed on AWOL status and he further indicated that she failed to respond to this request. That statement is untrue.

On January 31, 2003 Dr. Milowe provided Mr. Gagnon with an additional letter detailing Colleen's medical condition. Dr. Milowe provided Mr. Gagnon with the information that he requested. If for some reason, this information was not specific enough, either Colleen or her representative should have been advised. Colleen was never advised and was simply placed on AWOL status. It is unfortunate that there were issues between attorney Rizzitelli and you and others at the institution. However it is clear that Colleen made every attempt to comply with the demands placed upon her. Colleen did apply for the voluntary leave transfer program, leave without pay, and advanced sick leave on two occasions. Colleen was denied at every turn. She was asked to provide medical documentation and she provided medical documentation. She provided this documentation within the time lines given her. It became apparent that no matter what she provided she would remain on AWOL status.

Specification B

Colleen was cleared, by her doctor, to return to work on June 11, 2003, Attorney Rizzitelli wrote to you on June 9, 2003 asking how the workplace would be made safe for Colleen given the fact that Reynoso was still employed and working in close proximity to her. (Exhibit J) Your only response was that you believed the courts have resolved the issues between Colleen and Reynoso and that you were glad that she was back to work. (Exhibit K)

Upon Colleen's return to work on June 16, 2003 she arrived at work to discover that the side of the mailroom had been painted with vulgar statements regarding her.

On June 18, 2003, Dr. Milowe wrote Colleen a note indicating that due to the re-traumatazation on June 16, Colleen was again totally disabled due to her post traumatic stress disorder. (Exhibit L) You, at that time, authorized 10 days of administrative leave for Colleen's personal safety.

On June 23, 2004, Mr. Gagnon advised Colleen that she must apply for leave without pay prior to June 30. (Exhibit M) Colleen did so in the form of a letter to you of June 26, 2003 requesting advanced sick leave, administrative leave, or leave without pay along with an application for medical retirement. (Exhibit N)  The leave without pay was approved until July 29, 2003.

On July 28, Colleen again requested leave without pay, which was granted until August 11, 2003. Colleen was to provide an updated doctors note on August 11, 2003. At that time, Colleen requested an extension to obtain the doctor's note as her appointment was scheduled for September and her doctor was on vacation for the remainder of the month of August. (Exhibit O)

On August 12, 2003, leave without pay was denied and Colleen was placed on AWOL status. Unfortunately, attorney Rizzitelli represented Colleen through October 2003. During this

BOP0012

May 13, 2004
Page 6
David L. Winn, Warden

time she was advised that there was no need to provide addition medical information regarding her post traumatic stress disorder. Relying on the advice of her attorney, once the leave was denied, Colleen did not pursue getting medical documentation.

## CHARGE 2; FAILURE TO FOLLOW LEAVE PROCEDURES

Specification A

With regard to Specification A of Charge 2, Failure to Follow Leave Procedures, Mr. Gagnon indicates that Colleen did not follow procedures because she did not provide an estimated date of full or partial recovery. This request was impossible to comply with. In multiple notes from Dr. Milowe he indicated that the duration of Colleen's illness was "unknown" and "indefinite", and likely to be "lengthly". Dr. Milowe did indicate that some partial recovery might be had if circumstances at Colleen's workplace were to change. Circumstances did not change. It is impossible for a doctor to make clinical assessments in the abstract, and Dr. Milowe was only able to provide an opinion at that time as to the duration of Colleen's illness. Given the circumstances, it was impossible for him to provide a date of actual full or partial recovery and Colleen should not be penalized for this impossibility.

Specification B

With regard to Specification B of charge 2, failure to provide medical documentation, again, it was impossible for Colleen to comply with this request on August 11, 2003. Her doctor was on vacation for three weeks out of the month of August and was not to return until September when Colleen had scheduled an appointment. Colleen had informed you she would obtain the requested documentation at that time. Apparently this was an inadequate explanation and Colleen was denied. When she consulted her attorney he advised her it was not necessary that she provide further medical documentation as the Agency had all the medical documentation it required with respect to her condition. Unfortunately, it does not appear the attorney Rizzitelli made any contact with you whatsoever with regard to Colleen's rights in this regard and again she is being penalized for failing to provide information which she cannot, which was impossible for her to provide, which she was advised not to provide by her attorney, and for lack of communication between the agency and either Colleen or her attorney.

There is no question that Colleen was apprised of the procedures that she was to follow in applying for leave. Colleen followed all procedures in this regard. Colleen's only failing was that the Agency was requesting information which it was impossible for her to provide. Due to this impossibility she is now subject to discipline.

Since the beginning of her employment with the Federal Bureau of Prisons, Colleen O'Donnell has been and exemplary employee. Colleen has always complied with all policies and procedures and has never been subjected to any discipline.

Unfortunately, on April 8, 2003, Colleen suffered a very traumatic event in that she was assaulted and battered by her then boyfriend, David Reynoso. Mr. Reynoso was arrested, convicted and subject to an Order of Protection, all facts, which Colleen advised you of.

BOP0013

May 13, 2004
Page 7
David L. Winn, Warden

     Despite the fact that she was a victim, Colleen's job duties were changed and her hours of work were changed. She was forced to work in proximity to Reynoso who had the ability to access her personal and private information and watch her on TV monitors. Because of all of these traumatic events including the failure of the Agency to address her safety concerns, Colleen was diagnosed with Post Traumatic Stress Disorder and became unable to attend work. Her doctor recommended removal of Reynoso, whether it be by transfer or termination. The fact that you disagree with this recommendation is irrelevant to Colleen's medical condition. The fact remains that the presence of Reynoso within the institution was traumatic for Colleen and exacerbated her medical condition.

     All of these facts were well known to both Colleen's supervisor and you, as Warden of the institution. There was absolutely no legitimate reason for you denying Colleen LWOP status rather than AWOL status.

     I ask at this time on behalf of Colleen that you take into account her past employment history, the unfortunate incident which she has suffered, her disability which prevented her from working, and all other extenuating circumstances and forego any discipline for these charges.

                          Very truly yours,

                          Dawn D. McDonald

DDM/as
cc:   Colleen O'Donnell