**EXHIBIT 68**

1

Vol I
1 - 152

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

COLLEEN O'DONNELL,            )
                              )
        Plaintiff,            )
                              )
-v-                           ) CIVIL ACTION NO.
                              ) 04-40190-FDS
ALBERTO R. GONZALES,          )
Attorney General,             )
U.S. Department of Justice,   )
                              )
        Defendant.            )

THE ORAL DEPOSITION OF VICTOR J. CARBONE, M.D., held pursuant to Notice, and the applicable provisions of the Federal Rules of Civil Procedure, before Carol Summers, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the offices of the United States Attorney, 1 Courthouse Way, Suite 9200, Boston, Massachusetts, Massachusetts, on Friday, March 3, 2006, commencing at 10:14 a.m.

**ORIGINAL**

*APEX Reporting*
(617) 426-3077

2

PRESENT:

On Behalf of the Plaintiff:

    DAWN D. McDONALD, ESQ.
    Cooley, Shrair P.C.
    1380 Main Street, Fifth Floor
    Springfield, MA  01103
    (413) 735-0750

On Behalf of the Defendant:

    DAMIAN W. WILMOT, ESQ.
    Assistant U.S. Attorney
    Office of the United States Attorney
    1 Courthouse Way
    Boston, MA  02210
    (617) 748-3100

    KELLY L. MCDONALD, ESQ. (Via telephone)
    Assistant General Counsel
    Federal Bureau of Prisons
    Office of General Counsel, Labor Law Branch
    4211 Cedar Springs Road
    Dallas, TX  75219
    (214) 224-3429

### Page 89

[1] A Right.
[2] Q But I'm asking you with, in, with relation to [3] PTSD, –
[4] A Right.
[5] Q – doesn't it tend to show that she does not meet [6] the avoidance criteria during that time period because of [7] her persistent contact with Mr. Reynoso?
[8] A Again, no, because of the learned helplessness [9] pattern that goes with this particular diagnosis.
[10] Q Um-hum.
[11] A There is a tendency, it sounds very [12] counter-intuitive. I know.
[13] Q Um-hum.
[14] A But have a tendency to go back to the perpetrator [15] of the problem in your life over and over again, in essence, [16] trying to fix it because you start to believe, in a [17] self-loathing way, that that's all you deserve.
[18] So, her not avoiding him does not really surprise [19] me at all, and I've seen it multiple times. This is not the [20] first case where I've seen that pattern, and it still [21] doesn't speak to the avoidant behavior that I saw, that I [22] can speak to, when I did my interview with her and her [23] avoidance of almost everything at this point that had to do [24] with anything that resembled that event. That included me. [25] That included her attorney. That included anyone.

### Page 90

[1] Q So, you're talking about today?
[2] A Today.
[3] Q Yeah.
[4] A Well, I can only speak to when I examined her, and [5] the notes that I have in front of me, and, and my, what I [6] felt was avoidance in my report, I'm talking about what I [7] literally saw and had to deal with in getting into my [8] office. I mean, it was, it was quite an interesting process [9] to get her to look at that at all.
[10] Q Based on your view of the medical records, your [11] interview of, of her, and whatever else you looked at, –
[12] A Um-hum.
[13] Q – can you make an opinion here today, to a [14] reasonable degree of medical certainty, that she has Post [15] Traumatic Stress Disorder for, at some point between April [16] 8th, 2002 and December of 2003?
[17] Are you able to make –
[18] A April 8th.
[19] (Witness reviews document.)
[20] A I believe I could based on this note on 1/8/03.
[21] Q And –
[22] A Coming, coming from a physician with that many criteria indicated on a medical document, yes, on 1/8/03.
[25] Q So, to a reasonable degree of medical certainty, [25] –

### Page 91

[1] A I would, I would, as a doctor looking at the note, [2] you know, when somebody goes to a doctor, as a doctor [3] looking at the note, it would be a clear pattern consistent [4] with PTSD in reading the note. Yes.
[5] Q Okay.
[6] A On 1/8/03.
[7] Q And you would reach that conclusion even though [8] the notes don't show what type of tests he's conducted if [9] any?
[10] A You, you asked me if I would say it was PTSD, and [11] –
[12] Q Right.
[13] A – the answer is yes. I would say, at that point, [14] it's PTSD.
[15] Q Okay.
[16] A I didn't say, if I'd asked for more tests or [17] something. I just indicated that, on that date, I'd look at [18] it and say that this certainly is consistent with a [19] diagnoses of PTSD based on the symptomatology being [20] presented by a psychiatrist on a limited piece of paper to [21] provide his note.
[22] Q Well, I guess that's not really, my question is [23] can you, sitting here today, state to a reasonable degree of [24] medical certainty that she had PTSD from, you know, I'm not [25] talking about today or currently, but for the time period

