# EXHIBIT 2

**Depo-O'Donnell V Gonzales, 04-40190-FDS - Depo of David Winn - 09/15/05**

**APEX Reporting**

**Page 1 to Page 170**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*APEX REPORTING*
*327 Summer Street*
*Boston, MA    02210*
*Phone:    617-426-3077*
*FAX:    617-426-6844*

Case 4:04-cv-40190-FDS Report Of Donnell M. Gonzales, 04-40190-FDS Dep of David Winn - 09/14/05 XMAX(1/1)



**Page 1**

[ 1]  1 - 170
[ 2]
[ 3]        IN THE UNITED STATES DISTRICT COURT
[ 4]                  FOR THE
[ 5]          DISTRICT OF MASSACHUSETTS
[ 6]
[ 7]
[ 8] COLLEEN O'DONNELL,           )
                                  )
[ 9]        Plaintiff,            )
      -v-                         ) CIVIL ACTION NO.
                                  ) 04-40190-FDS
[10]                              )
     ALBERTO R. GONZALES,         )
[11] Attorney General,            )
     U.S. Department of Justice,  )
[12]                              )
            Defendant.            )
[13]
[14]
[15]
[16]        THE ORAL DEPOSITION OF DAVID L. WINN,
[16] held pursuant to Notice, and the applicable provisions of
[17] the Federal Rules of Civil Procedure, before Marilyn
[18] Franklin, a Court Reporter and Notary Public, within and for
[19] the Commonwealth of Massachusetts, at FMC Devens,
[20] Ayer, Massachusetts, Massachusetts, on Thursday, September
[21] 14, 2005, commencing at 10:04 a.m.
[22]
[23]
[24]
[25]

**Page 2**

[ 1] PRESENT:
[ 2] On Behalf of the Plaintiff:
[ 3]     DAWN D. McDONALD, ESQ.
        Cooley, Shrair P.C.
[ 4]    1380 Main Street, Fifth Floor
        Springfield, MA 01103
[ 5]    (413) 735-0750
[ 6] On Behalf of the Defendant:
[ 7]    DAMIAN W. WILMOT, ESQ.
        Assistant U.S. Attorney
[ 8]    U.S. Attorney's Office
        1 Courthouse Way, Suite 9200
[ 9]    Boston, MA 02210
        (617) 748-3100
[10]
        KELLY L. McDONALD, ESQ.
[11]    Assistant General Counsel
        Federal Bureau of Prisons
[12]
     ALSO PRESENT:
[13]
        Colleen O'Donnell
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 3**

[ 1]                    I N D E X
[ 2] WITNESS                                    PAGE
[ 3] David L. Winn
[ 4]     Examination by Ms.McDonald
7
[ 5]     Examination by Mr.Wilmot
121
[ 6] EXHIBITS              DESCRIPTIO      PAGE
[ 7]    1    Certificate of Investigatio   33
[ 8]    2    Reinvestigatio                34
[ 9]    3    Declaration for Employmen     35
[10]   4    Committee Repor                43
[11]   5    Committee Repor                44
[12]   6    Case Descriptio                54
[13]   7    DIA Repor                      54
[14]   8    Restraining Order Against Reynos  51
[15]   9    Letter to Reynoso: Suspensio   55
[16]  10    Memo re: Meeting with Reynos   57
[17]  11    Letter to Reynos               64
[18]  12    Personnel Actio                65
[19]  13    Personnel Actio                67
[20]  14    Personnel Actio                68
[21]  15    Email from O'Donnell to Win    73
[22]  16    Memo to Gagnon from O'Donne    74
[23]  17    Memo from Reynos               77
[24]  18    Medical Documentatio           80
[25]  19    Letter from Dr.Milow           71

**Page 4**

[ 1]                    I N D E X
     EXHIBITS  DESCRIPTIO      PAGE
[ 2]
[ 3]   20    Letter to O'Donne    86
[ 4]   21    Letter TO Winn 2-10-0    88
[ 5]   22    Letter to Winn 2-18-0    92
[ 6]   23    Letter to Winn 3-3-0     93
[ 7]   24    Letter to Win            94
     101
[ 8]   25    Letter from Winn
     110
[ 9]   26    Letter to Winn 3-24-03
     112
[10]   27    Letter from Dr.Milowe 1-8-03
     116
[11]   28    Ltr. to O'Donnell from Winn 11-18-03
     118
[12]   29    Letter from Winn to O'Donnell
     119
[13]   30    Punishment of AWOL
     120
[14]   31    Proposed Suspension
     125
[15]   32    Notification of Decisio--
[16]   33    Letter to Reynoso
     155
[17]   34    Memo re: EEO meetings
          35    Memo re: EEO meetings

**Page 5**

[1]                    S T I P U L A T I O N S
[2]
[3]           IT IS HEREBY STIPULATED AND AGREED TO,
[4]    by and between the parties and their
[5]    respective attorneys, that all
[6]    objections, except as to the form of the
[7]    questions, shall be reserved until the
[8]    time of trial; that the filing of the
[9]    deposition be waived; and, that the
[10]   witness may read and sign the deposition
[11]   without any Notary Public being present.
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 6**

[1] P R O C E E D I N G S
[2]    (10:04 a.m.)
[3]    MS. MCDONALD: Good morning, Warden. My name is
[4] Dawn McDonald and I am the attorney for Colleen O'Donnell
[5] for the matter now pending in Federal Court with regard to
[6] discrimination claims and retaliation claims.
[7] I am going to ask you a number of questions today [8] and I
just want to go over some ground rules before we [9] begin.
[10]   MR. WILMOT: Have you sworn in the Warden yet?
[11]   MS. MCDONALD: Oh, sorry.
[12] DAVID L. WINN, Sworn
[13]   MS. MCDONALD: Damian, usual stipulations?
[14]   MR. WILMOT: Yes.
[15]   MS. MCDONALD: Waive the notary. Okay, first [16] ground
rule is please respond verbally because the [17] stenographer
cannot take down a shake or a nod of the head [18] or a gesture.
[19]   THE WITNESS: Okay.
[20]   MS. MCDONALD: Please allow me to finish my
[21] question before you answer even if you think you know what
[22] the answer is going to be or if it is apparent what I am
[23] asking.
[24] It just makes it clearer on the record and easier [25] for the
stenographer to take down your testimony.

**Page 7**

[1]    THE WITNESS: Okay.
[2]    MS. MCDONALD: If you don't understand a question, [3] let
me know and I'll be happy to rephrase it. If you need [4] to take a
break, let me know that.
[5]    THE WITNESS: Okay.
[6]    MS. MCDONALD: We can accommodate that.
[7] EXAMINATION BY MS. MCDONALD:
[8]    Q Please state your name and position here at FMC
[9] Devens?
[10]   A David L. Winn, Warden.
[11]   Q And have you reviewed any documents to prepare for
[12] your testimony today?
[13]   A Yes I have.
[14]   Q What documents did you review?
[15]   A The information that the attorneys have. The
[16] documents that the attorneys have which, I don't know, all
[17] the documents that you requested, they requested. That's
[18] what I reviewed.
[19]   Q That's a lot of documents.
[20]   A Yeah.
[21]   Q Okay. Did you review your Answers to
[22] Interrogatories?
[23]   A Yes I did.
[24]   Q Okay. And did you review the Complaint? The
[25] Plaintiff's Complaint in this matter?

**Page 8**

[1]    A Yes I did.
[2]    Q Okay. Are you currently other any medications [3] that
would impair your memory or ability to testify today?
[4]    A No.
[5]    Q How long have you been employed by the Federal
[6] Bureau of Prisons?
[7]    A Approximately thirty-two years.
[8]    Q And starting from the beginning of your [9] employment,
can you tell me the course of your employment [10] throughout
your thirty-two years?
[11]   A If I can remember. Let's see in 1973, I joined [12] the
Bureau of Prisons as a correctional officer at [13] Englewood,
Colorado. Approximately 1977, I was promoted to [14] counselor.
[15]   Q And what type of job is a counselor?
[16]   A A counselor, you have a case load of approximately
[17] 120 inmates that you are seeing, giving guidance and help.
[18]   Q Okay.
[19]   A Then in 1984, I was transferred to Philadelphia, [20] PA
as a community corrections trainee.
[21]   Q And what does that mean?
[22]   A You have oversight; you are in training to be a
[23] community corrections managers for halfway houses.
[24]   Q Okay.
[25]   A For the Northeast region.

Depo O'Donnell V Gonzales, 04-40190-FDS - Depo of David Minn - 09/15/05    XMAX(3/3)

### Page 9

[1]    Q Okay.
[2]    A Four months later, I was promoted to actually,
[3] community corrections manager here in Boston. That was in
[4] 1987. Excuse me, 1985. In 1987, I was promoted to
[5] community corrections administrator for the Northeast from
[6] 1987 to 1990.
[7] From 1990 to 1997, I was Associate Warden at [8] Otisville,
New York.
[9]    Q A Social Warden?
[10]    A Associate.
[11]    Q Oh, associate.
[12]    A Warden. From 1997 to 1999, I was Associate Warden
[13] at Chicago, MCC Chicago, Illinois. Approximately that time.
[14]    Q Okay.
[15]    A In that same year, I was promoted Warden at FCIP [16] in
Illinois. Give or take a month in between there. And [17] December
2000, I was promoted or lateralled to Warden here [18] at Devens.
[19]    Q What was the year that you came here again?
[20]    A 2000. December 1, 2000.
[21]    Q And can you tell me about your education?
[22]    A I don't have a degree. I have two years of [23] college.
[24]    Q Okay. And where did you go to college?
[25]    A Rockland Community College.

### Page 10

[1]    Q And where is that?
[2]    A Littleton, Colorado.
[3]    Q Can you tell me briefly, I know you have a lot of
[4] responsibilities but can you tell me, kind of generally, [5] what
your responsibilities as the Warden are?
[6]    A I'm responsible for the care, custody and [7] treatment of
approximately 1250 inmates. With approximately [8] an oversight
of approximately 450 staff with a budget of [9] approximately 50
million dollars.
[10]    Q And can you be a little bit more specific with [11] regard
to your duties of oversight of the staff.
[12]    A Well, I'm responsible to make sure that they come [13] to
work, they leave on time, they actually do their job.
[14] I oversee performance issues, discipline issues, [15] and I
insure that the staff members don't violate the [16] inmates' rights.
That's probably one of my biggest [17] responsibilities.
[18]    Q Okay.
[19]    A And if they do, I intervene.
[20]    Q Okay. So are you pretty much apprised of any
[21] current issues that are going on in the institution at any
[22] given time?
[23] Do your, let me explain a little more. Do your [24] supervisors
report to you regularly on any staff issues, [25] performance issues
or disciplinary issues as they rise?

### Page 11

[1]    A Yes they do.
[2]    Q Okay. Can you explain the disciplinary issue that [3] you
follow here at Devens?
[4]    A If a staff member were to make an allegation or an
[5] inmate would make an allegation, I'm obligated to ensure
[6] that allegation is processed properly in accordance with
[7] Bureau policy.
[8]    Q And when you say process properly, what do you
[9] mean by that?
[10]    A Well, for example, if a staff member were to make [11] an
allegation against another staff member, I have to report [12] that
to the Central Office for review.
[13] If it's a Category Two or a Category Three, excuse [14] me,
Category One or Category Two case. If it's a
[15]    Q Let me interrupt you. What is a Category One and [16] a
Category Two?
[17]    A Category One and Category Two case is a pretty
[18] serious case. It could be a civil rights violation against [19] an
inmate or it could be a staff member that is convicted of [20] a
felony or it could be a staff bringing in contraband.
[21] Those cases are handled at the Central Office [22] level.
Category Three is a minor violation in the Bureau's [23] eyes in my
opinion. It would be a DUI, an AWOL, something [24] minor to that
effect.
[25]    Q And those are handled within the institution?

### Page 12

[1]    A Locally. But I still have to make a report on [2] those
Category Threes every month.
[3]    Q Okay. And I interrupted you. I don't remember [4] where
you were but you were telling me you have to report [5] Category
Ones and Category Twos to central office.
[6]    A Correct.
[7]    Q And then I interrupted you.
[8]    A Well, I report that. They make a determination if [9] it is a
Category One or if it is a Category Two and if it [10] goes to
Central Office, they make the determination and they [11] do the
investigation.
[12] If they return it to me, refer it back to me as a [13] Category
Three, then it's my job to do the investigation.
[14]    Q And do you have any discretion in determining, in
[15] making that determination?
[16]    A Only on Category Three cases.
[17]    Q Okay. Is that the same disciplinary procedure [18] that
followed in other federal prisons?
[19]    A Yes.
[20]    Q Within the Bureau prisons, that's the policy?
[21]    A Yes.
[22]    Q Not any deviations from that policy?
[23]    A Not that I'm aware of, no.
[24]    Q Okay. Now on a Category Three issue, once the
[25] determination is made that it's a Category Three, what is

**Page 13**

[1] the next step that you take?

[2]    A The next step I'm going to take is that I'm going [3] to call my special investigative agent up to my office, he [4] is already aware of it anyway because he's the one who's [5] going to report to the Central Office whether we do a [6] referral process.

[7] So he is pretty much aware of the Category Three. [8] And I'm going to tell him to proceed to investigate that [9] Category Three in hopefully, sixty days.

[10]    Q And is there only one of these officers that does [11] the investigation?

[12]    A There is only one officer that does staff cases [13] and there is another lieutenant that will do inmate cases, [14] If an inmate makes an allegation against another inmate.

[15]    Q And who is the officer that does the staff [16] investigations?

[17]    A That would be Darren Brown.

[18]    Q And who is -

[19]    A As of today.

[20]    Q As of today?

[21]    A Yeah.

[22]    Q And prior to today, who did those investigations?

[23]    A Well, prior to today, it's always been Darren [24] Brown for approximately, the last two years.

[25]    Q Okay. How come you said as of today?

**Page 14**

[1]    A As of today. As of today, he -

[2]    Q Okay.

[3]    A Doing the investigations.

[4]    Q Okay. And who does the inmate investigations?

[5]    A That's Al Colon.

[6]    Q Now you're familiar with the incident that [7] occurred between Officer David Reynoso and Colleen O'Donnell [8] on April 8, 2002?

[9]    A Yes I am.

[10]    Q And we're going to skip around a little bit but [11] since we're on the subject, Darren Brown did not do that [12] investigation, did he?

[13]    A No he did not.

[14]    Q And was that a Category Three incident?

[15]    MR. WILMOT: Objection. You can answer. You can [16] answer.

[17]    THE WITNESS: Okay. It was referred that same day [18] and I think they categorized that as a Category One, [19] Category Two. I'm not quite sure. However, they did refer [20] that back to me back in May of that year, if I remember [21] correctly.

[22]    BY MS. MCDONALD:

[23]    Q And when you say they, you mean the Central [24] Office?

[25]    A Right.

**Page 15**

[1]    Q And -

[2]    A But it still could have been a Category One or [3] Two, however, they would allow me, they made the decision to [4] allow me to do the investigation.

[5]    Q Okay. And did you object to that decision?

[6]    A Yes I did.

[7]    Q And what were the reasons you objected?

[8]    A Because I thought it would be a conflict of [9] interest.

[10]    Q And why did you think that?

[11]    A Because Mr.Reynoso worked in the SIS shop in the [12] department and I objected, I didn't object, I requested that [13] they do the investigation based upon the fact, that he was [14] part of the investigative process.

[15] He worked there, he did investigate. But he [16] worked in the shop.

[17]    Q So SIS is the department that handles [18] investigations?

[19]    A Correct.

[20]    Q And what does SIS stand for?

[21]    A Well, it's special investigative supervisor.

[22]    Q Okay. So did David Reynoso work under Darren [23] Brown?

[24]    A Yes he did.

[25]    Q So Darren Brown was his supervisor?

**Page 16**

[1]    A That's correct.

[2]    Q So you asked them, the Central Office, to conduct [3] the investigation?

[4]    A Yes I did.

[5]    Q And did they agree?

[6]    A Yes they did.

[7]    Q And who conducted the investigation?

[8]    A Brian Ross.

[9]    Q Okay, I'm going to leave that subject for the [10] moment. And I want to go back to talking about the [11] disciplinary process.

[12]    A Okay.

[13]    Q Once you assign somebody to investigate for a [14] staff incident, for example, Darren Brown, assuming he is [15] investigating a staff incident?

[16]    A Okay.

[17]    Q What are the procedures he follows in conducting [18] his investigation?

[19]    A You would have to ask him.

[20]    Q You don't know what the procedures are?

[21]    A No.

[22]    Q There are not standard procedures that they [23] follow?

[24]    A It all depends, well, I'm not the investigator. I [25] may have a different procedure than on how he investigates,

**Page 17**

[1] so you would have to call him in.
[2]    Q So there are no specific procedures as to how an
[3] investigation should be conducted?
[4]    A No, not that I'm aware of.
[5]    Q Okay. So once he finishes his investigation, does [6] he make recommendations or drafts a report?
[7]    A He drafts a report.
[8]    Q And who does his report go to?
[9]    A It goes to me.
[10]    Q I've seen in some of the documentation here and [11] some of the investigations that Captain Bollinger -
[12]    A Correct.
[13]    Q Makes recommendations to you?
[14]    A He may have. Most likely, he would not. He would [15] sign off on it. Signed off by certain people. For example, [16] the Captain does sign off on those investigations and so [17] does the Associate Warden Programs. So I know they've seen [18] them before I do only to make corrective errors, grammatical [19] errors, corrected before I get the report.
[20]    Q So Darren Brown's report doesn't always go [21] directly to you?
[22]    A No.
[23]    Q Sometimes it makes a stop in between.
[24]    A It stops at the Captain and Associate Warden [25] Programs.

**Page 18**

[1]    Q Okay. So then, it is no longer his report at that [2] point? Do they make their grammatical changes and then put [3] their name on it?
[4]    A Actually that report belongs to the Office of [5] Internal Affairs.
[6]    Q Okay.
[7]    A The actual report. Which is Darren Brown. He [8] represents the Office of Internal Affairs. The Central [9] Office.
[10]    Q Okay.
[11]    A So it's actually their report.
[12]    Q Okay. So once you get the report, then what do [13] you do?
[14]    A I review the report and look at the affidavits and [15] make a decision whether there's going to be discipline to [16] follow or if it's not sustained, I go with what the [17] investigator reports to me.
[18] I don't think in my career, I've ever changed one [19] of those reports.
[20]    Q Okay.
[21]    A Because I want it independent.
[22]    Q And you said you look at affidavits?
[23]    A Correct.
[24]    Q So is it part of the investigative process for [25] them to take affidavits?

**Page 19**

[1]    A Yes it is.
[2]    Q From witnesses or parties involved?
[3]    A Yes.
[4]    Q Do you look at anything else other than the [5] investigative report in determining what discipline you're [6] going to hand out to an employee who may have committed a [7] wrong?
[8]    A Basically I make my decisions based on the [9] affidavits.
[10]    Q Just what the investigator hands you?
[11]    A Correct.
[12]    Q You don't look in personnel files or at any other [13] documentation?
[14]    A No.
[15]    Q Would prior disciplinary information be contained [16] in the report that is given to you by the investigator?
[17]    A No.
[18]    Q So they don't, the investigators don't typically [19] look at past disciplinary actions either?
[20]    A No.
[21]    Q Is the policy, the FBOP, do you understand what I [22] mean when I say FBOP?
[23]    A Yes.
[24]    Q Is their disciplinary policy, what's called the [25] Progressive Disciplinary Policy?

**Page 20**

[1]    A I don't know if there's a Progressive Disciplinary [2] Policy. You do take progressive discipline to change one's [3] behavior. I do agree with that.
[4]    Q Okay. Let me explain what I mean by Progressive [5] Discipline.
[6]    A Okay.
[7]    Q So we don't get confused. For example, if a [8] person, a staff member commits a Category Three offense and [9] they receive a written warning and the next time, they [10] commit a Category Three offense, perhaps would they get [11] another warning or would it be a more, suspension?
[12] And the next time, would there be, you know, I [13] guess, increasingly severe levels of discipline it's what I [14] mean by a progressive disciplinary policy.
[15]    A Right.
[16]    Q Do you have that or--?
[17]    A Yeah, I think we have that. I think that if [18] you've got a Category Three, for example, of an AWOL, it all [19] depends on the circumstances of that AWOL.
[20] And then you get another AWOL, it would depend on [21] the circumstances of that AWOL. What the discipline would [22] be.
[23]    Q And would the prior AWOL be taken into account, if [24] a person had a second AWOL?
[25]    A It would be if it was in the two year reckoning

---

Page 21

[1]  period.
[2]    Q Okay. What's the two year reckoning period?
[3]    A Well, if somebody would get, if an individual [4] would get
disciplined today, and I give, excuse me, if they [5] commit offense
today and I give them discipline tomorrow, [6] there's a two year
reckoning period that I would have to [7] look at that case and
based upon that reckoning period, what [8] my discipline would
be.
[9]  It's my decision whether I would do progressive. [10] Give
them the same discipline or well, do progressive [11] discipline.
[12]    Q Okay. But you have a great deal of discretion in
[13] making that determination?
[14]    A Yes and no. I do have the discretion of making [15] once
the proposal is given to me on the discipline; it is [16] reviewed by
the regional and central office. It's Central [17] Office or Region
that would disagree with the amount of [18] discipline and if they
think it's inappropriate, they would [19] advise me that it's
inappropriate discipline and usually [20] when they do that, I go
along with the recommendation.
[21]    Q Okay.
[22]    A But I'm the final authority when I do give the
[23] discipline.
[24]    Q Okay. And so, if it's, is it fair to say if a [25] person hasn't
receive more than one discipline in the two

---

Page 22

[1]  year reckoning period that you do look at prior disciplines
[2]  in determining what punishment they're going to receive?
[3]    A I don't. No, I don't.
[4]    Q Okay. Well, I'm confused then.
[5]    A There is progressive discipline in the Bureau [6] prisons.
[7]    Q Okay.
[8]    A Do I? I give discipline based upon the present [9] case.
[10]    Q Okay. So if a person had an AWOL today and then
[11] next week had another AWOL, and you need to discipline
them, [12] would you look at the first one or would you only go on
the [13] facts of the second one?
[14]    A I would probably look at the first one as why but [15] I'm
going to deal with the discipline on the present one.
[16]    Q Okay. I believe and correct me if I'm wrong, have [17] a
number of different files where you keep employee records
[18] here, is that correct?
[19]    A Well, the only file I know on employees other than
[20] the employee files, would be the performance log that the
[21] supervisors keeps on his staff members and a Human
Resource [22] file. And if somebody had a discipline issue, then
there [23] would be a file down in the SIS shop.
[24]    Q Okay. So there could be potentially three files [25] where
employees, where information about employees could be

---

Page 23

[1]  in this facility, be maintained?
[2]    A That is correct.
[3]    Q And this disciplinary file is separate from a [4] personnel
file?
[5]    A Yes.
[6]    Q And when a person applies for a job here, I saw [7] from
all the documents that there are a number of things [8] that they
need to fill out all in order to obtain employment [9] here?
[10]    A Correct.
[11]    Q And where are those documents maintained?
[12]    A Those would be in Human Resource Department.
[13]    Q Okay. And it's standard procedure that the FBOP [14] do
background checks on employees who apply to work here?
[15]    A Yes they do.
[16]    Q And where are those maintained?
[17]    A Human Resource Department.
[18]    Q And would those also be in the personnel file? [19] The
background checks?
[20]    A Yes. The only reason I'm answering that question [21] is
that there might be a file in Texas that I'm unaware of [22] where
they keep a personnel file based upon the background
[23] checks.
[24]  You know, I don't know that for a fact, I just [25] know what
files we have.