### Page 92

[1] that really is relevant here in this case, April 8th, 2002 [2] to sometime, I guess, in late 2003?
[3] A What you're asking me, then, is according to the [4] diagnostic and statistical manual of psychiatry, –
[5] Q Um-hum.
[6] A – and their criteria against these notes, –
[7] Q Yes.
[8] A – in that time frame –
[9] Q Um-hum.
[10] A – can I state it? No.
[11] Q Okay.
[12] MS. McDONALD: You know, I'm going to object to [13] that question because that wasn't the question that he asked [14] you.
[15] MR. WILMOT: Huh?
[16] MS. McDONALD: That wasn't the question that you [17] asked him.
[18] MR. WILMOT: No, that was the question I was [19] asking.
[20] MS. McDONALD: You asked him if he could say, as a [21] doctor, to a reasonable degree of medical certainty if she [22] had PTSD between, I forget the first date.
[23] THE WITNESS: April and –
[24] MR. WILMOT: And his –
[25] MS. McDONALD: April and December, 2003.

Page 93

[1]  MR. WILMOT: – answer to that was no.
[2]  MS. McDONALD: And, then, you started talking [3] about the, no, he said, yes.
[4]  THE WITNESS: If, if we're talking about this [5] note, and I'm a doctor at another establishment reading it, [6] I would be comfortable that this is PTSD if that's the [7] question.
[8]  If the question is, according to this manual, can [9] I prove it, –
[10] MR. WILMOT: Right.
[11] THE WITNESS: – the answer is no.
[12] MR. WILMOT: Okay.
[13] MS. McDONALD: Right.
[14] MR. WILMOT: Right.
[15] MS. McDONALD: I think that's clearer.
[16] BY MR. WILMOT:
[17] Q And that manual, the DMS, is the criteria that [18] psychologists, psychiatrists, what have you –
[19] A Social workers.
[20] Q – social workers, they follow these criteria to [21] reach a diagnosis of PTSD?
[22] A That's correct.
[23] May I speak?
[24] Q Yes.
[25] A Okay.

Page 94

[1]  Q There is no question pending, but –
[2]  A Maybe I'll speak anyways. The, but that being [3] said, and, again, this is, maybe just having been in the [4] field for a long time, but doctors write notes to me all the [5] time, and doctors write notes to facilities all the time; [6] including, in my case, many school systems, about various [7] issues.
[8]  Frequently, with the MD at the end of their name [9] and a lot of the criteria mentioned, it is usually accepted [10] that the doctor, who is licensed in the state that they're [11] working in, has the competence to make the diagnosis as [12] well.
[13] Q Um-hum.
[14] A So, the reason why I say that I feel comfortable [15] is that there is enough of the criteria here. It is not as [16] though there is nothing in the note. Most of the note is [17] covered with what needs to be covered. Every criteria is [18] not.
[19] Q Um-hum.
[20] A That's why I'm, so, to answer your question, it's [21] no to the question of DSM, –
[22] Q Um-hum?
[23] A – and yes to the question of does this document [24] indicate there is a problem related to this woman that's [25] significant enough to warrant consideration. the answer is

Page 95

[1]  yes to that question.
[2]  Q And, of course, in that answer, you're assuming [3] that Dr. Milowe knew what he, what the criteria was from the [4] DSM?
[5]  A Exactly. Exactly –
[6]  Q Okay.
[7]  A – true.
[8]  Q Okay. Now, you may have mentioned this before, [9] but in reaching the conclusions that, that you make in your [10] report, did you take into account that the plaintiff was [11] involved in active litigation here and is seeking monetary [12] damages?
[13] A Yes.
[14] Q Do you note that in your report?
[15] A Yeah. I, I believe the opening line is that the [16] referral was made through legal counsel.
[17] Q Okay. Well, I mean, did you note in your report [18] that you, I guess, discounted some of her questions or what [19] have you, or factored that, that issue in?
[20] A I don't remember.
[21] Q Okay.
[22] A I don't remember.
[23] Q Are you able to, to identify which, if any, of the [24] plaintiff's life activities were affected by the PTSD that [25] Dr. Milowe diagnosed her with, I guess, starting in June,

Page 96

[1]  June 24th, '02 going forward?
[2]  A Based on notes or –
[3]  Q Based on the record.
[4]  A My record or Dr. Milowe's record?
[5]  Q Dr. Milowe's record?
[6]  A I'd have to look.
[7]  (Witness reviews document.)
[8]  MR. WILMOT: I should probably go beyond [9] Dr. Milowe's record to her subsequent treatment.
[10] (Witness reviews document.)
[11] A Did you want it by reference date? Would that be [12] helpful to you?
[13] Q That would be great.
[14] A First indication of a significant sleep [15] disturbance was on 5/8/02 that I can find.
[16] Q Okay.
[17] A That was in note under poor sleep under mental [18] status.
[19] Q And, then, if you look at the next note, which is [20] 5/29?
[21] A He placed her on medicine for sleep.
[22] Q Okay.
[23] A Ambient is a medicine for sleep.
[24] Q On 5/29, there is a note there that says, "Sleeps [25] very well."