---

Page 24

[1]    Q So do you have the background checks for all of [2] the
employees who--?
[3]    A Yes.
[4]    Q Who have applied for work at this facility?
[5]    A Yes.
[6]    Q What procedures does an applicant for employment
[7]  go through in order, what is the application process?
[8]  Let me put it that way.
[9]    A Well, I'm not an expert at that. Just, they fill [10] out an
application, we do an interview. They have to go [11] down to the
hospital for a urinalysis test and they have to [12] clear the
background.
[13]    Q Okay.
[14]    A That's pretty much, that's pretty much in my mind,
[15] excuse me, in simple terms, my knowledge of the procedure.
[16]    Q Okay. Do you know if they have to do a physical
[17] fitness test as well?
[18]    A Down in Glynco they do. Once they're employed by
[19] the Bureau of Prisons.
[20]    Q And Glynco was the training facility?
[21]    A Right.
[22]    Q And what state is that in? Georgia?
[23]    A Georgia.
[24]    Q Why do they require a background check for
[25] applicants?

---

## Page 25

[1]    MR. WILMOT: Objection. You can answer.

[2]    THE WITNESS: Well, they do a background check to [3] see if number one, if the employee is telling the truth. If [4] there would be any prior convictions. If they meet certain [5] guidelines. Do I know all those guidelines? No I don't. [6] But there are certain guidelines that the employee would [7] have to meet.

[8]    BY MS. MCDONALD:

[9]    Q And do you know whether these guidelines and [10] possibly one of the reasons for the background check is [11] because these individuals will be working with inmates? [12] Is that part of the reason the background check is [13] conducted?

[14]    MR. WILMOT: Objection. You can answer.

[15]    THE WITNESS: Well, I think the background check [16] is done to make sure the employee is telling the truth.

[17]    BY MS. MCDONALD:

[18]    Q Okay.

[19]    A On their application.

[20]    Q Is there anything on a background check that would [21] be, what I'm going to call a red flag. That the person may [22] still be allowed to become an employee here that would maybe [23] be a note of caution that you would pay attention to in [24] hiring somebody?

[25]    A Well, I guess if a person said that they didn't

## Page 26

[1] use drugs and we find out they did use drugs, that could be [2] a problem.

[3]    Q Would you hire that person?

[4]    A No.

[5]    Q And if an applicant stated on his application that [6] he had been arrested for some offense but not convicted, [7] would you hire, would you still be able to hire that person?

[8]    A Well, I would get advise first by the Human [9] Resource manager. What the guidelines are and do they meet [10] the guidelines and would there be any waivers involved.

[11]    Q Okay.

[12]    A But I would make the final decision on whether a [13] waiver would be forwarded to the Regional Director.

[14]    Q And when you say a waiver, what do you mean by [15] that?

[16]    A If it was a minor offense, told the truth, but it [17] was a minor offense but, then I would probably request a [18] waiver.

[19]    Q From whom?

[20]    A From the Regional Director.

[21]    Q I see. Is there a policy at the FBOP and [22] specifically, at Devens, that all employees have to have the [23] ability to use physical force, possibly including deadly [24] force if there were, in order to maintain control over the [25] inmates?

## Page 27

[1]    A Is there a policy in place?

[2]    Q Yes.

[3]    A Yes. Have I waived that for pregnant females or [4] someone with a doctor's note, yes.

[5]    Q And you're able to waive that policy?

[6]    A For a period of time.

[7]    Q What's time period of time?

[8]    A Until they get cleared by their doctor. That [9] would be an example.

[10]    Q Okay. So you only have the ability to waive that [11] policy for medical reasons?

[12]    A I could waive it for other reasons.

[13]    Q Okay. So you have some discretion?

[14]    A I have a little bit of discretion. Correct.

[15]    Q Okay. Is that policy barring the medical issues, [16] a pregnant female or somebody that is perhaps on Workers [17] Comp and has light duty, is that policy a condition of [18] any correctional officer's employment here?

[19]    A Repeat the question.

[20]    Q Okay. You said that there's a policy that any [21] correctional officer here has to be able to use physical [22] force in order to control inmates?

[23]    A Correct.

[24]    Q You also said that you had the ability to waive [25] that in certain circumstances?

## Page 28

[1]    A For short periods of time, that's correct.

[2]    Q Okay. Barring any waivers, is that policy a [3] condition of any correctional officer's employment?

[4]    A Yes.

[5]    Q And does the policy require that the employee have [6] the ability to use a firearm?

[7]    A Yes it does.

[8]    Q Okay. Can you explain the Administrative Leave [9] Policy to me?

[10]    A The Administrative Leave Policy?

[11]    Q Yeah.

[12]    A I can grant administrative leave. I'm the only [13] person in the institution that allows administrative leave [14] to be granted by me. Administrative leave would be given to [15] an employee since I'm the granting authority, I would [16] determine how, I can only give so much administrative leave [17] in a period of time. [18] It would be on the individual's request to me what [19] the reasons would be for administrative leave.

[20]    Q What is the, I guess, largest amount of [21] administrative leave that you're allowed to grant?

[22]    A Up to ten days.

[23]    Q Okay. And you have a certain amount of discretion [24] in determining whether the reason for administrative leave [25] is valid or invalid and what you may grant administrative

BSA

Case 4:04-cv-40190-FDS    Document 24-4    Filed 04/18/2006    Page 10 of 45
Depo-O'Donnell V Gonzales, 04-40190-FDS - Depo of David Winn - 09/15/05    XMAX(8/8)

Case 4:04-cv-40190-FDS    Document 24-2    Filed 04/18/2006    Page 10 of 115

**Page 29**

[1] leave for?
[2]    A Repeat the question.
[3]    Q Can you grant administrative leave for any reason?
[4]    A For any reason? I could. Pretty much.
[5]    Q But clearly, you would have to believe that it was [6] a valid reason but–?
[7]    A Yeah.
[8]    Q As long as you considered it a valid reason, you [9] could grant it for any reason at all?
[10]    A Yes.
[11]    Q Are there any responsibilities placed on an [12] individual who is out on administrative leave?
[13]    A Only if I put stipulations. Since I'm the [14] granting authority, there could be stipulations in granting [15] that administrative leave?
[16]    Q And what would be a reason that you would put [17] stipulations on it?
[18]    A A good example would be if an employee had a [19] medical problem and if the employee used all of their sick [20] leave and annual leave, and including abusing the annual [21] leave or sick leave, then I would take a look at that and I [22] would put in writing or I may do it verbally, I would grant [23] the administrative leave and I would put some stipulations [24] in that.
[25]    Q What kind of stipulations?

**Page 30**

[1]    A That you could stay, you know, I'm going to grant [2] you administrative leave, but you need to call in to your [3] supervisor occasionally to ensure that one, that you know [4] when the administrative leave expires.
[5] It could be given some type of direction to the [6] employee.
[7]    Q Okay. Would they have to call on a daily basis [8] or–?
[9]    A If I put that in the stipulation.
[10]    Q And you've done that?
[11]    A Yes I have.
[12]    Q Put the stipulations on people before?
[13]    A I've put that on a person before?
[14]    Q Which person?
[15]    A Ms.O'Donnell.
[16]    Q She's the only person you've put that stipulation [17] on?
[18]    A That's correct.
[19]    Q When did you first meet Ms.O'Donnell?
[20]    A I guess the year I walked in here. The year 2000.
[21]    Q She was already working here at that time?
[22]    A Well, I'm not certain of the exact date. 2000, [23] 2001.
[24]    Q Okay. And do you know what her job position was [25] at the time?

**Page 31**

[1]    A As far as I'm concerned, she worked in the inmate [2] system, the inmate ISN Department and she was an inmate [3] specialist or in the Record Department.
[4]    Do I know her exact job title at that time? No.
[5]    Q Okay. And do you know whether her job has changed [6] substantially since 2000, 2001 to the present?
[7]    Has she changed posts or changed –?
[8]    A Well, they rotate down there.
[9]    Q Okay, post is the wrong word. Has she changed [10] departments or has she been in the same department since [11] 2000, 2001?
[12]    A That is correct.
[13]    Q And as far as you know, has she always performed [14] her job duties in an acceptable and satisfactory manner?
[15]    A Yes she has.
[16]    MS. O'DONNELL: Excuse me, I'm just going to go to [17] the ladies' room, okay?
[18]    MS. MCDONALD: Okay. Take a quick break.
[19]    (Off the record at 10:40)
[20]    (On the record at 10:48)
[21]    BY MS. MCDONALD:
[22]    Q Okay, from the beginning of Ms.O'Donnell's [23] employment up until she was disciplined for being AWOL, [24] which was on or about December of 2003, I believe.
[25]    A Okay.

**Page 32**

[1]    Q Had she ever been disciplined for any reason?
[2]    A Not that I recall.
[3]    Q To the best of your knowledge, is the discipline [4] that she received for being AWOL, the only discipline she [5] has ever received?
[6]    A Yes.
[7]    Q And that discipline was a written warning placed [8] in her personnel file, is that correct?
[9]    A Yes.
[10]    Q And the original recommendation was that Colleen, [11] Ms.O'Donnell, be suspended for thirty days, is that [12] correct?
[13]    A I don't remember the original.
[14]    Q Do you recall whether it was more than a written [15] warning? The recommended discipline?
[16]    A There was more discipline proposed. However, [17] based upon her situation, her medical situation, I reduced [18] it.
[19]    Q Okay. Were you aware that Ms.O'Donnell and David [20] Reynoso were dating in 2002?
[21]    A No.
[22]    Q When did you become aware that they had a dating [23] relationship?
[24]    A April 8, 2002.
[25]    Q And have you ever seen the background check

Case 4:04-cv- Dan G. Powell v. Gonzalez 04-40190-FDS Depo of David Winn 09/15/05    XMAX(9/9)

## Page 33

[1] conducted on David Reynoso?

[2]    A  Yes I have.

[3]    Q  And do you recall what his background check

[4] revealed?

[5]    A  I think there was an issue of just debts.

[6]    Q  Anything else?

[7]    A  Not that I recall.

[8]    Q  Did it reveal an arrest for assault and battery [9] with a dangerous weapon?

[10]    A  Not that I recall.

[11]    Q  Have you ever seen David Reynoso's application for

[12] employment?

[13]    A  At one time, I reviewed it. The date of review, I

[14] couldn't tell you.

[15]    (Exhibit No. 1 marked for [16] identification.)

[17]    BY MS. MCDONALD:

[18]    Q  Okay. I am going to show you this document? Do

[19] you recognize this document?

[20]    A  Do I recognize it?

[21]    Q  Yes.

[22]    A  No I don't.

[23]    Q  You've never seen that document before?

[24]    A  I may have but I don't remember it.

[25]    Q  Do you know what this document is?

## Page 34

[1]    A  It's a document from my understanding, I'm not an

[2] expert at it, would give me information either that the

[3] investigation has been cleared or not cleared.

[4]    Q  Okay. And do you see the date on the bottom. [5] Would

that represent when you received that document.

[6]    MR. WILMOT: Objection.

[7]    THE WITNESS: I wasn't here at that time.

[8]    (Exhibit No. 2 marked for [9] identification.)

[10]    BY MS. MCDONALD:

[11]    Q  I am going to show you another document.

[12] Can you describe that document?

[13]    A  It's a reinvestigation and it closed out the

[14] investigation on 7-30-04.

[15]    Q  And what is the date on that document?

[16]    A  March 31, 2005.

[17]    Q  Do you know what investigation --?

[18]    A  Excuse me, I can't tell if it's March 3rd or March [19] 31st.

[20]    Q  Okay. Do you know what investigation that

[21] document is referring to?

[22]    A  No.

[23]    Q  What would be a reason that another, an additional

[24] background check would be conducted on an employee once

he's [25] already hired?

## Page 35

[1]    A  They do a five year background check.

[2]    Q  And that's standard for all employees?

[3]    A  That's correct.

[4]    Q  So it's possible that was the five year background

[5] check that you don't recall?

[6]    A  That's possible.

[7]    (Exhibit No. 3 marked for [8] identification.)

[9]    BY MS. MCDONALD:

[10]    Q  Okay. I am going to show you another document and

[11] ask if you can take a look at that and state for the record

[12] what that document is?

[13]    A  I have no idea.

[14]    Q  You don't know what this document is?

[15]    A  No.

[16]    Q  Now you testified a few moments ago that you had

[17] reviewed Mr. Reynoso's application for employment at some

[18] point in time, I believe, was your testimony.

[19] Is this not his application for employment?

[20]    MR. WILMOT: Objection. You can answer.

[21]    THE WITNESS: Well, I reviewed his, you're asking [22] me

if I know what that form is and the answer is no, I don't [23] know

what that form is.

[24] Is it part of the background, it could be, but I'm [25] not

certain.

## Page 36

[1]    BY MS. MCDONALD:

[2]    Q  Okay. You've never seen this form before?

[3]    A  Not that I recall.

[4]    Q  I am going to refer you to paragraph 8. If you [5] could

read what paragraph states for the record.

[6]    A  Paragraph 8?

[7]    Q  Yes.

[8]    A  "During the last ten years have you ever been

[9] convicted, imprisoned, been on probation or been on parole?

[10] Includes felonies, firearms, explosive violations,

[11] misdemeanors and all other offenses. If you answered yes to

[12] Item 15, you need to provide the date, explanation of the

[13] violation and place of occurrence, and names and addresses

[14] of the police department or court involved."

[15]    MR. WILMOT: For the record, I just want to state [16] the

right side of this document is support copy, I guess. [17] So, it's

hard to read anything in the right margin of the [18] document.

[19]    MS. MCDONALD: Yeah. And I won't ask him anything

[20] about the right margin.

[21]    MR. WILMOT: All right.

[22]    MS. MCDONALD: That's how the copy was that I got.

[23]    BY MS. MCDONALD:

[24]    Q  So this is, paragraph 8 states that any yes [25] answers

should be explained in Item 15. So I am going to

Page 37

[1] refer you to Item 15 on the second page and first let me ask
[2] you, does that document if I represent to you that document
[3] is the declaration for federal employment for David Reynoso,
[4] would you agree with that?
[5]     A Repeat the question.
[6]     Q If I represent to you that document is the [7] declaration
for federal employment filled out by Mr.David [8] Reynoso, would
you agree with that statement?
[9]     A Yes.
[10]    Q And under Item 15, does he explain a situation
[11] which was asked about in paragraph 8?
[12]    MR. WILMOT: Objection. You can answer.
[13]    THE WITNESS: YES.
[14]    BY MS. MCDONALD:
[15]    Q And what does it state there?
[16]    A Arrested for assault and battery on May 3, 1991.
[17] Case was brought before a judge on October of 1991. He
[18] continued the case without a finding for one year. I was
[19] ordered to report to probation, probation officer, where she
[20] instructed me to report to her once a month. I was also
[21] instructed to attend emergency, or I think it's emergency
[22] classes, merge classes. When I went before the judge, he
[23] later dropped all charges from the case and was dismissed.
[24] The court was Lynn District Court, Essex County.
[25]    Q Were you ever aware of these facts as are stated

Page 39

[1]     Q Regional Director. Is this possibly a [2] circumstance that
you would have requested a waiver?
[3]     MR. WILMOT: Objection. You can answer.
[4]     THE WITNESS: I don't know. I've never had that [5] brought
before me as a warden on something like that.
[6]     BY MS. MCDONALD:
[7]     Q Okay. In your many number of years as a warden [8] and
thirty-two years working for the Bureau of Prisons, can [9] you
state whether this is something that you may call for a [10] waiver
on?
[11]    A If it wasn't, if it was a continuation of finding, [12] and
there wasn't, he wasn't, the person wasn't found guilty [13] or
innocent, to be honest with you, I don't know if I would [14] or I
wouldn't.
[15]    Q Okay.
[16]    A I may have. I mean, I may -
[17]    Q You would have to look into the facts and
[18] circumstances?
[19]    A Pretty much, yes.
[20]    Q Okay. When did you first become aware of the [21] April
8, 2002 incident?
[22]    A On that particular day, I was sitting in my [23] office.
Approximately 11 a.m. or 11, between 11 a.m. and [24] 11:30, I
received a call from Steve Gagnon indicated that [25] there had
been an incident involving two staff members down

Page 38

[1] in this document?
[2]     A Was I aware of those?
[3]     Q Yes.
[4]     A Not that I recall. No.
[5]     Q Okay. Now I understand that in May of 1998, you [6] were
not the Warden at this facility? Is that correct?
[7]     A Correct.
[8]     Q But let me ask you a hypothetical question. Were [9] an
individual to apply for employment, and state these facts [10] as
they are stated in this document, is this an individual [11] that you
would hire for employment at this facility?
[12]    A Well, number one, I don't know the rules or
[13] guidelines on a continuation without a finding. From my
[14] understanding continuation without a finding doesn't mean
[15] that he was found guilty or innocent.
[16] That's a hypothetical question. I don't know what [17] the
guidelines are, I would have to refer -
[18]    Q So you would make a phone call on something like
[19] this?
[20]    A I would refer back to my Human Resource manager
[21] for advice.
[22]    Q Okay. And you testified earlier that there may be
[23] circumstances where you would request a waiver from I
[24] believe you said, the Central Office.
[25]    A Region Director.

Page 40

[1] at Mirror Lake and that Ms.O'Donnell was coming to my
[2] office.
[3]     Q And when she got to your office what did she say [4] to
you?
[5]     A As she was coming up to my office, I called [6] Ms.Lord,
Human Resource Manager, to come in and when [7] Ms.O'Donnell
got there she advised me of an alleged assault [8] that involved
another staff person. And I asked who that [9] staff person was,
and she mentioned Mr.Reynoso.
[10] She said she didn't know what to do. I asked her [11] if she
needed medical attention and she stated no, I don't [12] need
medical attention. I asked her what occurred and she [13] advised
me that her and Mr.Reynoso got in an argument and [14] that
Mr.Reynoso allegedly assaulted her.
[15] She also mentioned and I'm sure I asked a couple
[16] questions but I don't recall what I asked, I asked her, well
[17] she advised me that there was a policeman in their proximity
[18] and I, I would also not be my money, that I asked her if she
[19] went to that police officer for assistance and she didn't
[20] request assistance from that police officer.
[21] I know I asked her on a couple of occasions, are [22] you set
you don't want to go down to the medical to get [23] assessed of
any injuries and she said no.
[24] And then I advised her, she asked me what to do. [25] I said,
well, you need to file a police report. You need to

Case 4:04-cv-40190-FDS    Document 24-2    Filed 04/18/2006    Page 13 of 15    XMAX(11/11)

Depo.O'Pennell V Gonzales, 04-40190-FDS Depo.of David Winn 09/15/05

## Page 41

[1] go down to the State Police and file a police report because
[2] the subject came up whether it was on duty, whether it was
[3] on government property or not. I don't know if I brought it
[4] up, I can't remember if Ms.O'Donnell brought it up. But it
[5] came up that it was off government property and it was
[6] during both individual's lunch break.
[7] So at that time, I said, I think I gave her admin [8] leave for the
day. I had a staff member, I asked her if she [9] wanted a staff
member to go with her to report it and I [10] don't know if she said
yes or no, I can't remember that on [11] that day.
[12] Later on, I found that a staff member did go with [13] her. She
did report it.
[14] I notified my Regional Director of the incident [15] because it
dealt with an alleged assault. Staff on staff. [16] I gave him the
information that was provided to me by [17] Ms.O'Donnell.
[18] I did request that both staff persons be placed on [19] home
duty status.
[20]    Q Okay. Go ahead.
[21]    A The Regional Director at that time stated no, this
[22] would not qualify for home duty status case.
[23]    Q Can you, let me interrupt you. Can you explain [24] what
home duty status is?
[25]    A Home duty status would be that they would be

## Page 42

[1] placed at home during their scheduled shift with pay or
[2] without pay and that would be their duty station.
[3]    Q So that's different than admin leave?
[4]    A Yes.
[5]    Q Okay. Go ahead, you can continue.
[6]    A Okay. After I notified my Regional Director, then [7] I
conducted a work place violence committee-
[8]    Q You conducted it or you asked somebody to-?
[9]    A Well, I didn't conduct it. I gathered a committee [10] up
[11]    Q Okay.
[12]    A By policy in accordance with Bureau policy to [13] advise
me whether workplace violence existed or not. I [14] gathered the
staff that was outlined by policy and I may [15] have added a staff
member or two to that policy.
[16] I presented the chairperson, who was David Porter [17] and
the people in the committee, the committee members, what [18] I
was told by Ms.O'Donnell and that's all I did and I told [19] them to
report back to me when they come up for some
[20] recommendations or their review.
[21] I mean, that day and then I guess they met the [22] next
morning. They reviewed the information they had that [23] was
provided by me, by Ms.O'Donnell and they provided me a
[24] report.
[25]    Q Okay. Did you, actually let me find that report.

## Page 43

[1]    (Pause)
[2]    MS. MCDONALD: Let me show you this document. [3] Take
a look at that.
[4]    (Exhibit No. 4 marked for [5] identification.)
[6]    THE WITNESS: Okay.
[7]    BY MS. MCDONALD:
[8]    Q Do you recognize that document?
[9]    A Yes I do.
[10]    Q And what it is?
[11]    A It's the Workplace Violence Committee Meeting
[12] Report to me.
[13]    Q And I think you mentioned they met a couple of
[14] times. Do you know whether this is the first report or the
[15] second report?
[16]    MR. WILMOT: Objection. You can answer.
[17]    THE WITNESS: I'm not sure if it was the first or [18] second
time they met. They met in the afternoon and the [19] morning.
[20]    BY MS. MCDONALD:
[21] Okay. And down towards the bottom of the page, [22] the
Committee Recommendations.
[23]    A Yes.
[24]    Q It states that the committee decided to reconvene [25] on
Tuesday, April 9th, at 9 a.m. to further consider the

## Page 44

[1] incident based on how the Mass State Police responded.
[2] Do you see where it says that?
[3]    A Yes.
[4]    Q Is that the second meeting to which you were [5] referring
to?
[6]    A This document, I don't know if they wrote them up [7] the
same day, this must be the first time they met at.
[8]    Q Would it be safe to say that based on that [9] committee
recommendations in this document, that at this [10] point in time,
Mr.Reynoso had not yet been arrested?
[11]    MR. WILMOT: Objection. You can answer.
[12]    THE WITNESS: I don't know if he had been arrested [13] or
not at that time.
[14]    (Exhibit No. 5 marked for [15] identification.)
[16]    BY MS. MCDONALD:
[17]    Q Okay. Let me show you this one.
[18]    A Okay.
[19]    Q Do you recognize that document?
[20]    A Yes I do.
[21]    Q And what is that document?
[22]    A Again, it is a Workplace Violence Committee [23] Meeting
Minutes to me.
[24]    Q And what is the date?
[25]    A April 8th.

BSA                    **Depo-O'Donnell V Gonzales, 04-40190-FDS - Depo of David Winn - 09/15/05**    XMAX(12/12)

[1]    Q 2002?
[2]    A Correct.
[3]    Q And that's the same date as the previous report,
[4] Exhibit 4 is it? Yeah.
[5] Both those documents are dated the same?
[6]    A Correct.
[7]    Q They are a little bit different though. Let me [8] call your
attention to the second paragraph of Exhibit 5. [9] Where it says
the committee reconvenes.
[10]    MR. WILMOT: You mean Exhibit 4?
[11]    MS. MCDONALD: I think it's 5.
[12]    MR. WILMOT: We have it as 4.
[13]    MS. MCDONALD: Right here. Oh, Okay. Sorry.
[14]    MR. WILMOT: That's all right.
[15]    THE WITNESS: I'm sorry. What was the question?
[16]    BY MS. MCDONALD:
[17]    Q The second paragraph states that the committee
[18] reconvened on Tuesday, April 2nd [sic] and they were
[19] informed that Mr.Reynoso was arrested on April 8th.
[20] Do you see that?
[21]    A Yes.
[22]    Q And down on committee findings, it states that the
[23] committee does not believe this met the definition of
[24] workplace violence.
[25] Do you see that?

                          Page 46
[1]    A Yes.
[2]    Q Do you know why they came to that conclusion?
[3]    A No.
[4]    Q And under committee recommendations, can you read
[5] paragraph one?
[6]    A Which document?
[7]    Q Exhibit 4.
[8]    A Can I read it?
[9]    Q Yes. For the record.
[10]    A Committee was advised that since the charge
[11] against Mr.Reynoso is a state felony, he would have to be
[12] placed on indefinite suspension until the charges are
[13] resolved.
[14]    Q Did you accept that recommendation?
[15]    A No.
[16]    Q Why?
[17]    A Because prior to this, I had already talked to the
[18] Regional Director and advised him of the incident and he
[19] advised me that he, Mr.Reynoso could not be placed on
home [20] duty status.
[21]    Q Okay. But that doesn't say home duty status, does
[22] it?
[23]    A No it doesn't.
[24]    Q It says indefinite suspension.
[25]    A Indefinite suspension in my opinion, means the

[1] same thing as home duty status. I could not put him at
[2] home. That's my definition of both of them. They're the
[3] same.
[4]    Q After the Workplace Violence, did they have any [5] further
functions? The Workplace Violence Committee. Did [6] they do,
have any other responsibilities, once they gave you [7] that report?
[8]    A No.
[9]    Q They just gave you the recommendations and that's
[10] the end of their job duties, I will call it?
[11]    A Correct.
[12]    Q Okay. And what else did you with regard to this
[13] incident?
[14] Did you order an investigation?
[15]    A Yes I did.
[16]    Q And why don't you explain to me the process you
[17] took?
[18]    A Either that day or the next day, I reported the
[19] incident to Central Office to open up an investigation of an
[20] alleged assault on staff.
[21] I think it was the next day that I also late in [22] the afternoon,
got a restraining order which was included as [23] part of the
investigation.
[24]    Q Who did you get the restraining order from?
[25]    A I don't recall.

                          Page 48
[1]    Q Okay. And who was conducting the investigation?
[2]    A At that time?
[3]    Q Yes.
[4]    A There was no investigation being conducted.
[5]    Q Oh, okay.
[6]    A It was referred for investigation.
[7]    Q Okay.
[8]    A To Central Office, Office of Internal Affairs.
[9]    Q So nobody approached Mr.Reynoso and asked him for
[10] his side of the story at this point in time?
[11]    A No.
[12]    Q And that's standard procedure?
[13]    A It's standard procedures. I follow that procedure [14] until
an investigator would discuss the case and take [15] affidavits and
an investigation would actually be initiated.
[16]    Q So do you recall when the investigation was [17] actually
initiated?
[18]    A That, to the best of my recollection, it would be [19] after
the disposition of the court case was finalized in [20] January of
2003.
[21]    Q So until that happened, until the beginning of the
[22] investigation which I understand you don't recall, but it
[23] could have been months before that investigation was begun?
[24]    A That's correct.
[25]    Q Okay. And so between April 8 of 2002 and the

**Page 49**

[1] beginning of the investigation, you don't really have to,
[2] you're not obligated or required to do anything about
[3] Ms.O'Donnell's allegations?
[4]     MR. WILMOT: Objection. You can answer.
[5]     THE WITNESS: I did several things to her [6] allegations. I
held a Workplace Violence Committee. I [7] referred it by policy in
a bureaucratic policy to the Office [8] of Internal Affairs.
[9] Once I referred that case to the Office of [10] Internal Affairs,
it's not in my hands, to do an [11] investigation. It's in the Office of
Internal Affairs to do [12] the investigation.
[13]     BY MS. MCDONALD:
[14]     Q Did you, correct me if I'm wrong? Did you testify
[15] earlier that Darren Brown was in the Office of Internal
[16] Affairs?
[17]     A He's, he's in the Office, he's a special [18] investigation,
special investigation agent. He's not in the [19] Office of Internal
Affairs. Office of Internal Affairs is a [20] central office.
[21]     Q Okay. Okay. When you received the restraining
[22] order, what did you do about that?
[23]     A That, once I received the restraining order [24] obviously I
had to act on the restraining order which [25] indicated to me that
Mr.Reynoso could continue working.

**Page 50**

[1] However, there would have to be fifty yard difference
[2] between Ms.O'Donnell and Mr.Reynoso.
[3] So at that time, I think Mr.Reynoso was on leave [4] and
Ms.O'Donnell, if I remember correctly, gave her admin [5] leave for
a period of time.
[6] Then I decided to ensure staff safety not only for
[7] Ms.O'Donnell but for Mr.Reynoso, and still make it as
[8] minimum disruptive to both employees. I changed schedules
[9] when they returned to work.
[10]     Q And you said Mr.Reynoso was on leave also?
[11]     A He could have been on days off or leave, I'm not
[12] certain?
[13]     Q You don't recall whether you granted him
[14] administrative leave?
[15]     A I may have granted both of them administrative
[16] leave.
[17]     Q How did you change their schedules?
[18]     A Well based upon the restraining order, my concern
[19] was to make sure both employees, to the best of my ability,
[20] to make both employees separate working areas to ensure
that [21] they did not run into each other and that I could abide by
[22] the restraining order.
[23] Again, at that time, prior to that, the Union had [24] come to
me and requested to me that if any employee would [25] get some
kind of disciplinary action while on Workman's

**Page 51**

[1]     Comp, that I would try to maintain their schedules as best I
[2] could.
[3]     Okay, keeping that in mind, the best I could do, [4] they're
both bargaining unit employees, or excuse me one is,
[5] Ms.O'Donnell, Mr.Reynoso is not a bargaining unit
[6] employee, the best I could do was to change a half hour of
[7] her schedule.
[8] And I changed MR. Reynoso's shift from day shift [9] to night
shift and I stipulated in my letter that they would [10] have to once
their shift ended, they could, they would have [11] to leave within
the thirty minutes period of time so they [12] wouldn't run into one
another.
[13]     Q And did you make these changes right away after
[14] the incident or was there some lapse in period of time?
[15]     A There may have been three or four or five days. [16] It all
depends on—
[17]     Q Okay. But just a few days?
[18]     A I would say yes.
[19]     MS. MCDONALD: Okay. Unfortunately, I've got all [20] my
exhibits out of order.
[21]     (Exhibit No. 8 marked for [22] identification.)
[23]     BY MS. MCDONALD:
[24]     Q But let me show you Exhibit 8. Do you recognize [25] that
document?

**Page 52**

[1]     A Yes, yes, I do.
[2]     Q And what is that document?
[3]     A It's a restraining order issued by Malden District [4] Court.
[5]     Q And was that the order obtained by Ms.O'Donnell [6] for
protection from David Reynoso?
[7]     A That I don't know. I don't know. My, I don't [8] know if she
got it or she gave it to me. I don't know.
[9]     Q But this document is concerning Ms.O'Donnell and
[10] David Reynoso?
[11]     A Correct.
[12]     Q Correct?
[13]     A Correct.
[14]     Q And you already mentioned that they had to stay, I
[15] believe it was fifty yards from each other or Mr.Reynoso
[16] had to stay fifty yards away from Ms.O'Donnell, correct?
[17]     A That is correct.
[18]     Q And were there any other restrictions placed on
[19] Mr.Reynoso?
[20]     A There was a restriction that he couldn't carry a
[21] firearm.
[22]     Q And what is the date on that document? I believe [23] it's
on the second page.
[24]     A Date of order was April 9, 2002.
[25]     Q And was there a date that the order expires?

### Page 53

[1]    A  Expiration date of order was April 23, 2002. If [2]  I'm
reading it correctly.

[3]    Q  Does it state on there that the order was extended [4]  at
any point?

[5]    A  Next hearing date was April 23, 2002. Date of, [6]  yeah,
there was an expiration date. They extended it, April [7]  23, 2003.
With a hearing date of April 23, 2003. If I'm [8]  reading this
correctly, okay.

[9]    Q  And without looking at that document, do you [10]  recall
whether the order was extended beyond April 23, 2003?

[11]    A  I extended their separation until, I can't [12]  remember if
the date was April 23, April 27, I extended it [13]  until the probation
period ended for Mr.Reynoso.

[14]    Q  The probation period set by the Court?

[15]    A  Right.

[16]    Q  Okay.

[17]    A  Because I think that restraining order was still [18]  in
effect. In fact, there were many restraining orders that [19]  I
received. But I can't recall every one of them.

[20]    Q  I understand. You can't recall the dates, but [21]  you–

[22]    A  That's pretty much

[23]    Q  You recollect the order was extended a couple of
[24]  times?

[25]    A  Correct.

### Page 54

[1]    Q  And do you recall whether the order was extended [2]  into
2004?

[3]    A  I, I don't know.

[4]    Q  Okay. Let's go back to the investigation.

[5]    A  Okay.

[6]    MS. MCDONALD: Let me show you Exhibit 6. And I
[7]  would ask you to take a look at that.

[8]    (Exhibit No. 6 marked for [9]  identification.)

[10]    (Pause)

[11]    BY MS. MCDONALD:

[12]    Q  Do you recognize that document?

[13]    A  No this is an Office of Internal Affairs' [14]  document.

[15]    Q  Have you ever seen that document?

[16]    A  Not that I recall.

[17]    (Exhibit No. 7 marked for [18]  identification.)

[19]    MS. MCDONALD: Okay. Let me show you Exhibit 7.

[20]    (Pause)

[21]    THE WITNESS: Yes.

[22]    BY MS. MCDONALD:

[23]    Q  Have you ever, first of all, what is that [24]  document?

[25]    A  It's an OIA, Office of Internal Affairs

### Page 55

[1]  Investigative Report Executive Staff Summary that outlines
[2]  the case and provides information regarding the case.

[3]    Q  And is this the document that you received?

[4]    A  Yes I did.

[5]    Q  And did you review this document in determining [6]  what
discipline may be appropriate for Officer Reynoso?

[7]    A  Yes.

[8]    Q  And were the allegations of off duty misconduct
[9]  sustained?

[10]    A  Yes they were.

[11]    Q  I have a question. What is, for the record, what [12]  is the
date on this report?

[13]    A  The dated report is March 26, 2003. That doesn't
[14]  necessarily mean that I received it on that date but that is
[15]  the date of this report.

[16]    Q  So essentially the investigation was completed in
[17]  March of 2003?

[18]    A  Correct.

[19]    MS. MCDONALD: I am going to show you Exhibit 9
[20]  and ask you to look at that.

[21]    (Exhibit No. 9 marked for [22]  identification.)

[23]    MS. MCDONALD: I'm all out of order.

[24]    THE WITNESS: Okay.

[25]    BY MS. MCDONALD:

### Page 56

[1]    Q  Do you recognize that document?

[2]    A  Yes I do.

[3]    Q  And what is it?

[4]    A  It's a letter of proposal to Officer Reynoso for a
[5]  suspension of thirty days for off duty misconduct.

[6]    Q  And who drafted that this document?

[7]    A  It would be either done by the Captain or the [8]  Human
Resource Department.

[9]    Q  The document is signed by Michael Bollinger,
[10]  correct?

[11]    A  Correct.

[12]    Q  And it's also signed as being received by Officer
[13]  Reynoso?

[14]    A  Correct.

[15]    Q  And what is the date on the document?

[16]    A  That Mr.Reynoso signed or–?

[17]    Q  The date it was drafted?

[18]    A  June 4th.

[19]    MR. WILMOT: Objection.

[20]    BY MS. MCDONALD:

[21]    Q  And now did you meet with Officer Reynoso prior to
[22]  issuing him discipline?

[23]    A  I'm sure I met him on several occasions.

[24]    Q  In regard to this incident?

[25]    A  Correct.

Case 4:04-cv-40190-FDS     Document 24-4     Filed 04/18/2006     Page 17 of 45

Case 4:04-cv-40190-FDS   Document 24-4   Filed 04/18/2006   Page 99 of 115
Donna O'Donnell v. Gonzales, 04-40190-FDS   Depo. of David Winn   09/15/05     XMAX(15/15)

**Page 57**

[1]    Q Do you recall the substance of your conversations [2] with Mr.Reynoso during those meetings?

[3]    A The conversations were I met with Ms.O'Donnell on [4] a couple of occasions, probably just as much as I did with [5] Mr.Reynoso, advising both of them that there was a fifty [6] yard restraining order and that they would have to maintain [7] that. If there's any violations, I need to be aware of it. [8] Prior to any other meetings, Ms.O'Donnell came to [9] my office on several occasions where the conversations were [10] about I don't remember.

[11] There's no one time I remember Mr.Reynoso coming [12] to my office. That was to tell him about the separation [13] issue.

[14]    Q Okay. You don't remember calling him to your [15] office of having a meeting with him with regard to his [16] discipline?

[17]    A Prior to his discipline.

[18]    Q Or at the set time it was handed out or–?

[19]    A Not that I recall.

[20]    MS. MCDONALD: Okay. I am going to show you [21] Exhibit 10. If you could review that.

[22]    (Exhibit No. 10 marked for [23] identification.)

[24]    THE WITNESS: Okay.

[25]    BY MS. MCDONALD:

**Page 58**

[1]    Q Do you recognize that document?

[2]    A Yes I do.

[3]    Q And what is that document?

[4]    A I don't know if this is a response from him [5] regarding the proposal matter or–

[6]    Q Well, what is the title of the document, I guess [7] on the first page?

[8]    A Meeting with Mr.Reynoso.

[9]    Q And who is it from?

[10]    A It's from me.

[11]    Q And is this just something that you typed up for [12] the file or, do you recall?

[13]    MR. WILMOT: Objection. You can answer.

[14]    THE WITNESS: Mr.Reynoso, no, this could have [15] been during his probation period after I have given the dis [16] - I'm not sure when this memo or our discussions occurred.

[17] Whether it was in between the proposals, in [18] between after I gave him discipline, I'm not quite sure.

[19]    BY MS. MCDONALD:

[20]    Q Let me call your attention to the first line.

[21]    A Okay.

[22]    Q On Tuesday, June 17, 2003 at 8:30 a.m., a meeting [23] was held between Warden Winn and David Reynoso regarding his [24] proposed suspension.

[25] Would it be fair to say that based on that

**Page 59**

[1] language, he had not yet received his suspension at the time [2] you had met with him?

[3]    A Well, after reading the first sentence, it sounds [4] like this is Mr.Reynoso's written response to the proposal [5] or his discussion with me to his response to the proposal.

[6]    Q Okay.

[7]    A Because I'm not sure there was a proposal that was [8] also done for termination.

[9]    Q You think there may have been a proposal that he [10] be terminated?

[11]    A There was a proposal for termination.

[12]    Q And is that a written document that you've seen?

[13]    A No. Because Central Office advised me that this [14] case would not be a termination case or excuse me, the [15] Regional Office or Central Office, I can't recall, advised [16] me this would not be a termination case.

[17]    Q So who proposed that he be terminated?

[18]    A That would be the Captain who would propose [19] termination.

[20]    Q And that would have been a verbal proposal?

[21]    A No, that would have been a proposal written [22] then sent up for review to the Region and Central Office [23] prior to the employee seeing the proposal of termination.

[24]    Q Okay. So the Captain, in this case, Captain [25] Bollinger?

**Page 60**

[1]    A Bollinger.

[2]    Q Bollinger. Would have prepared a proposal for [3] termination?

[4]    A Or the Human Resource Manager and Mr.Bollinger [5] would have signed it, if he agreed. If he agreed with the [6] termination.

[7]    Q And that was forwarded to the Central Office?

[8]    A Regional Office.

[9]    Q Regional Office. And they, do you know if they [10] received this proposal?

[11]    A Well, they received the proposal and advisement [12] was given that this would not be a termination case.

[13]    Q A verbal advisement or written advisement?

[14]    A I don't know whether it was written or verbal.

[15]    Q But you recall, do you recall speaking with [16] somebody about this at the Regional Office.

[17]    A No, I don't talk to people in the Regional Office [18] about discipline.

[19]    Q Okay. Just somehow it came to your attention that [20] this was not a case for termination?

[21]    A Correct.

[22]    Q You don't recall how, how it came to your [23] attention?

[24]    A Well, through my Human Resource Manager.

[25]    Q Oh, okay. Do you recall whether at the time–?

Page 61

[1]  A Do you want this back?

[2]  Q No, you can hang on to it.

[3]  A Okay. I've got a couple of them here. Okay, go [4] ahead.

[5]  Q Whether at the time that you met with Mr.Reynoso [6] and were considering what discipline you should give him, do [7] you recall whether he had any prior discipline?

[8]  A At that time that I met with him while he was [9] giving me his response?

[10]  Q Or anywhere in the time that you had received the [11] investigative report and you were trying to make a [12] determination as to what discipline was warranted in that [13] time period?

[14]  A If I remember correctly, he had a DUI.

[15]  Q And was that a recent occurrence close in time to [16] –?

[17]  A To, I'm not certain.

[18]  Q Okay. And I believed you testified earlier that [19] would be a Category Three –?

[20]  A Correct.

[21]  Q Offense?

[22]  A Correct. A DUI.

[23]  Q A DUI would be. And I believe you testified that [24] an assault between staff members, initially, this particular [25] assault was classified as a Category One or a Category Two?

Page 62

[1]  A Actually, I don't know what Central Office [2] categorized it. I set it up and they categorized it.

[3]  Did they categorize it as a one or two? I never [4] got a call back. I'm waiting on what they're categorizing [5] and who's going to do the investigation.

[6]  Q Okay. So, was it ever downgraded to a Category [7] Three or the category never came up again?

[8]  A Actually, the category never came up again but [9] they did authorize a local investigation.

[10]  Q Okay. But they could do that even for a Category [11] One or a Category Two? They could authorize a local–?

[12]  A They could.

[13]  Q Okay.

[14]  A They could.

[15]  Q Let me refer you in Exhibit 10 to the second to [16] the last paragraph. Do you see where it says Warden Winn [17] told Mr.Reynoso he may have to make some decisions that [18] could affect him, such as changing his work hours?

[19]  A Mm-hmm.

[20]  Q What is the date on this document?

[21]  A June 17, 2003.

[22]  Q Hadn't you already changed Mr.Reynoso's work [23] hours by this point in time?

[24]  A I changed work hours for both employees on [25] numerous occasions through this whole process.

Page 63

[1]  Q Okay. So there wasn't just one, we're just [2] talking about Mr.Reynoso.

[3]  A Okay.

[4]  Q I believe you testified that you had changed his [5] work hours within five days of the incident or so?

[6]  A Correct.

[7]  Q And that was back in April, maybe the beginning of [8] May of 2003, correct? Sorry, 2002?

[9]  A Yeah, correct.

[10]  Q And now this document is saying, dated June 17, [11] 2003, states that you may have to change his work hours?

[12]  A That is correct. Based upon. I don't know the [13] exact date I gave him his discipline of twenty-one days. [14] The meeting if I recall correctly, was regarding that [15] because he was still on probation, that I would have to [16] continue to change his hours.

[17]  And I think that's part of this memo why I [18] discussed it with him. That, even though you've had your [19] disciplinary process, even though it's over, it's not over. [20] That I'm going to continue with the restraining order of the [21] fifty feet, the fifty yards, excuse me, until the [22] probationary period ended.

[23]  Because I think in his mind, it ended after the [24] Court hearing or whatever. I'm not certain. But I want to [25] make it clear to him that I would still keep him separated

Page 64

[1] from Ms.O'Donnell.

[2]  MS. MCDONALD: Okay. I am going to show you [3] Exhibit 11.

[4]  (Exhibit No. 11 marked for [5] identification.)

[6]  THE WITNESS: Okay.

[7]  BY MS. MCDONALD:

[8]  Q Do you recognize that document?

[9]  A Yes I do.

[10]  Q And what does that, what is that document?

[11]  A This is a proposal for suspension for thirty days [12] for off duty misconduct.

[13]  Q Is this a proposal or is this his actual–?

[14]  A Oh, I'm sorry.

[15]  Q Discipline?

[16]  A This is his actual discipline.

[17]  Q But you just stated initially that it was proposed [18] that he be suspended for thirty days, correct?

[19]  A Correct.

[20]  Q And you decided that he, that he would be [21] suspended for twenty-one days?

[22]  A That is correct.

[23]  Q Now it says in the third paragraph. You discussed [24] what you considered in determining what discipline would be [25] appropriate.

Case 4:04-cv-40190-FDS    Document 24-2    Filed 04/18/2006    Page 19 of 115

### Page 65

[1]  Do you see that?

[2]   A  Yes.

[3]   Q  And in the last sentence, you refer to a prior [4] discipline?

[5]   A  Correct.

[6]   Q  And that he had been disciplined twice in five [7] years?

[8]   A  Well, it says this is your second, which would [9] include this one, I would think.

[10]   Q  Okay. Do you know if at the time Mr.Reynoso [11] served his suspension, he was paid?

[12]   A  No.

[13]   Q  You don't know or he wasn't paid?

[14]   A  Do I–?

[15]   Q  At the time that he served the suspension. During [16] the time he was actually out of work, was he paid?

[17]   A  Was he paid? No.

[18]   Q  He wasn't?

[19]   A  At the time of his suspension, no, he wasn't paid.

[20]   Q  Is a DUI classified as off duty misconduct?

[21]   A  Yes.

[22]     MS. MCDONALD: I am going to show you this

[23] document.

[24]     (Exhibit No. 12 marked for [25] identification.)

### Page 66

[1]     (Pause)

[2]     THE WITNESS: Okay.

[3]     BY MS. MCDONALD:

[4]   Q  Do you recognize that document?

[5]   A  Yeah, it's a personnel action.

[6]   Q  And what is that for? That document? What's the [7] purpose of that document?

[8]   A  It's a, well, it's a notice of action that I [9] signed but it's, gives an effective date of suspension.

[10]  The document seems incomplete to me.

[11]   Q  Is this something that goes to payroll? For [12] payroll purposes?

[13]   A  It goes to payroll and they're supposed to follow [14] the Personnel Action.

[15]   Q  Who is this form about?

[16]   A  It's David Reynoso.

[17]   Q  And let me refer you to the second page of that [18] document. At the very end, under Part F Remarks.

[19]   A  Okay. Inappropriate use of a government computer, [20] is that correct?

[21]   Q  Yeah. Do you remember anything about that [22] incident?

[23]   A  No, I don't.

[24]   Q  This document states that he was suspended for [25] inappropriate use of a government computer?

### Page 67

[1]   A  Yes.

[2]   Q  Okay, but you don't recall issuing that discipline [3] to Mr.Reynoso?

[4]   A  Well, at the time, I had thirty-five cases. They [5] were all computer related. Do I remember? No, I don't.

[6]     MS. MCDONALD: Okay. Let me show you another one.

[7]     (Exhibit No. 13 marked for [8] identification.)

[9]     BY MS. MCDONALD:

[10]   Q  And can you just state for the record what that [11] document is?

[12]   A  Again, a Personnel Action.

[13]   Q  For? For who?

[14]   A  David Reynoso.

[15]   Q  And what is this one requesting or regarding?

[16]   A  Off duty misconduct.

[17]   Q  And what is the date of this document?

[18]   A  Effective date March 3, 2003.

[19]   Q  And that was another suspension?

[20]   A  It says suspension no later than March 3, 2003, so [21] I would have to agree that it's another suspension.

[22]   Q  But you don't recall what the off duty misconduct [23] was?

[24]   A  Well–

[25]   Q  Let me ask you another question.

### Page 68

[1]   A  Well–

[2]   Q  Is it possible that this suspension was the [3] suspension he received with regard to the incident with [4] Ms.O'Donnell, based on that date?

[5] Only if you know, if you don't know–?

[6]   A  I don't know but -

[7]   Q  Okay.

[8]   A  Because there's some things marked out that, I'm [9] not sure what the suspension was for.

[10]     MS. MCDONALD: Okay. I'm going to show you

[11] another one. I don't know if it will help or not.

[12]     (Exhibit No. 14 marked for [13] identification.)

[14]     BY MS. MCDONALD:

[15]   Q  Exhibit 14. Is that another Personnel Action form [16] for David Reynoso?

[17]   A  That's correct.

[18]   Q  And is that also regarding a suspension for off [19] duty misconduct?

[20]   A  Yes it is.

[21]   Q  And what is the date on that document?

[22]   A  Effective date is July 27, 2003.

[23]   Q  And as far as you remember, Mr.Reynoso received a [24] suspension for his DUI?

[25]   A  Correct.

Page 69

[1]    Q And be also received a suspension for the incident
[2] with Ms.O'Donnell?
[3]    A Correct.
[4]    Q And a third suspension for unauthorized use of a
[5] government computer?
[6]    A That's correct, which I didn't realize until [7] today.
[8]    Q Okay. But we're unsure of what Personnel Action [9] form
goes with which off duty misconduct, correct?
[10]    A Well, I am. Because at the time, as the [11] discipline
would be given out, that a Personnel Action would [12] come up to
me.
[13]    Q Okay. Do you consider an assault and battery with [14] a
dangerous weapon on a staff member similar in seriousness
[15] to a DUI?
[16]    A I would say it's more serious than a DUI, actually.
[17]    Q And in considering discipline for a DUI, actually,
[18] strike that.
[19] Do you recall the length of the suspension that [20] Officer
Reynoso received for his DUI?
[21]    A One day if I remember correctly.
[22]    Q Okay.
[23]    MS. MCDONALD: Do you want to break for lunch?
[24]    MR. WILMOT: What time is it?
[25]    MS. MCDONALD: It's 12:00.

Page 70

[1]    MR. WILMOT: 12:00, sure. A half hour or is that [2] enough
time?
[3]    MS. MCDONALD: How about forty-five minutes?
[4]    MR. WILMOT: Okay.
[5]    MS. O'DONNELL: I have a doctor's appointment at
[6] quarter to one.
[7]    MS. MCDONALD: That's fine.
[8]    MS. O'DONNELL: I could come right back. It's [9] right
down the street.
[10]    MS. MCDONALD: That's fine. We can go off the
[11] record.
[12]    (Off the record at 12:00 p.m.)

Page 71

[1] A F T E R N O O N   S E S S I O N
[2]    (12:45 p.m.)
[3]    MS. MCDONALD: Okay, are we ready?
[4]    THE WITNESS: Mm-hmm.
[5]    BY MS. MCDONALD:
[6]    Q What are Officer Reynoso's job duties as an SIS
[7] officer?
[8]    A Watching the compound through cameras. Could be
[9] listening to inmate phone calls or could be gathering, well
[10] gathering intelligence about inmates. That's pretty much
[11] it.
[12] Maybe taking urines from inmates.
[13]    Q Does he check their mail or~?
[14]    A He could, I don't know.
[15]    Q Okay. And how many other officers are there in [16] the
SIS Department, approximately?
[17]    A Approximately three.
[18]    Q And between April 8, 2002 and the present, having
[19] there always been approximately three officers in that
[20] department?
[21]    A Approximately. Give or take one or two based upon
[22] military leave. Yeah.
[23]    Q There hasn't been a drastic cutback or anything in
[24] reduction of hours or reduction in force in that department?
[25]    A No.

Page 72

[1]    Q Okay. And the other officers in that department, [2] do
they have similar job functions as Officer Reynoso?
[3]    A Yes.
[4]    Q They all kind of do the same things?
[5]    A Yes.
[6]    Q Except for Darren Brown who does investigations?
[7]    A Correct.
[8]    Q Okay.
[9]    MR. WILMOT: Just to clarify, you're talking about [10] when
Reynoso was in that department or~?
[11]    BY MS. MCDONALD:
[12]    Q Yes, I understand that he is no longer in the SIS
[13] Department, is that, is that correct?
[14]    A No he is not.
[15]    Q Okay. So I am talking about the period of time [16] from
April 8, 2002 until he was transferred out of that [17] department.
[18] And why was he, why was he transferred out of that
[19] department?
[20]    A I don't know.
[21]    Q Okay. Do you know whether Officer Reynoso started
[22] in the SIS Department or whether he was something else
[23] before he was an SIS officer?
[24]    A I don't know. I don't know.
[25]    Q Are SIS officers capable of performing the job

Case 4:04-cv-40190-FDS     Document 24-2     Filed 04/18/2006     Page 21 of 115

Depo O'Donnell V Gonzales, 94-40190-FDS Depo of David Winn - 09/15/05     XMAX(19/19)

### Page 73

[1]   duties in the other departments of the institution?

[2]   A All staff are.

[3]   Q All staff are able to rotate throughout –

[4]   A All staff are capable of doing different, during, [5] all staff
are capable of performing other duties. For [6] example, an
emergency.

[7]   Q So, based on needs of service, type thing?

[8]   A Right.

[9]   Q Did Colleen ever express her fears in regard to [10] Officer
Reynoso to you?

[11]   A Yes.

[12]   Q Either verbally or in writing?

[13]   A Yes.

[14]   Q Did she express them verbally?

[15]   A In writing. I don't recall verbally. But I know [16] it was in
writing.

[17]   MS. MCDONALD: Okay. I am going to show you a

[18]   document that is marked Exhibit 15.

[19]   (Exhibit No. 15 marked for [20] identification.)

[21]   (Pause)

[22]   BY MS. MCDONALD:

[23]   Q Do you recognize that document?

[24]   A Yes I do.

[25]   Q You can hang on to it. And what is that document?

### Page 74

[1]   A It's a memorandum to me from Colleen O'Donnell

[2]   indicating her issue of feeling unsafe. I would summarize [3] it
like that.

[4]   Q And what is the date of the document?

[5]   A May 13, 2002.

[6]   Q And did you take any action in response to this

[7]   document?

[8]   A No, I did not.

[9]   (Exhibit No. 16 marked for [10] identification.)

[11]   MS. MCDONALD: Let me show you this document.

[12]   THE WITNESS: Okay.

[13]   BY MS. MCDONALD:

[14]   Q Do you recognize that document?

[15]   A Yes I do.

[16]   Q And what is that document?

[17]   A It's a memo for Steve Gagnon, Inmate Systems

[18]   Officer, from Colleen O'Donnell regarding safety issues.

[19]   Q And you have seen this document before?

[20]   A Yes I have.

[21]   Q And what's the date on it?

[22]   A June 10, 2002.

[23]   Q And is it, is it fair to say that this is an [24] additional
memo from Ms.O'Donnell regarding her concern, [25] her fears or
concerns with regard to David Reynoso?

### Page 75

[1]   A Yes.

[2]   Q Did you take any action in response to this memo?

[3]   A No I did not.

[4]   Q Did you ever receive notice that Officer Reynoso

[5]   violated the terms of his violation by firing a weapon at

[6]   work?

[7]   A Yes I did.

[8]   Q And can you tell me about that? How you received [9] that
notice or what you recall about that incident?

[10]   A I can't recall who told me. What I do remember is [11] the
person that told me had mentioned that Mr.Reynoso was [12] at
firearms training, firing a weapon and that Ms.O'Donnell [13] had
called probation to report it.

[14]   And I asked that person, which I cannot remember [15] who
the person is, was that true and the person did say yes [16] he did
and so I said okay. And I called the Probation [17] Department and
reported the violation?

[18]   Q You did?

[19]   A Yes I did. In case it wasn't reported.

[20]   Q So you had no knowledge of him being at firearms

[21]   training?

[22]   A Not until I was notified that he had already been [23] out
there and shot.

[24]   Q And who would have assigned him there?

[25]   A It would be the Employee Development Manager.

### Page 76

[1]   Q And who was that?

[2]   A At the time?

[3]   Q Yes.

[4]   A It would have been Karen Parrott?

[5]   Q Karen Parrott?

[6]   A Mm-hmm.

[7]   Q Did you conduct any kind of investigation in, [8] regarding
how he got assigned there?

[9]   A No.

[10]   Q Did you do anything in regard to this incident [11] other
than phone the Probation Department?

[12]   A No.

[13]   Q Do you recall who you spoke to at the Probation

[14]   Department?

[15]   A I asked for Mr.Reynoso's probation officer. It [16] was a
female. I can't recall the name.

[17]   Q Okay. Did you ever give a statement to any court

[18]   official or district attorney or any other person in regard [19] to
Officer Reynoso assigned to train and shoot on the firing

[20]   range?

[21]   A Not that I can recall. I remember calling the

[22]   Probation Officer.

[23]   Q You didn't testify for him at the court [24] appearance,
did you?

[25]   A No.

## Page 77

[1]    Q If I suggested to you that the testimony at the [2] hearing was that you ordered Officer Reynoso to shoot at the [3] firing range, would that be accurate?
[4]    A No.
[5]    (Exhibit No. 17 marked for [6] identification.)
[7]    MS. MCDONALD: Let me show you--.
[8]    THE WITNESS: Okay.
[9]    BY MS. MCDONALD:
[10]    Q Does that, do you recognize that document?
[11]    A Yes.
[12]    Q And what is that document?
[13]    A It's a memorandum from me through Darren Brown
[14] from David Reynoso indicating that he did fire a firearm and
[15] that he had a hearing, a probation violation hearing for
[16] November 20, 2003.
[17]    Q And what is the date of this memo?
[18]    A November 13, 2003.
[19]    Q And does this memo refresh your recollection at [20] all as to who informed you of the probation violation?
[21]    A Honestly, no.
[22]    Q Okay. Is inmate transport a part of Officer [23] Reynoso's job duties in SIS?
[24]    A If he signs up for overtime, or an emergency [25] situation happens or if he signs up for overtime.

## Page 78

[1]    Q And does the transportation of inmates require the [2] use of a firearm?
[3]    A One officer has a firearm on him, that's correct.
[4]    Q And is there more than one officer on the [5] transport?
[6]    A Yes. Could be two, could be three.
[7]    Q Could it ever be one?
[8]    A It could be one with a camp inmate. It could be.
[9]    Q Okay. But only one officer would have a firearm?
[10]    A Correct.
[11]    Q And do you have any knowledge of Officer Reynoso
[12] transporting any inmates at the time he was on probation?
[13]    A No.
[14]    Q And subject to the restraining order?
[15]    A No. Except for the memo that was brought to my
[16] attention. I think it was -
[17]    (Pause)
[18] Umm, ahh.
[19]    Q You believed someone mentioned it in a memo?
[20]    A Could have, yeah.
[21]    Q But you don't recall who?
[22]    A No.
[23]    Q Okay. When, strike that. After you, after April [24] 8, 2002, when you changed Ms.O'Donnell's work hours and
[25] assignment, did she complain to you about that change?

## Page 79

[1]    MR. WILMOT: Objection. You can answer.
[2]    THE WITNESS: Not that I recall. No.
[3]    BY MS. MCDONALD:
[4]    Q You don't recall her ever asking to be put back on [5] her regular hours?
[6]    A Not that I recall.
[7]    Q Do you recall her at any point asking to be [8] allowed to rotate back in her department?
[9]    A Not that I recall.
[10]    Q Do you recall the, strike that. If I suggested to [11] you that Officer Reynoso pled to sufficient facts for [12] finding of guilty and received a continue without a finding [13] in January 2003, would that be accurate?
[14] Do you recall that?
[15]    A Yes.
[16]    Q And do you recall Ms.O'Donnell approaching you
[17] and expressing concerns or fears because Officer Reynoso, in
[18] her words, was convicted?
[19]    A I don't recall that at all.
[20]    Q Do you recall having any conversation with her [21] very soon after that court date?
[22] Within a few days of that court date?
[23]    A Not that I recall.
[24]    Q Okay. At some point, did you receive notice that
[25] Ms.O'Donnell needed a medical leave of absence?

## Page 80

[1]    A Repeat that question again. I'm sorry.
[2]    Q At some point in 2003, did you receive notice or [3] did you hear that Ms.O'Donnell needed a leave, a medical [4] leave of absence?
[5]    A Well throughout the period, probably at that time, [6] I received many medical documentation regarding her medical
[7] health.
[8] Around that time, I'm sure I did. I would have to [9] look at a document.
[10]    Q Okay. When Ms.O'Donnell informed you of the
[11] assault on April 8, 2002, was she upset?
[12]    MR. WILMOT: Objection. You can answer.
[13]    THE WITNESS: She was upset and had tears in her
[14] eyes.
[15]    MS. MCDONALD: Let me show you -
[16]    (Exhibit No. 18 marked for [17] identification.)
[18]    (Pause)
[19]    THE WITNESS: I don't remember seeing this
[20] document.
[21]    BY MS. MCDONALD:
[22]    Q Okay. Do you know what it is?
[23]    A It's a medical, it's a medical report from her [24] doctor, I guess. From doctor, I can't read the position [25] signature, but from a doctor.

---

**Page 81**

[1]    Q Now that document appears to actually be a portion [2] of
perhaps a larger document. And there are some numbers in
[3] the upper right hand corner.
[4] Do you have any idea what document this may be a [5] part
of?
[6]    A No.
[7]    Q Could it have been a request for some sort of [8] leave?
[9]    A I don't know. Because I've never, I don't recall [10] seeing
this particular document.
[11]    (Exhibit No. 19 marked for [12] identification.)
[13]    MS. MCDONALD: Okay. Let me show you this one.
[14]    THE WITNESS: Yeah, I – I know this document.
[15]    BY MS. MCDONALD:
[16]    Q Okay. You received that document?
[17]    A Yes.
[18]    Q And what is that document?
[19]    A It's a medical report of Colleen O'Donnell dated
[20] January 31, 2003.
[21]    Q And is that from her doctor?
[22]    A It's from a doctor, yes.
[23]    Q Doctor George Milowe?
[24]    A Right.
[25]    Q And does this document indicate that Ms.O'Donnell

---

**Page 82**

[1] suffers from post traumatic stress disorder?
[2]    A Yes it does.
[3]    Q And does it related to what her symptoms are?
[4]    A Yes.
[5]    MR. WILMOT: Can we go off the record for a [6] moment?
[7]    MS. MCDONALD: Sure.
[8]    (Off the record at 1:11 p.m.)
[9]    (On the record at 1:13 p.m.)
[10]    BY MS. MCDONALD:
[11]    Q Okay. I believe the question was does this note
[12] indicate to you what Ms.O'Donnell's symptoms, her post
[13] traumatic stress disorder were?
[14]    A Yes.
[15]    Q And does the doctor indicate in this note, any [16] action
that may be taken to alleviate Ms.O'Donnell's [17] symptoms?
[18]    A Yes.
[19]    Q And what does he recommend?
[20]    A Well, he recommends that Ms.O'Donnell not be
[21] required to work in the same facility as Mr.Reynoso.
[22]    Q Did you take any action in response to this [23] letter?
[24]    A There were several doctor notes given to me around
[25] this period of time, if I remember correctly. I think this

---

**Page 83**

[1] was the doctor note that I had a staff psychiatrist - I [2] wanted
additional information.
[3] I'm not a doctor. I'm not a psychiatrist. What [4] the treatment
in my - again, I'm not a psychiatrist, the [5] treatment plan was
basically to remove Reynoso or they [6] couldn't work in the same
environment. That's the treatment [7] plan.
[8] That didn't sound like a very good treatment plan [9] to me,
even though I'm not a doctor or psychiatrist. I had [10] a
psychiatrist read one of these doctor's note. I think it [11] was this
doctor's note, to explain to me if that is a good [12] treatment plan
or not. Or what his thoughts were.
[13] So if this is the doctor's note, I gave it to a [14] staff
psychiatrist and the psychiatrist provided me that he [15] needed
more information from the doctor which I requested to [16] get
permission from Ms.O'Donnell to get that.
[17]    Q Okay, and -
[18]    A Before I made a decision.
[19]    Q A decision on?
[20]    A Any decision what to do with Ms.O'Donnell or
[21] Mr.Reynoso, keeping them separated.
[22]    Q Okay. Was Ms.O'Donnell requesting some form of
[23] leave at this time, in this time period?
[24]    A If she was running out of leave without pay, yes.
[25]    Q Do you recall whether you granted her

---

**Page 84**

[1] administrative leave?
[2]    A I don't recall if I granted her administrative [3] leave at this
particular time. I did grant her [4] administrative leave throughout
the situation.
[5] I could, I don't recall. I don't remember. At [6] the same time, I
was getting two or three doctor's notes. [7] And I'm – one doctor's
note, I granted an extension of [8] administrative leave or leave
without pay to get more [9] information back.
[10]    Q Okay.
[11]    A From her doctor.
[12]    Q Now, also around this time, did you at some point,
[13] become aware that Ms.O'Donnell had hired an attorney?
[14]    A I got a letter, I think, from Mr.Rizzitelli, if I [15] remember
correctly, around the same time. Roughly around [16] the same
time.
[17]    Q Okay. So you, who did you make a request of that
[18] they obtain further medical information from Ms.O'Donnell
[19] or her doctor?
[20]    A If I remember correctly, her supervisor, [21] Mr.Gagnon,
made a phone call to Ms.O'Donnell. I can't [22] remember if it was
a written request from myself for [23] additional information but I
know a phone call was made to [24] get permission to get
additional information.
[25]    Q And do you know whether an authorization or

---

BSA    Case 4:04-cv-40190-FDS Depo of David Winn 02/15/05 Page 24 of 45

## Page 85

[1] release for medical information was sent to Ms.O'Donnell
[2] with a request that she sign it?
[3]    A No I do not.
[4]    Q Okay. Other than the two or three doctor's notes [5] that
you think you received during this period of time, did [6] you
receive any further medical information from [7] Ms.O'Donnell or
her attorney or her doctor?
[8]    A Well, I kept receiving a letter from [9] Mr.Rizzitelli.
[10]    Q And do you recall the content of those letters?
[11]    A I think, the first letter was I'm representing
[12] Ms.O'Donnell. Any issues or concerns, go through me, which
[13] I never responded to.
[14]    Q Did you disregard his letter of representation?
[15]    A No.
[16]    Q Okay. You just -
[17]    A Colleen O'Donnell never came me permission to talk
[18] to Mr.Rizzitelli. So I guess I did disregard his letters [19] until I
got permission.
[20]    Q And is it required that you obtain permission to
[21] speak to an employee's attorney?
[22]    A Yes.
[23]    Q Is that a Bureau of Prison's policy?
[24]    A It's a privacy policy, as far as I'm concerned.
[25]    Q Okay.

## Page 86

[1]    A It wouldn't be right to give information about a [2] staff
member to anybody whether it's a public person or [3] attorney
until I get written permission.
[4]    Q Okay. Did Ms.O'Donnell and/or her attorney, [5] request a
reasonable accommodation for her post traumatic [6] stress
disorder?
[7]    MR. WILMOT: Objection. You can answer.
[8]    THE WITNESS: Her attorney may have, [9] Mr.Rizzitelli?
[10]    MS. MCDONALD: Yes.
[11]    THE WITNESS: I can't, the best I can recall, is I [12] think in
one of Mr.Rizzitelli's letter requested [13] accommodation. Now
whether I had permission at that point, [14] to talk to him, I can't
recall.
[15]    MS. MCDONALD: Okay.
[16]    THE WITNESS: If she gave me permission, then I [17] did
address the letter to him.
[18]    MS. MCDONALD: Okay. I am going to show you this
[19] document.
[20]    (Exhibit No. 20 marked for [21] identification.)
[22]    THE WITNESS: Yes, I recall this.
[23]    BY MS. MCDONALD:
[24]    Q Is it fair to say that you are responding to a [25] request
of Ms.O'Donnell for an accommodation?

## Page 87

[1]    A Yes.
[2]    Q And what is the date of this letter?
[3]    A January 27, 2003.
[4]    Q Do you have a memory, does this refresh your [5] memory
as to whether Ms.O'Donnell asked you for an [6] accommodation
prior to January 27, 2003?
[7]    A She must have or I wouldn't have written this [8] letter.
[9]    Q Okay.
[10]    A Whether it was written. Verbal or written.
[11]    Q Okay. You state in the second paragraph that you
[12] provided an accommodation for her situation since April of
[13] 2002.
[14] Do you see that?
[15]    A Yes.
[16]    Q And what situation were you referring to?
[17]    A Her incident and alleged assault down at Mirror
[18] Lake.
[19]    Q And at the end of that second paragraph, you state
[20] that you can further restrict his, meaning Officer Reynoso's
[21] work area to the camp if she believes it's a viable
[22] accommodation.
[23] Do you see that?
[24]    A Yes I do.
[25]    Q And in the next paragraph, you ask her to advise

## Page 88

[1] you in writing is that accommodation is acceptable.
[2] Do you see that?
[3]    A Yes.
[4]    Q Did anyone ever respond to this letter in regard [5] to the
accommodation that you offered Ms.O'Donnell?
[6]    A Can you repeat the question, I'm sorry, I was [7] reading
the letter again.
[8]    Q Do you recall whether anyone responded to your [9] offer
of an accommodation?
[10]    A I don't think I got a response for this letter.
[11]    Q One way or another?
[12]    A I can't recall.
[13]    MS. MCDONALD: Okay. Thanks. They're all [14] different.
This is much better.
[15]    (Exhibit No. 21 marked for [16] identification.)
[17]    (Pause)
[18]    THE WITNESS: Okay.
[19]    BY MS. MCDONALD:
[20]    Q Do you recall receiving this letter?
[21]    A Yes.
[22]    Q Did you have prior dealings with Attorney [23] Rizzitelli
prior to his representation of Ms.O'Donnell?
[24]    A Yes.
[25]    Q And did, if you know, did Cindy Lord have prior

**Page 89**

[1] dealings with Attorney Rizzitelli?
[2]    A Yes.
[3]    Q Were those dealings difficult?
[4]    MR. WILMOT: Objection. You can answer.
[5]    A With me?
[6]    Q Yes. Between you and Attorney Rizzitelli?
[7]    A I didn't think so.
[8]    Q Did Attorney Rizzitelli use to work here?
[9]    A No.
[10]    Q At Devens?
[11]    A No.
[12]    Q Did he work for the Bureau of Prisons?
[13]    A Yes.
[14]    Q Let me call your attention to the second [15] paragraph?
[16]    A Okay.
[17]    Q Where he seems to be, he's stating that he has not
[18] been advised that Cindy's, I'm assuming Ms.Lord's, January
[19] 9, 2003 request for a full medical release be retracted.
[20] Does that statement refresh your memory as to [21] whether a
full medical release was sent to Ms.O'Donnell?
[22]    A No I don't.
[23]    Q Okay. Is it safe to say you usually handle those
[24] matters?
[25]    A That I handle which matters?

**Page 90**

[1]    Q That you don't handle those matters. Obtaining
[2] medical releases?
[3]    A No, usually H, the department, HR.
[4]    Q Okay. And let me call your attention to the third
[5] paragraph. The second sentence states that you advised
[6] Colleen that you would be willing to restrict Officer [7] Reynoso
to the camp. This may be in response to an [8] accommodation.
We thank you. Please elaborate on this [9] proposal.
[10] Is that a response to your offer of a reasonable
[11] accommodation?
[12]    MR. WILMOT: Objection. You can answer.
[13]    THE WITNESS: Obviously that's my response that I
[14] placed him in the camp to bring her back to work.
[15]    BY MS. MCDONALD:
[16]    Q But is this letter responsive to your letter of [17] January
27, 2003 wherein you offered to place Officer [18] Reynoso at the
camp?
[19]    MR. WILMOT: Objection. You can answer.
[20]    THE WITNESS: Is this my response.
[21] MS. MCDONALD: Is this responsive, is this letter [22] dated
February 10, 2003 from Ms.O'Donnell's attorney [23] requesting
more information about the camp?
[24]    THE WITNESS: Okay.
[25]    MR. WILMOT: Objection. You can answer.

**Page 91**

[1]    MS. MCDONALD: Responsive to your offer of a
[2] reasonable accommodation?
[3]    MR. WILMOT: Objection to the question. You can
[4] answer.
[5]    THE WITNESS: I'm confused. I'm sorry.
[6]    MS. MCDONALD: That's okay. That's okay. I'll [7] start over.
[8]    THE WITNESS: Okay.
[9]    BY MS. MCDONALD: In Exhibit, let me see that [10] letter
there, 20, letter of January 27, 2003. In the second [11] paragraph
-
[12]    A Right.
[13]    Q You offer an accommodation -
[14]    A Correct.
[15]    Q To restrict Officer Reynoso to the camp.
[16]    A Okay.
[17]    Q Is that correct?
[18]    A Yes.
[19]    Q Okay. And then you ask Ms.O'Donnell in that same
[20] letter to notify you if the accommodation is acceptable -
[21]    A Correct.
[22]    Q Or not?
[23]    A Correct.
[24]    Q Right?
[25]    A Correct.

**Page 92**

[1]    Q Is this letter of February 10, responsive to the [2] letter of
January 27?
[3]    MR. WILMOT: Objection. You can answer.
[4]    THE WITNESS: While I'm talking, while I'm writing [5] the
letter to Ms.O'Donnell, and in between that period of [6] time, I
received permission to write, or excuse me,
[7]    BY MS. MCDONALD:
[8]    Q Well, let me try to ask you–
[9]    A Well, I think Ms.O'Donnell notified him and I [10] received
this letter from him and he's asking me the [11] question. I don't
know what the next memo to either one [12] that I wrote. I can't
recall. I would have to look at the [13] next memo.
[14]    Q Okay. So you have no, do you know whether you
[15] responded to this letter of February 10, 2003?
[16]    A I can't remember. I would have to look at the [17] next
memo that's in order. I don't know.
[18]    (Exhibit No. 22 marked for [19] identification.)
[20]    MS. MCDONALD: I'm going to show you -
[21]    THE WITNESS: Okay. I remember this memo.
[22]    BY MS. MCDONALD:
[23]    Q Okay. And what is that memo?
[24]    A It's from Mr.Rizzitelli again saying by now we [25] should
have made decisions regarding accommodation. This is

Case 4:04-cv-40190-FDS    Document 24-4    Filed 04/18/2006    Page 26 of 45

BSA        Case 4:04-cv-40190-FDS    Document 24-4    Filed 04/18/2006    Page 26 of 45
Depo of Deborah Y Gonzales, 05/15/05 + Depo of David Winn, 08/15/05  Max pages 5

## Page 93

[1] his second request.
[2]    Q Is it fair to say that letter with the exception [3] of the
boldface type over the top of it is identical to the [4] previous letter
marked Exhibit 21.
[5]    A Yes.
[6]    Q So the only difference would be the boldface, [7] large
font type that says no response received regarding [8] sent
February 18, 2003?
[9]    A Yes.
[10]    MS. MCDONALD: Let me show you a document.
[11]    (Exhibit No. 23 marked for [12] identification.)
[13]    THE WITNESS: Okay.
[14]    BY MS. MCDONALD:
[15]    Q Do you recognize that document?
[16]    A The same letter.
[17]    Q And the only, is there anything different about [18] that
letter?
[19]    A Well, up on top it says U.S. Certified Mail [20] Received
or Certified Mail No Response, Resent March 3rd.
[21]    Q Otherwise the letter is identical to Exhibit 22?
[22]    A Correct.
[23]    Q And Exhibit 21, correct?
[24]    A Correct.
[25]    (Pause)

## Page 94

[1]    MS. MCDONALD: Okay, you know what, I'm going to
[2] have you look at this once first. I gave them to you out of
[3] order.
[4]    (Exhibit No. 24 marked for [5] identification.)
[6]    (Pause)
[7]    THE WITNESS: Yes. Okay. I know this memo.
[8]    BY MS. MCDONALD:
[9]    Q And what is that memo?
[10]    A That's a letter to Mr.Rizzitelli from me [11] outlining our
position on American Disabilities Act and [12] again, trying to
accommodate the situation ensuring the work [13] schedules differ
from each others and notifying him that the [14] Voluntary Leave
Transfer Program Committee met and [15] determined that
Ms.O'Donnell was not eligible or [16] disapproved her request.
[17] The decision is a final decision. It also [18] indicates that she
was placed on AWOL status.
[19]    Q In the second paragraph, the first sentence it [20] says I
have provided accommodations for Ms.O'Donnell's [21] personal
situation since April of 2002. And again, the word [22] situation, to
what were you referring when you said the word [23] situation?
[24]    A To the alleged assault at Mirror Lake on April [25] 8th.

## Page 95

[1]    Q Were you referring to the restraining order as [2] well?
[3]    A Well, I had to take that into consideration when I [4] wrote
the letter, yes.
[5]    Q Can you explain the Voluntary Leave Transfer [6] Program
to me?
[7]    A There is a committee that meets. It's an [8] independent
committee. If you ask me who's on it, I [9] wouldn't be able to tell
you.
[10] But anyway they meet if an employee needs annual
[11] leave, sick leave. They make a request in writing to me or
[12] to Human Resource Development Manager. At that time, if I
[13] get it, I sent it down. I tell the Committee to meet. I [14] don't
know how Ms.Lord does it, but I do it that way.
[15] I tell them to meet, go over the facts and either [16] approve
or deny it.
[17]    Q And is this leave program, is this the one where
[18] other employees donate time?
[19]    A Correct.
[20]    Q And it's put into some kind of bank or-?
[21]    A There's a national one you can get into or a local [22] one
where an employee makes a request for leave, makes a
[23] request for staff to loan their leave to them or give their
[24] leave to them.
[25]    Q Okay. And you are not on this committee, right?

## Page 96

[1]    A No.
[2]    Q Do you know they denied Ms.O'Donnell voluntary
[3] leave?
[4]    A No.
[5]    Q I've lost a document. I'll have to use this one. [6] I'm sorry,
let's go off the record for one second.
[7]    (Off the record at 1:40)
[8]    (On the record at 1:40)
[9]    (Pause)
[10]    A I already have this document. This document that
[11] you gave me.
[12]    Q Okay. So that would explain where my copy went.
[13] Can you unmark this. I thought it looked [14] familiar.
[15] What is advanced sick leave?
[16]    A A person could request advanced sick leave.
[17]    Q but what does that mean? How does that differ [18] from
sick leave or-?
[19]    A Well, when a person runs out of sick leave and
[20] needs sick leave, they can make a request to me requesting,
[21] I don't know the total amount they can request. Up to
[22] thirty days, sixty days, one hundred and twenty days, I
[23] don't know what the statute is on that but they can make a
[24] request to me for advanced, I can give them advanced sick
[25] leave.

**Page 97**

[1]  Q  Is that like borrowing sick leave from the next [2] year or something?

[3]  A  No, you're not borrowing, you're actually, if I [4] approve that, I can give you thirty days advanced sick leave [5] and then it would be deducted from your sick leave, let's [6] say, you get four hours per pay period, or four hours per [7] pay period, and I advanced you thirty hours sick leave, when [8] you gain that four hours on your pay check, that four hours [9] would be deducted from your thirty hours.

[10]  Q  Okay.

[11]  A  And so on and so forth until you pay it back. So, [12] like if you want to call it borrowing, I guess you can call [13] it borrowing.

[14]  Q  Okay. And so what are the circumstances where you [15] would deny somebody advanced sick leave?

[16]  A  I would deny, number one, I have told all staff in [17] the institution through recalls from the last five years, [18] that don't abuse your sick leave. I told all staff that in [19] my recalls.

[20]  And that you're pretty much at the mercy of the [21] Warden if you would request sick leave.

[22]  If there's any kind of abuse, it would probably be [23] denied. [24] If I got a doctor's note from an individual that [25] said is unable to return to work or there's no, and if I

**Page 98**

[1] requested medical documentation from a staff member and they [2] failed to provide me medical documentation, I wouldn't [3] approve it.

[4]  Q  So in Ms.O'Donnell's case, she, at some [5] point, gave you a doctor's note from her doctor saying that [6] she had post traumatic stress disorder and could not work, [7] is that correct?

[8]  A  That's correct.

[9]  Q  And is it fair to say she made various requests [10] for leave? Whether it be the Voluntary Leave Transfer [11] Program or Advanced Sick Leave, is that correct?

[12]  A  That's correct.

[13]  Q  And do you have a recollection of why [14] Ms.O'Donnell was denied Advanced Sick Leave as you sit here [15] today?

[16]  A  One doctor's note says unable to return to work, [17] and I requested additional medical documentation from [18] Ms.O'Donnell and she never supplied any more documentation [19] after I requested it.

[20]  Q  Do you recall her attorney objecting to the medial [21] authorization that was sent to Ms.O'Donnell?

[22]  A  He may have, but I'm not dealing with an attorney [23] on this case, I'm dealing strictly with Ms.O'Donnell and [24] her request.

[25]  Q  So if Ms.O'Donnell were to come back to you and

**Page 99**

[1] say hypothetically, I believe this medical release violates [2] my privacy rights and I'm not going to sign it, what would [3] you then say to her?

[4]  Would you simply deny her request or--?

[5]  A  Well, number one, I would call her in or call any [6] person in, not necessarily Ms.O'Donnell, which I've had in [7] the past, and ask them well that's fine if that's what you [8] choose to do or we can talk about it and it's confidential [9] between the two of us. [10] And if I think it's a reasonable request, whether [11] they abuse their sick leave, whether they have sick leave or [12] they need sick leave, you know, I'm going to approve it. [13] If it's a reasonable request and if they provide [14] me in as a confidential between that person and myself, it's [15] not going to go anywhere. If they still feel say like, I'm [16] not going to do it, then I'm not going to approve sick [17] leave, advanced sick leave. [18] I mean I have advanced sick leave, but I have to [19] know what the issues are and I have to have cooperation from [20] the staff person.

[21]  Q  Now in this case, you received notice from [22] Mr.Rizzitelli that they objected to the medical release, [23] correct?

[24]  A  Well, I don't recall that. I don't recall that [25] they objected to that.

**Page 100**

[1]  Q  Okay. You don't remember, but is it possible?

[2]  MR. WILMOT: Objection. You can answer.

[3]  THE WITNESS: I don't recall that they, I'm sorry, [4] what was your --

[5]  BY MS. MCDONALD:

[6]  Q  Just whether you recalled either Colleen or her [7] attorney objecting to the medical release that was sent to [8] them?

[9]  A  I do not recall them objecting to the medical [10] release.

[11]  Q  Okay. Nobody ever told you that they objected to [12] the medical release?

[13]  A  Not that I recall.

[14]  Q  Okay. So because you denied Ms.O'Donnell [15] advanced sick leave, was she then placed on AWOL status?

[16]  MR. WILMOT: Objection. You can answer.

[17]  THE WITNESS: I don't know the given time. The [18] time span. She could have been given extended leave without [19] pay for a short period of time to give me doctor's, an [20] updated doctor's note but sometime during that period, she [21] was placed on AWOL status.

[22]  BY MS. MCDONALD:

[23]  Q  Okay. And the period of time we're talking about [24] is approximately February of 2003?

[25]  Do you have a recollection of that?

Page 101

[1]     A It was around then. It could have been March. It [2] could
have been February when she was placed on AWOL. I [3] know
she was placed on AWOL status.
[4]     Q Okay.
[5]     A I don't know the exact date.
[6]     Q You know that Ms.O'Donnell was placed on AWOL
[7] status twice?
[8]     A Correct, yes.
[9]     Q And we're talking about the first incident of [10] AWOL,
correct?
[11] Right now?
[12]    A Well, honestly, I don't remember the dates.
[13]    Q Okay.
[14]    A I don't remember the dates. I know she was placed
[15] on AWOL status.
[16]    MS. MCDONALD: Okay. Let me show you this
[17] document.
[18]    (Exhibit No. 25 marked for [19] identification.)
[20]    (Pause)
[21]    THE WITNESS: Okay.
[22]    BY MS. MCDONALD:
[23]    Q Do you recall that letter?
[24]    A Yes.
[25]    Q What is the date on that letter?

Page 102

[1]     A March 24, 2003.
[2]     Q And what is this letter?
[3]     A Well he's claiming that I'm not responding, that [4] I'm not
corresponding responsively.
[5]     Q Who is he?
[6]     A Mr.Rizzitelli.
[7]     Q Does he again ask you to elaborate on restricting
[8] Officer Reynoso to the camp?
[9]     A Yes.
[10]    MR. WILMOT: Objection to the question.
[11]    Q And did you respond to this letter?
[12]    A I don't recall.
[13]    Q Do you recall ever responding or elaborating on
[14] your proposal to restrict Officer Reynoso to the camp?
[15]    A No, I never elaborated. Because I gave him my [16] plan
of action to put Mr.Reynoso at the camp. I thought it [17] was
self-explanatory.
[18]    Q Even though you received about five letters asking
[19] for elaboration?
[20]    MR. WILMOT: Objection. You can answer.
[21]    THE WITNESS: Five, I think three of the five [22] letters or
four of the five letters I never had permission [23] to talk to him.
[24]    BY MS. MCDONALD:
[25]    Q Okay. You had permission to talk to Colleen

Page 103

[1] though?
[2]     A Yeah, I did, I guess.
[3]     Q At some point, did you receive notice from either
[4] Ms.O'Donnell or her attorney that she wanted to return to
[5] work?
[6]     A I received either correspondence or the supervisor
[7] advised me Colleen wanted to come back to work.
[8]     Q Okay. And did you take any action in that regard?
[9]     A I don't know if I put anything in writing. I did [10] have the
supervisor call Colleen and I mentioned that she [11] would have
to have a doctor's note saying she could return [12] to work full
duty. And that because of, I think it was [13] around the time that
he, Mr.Reynoso was still on probation; [14] I still had to keep them
separated.
[15] And I think in one of the doctor's notes, I think [16] it was
before or after or during, the doctor even said she [17] should be
at a different facility and I had the supervisor, [18] I put it in writing,
that I can't remember, but we contacted [19] Colleen,
Ms.O'Donnell and offered to place her at the camp.
[20] And she agreed to it verbally.
[21]    Q I we talking about in June of 2003 right now?
[22]    A I'm, I'm–
[23]    Q You're not sure?
[24]    A I'm not sure of the timeframe. I do know she [25] didn't
want to come back to work. I offered her the camp.

Page 104

[1] Verbally she agreed to the camp and then she rescinded.
[2] She did not want to go to the camp.
[3]     Q Okay.
[4]     A I don't know if it was in June. I don't know if [5] it was in
July. The timeframe, I–
[6]     Q Okay. Let me just say that for the following [7] questions
okay?
[8] You already stated that Ms.O'Donnell was twice [9] AWOL,
correct?
[10]    A Yes.
[11]    Q You testified to that already. And if I suggest [12] to you
that her first AWOL was from February 3, 2003 through [13] June
10, 2003, would that comport with your recollection of [14] the
event?
[15] Does that time line ring any bells for you?
[16]    A Right around that given time, yes, based upon that [17] I
was not receiving any medical updates.
[18]    Q Okay. But those are the dates?
[19]    A I don't know if they were the exact dates
[20]    Q Okay.
[21]    A But right around that timeframe, you're correct.
[22]    Q Okay. And then you received some kind of notice
[23] that she wants to return to work?
[24]    A Correct.
[25]    Q And if I suggest to you that Ms.O'Donnell

## Page 105

[1] returned to work on June 11, 2003, does that comport with
[2] your memories of that timeframe?
[3]    A  No. I don't know when she came back to work.
[4]    Q  Okay.
[5]    A  The exact day or month.
[6]    Q  Do you recall an incident where there was
[7] vandalism to the mailroom?
[8]    A  Yes.
[9]    Q  And do you recall that was approximately five days
[10] after Ms.O'Donnell's return to work?
[11]    A  It was rather a short period of time. She came [12] back
to work. Whether it was five days, but it did happen, [13] yes.
[14]    Q  And the vandalism on the mailroom, strike that. [15] What
was the vandalism on the mailroom?
[16]    A  The vandalism was pornography. The exact wording,
[17] I can't remember the exact wording. It was very
[18] pornography-type wording towards Ms.O'Donnell.
[19] The exact words now, I couldn't tell you the exact [20] words.
[21]    Q  Okay. And was Ms.O'Donnell upset or emotionally
[22] distressed over this incident?
[23]    A  Yes.
[24]    Q  And you, in fact, granted her administrative leave
[25] because of that incident?

## Page 106

[1]    A  Yes.
[2]    Q  Did you then, do you recall whether you received [3] an
additional doctor's note from Ms.O'Donnell again taking [4] her out
of work?
[5]    A  Yes.
[6]    Q  Did Ms.O'Donnell ever provide you with further
[7] medical documentation following that incident?
[8]    A  I don't recall. I'm sorry.
[9]    Q  Okay. Did, you already testified that you gave [10] her
administrative leave because of that event?
[11]    A  Yes.
[12]    Q  And do you recall whether she applied for any [13] other
type of leave?
[14] Whether it be leave without pay or advanced sick [15] leave
because of that event?
[16]    A  I believe she applied for leave without pay.
[17]    Q  And did you grant that request?
[18]    A  No.
[19]    Q  And why not?
[20]    A  Because again, I think, well, I requested [21] additional
medical documentation.
[22]    Q  And she did not provide it to you?
[23]    A  I don't recall if she did or she didn't.
[24]    Q  Okay. Well if she had provided it to you, would [25] you
have granted her leave without pay?

## Page 107

[1]    A  I don't know. I would have to see the doctor's [2] note.
[3]    Q  Okay.
[4]    MR. WILMOT: Would this be a good time to take a [5] quick
break?
[6]    MS. MCDONALD: It would be a really good time so I [7] can
straighten out my documents.
[8]    MR. WILMOT: Okay. Thanks.
[9]    (Off the record at 1:58 p.m.)
[10]    (On the record at 2:07 p.m.)
[11]    BY MS. MCDONALD:
[12]    Q  What was you understanding of the accommodation
[13] that Ms.O'Donnell and her attorney was requesting?
[14]    A  At which time?
[15]    Q  At any time.
[16]    A  Well throughout the ordeal, was the removal of
[17] Mr.Reynoso and she could come back to work.
[18]    Q  Okay. The removal of Mr.Reynoso. What did you
[19] take that to mean?
[20]    A  The removal. The termination. To get, to remove [21] him
from the institution.
[22]    Q  Could he have been transferred to another
[23] institution?
[24]    A  No.
[25]    Q  You don't have the authority to transfer staff?

## Page 108

[1]    A  Well an investigation has not been completed. I [2] think
he is innocent until proven guilty at this point.
[3]    Q  Okay. Well, Ms.O'Donnell didn't get an attorney [4] until
long after -
[5]    A  Okay.
[6]    Q  The incident, right?
[7]    A  Okay.
[8]    Q  And the investigation and his discipline was [9] following
his court date, right?
[10]    A  Correct.
[11]    Q  And at his court date, he pled to sufficient facts [12] for
finding of guilty, correct?
[13]    A  Correct.
[14]    MR. WILMOT: Objection.
[15]    A  Correct.
[16]    Q  And the investigative report indicates that
[17] Mr.Reynoso admitted to kicking Ms.O'Donnell, correct?
[18]    A  Correct.
[19]    Q  I forgot where I was going with this line of
[20] questioning. Okay. Then her doctor gives you a note
[21] following his plea saying that she is disabled and has post
[22] traumatic stress disorder and can't come to work, correct?
[23]    A  Yes.
[24]    Q  At some point, she obtains an attorney?
[25]    A  Correct.

## Page 109

[1]    MR. WILMOT: Objection.

[2]    Q And then either she or he begin requesting

[3]    "reasonable accommodations"?

[4]    MR. WILMOT: Objection.

[5]    BY MS. MCDONALD:

[6]    Q Do you recall that?

[7]    MR. WILMOT: Objection. You can answer.

[8]    THE WITNESS: Yes.

[9]    BY MS. MCDONALD:

[10]    Q I'm sorry. I'm so tired. The questions are not [11] coming out very well.

[12]    At that time, between subsequent to Officer [13] Reynoso pleading, making his plea, and Ms.O'Donnell being [14] out of work for medical reasons in or about January, [15] February of 2003--?

[16]    A Okay.

[17]    Q What was the accommodation being requested at that [18] time?

[19]    MR. WILMOT: By whom are we talking about?

[20]    MS. MCDONALD: By either Ms.O'Donnell or her [21] attorney.

[22]    THE WITNESS: Around that time, I took the request [23] of accommodation to come back to work form Ms.O'Donnell. [24] The issue, I could do the best I could to accommodate her [25] and Mr.Reynoso.

## Page 110

[1] I mean, I couldn't do, I had no other options but [2] to keep them separated.

[3]    BY MS. MCDONALD:

[4]    Q Did Mr.Reynoso have a disability?

[5]    A Not that I'm aware of.

[6]    Q Okay. Did he make any requests for an [7] accommodation?

[8]    A No.

[9]    MS. MCDONALD: Let me show you this document.

[10]    (Exhibit No. 26 marked for [11] identification.)

[12]    THE WITNESS: Okay.

[13]    BY MS. MCDONALD:

[14]    Q Have you seen that document before?

[15]    A Yes.

[16]    Q And what is that document?

[17]    A It's a doctor's note indicating Ms.O'Donnell [18] suffers from post traumatic stress disorder. Totally [19] disabled. Unable to return to work. If Reynoso is not at [20] work premises at all, Ms.O'Donnell would be able to return [21] full-time without restrictions.

[22]    Q And what is the date of this note?

[23]    A Up on top? 1-8-03.

[24]    Q Okay. And does this, do you recall whether this [25] was the first doctor's note that you received for

## Page 111

[1] Ms.O'Donnell?

[2]    A No.

[3]    Q This is one of the two or three that you received, [4] right?

[5]    MR. WILMOT: Objection. You can answer.

[6]    THE WITNESS: I don't know how many doctor's notes [7] that I did receive. Every doctor's note that I receive, I [8] looked at it and reviewed it and made a decision on it. [9] This is just one of, I can't tell you, how many doctor's [10] notes I receive.

[11]    BY MS. MCDONALD:

[12]    Q In this doctor's note, does he say that Officer [13] Reynoso or Colleen's assailant as he calls him, has to be [14] terminated does it?

[15]    A No.

[16]    Q Okay. So following the vandalism on the mailroom [17] incident, you already discussed that Ms.O'Donnell was [18] again, out of work?

[19]    A Correct.

[20]    Q At some point following her absence, did she again [21] request to come back to work?

[22]    A I can't recall.

[23]    Q Well you didn't order her to come back to work, [24] did you?

[25]    A No.

## Page 112

[1]    (Pause)

[2]    (Exhibit No. 27 marked for [3] identification.)

[4]    MS. MCDONALD: I am going to show you a document.

[5]    THE WITNESS: Yes I know this document.

[6]    BY MS. MCDONALD:

[7]    Q And what is this document?

[8]    A It's a document from me to Colleen O'Donnell to [9] you; cc'd you November 18th, outlining a job site for her to [10] work at. It's also advising her that she could go to the [11] staff dining hall, free to go around the institution, and [12] enter the main institution and I put in a time limit to go [13] to work, or excuse me, to go the staff dining room.

[14]    Q Okay.

[15]    A And that you can work overtime.

[16]    Q What's the date of this document?

[17]    A November 18, 2003.

[18]    Q When you state in the first paragraph that's this [19] is a response to your first message of November 12th, where [20] she informed you that she would like to return to work. [21] Does that refresh your memory as to when she asked [22] to come back to work?

[23]    A That is correct.

[24]    Q And you received a note from her doctor releasing [25] her to full-time duty without any restrictions.

Page 113

[1]  Is that correct?

[2]  A Yes.

[3]  Q And you assigned her to the camp. Is that right? ·

[4]  A That's correct.

[5]  Q And you state in approximately the middle of the

[6]  second paragraph, in an effort to facilitate the orderly

[7]  running of the institution while still allowing Mr.Reynoso [8] to

comply with the terms of the order of protection, per [9] your

agreement, you will be reassigned as camp officer upon [10] your

return.

[11] Do you see that?

[12]  A Yes.

[13]  Q But what agreement did Ms.O'Donnell make with you

[14] that she would be assigned to the camp?

[15]  A There was a phone call made by her supervisor,

[16] Mr.Gagnon asking her or requesting her however how he

[17] mentioned, again, I advised him that if she was willing to

[18] come back to work, you know, to have Mr.Gagnon call her

and [19] see if she would go to camp and at that particular time,

she [20] did agree to go to the camp.

[21]  Q And why did you want to assign her to the camp?

[22]  A I have, I don't know. It was a different [23] facility. She

was out of, well, when I say I don't know, my [24] recollection of

this event is Ms.O'Donnell had been out of [25] work for a period

of time.

Page 114

[1]  Mr.Reynoso is on a job inside the institution, if [2] I remember

correctly.

[3]  Q On a job?

[4]  A Inside.

[5]  Q A specific assignment, do you mean?

[6]  A Well, he was working inside. Either the mailroom [7] or he

could have been working here at the time. I don't [8] recall where

his job assignment was.

[9]  Fifty yards from this institution is the camp. [10] That's why I

offered her the camp.

[11] I couldn't offer her the mailroom. This is after [12] the incident

in the mailroom, if I'm not mistaken.

[13]  Q And when Ms.O'Donnell returned to work was she,

[14] in fact, placed at the camp?

[15]  A I don't recall. I don't remember that.

[16]  Q Okay. I think I already asked you this but do you

[17] have the authority to transfer a staff member to another

[18] institution?

[19]  A No.

[20]  Q Who has the authority to do that?

[21]  A That would have to go through the Regional [22] Director

for approval.

[23]  Q Okay. Did you put restrictions on Ms.O'Donnell [24] with

regards to signing up for overtime?

[25]  A At the beginning or the end?

Page 115

[1]  Q At any time.

[2]  A I put restrictions on both of them to start out [3] with. I

wouldn't say restrictions, I would say limitation [4] duties to make

sure that fifty yard restraining order was in [5] effect and then later

on, they were lifted.

[6]  Q Why did the restrictions have to be put on both of

[7] them?

[8]  Why not just put the restrictions on Officer [9] Reynoso?

[10]  A I felt only, it was put on Reynoso, but I felt [11] that both

staff members had an obligation to keep that fifty [12] yard

distance.

[13] Both of them were aware of the restraining order. [14] I felt

you know, it was only fair that both of them should [15] ·abide by

that restraining order.

[16] It's both responsibility in my mind that if either [17] one came

into contact with one another within that fifty [18] yards, they

needed to report it.

[19]  Q So you believe that Colleen was responsible for

[20] ensuring that the restraining was enforced?

[21]  A No. I believe she had an obligation that she was

[22] aware of the restraining order. That if she did come in

[23] contact, I couldn't guarantee a fifty yard distance no

[24] matter if I put them in the mailroom, the camp or the

[25] institution.

Page 116

[1]  I couldn't guarantee. I could just do the best [2] job I could of

implementing that restraining order. But I [3] couldn't stop one or

the other party from bumping into one [4] another for whatever

reason and I felt a staff person, each [5] staff person has an

obligation and that they both knew what [6] the restraining order

was.

[7]  So in making decisions on jobs, my job is to make [8] sure

everybody is safe and that is what I felt most [9] comfortable with.

[10]  Q So you could never ensure that the restraining [11] order

would be complied with. You could only do the best [12] that you

could?

[13]  A That's correct. I couldn't stop one of them from

[14] bumping into one another. If they chose to do that.

[15]  (Exhibit No. 28 marked for [16] identification.)

[17]  MS. MCDONALD: Okay. Let me show you this.

[18]  THE WITNESS: Okay.

[19]  BY MS. MCDONALD:

[20]  Q Do you recall that document?

[21]  A Yes I do.

[22]  Q What is that document?

[23]  A The, it was a memo to Colleen and there was a memo

[24] to Reynoso. This memo is to Colleen, indicating that the

[25] Abuse and Prevention Order against David Reynoso was

vacated

Page 117

[1] and that accordingly, all parties involved would now be
[2] placed on regular duty status.
[3] There would be no further accommodations regarding [4] this
matter.
[5]    Q And what is the date of this letter?
[6]    A April 23, 2004.
[7]    Q And what was the date that the Abuse and [8] Prevention
Order was vacated?
[9]    A I don't have it in front of me. I don't know.
[10]    Q In the first line?
[11]    A Oh, okay. On April 27th.
[12]    Q 2004?
[13]    A 2004.
[14]    Q So from April 9 of 2002 through April 22, 2004,
[15] Officer Reynoso was subject to an Abuse Prevention Order, a
[16] restraining order?
[17]    A That's correct.
[18]    Q And once that restraining order was lifted, there [19] were
no further accommodations made concerning this matter?
[20]    MR. WILMOT: Objection. You can answer.
[21]    THE WITNESS: Not that I'm aware of.
[22]    MS. MCDONALD: Okay. I think I'm almost done. If [23] you
want to take a five minute break to see if I've got [24] anything
else?
[25]    MR. WILMOT: Is that what - okay.

Page 118

[1]    MS. MCDONALD: Okay.
[2]    (Off the record at 2:29 p.m.)
[3]    (On the record at 2:42 p.m.)
[4]    BY MS. MCDONALD:
[5]    Q Was there an investigation conducted when
[6] Ms.O'Donnell returned to work in November 2003 in regard to
[7] her AWOL?
[8]    A Yes.
[9]    Q And who conducted that investigation?
[10]    A I'm not sure.
[11]    (Exhibit No. 29 marked for [12] identification.)
[13]    MS. MCDONALD: Okay. Let me show you this
[14] document.
[15]    THE WITNESS: Okay.
[16]    BY MS. MCDONALD:
[17]    Q Do you recognize that document?
[18]    A Yes.
[19]    Q What is that document?
[20]    A It's a proposal for a thirty day suspension for
[21] excessive, unauthorized absence, failure to follow leave
[22] procedures.
[23]    Q To Ms.O'Donnell?
[24]    A Correct.
[25]    Q And what is the date of–

Page 119

[1]    A April 20, 2004 and she signed on it on April 19, [2] 2004.
[3]    Q Okay. And you received this proposal?
[4]    A I received
[5]    Q Did you receive this proposal?
[6]    A Yes.
[7]    Q And did Ms.O'Donnell respond to this proposal?
[8]    A Yes she did.
[9]    Q Did you take into account her response in
[10] determining what discipline she should be administered?
[11]    A Yes.
[12]    (Exhibit No. 30 marked for [13] identification.)
[14]    MS. MCDONALD: Let me show you this document.
[15]    THE WITNESS: Okay.
[16]    BY MS. MCDONALD:
[17]    Q And do you recognize this document?
[18]    A Yes.
[19]    Q And what is this document?
[20]    A This is Notice of Proposed Suspension Notification
[21] that I give staff that I considered the case and that – [22] It's a
decision letter.
[23]    Q And what was your decision with regard to
[24] Ms.O'Donnell's AWOL charges?
[25]    A Ms.O'Donnell brought up, my decision was based on

Page 120

[1] Ms.O'Donnell's response to me which was she had a medical
[2] condition that she did not want staff to be aware of and I
[3] told her that if she could provide me medical documentation,
[4] I would take that into consideration and be held [5] confidential
and she brought in the doctor's note. It was [6] held confidential.
[7] That's what I took into consideration and that's [8] why I gave
her the letter of reprimand instead of the thirty [9] day suspension.
[10]    Q So she readily provided you with medical
[11] documentation when you discussed the issue with her?
[12]    A At that particular time, yes.
[13]    Q And did she relate to you that she had been [14] advised
not to provide medical documentation previously?
[15]    A I don't know if it was during that period of time. [16] She
did mention that she, I think it was during that time, [17] that she
said got bad advice from her attorney.
[18]    Q Not me, right?
[19]    A Mr.Rizzitelli. Let's clarify that.
[20]    MS. MCDONALD: Thank you.
[21]    (Exhibit No. 31 marked for [22] identification.)
[23]    THE WITNESS: Okay.
[24]    BY MS. MCDONALD:
[25]    Q Do you recognize that–

**Page 121**

[1]   A Yes.

[2]   Q Document?

[3]   A Yes.

[4]   Q And what is that document?

[5]   A This is just to notify her that my decision in, to [6] let her know what my decision was in writing and to close [7] out the case.

[8]   Q And is this her actual letter of reprimand that [9] was placed in her personnel file?

[10]   A Yeah, uh, I don't know.

[11]   Q It says that a copy of this letter will remain in [12] her personnel file.

[13]   A Is it there or not, I don't know. I'm sorry.

[14]   Q Oh, that's okay. Maybe I wasn't clear. I just [15] wanted to know if this was the actual discipline letter?

[16]   A This should be the actual discipline letter.

[17]   Q So there was no suspension, there was simply this [18] letter placed in her file?

[19]   A That's correct.

[20]   MS. McDONALD: Okay. I'm done.

[21]   EXAMINATION BY MR. WILMOT:

[22]   Q Okay. I've just got a couple of questions. You

[23]   testified earlier begin as Warden in December of 2002,

[24]   correct?

[25]   A No.

**Page 122**

[1]   Q When did you begin as Warden, I'm sorry, of FMC

[2]   Devens?

[3]   A December 2000.

[4]   Q 2000, sorry. Did you actually hire Officer [5] Reynoso?

[6]   A No.

[7]   Q He was here before you began as Warden?

[8]   A Yes.

[9]   Q Jumping forward to the April 8, 2002 incident. [10] You testified that you changed Officer Reynoso and

[11] Ms.O'Donnell's work schedules.

[12] Do you remember that testimony?

[13]   A Yes.

[14]   Q Can you state again why you changed their

[15] schedules?

[16]   A The reason I changed their schedules was when I

[17] received the restraining order and the alleged assault,

[18] that's when I decided I had to separate both parties from

[19] different job areas or different job sites.

[20]   Q Do you remember what you changed Ms.O'Donnell's

[21] schedule to?

[22]   A Ms.O'Donnell was working day shift and so I

[23] changed her schedule by half an hour.

[24]   Q Do you know to what times?

[25]   A I think if I recall correctly she worked from 7:00

**Page 123**

[1] to 3:30 and I changed Mr.Reynoso's schedule, he was working

[2] day shift. I moved him to day shift to night shift. Night [3] shift from 4:00 to 12:00.

[4]   Q I am going to show you what has been previously

[5] identified by Ms.O'Donnell in her deposition. This is [6] Exhibit No. 29.

[7] Do you recognize that document?

[8]   A Yes I do.

[9]   Q And can you identify what it is.

[10]   A It's changing of the schedule. And actually I

[11] changed it in accordance with this document.

[12] She was working Monday through Friday shift, but I [13] did change the time from 6:00 a.m. to 2:30 p.m.

[14]   Q Okay. So based on this document, it shows that

[15] Ms.O'Donnell's schedule was changed to that, 6:00 to, I'm

[16] sorry?

[17]   A 2:30 p.m.

[18]   Q To 2:30. Okay. And does that document state

[19] anything else as to limitations or changes with regard for

[20] assignment you made?

[21]   A Yes it does.

[22]   Q What else does it say?

[23]   A It states that if you plan to work outside these [24] hours for any reason, overtime, you must notify your [25] supervisor prior to working.

**Page 124**

[1] You are not to contact in person or telephonically [2] or associate with David Reynoso, Intelligence Officer at any [3] time.

[4] The schedule will remain in effect until further [5] notice.

[6]   Q Okay. So, anything else in this document that you [7] - any changes that you made to Ms.O'Donnell's assignment.

[8]   A No.

[9]   Q Okay. So based on that document, in your memory,

[10] the only changes you made to Ms.O'Donnell's assignment

[11] here [11] at FMC Devens, was with regard to her schedule and her

[12] requirement to notify supervisors that when she wanted to

[13] perform overtime work.

[14]   A That's correct.

[15]   Q Do you also, did you also limit her to work in the

[16] mailroom?

[17]   A Yes.

[18]   Q Does that letter state that?

[19]   A Yes.

[20]   Q Okay. So the changes you made with regard to

[21] Ms.O'Donnell was that one, she had to continue to work in

[22] the mailroom, the changes in her time as you said, the half

[23] hour change and that she had to notify supervisors when she

[24] wanted to work overtime?

[25]   A That is correct.

**Page 125**

[1]   Q Anything else, any other restrictions or [2] limitations that
you - or changes that you placed on [3] Ms.O'Donnell's work here
at FMC Devens?
[4]   A No.
[5]   Q Did her pay change in any way?
[6]   A No.
[7]   Q Did her access to certain benefits change in any [8] way?
[9]   A No.
[10]   MR. WILMOT: Okay. Could you mark this? I am [11] going
to show you what has been marked as Winn Exhibit No. [12] 33.
[13]   (Exhibit No. 33 marked for [14] identification.)
[15]   BY MR. WILMOT:
[16]   Q Do you recognize that document?
[17]   A Yes.
[18]   Q Can you identify what it is?
[19]   A It's a letter to Mr.Reynoso regarding his [20] schedule
and assignment.
[21]   Q And does that document - any changes, if any, [22] that
you made with regard to Mr.Reynoso's work here at FMC
[23] Devens?
[24]   A Yes.
[25]   Q Can you identify for me what changes were made to

**Page 126**

[1] Mr.Reynoso's work at FMC Devens that are documented in that
[2] Exhibit No. 33?
[3]   A At the time of the incident, he was working day [4] shift. So
I changed him from day shift to evening shift.
[5]   Q Until what time?
[6]   A His day shift was, could have been 7:30 to 4:00 or [7] 8:00
to 4:00. His, I don't know what his days off were at [8] the time but
I put him on a Monday through Friday schedule [9] from 4:00 p.m.
to 12:00 p.m. and also not to arrive at the [10] institution prior to
3:30 p.m.
[11] He would not be permitted to work an armed post [12] until
resolution of the pending criminal charges against [13] him.
[14] If he planned to work outside these hours of [15] overtime
again, he would have to notify his supervisor prior [16] to the shift.
[17] He wasn't to contact in person or telephonically [18] or
associate with Colleen O'Donnell at any time.
[19]   Q Okay. Would it be a fair statement for me to make
[20] that other than the limitations on their physical location
[21] here at FMC Devens, that the changes that you made with
[22] regard to Mr.Reynoso and Ms.O'Donnell's work here at FMC
[23] Devens was identical?
[24]   A Yes.
[25]   Q Okay. And just to refer back to Colleen Exhibit

**Page 127**

[1] No. 29, anywhere in this letter does it say that [2] Ms.O'Donnell
was prevented from working overtime?
[3]   A No.
[4]   Q Okay. What were the effective dates of or - [5] well, let me
break them up.
[6] What was the effective date of Ms.O'Donnell's, [7] the changes
to Ms.O'Donnell's work here at FMC Devens?
[8]   A April 15, Monday, April 15, 2002.
[9]   Q What was the effective date of the changes to
[10] Mr.Reynoso's work here at FMC Devens?
[11]   A Monday, April 15, 2002.
[12]   Q Now the incident occurred on April 8, 2002. [13] Correct?
[14]   A Correct.
[15]   Q Why was there - what happened in between or [16] strike
that.
[17] Why didn't the changes go into effect immediately, [18] I
guess, after April 8, 2002 or it looks like there's about [19] a week
lapse in time?
[20]   A Both of them were given either annual leave or
[21] administrative leave until that particular day of Monday, or
[22] their days off coincided with the admin leave or regular
[23] leave.
[24] Therefore, I knew both of them would not come to [25] the
institution and the Workplace Violence Committee had met

**Page 128**

[1] and the investigation had been forwarded.
[2] The restraining order was received and I knew [3] basically the
facts of the case and I knew I had some time [4] to devise a plan to
make it safe for both individuals to [5] come into the institution and
that was the date that they [6] came back to work.
[7]   Q Okay. So just so I'm clear, is it your testimony [8] that after
April 8, 2002, neither Mr.Reynoso or [9] Ms.O'Donnell returned to
work that work week?
[10]   A That is correct. That I'm aware of.
[11]   Q And they both returned back to work, returned back
[12] to duty on April 15, 2002?
[13]   A That's correct.
[14]   Q When they returned back to work on April 15, 2002,
[15] is that the date that these changes to their work began?
[16]   A That is correct.
[17]   Q So when, for example, Mr.Reynoso returned back to
[18] work on April 15, 2002, he returned to this new shift?
[19]   A That is correct.
[20]   Q Okay. When you made the decision to change
[21] Ms.O'Donnell's work schedule by the half hour as you
[22] testified, and to limit her to the mailroom and required her
[23] to notify her supervisor if she wanted to work overtime, was
[24] her sex or gender a factor in that decision?
[25]   A No.

### Page 129

[1]  Q Okay. Now you gave some testimony before. I'll [2] just
see those exhibits there. Thank you.

[3]  You gave some testimony before about the Workplace

[4]  Violence Committee.

[5]  Do you remember that testimony?

[6]    A Yes.

[7]    Q And you said then that you received [8] recommendations
from them and that thereafter, you received [9] the Protective
Order.

[10]  Do you remember that testimony?

[11]    A Yes.

[12]    Q Let me show you what you have already testified to

[13] and has been marked as Exhibit 4 and 5.

[14]  Just bring your attention first to Exhibit 5 which [15] you
identified earlier as the first recommendations from the

[16] Workplace Violence Committee that was convened after this

[17] April 8, 2002 incidence.

[18]  Do you know when you received this memo?

[19]    A This memo?

[20]    Q Exhibit 5, yes?

[21]    A That morning.

[22]    Q That morning. Which morning would that be?

[23]    A On April 9, 2002.

[24]    Q And the second memo that you identified which has

[25] been marked as Exhibit 4 and it's the second memo from the

### Page 130

[1]  Workplace Violence Committee, do you know when you
received [2] that memo?

[3]    A April 9, 2002.

[4]    Q So you received them both on the same day?

[5]    A Right. Yes.

[6]    Q Now do you know whether or not the Workplace

[7]  Violence Committee had in its possession or was aware that

[8]  there was a protective order entered with regard to

[9]  Ms.O'Donnell and Mr.Reynoso?

[10]    A At this time when I received these, no.

[11]    Q Okay. So they did not have the restraining order?

[12]    A No. But if I had them, they would have received; [13] the
committee would have received the restraining order.

[14]    Q So they made these recommendations to you not

[15] knowing there was a restraining order issued with regard to

[16] Ms.O'Donnell and Mr.Reynoso?

[17]    A That's correct.

[18]    Q Okay. All right. Let me show you that has been

[19] previously identified by Ms.O'Donnell and you identified

[20] the same document here today. In the O'Donnell deposition,

[21] it is Exhibit 27.

[22]  And this is the restraining order that you [23] testified to that
was issued on April 9, 2002.

[24]  Were there, can you identify for me whether or not [25] on that
order, the Court, strike that.

### Page 131

[1]  There's some handwritten language here on the [2] order.

[3]  Do you see that?

[4]    A Yes.

[5]    Q What does that say?

[6]    A You may lawfully attend work but must remain fifty

[7]  yards from the plaintiff.

[8]    Q Okay. So what was your understanding of that

[9]  statement when you read it?

[10]    A That Mr.Reynoso could return to work. But must

[11] remain fifty yards from Ms.O'Donnell.

[12]    Q when you decided to change the schedules of

[13] Ms.O'Donnell and Mr.Reynoso in the way that you did make

[14] the changes, did you do that, did you make that decision

[15] before or after you received the restraining order from the

[16] Court?

[17]    A I made that decision when I received that [18] restraining
order.

[19]    Q Okay. You also testified before as to, you stated

[20] before that an investigation of an incident like this would

[21] not occur until after adjudication.

[22]  Why is that?

[23]    A The investigation would be initiated until after [24] the
adjudication based upon if the person was found [25] innocent,
then we would have to – if he was found guilty

### Page 132

[1]  during the investigation but then found innocent at the

[2]  Court hearing, we would have to go back and provide back

[3]  pay [3] and benefits to that employee.

[4]  So the Bureau waits until after adjudication and [5] the final
disposition in the Court hearing before initiating [6] an
investigation.

[7]    Q Okay. Now it wasn't until almost the following, [8] the
beginning of the next year that the investigation [9] started.

[10] Is that correct?

[11]    A That's correct.

[12]    Q And you just stated as to why the Bureau waits [13] until
after the adjudication.

[14]  Was that delay in the beginning of the [15] investigation, did it
have anything to do with the fact that [16] Ms.O'Donnell is a
woman?

[17]    A No.

[18]    Q Okay. Now you identified previously some memos

[19] that you received from Ms.O'Donnell.

[20]    (Pause)

[21]  And they're marked as Exhibits 15 and 16. Exhibit [22] 15 is
the memo you identified from Ms.O'Donnell's that's [23] dated May
13, 2002 and Exhibit 16 is the memo you identified [24] from
Ms.O'Donnell dated June 10, 2002. Both which you said [25] that
at some point, you received as you became aware of.

**Page 133**

[1]  After this second memo, Exhibit 16, June 10, 2002, [2] did
Ms.O'Donnell ever complain to you again about the fact [3] that
she was working at the Bureau and Mr.Reynoso was still
[4] employed and allowed to work here at the Bureau of Prisons?
[5]   A No.
[6]   Q Did she ever complain after this June 10, 2002 [7] memo
about the conditions under which she had to work?
[8]   A No.
[9]   Q Did you here anything else from Ms.O'Donnell [10] after
this memo concerning this incident or you know, the
[11] circumstances surrounding she and Mr.Reynoso?
[12]   A No, I, not me. She never said anything to me.
[13]   Q Okay. Do you remember when you next heard any
[14] additional, anything new or any new complaints or issues
[15] arising out of the situation between she and Mr.Reynoso?
[16] The next time?
[17]   A The only other complaint was everything was going
[18] fine. The situation was going fine. The only other
[19] complaint was the mailroom incident in June. I think it was
[20] June.
[21]   Q The mailroom incident?
[22]   A Yeah.
[23]   Q What do you mean the mailroom incident?
[24]   A Where there was righting on the wall.
[25]   Q All right.

**Page 134**

[1]   A She didn't approach me about it. But there were
[2] rumors that she was accusing Reynoso of doing that.
[3]   Q Well, that didn't happen the same year as the [4] incident,
correct?
[5]   A Right.
[6]   Q And prior to the mailroom incident as you call it, [7] and I
think you gave some testimony to this.
[8] Before that, you did have the issue of when there [9] was a
hearing with regards to Mr.Reynoso, correct?
[10]   A I'm sorry. Repeat the question.
[11]   Q Was there a hearing with regards to Mr.Reynoso
[12] about the allegations that Ms.O'Donnell made that he kicked
[13] by Mirror Lake?
[14]   A Was there a hearing?
[15]   Q correct. Let me show you a document here. I am
[16] going to show you what has been previously identified as
[17] Exhibit 37.
[18] Ms.O'Donnell identified that document at her [19] deposition
and it identifies that on January 3, 2003 that [20] there was a
hearing on the charges that were filed against [21] Mr.Reynoso?
[22]   A Correct, there was a hearing.
[23]   Q Okay. So in answer to my question, the memo that [24] is
marked as Exhibit 16 which is June 2002, between the time [25] of
this memo and this hearing which occurred in January

**Page 135**

[1] 2003, did you hear anything from Ms.O'Donnell direct or
[2] indirectly, concerning the circumstances surround she and
[3] Mr.Reynoso working here at FMC Devens?
[4]   A No.
[5]   Q And how did you become aware of the hearing
[6] concerning the charges against Mr.Reynoso?
[7]   A Rumors were flowing around the institution. I [8] know
there was a hearing date. And I got the final [9] disposition through
my, not my, but the Bureau's attorney [10] requesting the Court
document which we had to pay for.
[11]   Q And when did you learn of the disposition of the
[12] charges against Mr.Reynoso?
[13]   A I'd have to, well, it was that day or the day [14] after.
[15]   Q Okay.
[16]   A I don't know the exact date.
[17]   Q Okay. Now after that incident, or after that [18] hearing
on January 3, 2003, did you speak to Ms.O'Donnell [19] around
that time?
[20]   A Not that I recall. No.
[21]   Q Was Ms.O'Donnell working at that time? January [22] 3,
2003?
[23]   A No.
[24]   Q Where was she?
[25]   A She had been on leave without pay, sick leave,

**Page 136**

[1] annual leave or day off.
[2]   Q The day of the incident, I mean, the day of the
[3] hearing?
[4]   A Correct. To the best of my knowledge.
[5]   Q And did she return to work at some, soon [6] thereafter or
the day after the hearing, was she back here [7] at work?
[8]   A I don't remember seeing Colleen O'Donnell that [9] week.
[10]   Q The week of the hearing?
[11]   A Right.
[12]   Q Okay. Let me show you what has been previously
[13] identified in Colleen's deposition as Exhibit 39. The
[14] January 8, 2003 letter from you to her.
[15] Do you recognize that document?
[16]   A Yes.
[17]   Q And what are you stating in that letter?
[18]   A I'm stating that effective Monday, January 13, [19] 2003;
you will be assigned you regular duties at ISM.
[20] Your scheduled duties will be Monday through [21] Friday,
9:30 a.m. to 6:00 p.m. If you plan to work outside [22] these hours
for any reason, you must notify your supervisor [23] in advance.
[24] This schedule and restrictions will remain in [25] effect until
further notice.

Page 137

[1] Q Now there's a blank line there for a signature. [2] Whose
signature was that line made for?
[3] A For Ms.O'Donnell.
[4] Q I notice it's blank. Do you know if this letter [5] was
communicated to Ms.O'Donnell, delivered to her, sorry?
[6] A I don't know if it was delivered or not. She [7] received this
letter.
[8] Q Okay. If I told you that Ms.O'Donnell had [9] testified that
after the hearing on January 3, 2003, she did [10] not return back
to work.
[11] Would that comport to your memory or refresh your
[12] memory as to what happened at that time?
[13] A On January, was it January 3rd?
[14] Q Mm-hmm.
[15] A I don't know if she reported back to work or not. [16] I
don't recall.
[17] Q Okay. I am going to show you what has been
[18] previously identified as Colleen Exhibit No. 40.
[19] It is an exhibit in your deposition today. I just [20] can't find it
at this time. But Colleen's Exhibit No. 40 is [21] a – she previously
identified as well as I believe you did, [22] a January 8, 2003 note
from Dr.George Milowe?
[23] A Okay.
[24] Q Now does that refresh your memory whether or not
[25] Colleen was working or was out of work early January 2003?

Page 138

[1] A Well, according to this memo or according to this
[2] doctor's note she was unable to work and it was dated
[3] January 8, 2003. So given that period of time, she was not
[4] able to work. So she couldn't have been at work.
[5] Q Okay. I found the exhibit that I wanted to refer [6] to that
was introduced today. The one you just referred to [7] was Colleen
Exhibit No. 40 which is the same as your Exhibit [8] No. 27.
[9] You also gave testimony as to Exhibit 19. There [10] was some
confusion as to what was the first doctor's note [11] that you
received concerning Ms.O'Donnell.
[12] On Exhibit No. 27, can you identify what the date [13] is of
that note?
[14] A January 8, 2003.
[15] Q And what is the date on Exhibit No. 19?
[16] A January 31, 2003.
[17] Q Okay. Does that refresh your memory as to which
[18] note you received first?
[19] A I received this one first. The Exhibit 27 first.
[20] Q Okay. And what did you with Exhibit No. 27 when
[21] she received it?
[22] A What this note was given, if I'm not mistaken, to [23] a
staff psychiatrist on January 8, 2003 for interpretation.
[24] Q And who is that psychiatrist that you gave it to?
[25] A Dr.Fletcher.

Page 139

[1] Q Do you know if he responded to Colleen with [2] regards
to that note?
[3] A Did he respond or did I?
[4] Q Did you or anyone at your direction respond to
[5] Colleen with regards to that note dated January 8, 2003?
[6] A We responded requesting additional medical
[7] information.
[8] Q When you say we, can you identify who?
[9] A I can't remember.
[10] Q Okay. I am going to show you what is marked as
[11] Colleen Exhibit No. 41. I will present to you that Colleen
[12] identified that in her deposition.
[13] It's a memo from Steve Gagnon to her dated January [14] 9,
2003.
[15] A That's correct.
[16] Q Can you read that or have you read it?
[17] A I've read it.
[18] Q Okay. And that memo refers to a phone
[19] conversation with Ms.O'Donnell on January 9, 2003.
[20] A I, actually, well, Steve explained to her that I [21] wanted
more written, I wanted a release from her doctor so [22] our doctor
at the institution could speak to her doctor [23] regarding the
medical documentation received which was the [24] January 8th
one.
[25] The reason I wanted that, the reason was to

Page 140

[1] adequately address her, any accommodation or whatever that
[2] she requested.
[3] Q Okay. And what time does Steve Gagnon say that he
[4] spoke with Colleen requesting that additional information?
[5] A Approximately 8:45 a.m.
[6] Q Okay. Do you know what time you received the note
[7] from Ms.O'Donnell's doctor which was dated January 8, 2003?
[8] A I never received any note.
[9] Q The note that you identified as Exhibit 27?
[10] A Oh, when did I receive this note? January 8, [11] 2003.
[12] Q Do you remember what time of day you received
[13] that?
[14] A No, I don't recall the time of day.
[15] Q At the top of there, there is a fax line. Do you [16] see
that?
[17] A Yes.
[18] Q What is the time of the fax?
[19] A 18:20.
[20] Q What would that be in –
[21] A 18:20 has got to be around 6:20, is that right?
[22] Military time.
[23] Q 18:20 will be military time, right?
[24] MS. MCDONALD: Aren't you supposed to know that?
[25] THE WITNESS: This isn't military. Let's see.

## Page 141

[1]   MR. WILMOT: 6:20?
[2]   THE WITNESS: Yeah.
[3]   BY MR. WILMOT:
[4]   Q So Steve called her the next morning. What time [5] does
Steve get in in the mornings or what time did he get in [6] in the
morning at that time?
[7]   A He works day shift so I would assume 7:00, 7:30 to
[8] 4:00.
[9]   Q Okay. Let me show you what has been previously
[10] identified as Exhibit 42 in Ms.O'Donnell's deposition and I
[11] represent to you that Ms.O'Donnell identified that document
[12] as a letter from Cindy Lord to her dated January 9, 2003.
[13] Can you take a second to just read what that [14] document
says?
[15]   A Okay.
[16]   Q What does the first page of that document, what is [17] it
stating?
[18]   A Basically it's saying we're requesting [19] authorization to
contact the physician to release [20] information to us so we can
determine medical or physical [21] ability to safety perform
essential functions of her [22] position at ISM.
[23] And it says please sign and return attached [24] release letter
no later than January 15, 2003.
[25]   Q Okay.

## Page 142

[1]   A If you do not sign and return the release, we will [2] base
further decisions regarding your ability to safely [3] perform your
essential functions of your position on the [4] information that is
currently available and there is an [5] attachment for her to sign.
[6]   Q Okay. So after receiving the note from Dr.Milowe [7] on
January 8, 2003, Cindy Lord and Steve Gagnon contacted [8] her.
Gagnon verbally on the telephone and Cindy by letter [9] in
response to that note, correct?
[10]   A Correct.
[11]   Q And did they do so at your direction?
[12]   A Yes.
[13]   Q Okay. Do you know if Ms.O'Donnell responded to
[14] either, strike that.
[15] Do you know if Ms.O'Donnell provided the [16] information
sought by Steve Gagnon in that phone call that [17] he documents
soon after that conversation?
[18]   A No, we didn't receive any documentation.
[19]   Q Do you know if Ms.O'Donnell responded to
[20] Ms.Lord's letter dated January 9, 2003?
[21]   A No, she did not respond.
[22]   Q Okay. Now you gave some testimony earlier. Let [23] me
try to clear some of this stuff.
[24] Before I go there, let me show you what you [25] earlier spoke
about. This is Exhibit 19. You identified it

## Page 143

[1] as a letter from Dr.Milowe to Steve Gagnon?
[2]   A Correct.
[3]   Q Now that letter is from Colleen's doctor, correct?
[4]   A Correct.
[5]   Q Can you identify for me what accommodation the
[6] doctor claims Colleen needed in order to return back to
[7] work?
[8]   A Working in the same environment as her assailant
[9] merely intensifies her symptoms and does not give her a
[10] chance to heal. Common sense and good will would dictate
[11] that Ms.O'Donnell not be required to work in the same
[12] facility, at the same time as Mr.Reynoso.
[13] And then it goes on, she receives good therapy [14] from me
and sees a psychotherapist as well. However, [15] recovery is
unlikely until the two are separated and [16] Ms.O'Donnell is
allowed to go through the hearing process. [17] Until then she will
remain totally disabled.
[18]   Q I want you to focus on the second sentence of that
[19] paragraph. Particularly, the latter part. Where the doctor
[20] says Ms.O'Donnell, he says that she should not be made to
[21] work at the same facility at the same time as Mr.Reynoso.
[22] Do you see that?
[23]   A Yes.
[24]   Q Now, I understand that Ms.O'Donnell was out at [25] that
time but if she were back at work, would she have been

## Page 144

[1] working at the same facility, at the same time as
[2] Mr.Reynoso?
[3]   A No. Not in accordance with this doctor's note.
[4]   Q I'm sorry?
[5]   A No.
[6]   Q Not according to–?
[7]   A Well, number one, I couldn't, I couldn't separate [8] them
in accordance with this doctor's note. The same [9] facility.
[10]   Q Well, maybe you're not following me?
[11]   A Okay.
[12]   Q You had already made certain changes with regards
[13] to Mr.Reynoso and Ms.O'Donnell's work here at FMC Devens,
[14] correct?
[15]   A Correct.
[16]   Q And so the question is if Ms.O'Donnell was at [17] work
at this time, January 31, 2003, under what changes [18] would she
be working under had she been at work?
[19]   MS. MCDONALD: Objection.
[20]   BY MR. WILMOT:
[21]   Q Do you understand the question? I'll ask it a [22] different
way.
[23] If Ms.O'Donnell was working on January 31, 2003, [24] what
would have been her schedule?
[25]   A Her schedule would have been the same as

## Page 145

[1] initially. That I gave her initially.

[2]   Q Which was what?

[3]   A Working in the mailroom and Mr.Reynoso would have
[4] been working in an area in the institution or vis-a- versa. [5] It
could have changed but they both would have been working [6] in
the same facility.

[7]   Q If Ms.- you said Ms.O'Donnell would be in the
[8] mailroom. What times would she have been working?

[9]   A She would have been working 6:00 to 2:30.

[10]   Q And where would Mr.Reynoso have been working
[11] January 31, 2003?

[12]   A He would have been working in this facility on
[13] evening watch.

[14]   Q When you say this facility, what do you mean?

[15]   A The inside of the institution, away from the [16] mailroom.

[17]   Q What would his times have been?

[18]   A 4:00 to 12:00.

[19]   Q Okay. So if Ms.O'Donnell was working January 31,
[20] 2003, under the time and the locations which you just
[21] specified, would you agree with me that she would not have
[22] been working at the same facility at the same time as
[23] Mr.Reynoso?

[24]   A I would agree with that.

[25]   Q Okay.

## Page 146

[1]   (Pause)

[2] Now you gave some testimony as to – these letters [3] here.
Winn Exhibit 21 is a letter from Mr.Rizzitelli to [4] you dated
February 10, 2003.

[5] Winn Exhibit 22, is the same letter but there's [6] the watermark
or whatever you want to call it stating that [7] no response
received, resent February 18, 2003.

[8] And the last Winn Exhibit 23, same letter again, [9] with the
exception of the watermark stating no response [10] received,
resent March 3, 2003.

[11] Why didn't you respond to, well strike that. [12] Between the
time of February 10, 2003 which is Exhibit 21 [13] and Exhibit 22
which states that it was resent February 18, [14] why didn't you
respond to Mr.Rizzitelli's February 10, 2003 [15] letter in that
timeframe?

[16]   A Because I didn't have, the reason I didn't respond
[17] was because I didn't have written permission from Colleen to
[18] pass to, to provide information to Rizzitelli.

[19]   Q Okay. And then in the last letter, Exhibit 23, [20] between
the timeframe of February 18, 2003, the date of [21] Exhibit 23,
why didn't you respond to Mr.Rizzitelli's in [22] that timeframe?

[23]   A I had yet to receive permission to provide [24] Mr.Rizzitelli
information regarding Ms.O'Donnell.

[25]   Q Do you remember when you received authorization

## Page 147

[1] from Ms.O'Donnell that Mr.Rizzitelli was indeed her
[2] counsel?

[3]   A I don't remember the exact date. It was some time [4] in
March.

[5]   Q I am going to show you what was previously [6] identified
as Colleen Exhibit 53. I will represent to you [7] that Ms.O'Donnell
identified that document as the letter in [8] which she identifies
Mr.Rizzitelli as her lawyer.

[9] What is the date of that document?

[10]   A March 4, 2003.

[11]   Q Okay. And can you just repeat again the date of [12] the
last letter in the sequence that we just went through in [13] the last
three letters when that was sent?

[14]   A March 10, excuse me, February 10.

[15]   Q No, it would be the watermark date?

[16]   A March 3, 2003.

[17]   Q Okay. So you received the written notification [18] from
Ms.O'Donnell after Mr.Rizzitelli sent this last [19] letter which is
dated March 3, 2003?

[20]   A That is correct.

[21]   Q And once you received this letter from [22] Ms.O'Donnell
which is Exhibit 53, did you then respond to [23] Mr.Rizzitelli?

[24]   A Yes I did.

[25]   Q Okay. I'm just referring your attention back to

## Page 148

[1] Exhibit 18. The document that you stated earlier that you
[2] had not seen before.

[3] I am going to show you what was marked as Exhibit [4] 48 in
Ms.O'Donnell's deposition.

[5] Do you recognize that document or can you identify [6] what it
is?

[7]   A It's a Request for Voluntary Leave Transfer.

[8]   Q If you flip to the second page of that document. [9] And
can you compare that page to what was marked as Exhibit [10] 18
in your deposition today.

[11]   A They're the exact same.

[12]   Q So Exhibit 18 of your deposition today is the [13] second
page of Colleen Exhibit No. 48?

[14]   A That is correct.

[15]   Q Okay. And you said that Exhibit 48 of [16] Colleen's
deposition is a Request for Voluntary Leave [17] Transfer.

[18] What involvement, if any, do you have in the [19] Voluntary
Leave Transfer application process or decision [20] with regard to
those applications?

[21]   A That's an independent committee that gathers to
[22] look at documents and approve or deny any kind of leave
[23] transfer program.

[24] I don't have any input on that.

[25]   Q Okay. Are you aware that the Voluntary Leave

**Page 149**

[1] Transfer Committee that met with regard to Colleen's
[2] application, denied her request?
[3]     A I knew it was denied, yes.
[4]     Q What role, if any, did you play in that [5] Committee's
decision to deny her request?
[6]     A I didn't have any role.
[7]     Q I'll show you what was marked in Colleen's [8] exhibit, I
mean, deposition as Exhibit No. 52.
[9] Do you recognize that document?
[10]    A Yes.
[11]    Q Could you identify what it is for me please?
[12]    A Ms.O'Donnell is requesting advanced leave,
[13] advanced sick leave.
[14]    Q Do you remember what your response was to that
[15] request for leave?
[16]    A I denied her leave request.
[17]    Q Do you remember why you denied her leave request?
[18]    A Based upon the doctor's note, she was unable to
[19] return to work and there was no end of her medical
[20] condition. Therefore, it was denied based upon that and I
[21] didn't get any update on her medical condition.
[22]    Q Let me show you what was previously marked and
[23] identified. This Exhibit No. 54.
[24] Do you recognize that document?
[25] And when I say 54, that's 54 from Colleen's

**Page 150**

[1] deposition.
[2]     A Yes.
[3]     Q And what is that letter?
[4]     A It's a letter from Ms.O'Donnell indicating that I [5] denied
her request for advanced sick leave.
[6] Based upon your offer of accommodations to work. [7] Based
on information, excuse me, on January 27th, you were [8] offered
accommodations to work, based on the information you
[9] previously submitted.
[10] To date, you failed to notify me of the [11] accommodations
that were offered were acceptable or present [12] any reasonable
alternative accommodation.
[13] In accordance with 5 USC 6307, the agency has the
[14] discretion to advance up to thirty days, 240 hours of sick
[15] leave to an employee who has a serious disability or
[16] ailment.
[17] In considering whether to advance sick leave, the
[18] Department of Justice on leave administration requires
[19] the approving official to consider several factors,
[20] including whether or not the employee can be expected to
[21] return to work, or to return to duty.
[22] Based on the medical document dated January [23] 31,
2003, there is no indication you would be able to return [24] to
duty as your doctor has indicated you remain totally [25] disabled.

**Page 151**

[1] Excuse me, additionally, I have been informed that [2] on
February 11, 2003, you requested the necessary forms from [3] the
Safety Office to file Workman's Compensation claim. [4] Another
factor which indicates you may not be returning to [5] work.
[6] Based upon that information, I was unable, I was [7] unable to
advance sick leave.
[8]     Q In making that decision that you had denied her
[9] request for advanced sick leave, did you consider at all
[10] Colleen's sex or gender?
[11]    A No.
[12]    Q I am going to show you what has been marked as
[13] Colleen Exhibit 60.
[14] Do you recognize that document?
[15]    A I remember the memo.
[16]    Q I'll represent to you that Colleen identified this
[17] document in her deposition as a memo from her to you
[18] through [18] Steve Gagnon requesting sixteen hours of leave
without pay [19] or advanced annual leave and it says handwritten
at the [20] bottom there, denied per Warden Winn.
[21] Do you see that?
[22]    A Correct. Yes.
[23]    Q Do you remember why, well before I get there, did
[24] you direct the acting warden to deny this request?
[25]    A Yes.

**Page 152**

[1]     Q Do you remember why you decided that this request
[2] should be denied?
[3]     A I was at a Warden's Conference and I remembered
[4] that, if I remember correctly, I still didn't have the [5] proper
documentation.
[6]     Q In making your decision to deny the request in [7] that
January 10, 2003 memo, did you consider Ms.O'Donnell's [8] sex
or gender?
[9]     A No.
[10]    Q Now do you remember when you became aware, if you
[11] did, that Ms.O'Donnell was pursuing an EEO action against
[12] the agency?
[13]    A I became aware an EEO action, I don't remember the
[14] exact date. She was off duty, whether she was on, she must
[15] have been on leave without pay.
[16] She came to the training center, met with an EEO
[17] counselor.
[18]    Q Do you remember when you became aware of that?
[19]    A That day she came in. I don't know the exact [20] date.
[21]    Q Okay. Do you remember who or how you learned that
[22] she came in and met with an EEO counselor?
[23]    A A staff member, I can't remember, the staff member
[24] came in and advised me that Colleen O'Donnell was at the
[25] training center with Ken Nichols filing an EEO complaint.

## Page 153

[1]   Q Do you know if that contact with you is [2] documented?
[3]   A I think I had the person write a memo.
[4]   Q Can you mark those two exhibits please? While the [5] reporter is marking those exhibits, I just want you to back [6] track briefly for a moment.
[7]   You stated before that you provided the first [8] note, the January 8, 2003 note to the psychiatrist here at [9] FMC Devens.
[10]  Do you remember what response, if any, the [11] psychiatrist had after reviewing the note?
[12]  A The psychiatrist from the Bureau of Prisons?
[13]  Q Yeah.
[14]  A Just basically, he needed more information to give [15] me input whether she can return to work or not or continue [16] without pay.
[17]  Whatever she was requesting at the time.
[18]  Q Could you mark this document as well? Did he [19] communicate that to you in writing?
[20]  A Yes.
[21]  MR. WILMOT: I am going to show you what has been [22] marked as Exhibit No. 36.
[23]  (Exhibit No. 36 marked for [24] identification.)
[25]  BY MR. WILMOT:

## Page 154

[1]   Q Do you recognize that document?
[2]   A Yes I do.
[3]   Q Can you identify what it is?
[4]   A It's a memorandum for me from Dr.Fletcher [5] regarding Ms.O'Donnell and requesting additional [6] information.
[7]   Q And what does he say with regards to his review of [8] Dr.Milowe's note?
[9]   A Well, he's saying I reviewed the letter written by [10] Dr.Milowe of January 2003. In this letter there is a [11] non-specific diagnosis offered to a post traumatic stress [12] disorder and statement that she (Colleen O'Donnell) is [13] totally disabled which equally, of a general purpose nature. [14] The closing portion that offer speculation of a [15] complete reversal of her disability. If certain [16] environmental factors were modified, my professional opinion [17] is that the letter does not contain significant information [18] to support any facts alleged in the letter and that the [19] conclusion that the total disability is completely [20] reversible owing to environmental factors is inconsistent [21] with the practice of psychiatry.
[22]  I suggest that a formal review of medical records [23] and that an independent evaluation of Ms.O'Donnell by an [24] independent psychiatrist be initiated for the purpose of [25] establishing fitness of duty at FMC Devens.

## Page 155

[1]   Q Now jumping back again into when you first learned [2] that Ms.O'Donnell met with an EEO officer. You stated that [3] you asked the person contacted you to put that in writing. [4] Do you know why you asked them to put it in [5] writing?
[6]   A Well, I already had put restrictions on both [7] parties and I wasn't upset that Ms.O'Donnell was filing an [8] EEO complaint. I didn't even know if the EEO complaint was [9] against me. [10] What concerned me that she came to the institution [11] on her own and Mr.Reynoso could have been in the area. [12] That's what I was upset about. He could have been [13] in a training class. He could have been around the training [14] center. He could have been in the camp. [15] And that violated the fifty yard rule. So far as [16] I was concerned. Whether she filed an EEO complaint, was [17] irrelevant to me whether it was against me or the [18] institution. That didn't bother me. [19] What bothered me was that she came in on her own.
[20]  MR. WILMOT: I am going to show you what has been [21] marked as Exhibit 34 and 35. Take a moment to review those [22] and let me know when you're finished.
[23]  (Exhibit Nos. 34 and 35 marked for [24] identification.)
[25]  BY MR. WILMOT:

## Page 156

[1]   Q And the question I'm going to ask you is whether [2] or not these memos refresh your memory as to when you [3] learned Ms.O'Donnell met with an EEO officer?
[4]   A I remember the day, yeah.
[5]   Q What is the date you learned that Ms.O'Donnell [6] met with the EEO officer?
[7]   A I don't remember. The dates are -- March 19th. I [8] don't know if it was March, I'm sure it was March 19th. Do [9] I know for sure if it was March 19th? All I know is that [10] around that time, that did occur.
[11]  Q And what is the date in the two memos as to when [12] Ms.O'Donnell met with an EEO complaint?
[13]  A March 19th at 1:00 p.m. Both memos indicate the [14] same day, just approximately, different times?
[15]  Q All right. And of what year?
[16]  A 2003.
[17]  Q Okay. And Exhibit 34 is a memo from whom?
[18]  A From Karen Parrott, the Employee Development [19] Manager.
[20]  Q Okay. And Exhibit 35 is a memo from whom?
[21]  A From Patrick Kelly, Employee Development [22] Specialist.
[23]  Q Okay. So I'm just referring you back to Exhibit [24] 60 of Colleen's deposition. When you made the decision to [25] deny her request for advance leave, was the fact that she

BSA    Case 4:04-cv-40190-FDS, 04-cv-40190-FDS 24-4 Depo of David White, 2005 5/09 Page 42 of 45

## Page 157

[1] had seen an EEO officer or was involved in an EEO activity a
[2] factor in your decision to deny her that leave?
[3]    A No.
[4]    Q Okay. I am going to show you what has been marked
[5] as Colleen Exhibit 69.
[6] Can you identify what that is?
[7]    A It's a request for leave from Colleen O'Donnell. [8] She
requested leave without pay from July 30, 2003 to August [9] 11,
2003.
[10]    Q What is the date of her request?
[11]    A July 28, 2003.
[12]    Q Okay. And what was your decision with regard to
[13] that request?
[14]    A I approved that request on July 29, 2003 with a
[15] stipulation that Ms.O'Donnell must provide an updated
[16] doctor's note to me.
[17]    Q Do you remember why you had approved this request
[18] without a doctor's note?
[19]    A No.
[20]    Q Do you remember whether or not this request came
[21] before or after the mailroom incident?
[22]    A This request came after the mailroom incident.
[23]    Q Okay. And you testified earlier that following [24] the
mailroom incident, you placed Ms.O'Donnell on [25] administrative
leave, correct?

## Page 158

[1]    A Correct.
[2]    Q If I told you that Ms.O'Donnell testified that [3] this request
was entered when her administrative leave that [4] she was placed
on after the mailroom incident was about to [5] run, would that
refresh your memory as to why you approved [6] this request for
leave?
[7]    A I, I don't remember.
[8]    Q Now you say here that you wanted an updated
[9] doctor's note from Ms.O'Donnell.
[10] Did you receive one?
[11]    A No.
[12]    Q I am going to show you what has been marked as
[13] Exhibit 70 from Ms.O'Donnell's deposition.
[14] I'll represent to you that Ms.O'Donnell testified [15] that this is
a request that she submitted August 11, 2003 [16] requesting leave
or approved absence?
[17]    A Leave without pay.
[18]    Q What was your response to that request?
[19]    A I denied it. Ms.O'Donnell failed to follow my
[20] instructions on July 29, 2003 by not providing an updated
[21] doctor's note.
[22]    Q Okay. When you made the decision to deny this
[23] request for leave, was the fact that Ms.O'Donnell is a
[24] woman a factor in your decision?
[25]    A No.

## Page 159

[1]    Q Was the fact that Ms.O'Donnell had been engaged [2] in
EEO activities here at the Bureau of Prisons a fact in [3] your
decision to deny the request that is marked as Colleen [4] Exhibit
70?
[5]    A No.
[6]    Q I think I'm almost done. Just give me a second. [7] I'm
going to show you what is marked as Colleen Exhibit 71.
[8] Do you recognize that document?
[9]    A I recognize, I recognize what was done at that [10] time to
attempt to contact her and get medical information.
[11]    Q Can you identify what Colleen Exhibit 71 is?
[12]    A It's a letter to Colleen O'Donnell from Steve [13] Gagnon,
Inmate Systems Manager. Numerous times tried to [14] contact
you by telephone Tuesday, August 12 and Wednesday,
[15] August 13 turned out to be unsuccessful. I did, however,
[16] leave three messages for you to contact me.
[17] This is to notify you that your request for [18] additional leave
without pay has been denied as you failed [19] to provide the
required medical update as directed on July [20] 29, 2003.
Effective August 13, 2003 you have been placed on [21] AWOL
status.
[22] As you were advised in a letter dated June 23, [23] 2002,
placement in AWOL status may lead to disciplinary [24] action up
to and including removal.
[25]    Q Okay. Do you remember when Ms.O'Donnell returned

## Page 160

[1] back to work following the date of this letter, August 13,
[2] 2003?
[3]    A No.
[4]    Q Okay. Do you remember when Ms.O'Donnell provided
[5] a medical update following this August 13, 2003 letter?
[6] No.
[7]    Q I am going to show you what has been previously
[8] marked as Colleen Exhibit No. 76 and identified in that
[9] deposition.
[10] Do you recognize that document?
[11]    A Yes I do.
[12]    Q Can you identify what that is?
[13]    A It's a letter from her doctor indicating what she
[14] suffered from and what kind of vacation she was on from July
[15] 2003 until present. And from July 2003 until September
[16] 2003, it outlines the medication.
[17]    Q What is the date of that letter?
[18]    A It was dated December 16, 2003.
[19]    Q Between the letter from Steve Gagnon to
[20] Ms.O'Donnell dated August 13, 2003 and marked as Colleen
[21] Exhibit No. 71 and this letter from Colleen's doctor dated
[22] December 16, 2003 and marked as Colleen Exhibit No. 76, do
[23] you know whether Colleen provided the BOP any medical
[24] update or documentation in the interim between these two
letters?
[25]    A No, she didn't.

Page 161

[1]    Q Okay. Now you testified before as to Colleen was
[2] ultimately disciplined with a warning placed in her file for
[3] being AWOL, correct?
[4]    A Correct.
[5]    Q In making the decision to discipline her for being
[6] AWOL, was the fact that Ms.O'Donnell was a woman, was that
[7] a factor in your decision?
[8]    A No.
[9]    Q The fact that Ms.O'Donnell was engaged or [10] involved
in EEO activities within the Bureau of Prisons, was [11] that a factor
in your decision?
[12]    A No.
[13]    Q You gave some testimony as well, as to
[14] Mr.Reynoso's discipline for the incident at Mirror Lake
[15] with Ms.O'Donnell and you said that he was suspended
[16] without pay.
[17] Do you remember that testimony?
[18]    A Yes.
[19]    Q Okay. Whose responsibility is it within the [20] agency to
actually dock pay from an employee's pay if he or [21] she is
suspended without pay?
[22]    A That would be the Timekeeper.
[23]    Q The Timekeeper?
[24]    A Is the actual one who would key in. From my
[25] understanding of the situation, it would be the Timekeeper

Page 162

[1] who would key in the dates you work, the dates you don't
[2] work.
[3]    Q Is that an administrative function?
[4]    A That's an administrative function.
[5]    Q And it's safe to assume that is not a function [6] that you
would perform?
[7]    A No.
[8]    Q Do you monitor whether or not such deductions are
[9] made from employee's pay?
[10]    A No. I do not monitor that.
[11]    Q Okay. So your statement before that Mr.Reynoso
[12] was not paid at the time of his suspension is based on the
[13] fact that you suspended him without pay.
[14]    A I suspended him without pay, correct.
[15]    MR. WILMOT: Let's take a break quick.
[16]    MS. MCDONALD: Yes. Hurry.
[17]    (Brief recess.)
[18]    BY MR. WILMOT:
[19]    Q You testified before about the -- and we covered [20] it
just now again about the "delay" in responding to [21] Mr.Rizzitelli,
his February 10, 2003 letter?
[22] Do you remember that testimony?
[23]    A Right. Yes.
[24]    Q It says because we had not received authorization
[25] from Colleen yet to speak with Mr.Rizzitelli about this

Page 163

[1] situation.
[2] Was the fact or, strike that. Was the fact that [3] Ms.O'Donnell
is a woman, was that fact a factor in your [4] decision not to
respond to Mr.Rizzitelli at that time?
[5]    A No.
[6]    Q The fact that Ms.O'Donnell had engaged in, strike [7] that.
Okay.
[8] You testified earlier today about discussions with
[9] Ms.O'Donnell about assigning to the camp.
[10] Do you remember that testimony?
[11]    A Yes.
[12]    Q Was Ms.O'Donnell ultimately assigned to the camp?
[13]    A No.
[14]    Q Just mark these two documents please.
[15]    COURT REPORTER: I think this is already marked.
[16]    MR. WILMOT: Which document is that? Okay. All [17] right.
[18]    COURT REPORTER: In there.
[19]    MR. WILMOT: Let me see.
[20]    COURT REPORTER: March 6th?
[21]    MR. WILMOT: March 6th, that's correct. It's [22] already in
there as 25. So if we can switch. Make 38, 37.
[23]    COURT REPORTER: I'm sorry. 37 is already in. [24] I'll put
38 on - 37 on this one. Yeah.
[25]    BY MR. WILMOT:

Page 164

[1]    Q Okay. So again going back to your contact with
[2] Mr.Rizzitelli, you stated that you did not respond to
[3] Mr.Rizzitelli until after receiving, you identified this [4] already,
after receiving Ms.Colleen O'Donnell's letter [5] dated March 4,
2003 as marked as Colleen Exhibit 53.
[6] And you stated earlier that you responded to [7] Mr.Rizzitelli
after receiving this letter from Colleen. [8] Exhibit 53 from her
deposition.
[9] Do you know when you first responded to [10] Mr.Rizzitelli?
[11]    A On March 6, 2003.
[12]    Q Okay. So the document that is marked as Winn
[13] Exhibit No. 25, is this your first contact with [14] Mr.Rizzitelli?
[15]    A Yes.
[16]    Q So two days after receiving Ms.O'Donnell's letter [17] that
Mr.Rizzitelli was her counsel, you do, in fact, [18] contact
Mr.Rizzitelli?
[19]    A Yes.
[20]    Q Do you remember when you received Ms.O'Donnell's
[21] letter authorizing you to speak to Mr.Rizzitelli?
[22]    A March 4, 2003.
[23]    Q Do you remember what time of day you received
[24] that?
[25]    A At 1:33. Well, it was sent down to Human

## Page 165

[1] Resources, so I probably got it a little after that.

[2]    MR. WILMOT: Okay. And I've marked her as Exhibit [3] 37, another document.

[4]    (Exhibit No. 37 marked for [5] identification.)

[6] BY MR. WILMOT:

[7]    Q Do you recognize that document?

[8]    A Yes.

[9]    Q Can you identify what it is?

[10]    A It's dated March 21, 2003 to Mr.Rizzitelli from [11] me.

[12]    Q Okay. So you did have contact with Mr.Rizzitelli

[13] concerning Ms.O'Donnell after she finally authorized you to

[14] speak to him.

[15]    A Yes.

[16]    Q Okay. You testified early this morning that

[17] Ms.O'Donnell was the only person that you had out on admin

[18] leave or administrative leave, and was required to call into

[19] her supervisor during that leave.

[20] Do you remember that?

[21]    A Yes.

[22]    Q Why did you require Ms.O'Donnell to call into her

[23] supervisor during her administrative leave?

[24]    A Because during that period of time, we, meaning

[25] myself, Ms.Lord and Mr.Gagnon, attempted on numerous

## Page 166

[1] occasions to contact Colleen O'Donnell and we cannot get a

[2] response through letters, telephones, fax machines, so the

[3] stipulation, I did stipulate that she call in so we can [4] provide her information.

[5] Whether it be a doctor's note or further leave [6] without pay requests and that's why we did it.

[7]    Q Okay. Was the fact that Ms.O'Donnell was a [8] woman, was that a factor in your decision to place that [9] requirement on her?

[10]    A No, it was strictly based on communication.

[11]    Q Was the fact that Ms.O'Donnell was involved or

[12] engaged in EEO activities within the Bureau of Prisons, a

[13] factor in your decision to place that requirement on her?

[14]    A No.

[15]    Q Was the fact that Ms.O'Donnell had previously

[16] requested a work accommodation a factor in your decision to

[17] place a requirement on her?

[18]    A No.

[19]    MR. WILMOT: Okay. I guess that's it for me.

[20]    MS. MCDONALD: I don't have any more right now. [21] But I would like to reserve my right to recall the Warden if [22] I have not received those documents which you intend to [23] provide me with.

[24] I'm probably finished but just in case.

[25]    MR. WILMOT: Okay.

## Page 167

[1]    MS. MCDONALD: Highly unlikely but –

[2]    MR. WILMOT: And pursuant to our protective order, [3] you know, there was a lot of testimony here today about [4] other employees that would be considered confidential under [5] that protective order so–.

[6] You know, would you be agreeable to our just [7] marking the entire deposition as confidential or does it [8] need to be specific pages?

[9] It would be easier if we could stamp the first [10] page confidential.

[11]    MS. MCDONALD: What's in place? Reynoso, isn't [12] that it?

[13]    MR. WILMOT: That would be it and of course, your [14] client.

[15]    MS. MCDONALD: Yeah, that's fine.

[16]    MR. WILMOT: All right. Thank you.

[17]    (Off the record at 4:31 p.m.)

## Page 168

[1] C E R T I F I C A T E [2] COMMONWEALTH OF MASSACHUSETTS )

) SS. [3] COUNTY OF SUFFOLK )

[4] I, Marilyn D. Franklin, a Court Reporter and [5] Notary Public, within and for the Commonwealth of [6] Massachusetts, do hereby certify that there came before me [7] on this 15th day of September, 2005, the person hereinbefore [8] named, who was by me duly sworn to tell the truth, the whole [9] truth, and nothing but the truth, concerning and touching [10] the matter in controversy in this cause; that he was [11] thereupon examined upon his oath, and his examination [12] reduced to typewriting, under my direction, and that this [13] deposition transcript is a true and accurate record of the [14] testimony given by the witness.

[15] I further certify that I am not related to any of [16] the parties hereto or their counsel, and that I am in no way [17] interested in the outcome of said cause.

[18] Dated at Boston, Massachusetts, this 5th day of [19] day of October, 2005.

[21]

Marilyn D. Franklin

[22] NOTARY PUBLIC

My Commission Expires:

[23] August 18, 2011

Page 169

[1] CORRECTION SHEET
[2] DEPOSITION OF DAVID L. WINN [3] PAGE NO. LINE NO.
SUGGESTED CORRECTION [4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 170

[1]    SIGNATURE OF WITNESS:
[2] I have read the foregoing transcript and the same [3] contains
a true and accurate recording of my answers to the [4] questions
therein set forth, subject to the change and/or [5] correction
sheet(s) attached.
[8]
[9] Deponent