# EXHIBIT 5

## Depo-O'Donnell V Gonzales, 04-40190-FDS - Depo of Cynthia Lordi - 09/16/05

**APEX Reporting**

**Page 1 to Page 132**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*APEX REPORTING*
*327 Summer Street*
*Boston, MA    02210*
*Phone:    617-426-3077*
*FAX:    617-426-6844*

Case 4:04-cv-40190-FDS    Document 24-5    Filed 04/18/2006    Page 3 of 43

Case 4:04-cv-40190-FDS    Document 24-2    Filed 04/18/2006    Page 48 of 115
BSA        Depo-O'Donnell V Gonzales, 04-40190-FDS - Depo of Cynthia Lord - 09/16/05        XMAX(1/1)

**Page 1**

```
[ 1]  1 - 132
[ 2]
[ 3]             IN THE UNITED STATES DISTRICT COURT
[ 4]                         FOR THE
[ 5]             DISTRICT OF MASSACHUSETTS
[ 6]
[ 7]
[ 8]  COLLEEN O'DONNELL,               )
                                       )
[ 9]          Plaintiff,               )
                                       )
       -v-                             )  CIVIL ACTION NO.
[10]                                   )  04-40190-FDS
       ALBERTO R. GONZALES,            )
[11]   Attorney General,              )
       U.S. Department of Justice,     )
[12]                                   )
                                       )
              Defendant.               )
[13]
[14]
[15]
[16]            THE ORAL DEPOSITION OF CYNTHIA LORD,
[16]  held pursuant to Notice, and the applicable provisions of
[17]  the Federal Rules of Civil Procedure, before Marilyn
[18]  Franklin, a Court Reporter and Notary Public, within and for
[19]  the Commonwealth of Massachusetts, at FMC Devens,
[20]  Ayer, Massachusetts, Massachusetts, on Friday, September 16,
[21]  2005, commencing at 10:39 a.m.
[22]
[23]
[24]
[25]
```

**Page 3**

```
[ 1]                       I N D E X
[ 2]  WITNESS                                          PAGE
[ 3]  Cynthia A. Lord
[ 4]      Examination by Ms.McDonald
      7
[ 5]  EXHIBITS                    DESCRIPTIO        PAGE
[ 6]     1    Referral to EA                          34
[ 7]     2    Message from O'Donnel                   38
[ 8]     3    Letter from Winn to O'Donnel            39
[ 9]     4    Memo to O'Donnel                        41
[10]     5    Court Docket                            51
[11]     6    Draft Proposa                          53
[12]     7    Email Sandum to Lor                     57
[13]     8    Record of Ca                            67
[14]     9    Letter from Gagnon to O'Donnel          71
[15]    10    Letter from Rizzitel                    74
[16]    11    Letter to Warden from Dawn McDonal      77
[17]    12    Letter from Milo                        88
[18]    13    Letter from Rizzitel                    88
[19]    14    Letter from Rizzitel                    89
[20]    15    Letter from Winn to Rizzitel            91
[21]    16    Letter from Gagnon to O'Donnel          91
[22]    17    Note from Milo                          93
[23]    18    Letter from Gagnon to O'Donnel          93
[24]    19    Letter from Lord to O'Donnel            94
[25]    20    Letter from Gagnon to O'Donnel          97
```

**Page 2**

```
[ 1]  PRESENT:
[ 2]  On Behalf of the Plaintiff:
[ 3]        DAWN D. McDONALD, ESQ.
             Cooley, Shrair P.C.
[ 4]        1380 Main Street, Fifth Floor
             Springfield, MA 01103
[ 5]        (413) 735-0750
[ 6]  On Behalf of the Defendant:
[ 7]        DAMIAN W. WILMOT, ESQ.
             Assistant U.S. Attorney
[ 8]        U.S. Attorney's Office
             1 Courthouse Way, Suite 9200
[ 9]        Boston, MA 02210
             (617) 748-3100
[10]
             KELLY L. McDONALD, ESQ.
[11]        Assistant General Counsel
             Federal Bureau of Prisons
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

**Page 4**

```
[ 1]  EXHIBITS    DESCRIPTIO      PAGE
[ 2]    21    Letter from O'Donnell to Win        97
[ 3]    22    Doctor's Not                        98
[ 4]    23    Notice of Investigatio              99
[ 5]    24    Daily Assignment Roster
      103
[ 6]    25    Acknowledgement of Receipt
      107
[ 7]    26    Memo by Milly Sheridan
      109
[ 8]    27    Winn to Reynoso
      114
[ 9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

BSA    Depo O'Donnell V Gonzales, 04-40190-FDS   Depo of Cynthia Lord   08/16/05

**Page 5**

[1] S T I P U L A T I O N S
[3] IT IS HEREBY STIPULATED AND AGREED TO, [4] by and
between the parties and their [5] respective attorneys, that all
[6] objections, except as to the form of the [7] questions, shall be
reserved until the [8] time of trial; that the filing of the
[9] deposition be waived; and, that the [10] witness may read and
sign the deposition [11] without any Notary Public being present.

**Page 6**

[1] P R O C E E D I N G S
[2]     (10:39 a.m.)
[3]     COURT REPORTER: Can you raise your right hand
[4] please.
[5] CYNTHIA A. LORD, Sworn
[6]     MS. MCDONALD: Good morning, Ms.Lord. My name is
[7] Dawn McDonald and I am Colleen O'Donnell's attorney in her
[8] discrimination suit against the Bureau of Prisons.
[9] I am going to be asking you a bunch of questions today [10] and I
just want to go over the ground rules before we start.
[11] Please answer all the questions verbally. The
[12] stenographer cannot take down a nod or a shake of the head
[13] or waving or pointing.
[14]     A Okay.
[15]     Q Please allow me to finish my question before you
[16] answer so that it is clear for the record. And if you don't
[17] understand a question, please let me know and I'll be happy
[18] to rephrase it or ask it again.
[19] And if at any time you need a break, let me know [20] and I
can accommodate that.
[21]     A Okay.
[22]     Q Can you please state your full name and your
[23] position here at FMC Devens?
[24]     A Cynthia A. Lord, Employee Services Manager.
[25]     Q And did you review any documents to prepare for

**Page 7**

[1] your testimony today?
[2]     A Yes.
[3]     Q What did you review?
[4]     A A variety of memos. Disciplinary file.
[5]     Q A disciplinary file of who?
[6]     A Mr.Reynoso.
[7]     Q Okay. Anything else?
[8]     A I probably have looked at the OPF. The Official
[9] Personnel Folder.
[10]     Q Yes, no abbreviations here.
[11]     A I'm sorry. There are just a lot of different [12] memos
addressed to Ms.O'Donnell from the Warden.
[13]     Q Okay. Are you currently on any medications that
[14] would impair your memory or ability to testify today?
[15]     A No.
[16]     Q And how long have you been employed with the
[17] Federal Bureau of Prisons?
[18]     A I have been employed with the Bureau of Prisons
[19] since September of 1984.
[20]     Q And how long have you been at Devens?
[21]     A I have been at Devens since January of 1998.
[22]     Q And can you just briefly give me a history of your
[23] employment with the Bureau?
[24]     A Sure.
[25]     Q What jobs you held?

**Page 8**

[1]     A I started – do you want to know where as well?
[2]     Q Yes.
[3]     A Okay. I started in U.S.P. Leavenworth, Kansas as [4] a
personnel assistant. I transferred to Central; well I [5] transferred to
the U.S. Marshal Service for a brief period [6] of time in
Washington, D.C. as a staffing specialist.
[7] I went to the Central Office for the Bureau of [8] Prisons in
January of 1986 as a Personnel Management [9] Specialist
trainee.
[10] Then I transferred to FCI Tallahassee, Florida in
[11] September of 1987. I was Personnel Management Specialist
[12] there and then maybe a year later; I was promoted to
[13] Assistant Personnel Manager at Tallahassee.
[14] In 1991, I transferred to FCI Danbury, Connecticut [15] as the
Personnel Officer and then transferred here in 1998.
[16]     Q And what is your title again, here?
[17]     A Employee Services Manager.
[18]     Q And how is that different from HR Manager?
[19]     A We had a title change probably a year ago from
[20] Human Resource Managers to Employee Service Managers.
[21]     Q So are you doing the same job duties?
[22]     A Doing the same job duties, yes.
[23]     Q And what is your educational background?
[24]     A College. Some college.
[25]     Q Okay, where did you go to college?

Case 4:04-cv-40190-FDS     Document 24-5     Filed 04/18/2006     Page 5 of 43
Case 4:04-cv-40190-FDS     Document 24-2     Filed 04/18/2006     Page 50 of 115
RSA    Depo of Donnell V Gonzales, 04-40190-FDS - Depo of Cynthia Lord - 09/16/05     XMAX(3/3)

## Page 9

[1]  A Southeastern University in Washington, D.C.
[2]  Q Can you tell me since you have, have you been the
[3]  Employee Services Manager for the entire time you've been at
[4]  Devens?
[5]  A Yes.
[6]  Q Okay. And can you tell me since you have come, [7] since
you came to Devens in January of 1998, how many EEO
[8]  complaints or grievances have been filed for gender
[9]  discrimination?
[10]  A I have no --
[11]  MR. WILMOT: Objection. You can answer.
[12]  THE WITNESS: I have no idea.
[13]  BY MS. MCDONALD:
[14]  Q Can you estimate?
[15]  A Oh, maybe three or four. I don't know. I have [16]  the files
but I don't know.
[17]  Q Less than five?
[18]  A I really don't know.
[19]  Q It could be more than five? Okay.
[20]  A Yes.
[21]  Q Can you remember any of the names of those
[22]  individuals who have filed gender discrimination complaints?
[23]  MR. WILMOT: Objection.
[24]  THE WITNESS: Lori Levitt Parsons. You want [25]  specific
gender?

## Page 10

[1]  BY MS. MCDONALD:
[2]  Q Just gender right now?
[3]  A Oh. I don't know.
[4]  Q Gender, sexual harassment?
[5]  A I really don't know. I would have to look. I [6]  mean, I
would have to look at the files.
[7]  Q Okay. And Lori Levitt Parsons, what were her
[8]  complaints?
[9]  A Hers were disability.
[10]  Q Oh, it was for disability?
[11]  A Yes.
[12]  Q And approximately when did she filed that
[13]  complaint?
[14]  A I really don't know the date.
[15]  Q Can you guess the year?
[16]  A 2002, maybe 2001.
[17]  Q Okay. And what was her disability?
[18]  A Mental.
[19]  Q Is she still employed here?
[20]  A No.
[21]  Q Did she leave of her own volition?
[22]  A No.
[23]  Q She was terminated?
[24]  A Yes.
[25]  Q And what were the grounds of her termination?

## Page 11

[1]  A Physical inability to perform the duties of her [2]  position.
[3]  Q Did she have a physical disability?
[4]  A No.
[5]  Q And what was her position here?
[6]  A Nurse.
[7]  Q And how long had she worked here approximately?
[8]  A Maybe three years. Two, three years. I'm not [9]  sure.
[10]  Q And did she file a complaint with EEO or a
[11]  grievance?
[12]  A EEO.
[13]  Q Was her case then filed in Court?
[14]  A No.
[15]  Q And what was the resolution of her complaint?
[16]  A I believe it was dismissed.
[17]  Q And any other employees since you've been here who
[18]  have filed a claim for disability either in EEO or filed a
[19]  grievance for disability discrimination?
[20]  A Yes.
[21]  Q And who are they?
[22]  A Michael Sheridan.
[23]  Q And what was his job position?
[24]  A He's Correctional Treatment Specialist.
[25]  Q What does that mean?

## Page 12

[1]  A A case manager.
[2]  Q And what was his disability? Physical or mental?
[3]  A Physical.
[4]  Q Was it a work-related injury?
[5]  A Yes.
[6]  Q And what was the injury?
[7]  A It was on his foot. I don't remember the specific
[8]  medical term for it -
[9]  Q But he did it at work?
[10]  A Damage to his foot. Yes.
[11]  Q Do you know how he did it at work?
[12]  A He was responding to an emergency at FMC Danbury
[13]  and he fell in a hole or twisted his ankle in a hole that [14]  was
in the ground.
[15]  Q Okay. Is he still employed here?
[16]  A Yes.
[17]  Q In the same position?
[18]  A Yes.
[19]  Q And did he file with the EEO or did he file a
[20]  grievance?
[21]  A EEO.
[22]  Q And what was the resolution of his complaint?
[23]  A I don't know.
[24]  Q Is it still ongoing?
[25]  A I don't believe so. I don't know.

### Page 13

[1]  Q Was that complaint ever filed in Court?

[2]  A No.

[3]  Q Any other employees who have had a disability, [4] filed a disability claim with the EEO?

[5]  A Ken Nichols.

[6]  Q What was his job description?

[7]  A Volunteer Job Coordinator.

[8]  Q And what does that mean?

[9]  A All the volunteers who come into the facility, he

[10] coordinates the badges and their backgrounds.

[11] Q And what was his disability?

[12] A It was his leg.

[13] Q Was it a physical disability?

[14] A I don't know if it was his back that effected his [15] leg or it was a physical –

[16] Q Leg/back?

[17] A Yeah, it was a physical disability.

[18] Q Okay. Is he still employed here?

[19] A No.

[20] Q Was he terminated?

[21] A Yes.

[22] Q Why was he terminated?

[23] A Physical inability to perform the duties of his [24] position.

[25] Q Wasn't he also an EEO counselor?

### Page 14

[1]  A Yes.

[2]  Q And is he the counselor who assisted Ms.O'Donnell [3] in preparing her complaint?

[4]  A Yes.

[5]  Q And do you know how he hurt his leg or his back?

[6]  A No I do not.

[7]  Q Was it a work-related injury?

[8]  A He did have a Workers Comp claim.

[9]  Q For this injury?

[10] A His Workers Comp claim was for his back because he [11] slipped and fell on ice.

[12] Q Here?

[13] A Yes.

[14] Q But you don't know if the leg was related or–?

[15] A I don't.

[16] Q Okay. And how long had he worked here before he [17] was terminated?

[18] A I believe Mr.Nichols started in 1998 as well.

[19] Q Okay. Anybody else who filed a disability claim [20] for EEO?

[21] A Not that I can remember. No.

[22] Q Could there have been more people?

[23] A There may have been.

[24] Q Okay. Now previously when I had asked you about

[25] gender claims filed with the EEO, you said three or four.

### Page 15

[1]  It could have been more than five, but then you gave me the

[2]  name of somebody with a disability.

[3]  Q Do you want to correct that answer?

[4]  A I don't remember any on gender.

[5]  Q Okay. You don't remember but could there have

[6]  been?

[7]  MR. WILMOT: Objection.

[8]  THE WITNESS: It's possible.

[9]  BY MS. MCDONALD:

[10] Q Okay. Can you tell me what your job [11] responsibilities are as HR supervisor?

[12] A I'm responsible for managing all the duties or the [13] job functions of employee services; payroll, staffing, [14] disciplinary actions, labor management relations, [15] classification of positions.

[16] Q When you say classification of position, do you

[17] mean promotions or–?

[18] A Classifications of job descriptions.

[19] Q Okay.

[20] A Classification of the job description.

[21] Q Okay.

[22] A We classify our jobs and the series, occupational

[23] series.

[24] Q Okay. Do you do training?

[25] A Payroll. We assume training in October of 2004.

### Page 16

[1]  Q Okay. Do you, are you involved in hiring?

[2]  A Yes, that's staffing.

[3]  Q And are you involved in promotions?

[4]  A Promotion is part of staffing.

[5]  Q Okay. Is there a kind of promotion other than a [6] merit promotion?

[7]  A No.

[8]  Q Okay.

[9]  A Merit promotion and then, but staffing entails [10] merit promotion and then we hire from what we call the [11] street. People who don't work for the federal government.

[12] Q Okay.

[13] A We hire them from the street.

[14] Q Okay. So you mentioned discipline. You [15] participate in the disciplinary process?

[16] A Yes.

[17] Q What is your role?

[18] A I prepare, I work with the supervisors of the

[19] employee. When an allegation has been sustained by our

[20] investigative office.

[21] Q Is that SIS?

[22] A SIS. Yes. As to what conduct, I work with the

[23] supervisors as to what they feel disciplinary action needs

[24] to be taken to correct the conduct, the misconduct.

[25] So then I assist them actually, preparing the

### Page 17

[1] letters, the proposal letter which is then reviewed by our
[2] Regional Office and then our Central Office before it's
[3] issued to the staff member.
[4] And then if the individual gives an oral response, [5] I would,
one of my staffers or myself, would sit in and take [6] minutes for
the oral response with the Warden.
[7] Then we prepare the decision letter based on what [8] the
Warden tells us and we would prepare, if it's a [9] suspension, we
would prepare the request for personnel [10] action, which is an
SF-52.
[11]     Q Okay.
[12]     A And then we would key the personnel action which [13] is
the official document for the suspension.
[14]     Q Key it, you mean enter it into the computer?
[15]     A Enter it into the computer system. Yes.
[16]     Q Okay. Now you said that you work with the
[17] supervisors on determining what kind of discipline or the
[18] level of discipline.
[19] Can you be a little more specific about what you [20] mean by
working with them on that?
[21]     A Well, the supervisor reviews the report depending [22] on
the type of misconduct, what he believes for that [23] individual.
[24] The appropriate sanction basically, would be to [25] correct
the behavior so it doesn't happen again.

### Page 18

[1]     Q Okay. And you have guidelines that you go by?
[2]     A Yes we do. They're in our Code of Conduct.
[3]     Q Okay. What procedures does an applicant for
[4] employment have to go through in order to become an
[5] employee?
[6]     A Person off the street, as you call them?
[7]     A Thank you. An external applicant, they apply to [8] what
we call a register. We have an announcement that's [9] open and
they have to go to the register. They apply to that [10] register. When
we have a vacancy, we request a Certificate [11] of Eligibles from
our Central Office or Regional Office.
[12] They will then send us a list of names. Those [13] individuals
are contacted, set up for interviews. They go [14] through a
pre-employment interview, a panel interview and a [15] physical
and UA and then vouchering.
[16]     Q What's a UA?
[17]     A Urinalysis.
[18]     Q Okay. Vouchering, what's that?
[19]     A Reference checking –
[20]     Q Okay.
[21]     A Of their previous employers and personal
[22] references?
[23]     Q Is that the background check?
[24]     A No. That's prior to the background and then we
[25] initiate a background investigation which is done by Office

### Page 19

[1] Personnel Management.
[2]     Q Where are they?
[3]     A They are located in Boyers, Pennsylvania.
[4]     Q And are the job applications maintained in the [5] official
personnel file?
[6]     A Their initial job application, yes.
[7]     Q And all the documents that go along with it?
[8]     MR. WILMOT: Objection.
[9]     MS. MCDONALD: I'm sorry. That was a bad [10] question.
[11]     BY MS. MCDONALD:
[12]     Q Are there other documents aside from the
[13] application for employment that an individual fills out in
[14] applying for employment here?
[15]     A Yes. There's several. You're going to ask me the
[16] names, aren't you?
[17]     Q Yes I am.
[18]     A There's a Selective Service form that they have to [19] fill
out. That they've registered with the Selective [20] Service. There's
a requirement to have a telephone. [21] There's a requirement to
report all financial hardships or [22] troubles, financial
responsibility. There's a Domestic [23] Violence form.
[24]     Q And what's that form?
[25]     A That's if they've been charged with and convicted

### Page 20

[1] of a domestic violence.
[2]     Q Only if they've been convicted of?
[3]     A Yes.
[4]     Q Okay.
[5]     A There is the INS form, the I-9. That they're a [6] U.S.
citizen. And that's just before they come to us. [7] There's a 85P
which is a Security and Investigation form [8] which goes to their
background, to initiate their background [9] in the investigation.
[10]     Q Okay.
[11]     A And I'm sure I'm missing some.
[12]     Q There could be some others?
[13]     A Yes. Definitely.
[14]     Q And you said that's just before they get there. [15] What
do they have to do once they get here?
[16]     A We do an Appointment Affidavit where they're sworn
[17] in as -
[18]     Q Okay, is this after they've been selected?
[19]     A Yes.
[20]     Q Okay, anything before they're selected?
[21]     A There's a form they have to sign for physical [22] ability
testing. They understand they have to pass [23] Glynco in the
physical ability test down there.
[24] I really can't think. I know there are more, I [25] just can think
of what I'm missing.

Page 21

[1]  Q Okay. What kinds of things on a background check
[2]  would prohibit a person from obtaining employment?
[3]  A They go through the pre-employment interview. [4] Prior to
employment, if we get bad reference checking from [5] prior
employers, if they have in the pre-employment [6] interview, if they
have not revealed something to us and [7] then later it turns up in
their law enforcement checks -
[8]  Q Is the law enforcement check, the background [9] check?
[10]  A No. That's an NCI, National Criminal and -
[11]  Q Okay.
[12]  A NCI check that we do. If their outside our [13] guidelines
during the pre-employment interview, they're [14] asked a variety
of questions that involve criminal history, [15] drug use, military
history, financial responsibility, did I [16] say drug and alcohol use,
misconduct on prior jobs.
[17]  Q Well, specifically on the background check, when
[18]  you get those –
[19]  A It's background.
[20]  Q Background check. When you get those back
[21]  A Okay.
[22]  Q What could show up on a background check that
[23]  would, what you would look at and say you know, we can't
[24]  hire this person?
[25]  A If they provided false information where they told

Page 22

[1]  us one thing at the pre-employment interview and when OPM
[2]  does the investigation and if it's conflicting information,
[3]  discrepant -
[4]  Q And who is OPM?
[5]  A Office of Personnel Management.
[6]  Q Okay.
[7]  A And if the information is discrepant, OPM would
[8]  highlight that.
[9]  Q Let me ask you. Get this out of the way. What [10] kind of
information is on the background check?
[11]  A It covers everything from drug use, [12] trustworthiness,
honesty, employment history.
[13]  Q Do you have any idea how they go about getting
[14]  that information?
[15]  A They send out investigators. They talk, they do
[16]  personal interviews. They go to police departments and
[17]  poll. They go to colleges and pull transcripts.
[18]  They actually have an investigator go out and [19] conduct
the investigation.
[20]  Q Okay. And do you handle staff applications for
[21]  leave?
[22]  A Not typically. On occasion, I do.
[23]  Q Does that come through your department?
[24]  A It depends on what the leave is for.
[25]  Q Okay. Do you have any authority for granting or

Page 23

[1]  denying leaves of absence?
[2]  A Just for my staff.
[3]  Q Okay.
[4]  A That report directly to me.
[5]  Q Okay. And can you explain the various types of [6] leave
available to employees at Devens? I know there's a [7] whole
bunch of them.
[8]  A We earn annual and sick leave. All employees in [9] the
federal government.
[10]  Q And when you say earn, you mean on an accrued –?
[11]  A It's accrued on a bi-weekly basis.
[12]  Q Okay.
[13]  A There is -
[14]  Q And is annual leave, vacation time? Is that the [15] same
thing?
[16]  A Yes.
[17]  Q Okay.
[18]  A Annual leave is vacation. Sick leave is for [19] illnesses or
medical appointments.
[20]  Q Okay. Is there administrative leave?
[21]  A That can only be granted by the Warden.
[22]  Q Okay. And do you know how many days the Warden is
[23]  allowed to grant?
[24]  A He can grant up to ten.
[25]  Q Okay. And what is leave without pay?

Page 24

[1]  A That's when an employee who has no leave or may
[2]  have leave, chooses not to use their leave. They can
[3]  request leave without pay from the Warden.
[4]  Q Okay. If an employee needed FMLA leave, do you
[5]  know what FMLA is?
[6]  A Family Medical Leave.
[7]  Q If an employee needed Family Medical Leave and [8] they
didn't have any sick or vacation time left, would that [9] be where
somebody would apply for leave without pay?
[10]  A Yes.
[11]  Q That wouldn't be classified as any other kind of
[12]  leave, would it?
[13]  A No.
[14]  Q Okay. And what is advanced sick leave?
[15]  A The Warden can advance up to 240 hours of advanced
[16]  sick leave for an employee. That puts the employee in the
[17]  whole and they have to pay that, they have to earn it back.
[18]  Q So if they take the full 240 hours, then they have [19] to
work, I don't know how many months, until it's made up.
[20]  A A long time. They earn four hours, we all earn [21] four
hours every two weeks.
[22]  Q Okay.
[23]  A It would be a long time. A couple of years.
[24]  Q And what is home duty status?
[25]  A Home duty status is when an employee is, it's like

## Page 25

[1] a reassignment to their home for their duty station.

[2]     Q And under what circumstances would that occur?

[3]     A Within the Bureau, very rarely. Abuse of an [4] inmate.

[5]     Q Okay. Let me stop you there. If someone abused [6] an inmate, they could be assigned to their home?

[7]     A If it's egregious enough, yes.

[8]     Q Would they be paid?

[9]     A If they're on home duty status, yes.

[10]     Q How is that punishment?

[11]     A It's not a punishment.

[12]     Q Okay.

[13]     A Home duty is to remove an individual from the [14] area.

[15]     Q And still pay them?

[16]     A From the institution.

[17]     Q And you used the example of abuse of an inmate and [18] you said if it was egregious enough.

[19] Would somebody not be punished for that?

[20]     A They will but there has, an investigation has to [21] take place.

[22]     Q Okay, so there are signs -

[23]     A It's to remove them immediately from the area.

[24]     Q Okay. Until somebody takes further action.

[25]     A Yes.

## Page 26

[1]     Q Until there is a further investigation or the [2] Warden determines what to do?

[3]     A Correct.

[4]     Q Okay. So it's a –

[5]     A Criminal violations -

[6]     Q It's like a temporary measure?

[7]     A Yes.

[8]     Q Okay. Now Ms.O'Donnell began her employment here [9] at the BOP on August 30, 1998, do you recall?

[10] Does that date sound about right?

[11]     A 1998 sounds about right.

[12]     Q Okay.

[13]     A I don't know when.

[14]     Q You were here when she started?

[15]     A I was here when she started, yes.

[16]     Q Were you also here when David Reynoso started [17] working here?

[18]     A Yes.

[19]     Q And has Ms.O'Donnell always performed her job [20] duties in a satisfactory manner?

[21]     A I really don't have any knowledge of her job [22] performance?

[23]     Q So you're not involved in the job evaluation, the [24] performance evaluation process?

[25]     A I do training for supervisors for them to do their

## Page 27

[1] log entries and the evaluation properly and we maintain the [2] original at the end of the year.

[3]     Q Okay, but you don't look at them or are involved [4] in speaking with the employee?

[5]     A No.

[6]     Q Okay. From the beginning of Ms.O'Donnell's [7] employment from the present, how many times has she been [8] disciplined for any reason?

[9]     A I only know of the one incident.

[10]     Q Okay. And was that the AWOL, the discipline for [11] being AWOL?

[12]     A Yes.

[13]     Q And what is David Reynoso's job, let me strike [14] that. [15] What was David Reynoso's job position during the [16] years 2002 to January of 2004?

[17]     A He was an Intel Officer.

[18]     Q Is that in the SIS Department?

[19]     A Yes it is.

[20]     Q What are his job duties or what were his job [21] duties?

[22]     A I really don't know.

[23]     Q Didn't - maybe I was mistaken. Didn't you testify [24] that you were involved in creating the job descriptions?

[25]     A For some of our positions, yes.

## Page 28

[1]     Q Okay, but not for that position?

[2]     A I personally didn't do that one. I mean, it would [3] have been someone in my department.

[4]     Q Okay, so you don't know what they do in the SIS [5] office?

[6]     A I don't know what Mr.Reynoso's specific job [7] duties were.

[8]     Q Okay. Did they all have different job duties in [9] there?

[10]     A A variety of them, yes. Phone monitoring. He [11] would probably, and I say probably because I really don't [12] know, he probably would have been involved in phone [13] monitoring, inmate investigations.

[14]     Q Okay. Now they have monitors in there for viewing [15] areas of the facility, don't they?

[16]     MR. WILMOT: Objection. You may answer.

[17]     THE WITNESS: Yes.

[18]     BY MS. MCDONALD:

[19]     Q And do you know whether in that job, in that [20] department, he had access to personal and private [21] information of staff members, such as addresses, telephone [22] numbers?

[23]     A I don't know.

[24]     Q Do you know of any other employees at Devens that [25] have been hired with a history of assault and battery?

**Page 29**

[1]   A I have no idea. I have no idea. I mean, can you [2] clarify that a little more.

[3]   Q Sure. Your were involved in the application and [4] hiring process of people, right?

[5]   A Yes.

[6]   Q And in that capacity, do you look at their [7] applications for employment?

[8]   A I do not review all the applications. I review [9] some of them, if there's an issue.

[10]   Q What do you mean there's an issue?

[11]   A If they were outside the guidelines. If they're [12] outside our guidelines sent down by Central Office, I would [13] review those.

[14]   Q What guidelines do you mean?

[15]   A We have a set of guidelines that are used. We ask [16] a set of questions and we have guidelines if they're – for [17] example, if someone has been disciplined for excessive [18] tardiness, our guidelines state that within a specific [19] period of time, if they've exceeded those guidelines, they [20] would be outside our ability to hire.

[21]   Q Okay. And how would you know if somebody had [22] excessive tardiness?

[23]   A Because we ask them a set of questions during the [24] pre-employment process.

[25]   Q Okay. So you're relying on the information that

**Page 30**

[1]   they're giving you?

[2]   A Yes.

[3]   Q Okay. So in the pre-employment process, do you [4] ask somebody whether they have ever been arrested or charged [5] with a crime and they responded in the affirmative, would [6] that be outside the guidelines?

[7]   A I believe the guidelines call for a conviction but [8] I would have to look them up. I don't know them by heart.

[9]   Q Okay. Would that at least cause you to question [10] on that subject further?

[11]   A No. If they're outside the guidelines, the [12] process stops. If they're within the guidelines, it just [13] continues.

[14]   Q Okay. I'm going to show you a document that was [15] marked Exhibit 3 in the Warden's deposition yesterday and [16] I'm going to ask you if you recognize that document?

[17]   A Yes.

[18]   Q And what is it?

[19]   A It's a Declaration for Federal Employment.

[20]   Q And who is it for?

[21]   A David Reynoso.

[22]   Q Have you seen that document before/

[23]   A Yes.

[24]   Q And did you see it at the time that he applied for [25] employment?

**Page 31**

[1]   A I don't remember.

[2]   Q Okay. Let me call your attention to paragraph 8 [3] on the front.

[4]   Could you read that to yourself and let me know [5] when you're finished.

[6]   A Okay.

[7]   Q And that, that paragraph instructs the person if [8] they are answering that question in the affirmative, that [9] they need to supply additional information, is that correct?

[10]   A That is correct.

[11]   Q And the additional information would be on the [12] second page under 15, I believe.

[13]   Is that correct?

[14]   A Yes.

[15]   Q And can you just state generally what that [16] handwritten paragraph says.

[17]   A He was arrested for assault and battery May 1991. [18] Case was brought before a judge in October of 1991. [19] Continued without a finding for one year. Ordered to [20] probation officer once a month. Attend a merge class. All [21] charges were dropped and the case was dismissed.

[22]   Q Do you have an understanding of the meaning of [23] continued without a finding?

[24]   A Typically they're on probation.

[25]   Q Is that the extent of your understanding?

**Page 32**

[1]   A That's the extent of my understanding, yes.

[2]   Q Okay. Now that you've read that, does that [3] refresh your memory as to whether or not you saw that [4] document at the time that he applied for employment?

[5]   A No.

[6]   Q No? Okay. So, just so I'm clear. Your testimony [7] is that you had received this document with that statement [8] written under 15 and as long as that was within the [9] guidelines that you have, he would have proceed to the next [10] step in the employment process or–?

[11]   A That is correct.

[12]   Q And if it was outside the guidelines, the process [13] would have stopped?

[14]   A That is correct.

[15]   Q And he never would have been hired?

[16]   A That is correct.

[17]   Q Okay. Is it possible that anything slipped past [18] the guidelines?

[19]   A Very possible.

[20]   Q Okay. Do you have any other employees currently [21] working at Devens who have been arrested, charged or [22] convicted of assault and battery with or without a dangerous [23] weapon?

[24]   A Not that I'm aware of.

[25]   Q Is it possible?

---

**Page 33**

[1]  A I have no idea.
[2]  Q Okay. Are you aware of the facts and [3] circumstances surrounding April 8, 2002 incident between [4] Ms.O'Donnell and Mr.Reynoso?
[5]  A Some of the facts, I believe. I'm not sure I know [6] all the facts.
[7]  Q Okay. When did you first become aware of that [8] incident?
[9]  A I guess it would have been the day of the [10] incident. The Warden called me up to his office and when I [11] went into his office, Ms.O'Donnell was in there with the [12] Warden.
[13]  Q And how did Ms.O'Donnell appear to you?
[14]  A A little upset, a little shaken.
[15]  Q Was she crying?
[16]  A Not when I arrived. No.
[17]  Q Was she crying at any point while you were there?
[18]  A Not that I remember.
[19]  Q Okay. So you entered the office, then what [20] happened?
[21]  A Well, I don't know if, I'm not sure who told me [22] what had happened if it was the Warden or Ms.O'Donnell. I [23] asked her if she was all right. Did she need medical [24] attention? I offered to take her down to seek medical [25] assistance in our hospital here.

---

**Page 34**

[1]  Offered to go to the police barracks with her to [2] report it.
[3]  Q When you say report it, what exactly were you told [4] about the incident?
[5]  A I was told that Mr.Reynoso had kicked her.
[6]  Q That's all you were told?
[7]  A Yes ma'am.
[8]  Q So you weren't in the Warden's office when [9] Ms.O'Donnell had explained to him what happened?
[10]  A I was not there initially, no.
[11]  Q Do you know whether Ms.O'Donnell was referred to [12] an EAP counselor?
[13]  A I believe so. Yes.
[14]  MS. MCDONALD: Let me show you this document. [15] It's been marked as Lord Exhibit 1.
[16]  (Exhibit No. 1 marked for [17] identification.)
[18]  BY MS. MCDONALD:
[19]  Q And I will ask you to take a look at that and let [20] me know if you recognize that document?
[21]  A Yes.
[22]  Q And what is that document?
[23]  A It's a referral to the EAP program.
[24]  Q For Ms.O'Donnell?
[25]  A For Ms.O'Donnell.

---

**Page 35**

[1]  Q And what is the date?
[2]  A April 10th.
[3]  Q 2002?
[4]  A 2002. Yes.
[5]  Q And do you know whether Ms.O'Donnell took [6] advantage of this referral?
[7]  A No I do not.
[8]  Q She may have but you don't know.
[9]  A I don't know.
[10]  Q Have you told me the extent of what you remember [11] about being in the meeting with the Warden and Colleen when [12] you first learned of the incident?
[13]  A Well I remember offering to go the police barracks [14] with her because I wanted her to report that. The incident.
[15]  And I remember she said no, Holly Brodur was going to go [16] with her.
[17]  Q Okay. And is that everything you remember?
[18]  A Yes.
[19]  Q And what was the next thing that you did or who [20] was the next person that you spoke to regarding this [21] incident?
[22]  A I don't know.
[23]  Q Did the Warden give you any instructions?
[24]  A I don't remember. I know he placed her on admin [25] leave.

---

**Page 36**

[1]  Q Okay. Do you know what was the next thing that you [2] did regarding this incident?
[3]  A I really don't remember.
[4]  Q Are you on the, what the heck do you call it, [5] Violence Committee? Is that what it's called?
[6]  Are you a member of the Workplace Violence [7] Committee?
[8]  MR. WILMOT: Objection. You can answer.
[9]  THE WITNESS: Yes.
[10]  BY MR. MCDONALD:
[11]  Q And were you a member of the Workplace Violence [12] Committee at the time of the incident on April 8, 2002?
[13]  MR. WILMOT: Objection. You can answer.
[14]  THE WITNESS: Yes.
[15]  BY MS. MCDONALD:
[16]  Q Did the Warden ask you to convene the Workplace [17] Violence Committee?
[18]  A No.
[19]  Q Did anybody ask you to convene a Workplace [20] Violence Committee?
[21]  A I don't chair the committee.
[22]  Q Okay.
[23]  A No.
[24]  Q Did somebody approach you about attending a [25] committee meeting?

---

BSA

**Page 37**

[1]   A Yes.
[2]   Q And who would that be?
[3]   A It would have been our Executive Assistant at the [4] time. David Porter.
[5]   Q Did he chair the Workplace Violence Committee?
[6]   A Yes.
[7]   Q Do you know whether Ms.O'Donnell reported the [8] incident to the state police?
[9]   MR. WILMOT: Objection. You can answer.
[10]   THE WITNESS: I think so.
[11]   BY MS. MCDONALD:
[12]   Q Do you know whether Ms.O'Donnell obtained a [13] restraining order?
[14]   A Yes.
[15]   Q Let me show you a document that was marked [16] yesterday as Winn Exhibit 8. I will ask you to take a look [17] at that and whether you recognize that document?
[18]   A Yes I recognize it.
[19]   Q And what is that document?
[20]   A It's an Abuse Prevention Order.
[21]   Q And who are the parties mentioned, strike that. [22] Is that an Abuse Prevention Order for David Reynoso?
[23]   A Yes.
[24]   Q And what are the conditions of that order?
[25]   A To not abuse the plaintiff. Not to contact the

**Page 38**

[1]   plaintiff. He may lawfully attend work but must stay away
[2]   from, 50 yards away from plaintiff.
[3]   Ordered to stay away from and leave plaintiff's [4] residence in Malden. And to surrender his, any weapons, [5] guns, ammunition, gun licenses to the Lynn Police [6] Department.
[7]   Q And what is the effective, what are the effective [8] dates of that order?
[9]   I think the dates are on the second page.
[10]   A The date of the order is April 9, 2002 and it [11] would have expired on April 20, 2003 but it looks like it [12] was extended on April 23, 2002 and expires on April 23, [13] 2003.
[14]   Q And do you know whether that order was extended [15] until 2004?
[16]   A I don't know.
[17]   (Exhibit No. 2 marked for [18] identification.)
[19]   BY MS. MCDONALD:
[20]   Q I'm going to show you a document that has just [21] been marked as Lord Exhibit 2 and ask if you recognize that [22] document?
[23]   A No.
[24]   Q You don't recall seeing it?
[25]   A No.

**Page 39**

[1]   Q What does that document purport to be?
[2]   A It's a message, a note from Colleen O'Donnell that [3] she received an extension until April 23, 2004 against David [4] Reynoso.
[5]   Q Okay. Do you know or recall that the Warden [6] changed Ms.O'Donnell's work hours soon after the April 8, [7] 2002 incident?
[8]   A Yes.
[9]   Q And when did he change her work hours?
[10]   A When she came back to work. I don't know the [11] exact day.
[12]   MS. MCDONALD: Okay. I'm going to show you a [13] document that has been marked as Exhibit 3.
[14]   (Exhibit No. 3 marked for [15] identification.)
[16]   BY MS. MCDONALD:
[17]   Q I'll ask you to take a look at that and let me [18] know if you recognize that document?
[19]   A Yes. I recognize the document.
[20]   Q And what is that document?
[21]   A The document is a letter from Warden Winn to [22] Ms.O'Donnell assigning her to her regular duties at the [23] mailroom. Her tour of duty will be Monday through Friday, [24] 6:00 a.m. to 2:30 p.m.
[25]   And she's not to leave the institution and she is

**Page 40**

[1]   to leave the institution no later than 3:00 p.m.
[2]   Q And what is the date of this letter?
[3]   A April 12th. And the letter is to be effective [4] April 15th.
[5]   Q Is there also an admonishment that she is not to [6] contact David Reynoso at any time?
[7]   MR. WILMOT: Objection.
[8]   THE WITNESS: Yes.
[9]   BY MS. MCDONALD:
[10]   Q And does this memo or letter say anything about [11] the duration of the restrictions?
[12]   MR. WILMOT: Objection.
[13]   THE WITNESS: No.
[14]   BY MS. MCDONALD:
[15]   Q Can I call your attention to the last paragraph of [16] the letter and ask you to read it for the record?
[17]   A The schedule and these restrictions will remain in [18] effect until further notice. Please contact Cynthia A. [19] Lord, Human Resource Manager, extension 1152 if you have any [20] questions or concern regarding this notice.
[21]   Q And this document is signed by Colleen O'Donnell.
[22]   A As being received, yes.
[23]   Q Okay. Now the Warden also changed David Reynoso's [24] hours, is that correct?
[25]   A Yes.

## Page 41

[1]  Q Do you recall what he changed his hours to?

[2]  A 4:00 to midnight, I would believe.

[3]  Q And was he told that he could not be on the [4] premises at certain hours of the day?

[5]  A Yes.

[6]  Q And was he restricted to any certain area of the [7] facility?

[8]  A I believe so, yes.

[9]  Q You believe, are you sure or not sure?

[10]  A I don't specifically remember.

[11]  Q Okay. Now, do you recall whether there were [12] restrictions placed on Ms.O'Donnell with regards to signing [13] up for overtime?

[14]  MR. WILMOT: Objection. You may answer.

[15]  THE WITNESS: That she would need to notify her [16] supervisor.

[17]  BY MS. MCDONALD:

[18]  Q Were there any other restrictions regarding [19] overtime?

[20]  MR. WILMOT: Objection. You can answer.

[21]  THE WITNESS: Not that I can remember.

[22]  MS. MCDONALD: Let me show you Exhibit 4.

[23]  (Exhibit No. 4 marked for [24] identification.)

[25]  BY MS. MCDONALD:

## Page 42

[1]  Q Do you recognize that document?

[2]  A Yes.

[3]  Q And what is this document?

[4]  A It's a memorandum for Ms.O'Donnell from Acting [5] Warden Ed Motley concerning overtime.

[6]  Q And let me call your attention to paragraph 2 of [7] this memo. It states there that Ms.O'Donnell could only [8] sign up for overtime when the other party is not at the [9] facility (morning watch) or any shift on weekends.

[10]  Do you see that?

[11]  A Yes.

[12]  Q Do you believe it was Ms.O'Donnell's [13] responsibility to ensure that the restraining order was [14] enforced?

[15]  A My personal opinion?

[16]  Q Yes.

[17]  A I believe she has a responsibility to protect [18] herself as well, I guess.

[19]  Q Okay. She has a responsibility to protect herself [20] but does she have an obligation to ensure that the [21] restraining order against David Reynoso is enforced?

[22]  A I don't know how to answer that.

[23]  Q Just your opinion?

[24]  A I don't know if she - could you repeat the [25] question please?

## Page 43

[1]  Q Yes. Do you believe that Ms.O'Donnell has an [2] obligation to ensure that the restraining order against [3] David Reynoso is enforced?

[4]  A Yes.

[5]  Q Do you know whether anyone other than [6] Ms.O'Donnell and Mr.Reynoso have ever been restricted from [7] signing or signing up for overtime?

[8]  A Yes.

[9]  Q Who else?

[10]  A Any staff member who is on limited night duty.

[11]  Q For medical reasons?

[12]  A Yes.

[13]  Q Any other reason other than a medical reason why [14] someone would be restricted from signing up for overtime?

[15]  A Under an investigation.

[16]  Q For misconduct.

[17]  A For misconduct.

[18]  Q So are they allowed to work if they're under [19] investigation for misconduct? An employee?

[20]  A Yes.

[21]  Q But they can't sign up for overtime?

[22]  A It depends on the misconduct.

[23]  Q What kind of misconduct prohibits somebody from [24] signing up for overtime?

[25]  A If they have to work an armed post and they have a

## Page 44

[1] restraining order.

[2]  Q Do you know of other employees who have a [3] restraining order against them?

[4]  A Not currently.

[5]  Q Since you've been here, do you know of anyone who [6] has had a restraining order against them other than David [7] Reynoso?

[8]  A Yes.

[9]  Q Who?

[10]  A Anthony Capocia. Salvatore Acevedo.

[11]  Q And who had the restraining order against these [12] individuals?

[13]  A I'm unsure with Capocia. I don't know if it was [14] his spouse or girlfriend and Mr.Acevedo was his wife.

[15]  Q Are these individuals working here any longer?

[16]  A No.

[17]  Q What were the circumstances of their, strike that. [18] Were they terminated?

[19]  A No.

[20]  Q They quit?

[21]  A They resigned.

[22]  Q Were they asked to resign?

[23]  A No.

[24]  Q Do you know why they resigned?

[25]  A No.

## Page 45

[1]    Q Did they resign while the restraining order was [2] still in effect against them?

[3]    A I don't remember.

[4]    Q Were there any other employees since you've been [5] here, that have had a restraining order against them other [6] than David Reynoso and the two that you have already [7] mentioned?

[8]    A Steve Larkin.

[9]    Q Is he still employed here?

[10]    A Yes.

[11]    Q And do you know who had the restraining order [12] against him?

[13]    A No.

[14]    Q And what is his job position?

[15]    A Correctional counselor.

[16]    Q Is that restraining order still in effect?

[17]    A I don't know.

[18]    Q You have the ability to find out this information, [19] do you not?

[20]    MR. WILMOT: Objection. You can answer.

[21]    BY MS. MCDONALD:

[22]    Q Let me rephrase that. Do you have the ability to [23] find out who had a restraining order against Anthony [24] Capocia?

[25]    MR. WILMOT: Objection. You can answer.

## Page 46

[1]    A If SIS has a copy of it.

[2]    Q And would the restraining order be maintained in a [3] disciplinary file or in the official personnel file?

[4]    A No.

[5]    Q And the reason why he resigned would be in his [6] official personnel file, wouldn't it?

[7]    A That's correct. Yes.

[8]    Q So you have the ability to find out that [9] information, right?

[10]    A Yes.

[11]    MR. WILMOT: Can we go off the [12] record?

[13]    MS. MCDONALD: Sure.

[14]    (Off the record at 11:40 a.m.)

[15]    (On the record at 11:52 a.m.)

[16]    BY MS. MCDONALD:

[17]    Q Okay. Did Ms.O'Donnell ever complain to you or [18] did you ever hear that she complained to somebody else about [19] the change to her hours or her job assignment?

[20]    A No.

[21]    Q Is Lois Swiderski in your department?

[22]    A No. Not anymore.

[23]    Q Was she in April of 2002?

[24]    A Yes.

[25]    Q Now you already said that you were a member of the

## Page 47

[1]    Workplace Violence Committee that convened regarding the [2] incident between Ms.O'Donnell and Mr.Reynoso in April of [3] 2002, right?

[4]    A Yes.

[5]    MR. WILMOT: Objection. You can answer.

[6]    THE WITNESS: Yes.

[7]    BY MS. MCDONALD:

[8]    Q Can you explain what the Workplace Violence [9] Committee does?

[10]    A When they're convened, we review the information [11] that is available to us and it's discussed amongst the [12] committee members and recommendations are made to the [13] Warden.

[14]    Q What's discussed?

[15]    A Whatever the act of or threat that precipitated [16] the meeting of the Workplace Violence Committee.

[17]    Q Is the purpose to determine whether there is a [18] potential for workplace violence?

[19]    Is that the purpose of the committee?

[20]    A The purpose of the committee meeting is to [21] determine or to ensure the individual's safety

[22]    Q Okay.

[23]    A And any further threat or acts of violence.

[24]    Q And specifically with regard to the April 8, 2002 [25] incident, do you recall how many meetings of the Workplace

## Page 48

[1]    Violence Committee there were?

[2]    A Two.

[3]    Q And were reports prepared at those meetings or [4] following those meetings?

[5]    A Yes.

[6]    Q did you prepare the reports?

[7]    A No.

[8]    Q I am going to show you two documents that have [9] been, that were marked as 4 and 5 to Winn's deposition and [10] ask you if you recognize them?

[11]    (Pause)

[12]    A I recognize these documents.

[13]    Q And are those the reports that were prepared [14] following the meetings of the Workplace Violence Committee [15] in April of 2002?

[16]    A Yes.

[17]    Q And let me call your attention first to Exhibit 5. [18] Can you tell me what the Committee's recommendation first [19] tell me what the Committee's findings were?

[20]    A That the incident did not meet the definition of [21] workplace violence but has a definite ability to result in [22] workplace violence.

[23]    Q And can you tell me what the Committee's [24] recommendations were?

[25]    A Recommend that Mr.Reynoso, that should

**Page 49**

[1] Mr.Reynoso be arrested, he be placed on immediate home

[2] duty status.

[3]    Q And was Mr.Reynoso placed on immediate home duty

[4] status?

[5]    A No.

[6]    Q Were there any other recommendations of the

[7] Committee?

[8]    A To reconvene on Tuesday, April 9th at 9:00 a.m. to

[9] further consider the incident based on how Mass State Police

[10] respond?

[11]    Q And did you convene on April 9th at 9:00 a.m.?

[12] Reconvene, I should say?

[13]    A Yes.

[14]    Q And can you now take a look at Exhibit 4 and tell [15] me

what the Committee, actually, strike that.

[16] Between the first Committee meeting and the second

[17] Committee meeting, did the Committee find out that Officer

[18] Reynoso had been arrested?

[19]    A I don't remember.

[20]    Q Can you read this paragraph here for the record?

[21]    A Committee reconvened on Tuesday, April 9th and was

[22] informed that Mr.Reynoso was arrested on Monday, April 8th.

[23]    Q Does that refresh your memory as to whether the

[24] Committee learned that Officer Reynoso had been arrested -

[25]    A Yes.

**Page 50**

[1]    Q On April 8th? That was a yes.

[2]    A Yes.

[3]    Q Okay. Thank you. And can you tell me what the

[4] Committee recommendations were following this meeting?

[5]    A The Committee advised that since the charge [6] against

Mr.Reynoso is a state felony, he would have to be [7] placed on

indefinite suspension until the charges were [8] resolved.

[9] The Committee recommending Ms.O'Donnell be [10] referred

to the Employee's Assistance Program and the [11] Committee

recommending Mr.Reynoso be referred to the [12] Employee's

Assistance Program should he return to work.

[13]    Q And what is indefinite suspension?

[14]    A Indefinite suspension is when an employee is [15] placed

on suspension for an indefinite period of time due to [16] criminal

proceedings.

[17]    Q Is that the same as home duty status?

[18]    A No.

[19]    Q And is the employee paid when he is on indefinite

[20] suspension?

[21]    A No.

[22]    Q And was Officer Reynoso placed on indefinite

[23] suspension?

[24]    A No.

[25]    Q Do you recall that there was a Court hearing

**Page 51**

[1] wherein Officer Reynoso pled to sufficient facts for a [2] finding

of guilty and received a continued without a [3] finding?

[4]    A No.

[5]    Q Okay. Do you know whether, do you know whether

[6] there was a Court hearing?

[7]    A No.

[8]    MS. MCDONALD: Okay. I'm going to show you the

[9] document that has been marked as Exhibit 5.

[10]    (Exhibit No. 5 marked for [11] identification.)

[12] BY MS. MCDONALD:

[13]    Q I'll ask you to take a look at that and I will ask [14] you

whether you recognize that document?

[15] Have you seen that document before?

[16]    A I've seen this first page.

[17]    Q Not the other two pages?

[18]    A I don't remember the other two pages.

[19]    Q Okay. And does that first page refresh your [20] memory

as to whether there was a Court hearing regarding [21] Officer

Reynoso on January 3, 2003?

[22]    A Yes.

[23]    Q Now following that Court hearing in January of [24] 2003,

was the matter referred for investigation, strike [25] that. Let me

rephrase that.

**Page 52**

[1] Was the matter concerning April 2002 incident [2] referred for

investigation?

[3]    MR. WILMOT: Objection.

[4]    THE WITNESS: I don't know.

[5] BY MS. MCDONALD:

[6]    Q Do you know whether the investigation was [7] conducted

regarding Officer Reynoso's conduct?

[8]    A Yes.

[9]    Q And who conducted that investigation?

[10]    A I don't know.

[11]    Q I am showing you two documents that were marked as

[12] Winn Exhibit 6 and 7 and ask you if you could first review

[13] them and let me know if you have, if you recognize either

[14] one of those documents?

[15]    (Pause)

[16] Do you recognize those documents?

[17]    A I recognize this one.

[18]    Q Okay. And which, when you say this one?

[19]    A The OIA Investigative Report.

[20]    Q And that is marked Winn Exhibit No. 7, is that [21] right?

[22]    A Yes.

[23]    Q Can you tell me what the results of the [24] investigation

were?

[25]    A The charge was sustained.

BSA    Case 4:04-cv-40190-FDS, 04-cv-40190-FDS 24-5 Depo of Gonzalez 18/2006/16 Page 53 of 55

## Page 53

[1]    Q And was discipline proposed for Officer Reynoso?

[2]    A Yes.

[3]    MS. MCDONALD: Can we go off the record for a

[4] second?

[5]    (Off the record at 12:04 p.m.)

[6]    (On the record at 12:06 p.m.)

[7]    BY MS. MCDONALD:

[8]    Q Was termination proposed for Officer Reynoso?

[9]    MR. WILMOT: Objection. You can answer.

[10]    THE WITNESS: Initially, in the initial proposal [11] letter,
yes.

[12]    BY MS. MCDONALD:

[13]    Q And who initially proposed that?

[14]    A It would have been Brown, SIS Brown.

[15]    Q Well, SIS Brown didn't conduct the investigation, [16] did
he?

[17]    A No, but he was his immediate supervisor.

[18]    Q So regardless of whether he conducted the

[19] investigation, he would have been the one to recommend

[20] discipline?

[21]    A Either him, Mr.Brown or the Captain.

[22]    Q And which Captain is that?

[23]    A Captain Bollinger. Sorry.

[24]    (Exhibit No. 6 marked for [25] identification.)

## Page 54

[1]    BY MS. MCDONALD:

[2]    Q Let me show you this document and ask if you

[3] recognize it.

[4]    A Yes.

[5]    Q And what is that document?

[6]    A It's a draft proposal letter for removal.

[7]    Q And who prepared that draft?

[8]    A I did.

[9]    Q And what is the date of that draft?

[10]    A April 16, 2003.

[11]    Q And it's your recollection that either SIS Brown [12] or
Captain Bollinger recommended termination?

[13]    MR. WILMOT: Objection.

[14]    THE WITNESS: Removal.

[15]    BY MS. MCDONALD:

[16]    Q Is removal termination?

[17]    A Yes.

[18]    Q Can I see that? Exhibit 6 has a number of [19] corrections
on it, including above the word Removed, it's [20] written in
suspended.

[21] Do you see that?

[22]    A Yes.

[23]    Q And how did the recommendation that Officer

[24] Reynoso be terminated, how did that recommendation
change?

[25]    A From advice on our Regional Employee Services

## Page 55

[1] staff.

[2]    Q So was that draft forwarded to the Regional [3] Office?

[4]    A Yes.

[5]    Q And, tell me about that?

[6]    A All of our proposal letters go through our [7] Regional
Office and our Central Office.

[8]    Q So did that letter go the Regional Office before [9] those
handwritten changes were on it?

[10]    A Yes.

[11]    Q And then who did you send it to there?

[12]    A Margaret or Marcy.

[13]    Q And did Marcy call you or write back to you?

[14]    A I don't remember.

[15]    Q Do you remember, strike that. Can we go off the

[16] record for one second?

[17]    (Off the record at 12:10 p.m.)

[18]    (On the record at 12:11 p.m.)

[19]    MR. WILMOT: What is the Bate stamp number on the

[20] email?

[21]    MS. MCDONALD: 1195.

[22]    MR. WILMOT: Okay.

[23]    BY MS. MCDONALD:

[24]    Q Okay. Was it Marcy Sandum who you sent the draft

[25] to?

## Page 56

[1]    A Yes.

[2]    Q Now the Warden testified yesterday that he [3] believes an
assault and battery is more serious, a more [4] serious offense
than a DUI.

[5] Would you agree with that statement?

[6]    A I don't -

[7]    Q Well, let me ask you this way. Do you think that [8] an
assault and battery with a dangerous weapon is a more [9] serious
offense than a DUI?

[10]    A I need more information.

[11]    Q Like what?

[12]    A DUI and - did they kill somebody?

[13]    Q No.

[14]    A Under –

[15]    Q Just driving under the influence charge? Somebody

[16] got caught driving, nobody got hurt.

[17]    A Okay.

[18]    Q They were just driving under the influence. Is an

[19] assault and battery on a staff member more serious, a more

[20] serious offense than a staff member being charged or

[21] convicted of driving under the influence?

[22]    MR. WILMOT: Objection.

[23]    THE WITNESS: There's a lot of variables.

[24]    BY MS. MCDONALD:

[25]    Q Okay. So you disagree with the Warden's

Case 4:04-cv-40190-FDS   Michael V. Gonzalez   04/29/2005   Cynthia 02/16/05   XMAX(15/15)

**Page 57**

[1] testimony?
[2]    MR. WILMOT: Objection.
[3]    THE WITNESS: I don't disagree or agree with it.
[4]    BY MS. MCDONALD:
[5]    Q You have no opinion?
[6]    A I have no opinion.
[7]    (Exhibit No. 7 marked for [8] identification.)
[9]    BY MS. MCDONALD:
[10]    Q Let me show you this document and ask if you
[11] recognize it?
[12]    A Yes.
[13]    Q And what is that document?
[14]    A It's an email from Marcy Sandum.
[15]    Q To you?
[16]    A To me.
[17]    Q and what is the date of that email?
[18]    A April 30, 2003.
[19]    Q and was that email in response to your sending her
[20] the draft proposing termination?
[21]    A Yes.
[22]    Q And can you read that email for the record please?
[23]    A Holy-Moly. I totally forgot. We do not agree [24] with the
termination on this one. Please review your other [25] files for
employees on probation like your DUI's and see

**Page 58**

[1] what has been done as far as disciplinary on them.
[2] I would suggest going along with those lines. [3] Also, I don't
know if you should spell out what the [4] dangerous weapon was.
With just saying that someone might [5] think that it was a gun or a
knife or something really [6] horrific.
[7] Who would think that a boot is a dangerous weapon?
[8]    Q So she doesn't seem to think that being assaulted [9] with
a boot is too serious, does she?
[10]    MR. WILMOT: Objection.
[11]    THE WITNESS: I can't speak for her.
[12]    BY MS. MCDONALD:
[13]    Q So did she give you reasons why they didn't think
[14] termination was appropriate in this case?
[15]    A Just that it wasn't in line with others who were [16] on
probation.
[17]    Q And that, whose handwriting is that below the [18] typed
text?
[19]    A This is mine.
[20]    Q And what does that handwriting represent?
[21]    A Other staff members who were on year probation.
[22]    Q So is that information that you gathered after
[23] receiving the email from Marcy?
[24]    A Yes probably.
[25]    Q And there's a blacked out portion on that

**Page 59**

[1] document. Do you know what information was –?
[2]    MR. WILMOT: That information is read active [3] because it's
privileged.
[4]    MS. MCDONALD: That's right. You did tell me [5] that.
[6]    BY MS. MCDONALD:
[7]    Q What was the next proposal made for discipline for
[8] Officer Reynoso?
[9]    A The proposal?
[10]    MR. WILMOT: Objection. You can answer.
[11]    BY MS. MCDONALD:
[12]    Q Well, the termination proposal was rejected -
[13]    A Right. Okay.
[14]    Q And so then was another proposal made?
[15]    A It was modified.
[16]    Q Okay. And what was the modification?
[17]    A A suspension for forty-five days.
[18]    Q And was Officer Reynoso suspended for forty-five
[19] days?
[20]    A I don't remember the specific days.
[21]    Q I'm showing you what has been marked as Exhibit 9
[22] in Warden Winn's deposition. I ask you to take a look at
[23] that document and let me know if you recognize it?
[24]    A Yes. This is a proposal letter.
[25]    Q And what is that letter proposing?

**Page 60**

[1]    A Thirty days.
[2]    Q And do you recall, strike that. Why was the [3] forty-five
day proposal revised?
[4]    A On advice from -
[5]    MR. WILMOT: Do you – who is the person?
[6]    MS. MCDONALD: I don't want to know if it was–?
[7]    MR. WILMOT: I can exacerbate that.
[8]    THE WITNESS: Okay. I'm sorry.
[9]    BY MS. MCDONALD:
[10]    Q Who proposed the thirty day suspension?
[11]    A Captain Bollinger.
[12]    Q And do you know if Officer Reynoso was suspended
[13] for thirty days?
[14]    A I don't remember.
[15]    Q I am going to show you Exhibit 11 from Warden
[16] Winn's deposition. I'll ask you to take a look at that and
[17] let me know if you recognize that document?
[18]    A Yes.
[19]    Q And what is that document?
[20]    A It's a decision letter.
[21]    Q And what discipline did Officer Reynoso receive?
[22]    A Twenty-one days suspension.
[23]    Q And Officer Reynoso had received an additional
[24] suspension, did he not?
[25]    MR. WILMOT: Objection. You can answer.

## Page 61

[1]   THE WITNESS: Yes.
[2]   BY MS. MCDONALD:
[3]   Q Do you recall what that suspension was for?
[4]   A DUI.
[5]   Q Did Ms.O'Donnell ever express her concerns for [6] her
safety regarding Officer Reynoso to you?
[7]   A No.
[8]   Q Do you know whether she expressed them to
[9] supervisors or officials at FMC Devens?
[10]   A Yes.
[11]   Q I'm showing you what has been marked Exhibits 15
[12] and 16 of Warden Winn's deposition and I ask you take a look
[13] at those documents and let me know if you recognize them?
[14]   (Pause)
[15]   A Yes I have seen these before.
[16]   Q And what are those documents?
[17]   A Look's like memos from Colleen O'Donnell.
[18]   Q And what are those memos regarding?
[19]   A Safety concerns and safety issues.
[20]   Q And can you summarize the substance of those
[21] memos?
[22]   (Pause)
[23]   A In the May 13th, that's my summarization, feels [24] that
we've done enough to protect her as she states here and [25] her
safety issues in the June 10th are that either she or

## Page 62

[1] Reynoso be placed on administrative leave.
[2]   Q Were any actions taken in response to those memos
[3] that you are aware of?
[4]   A I really don't remember.
[5]   MS. MCDONALD: Can we go off for one second?
[6]   (Off the record at 12:25 p.m.)
[7]   (On the record at 12:27 p.m.)
[8]   BY MS. MCDONALD:
[9]   Q I am going to show you what has been marked as
[10] Exhibit 39 in Colleen O'Donnell's deposition and ask if you
[11] recognize that document?
[12]   A Yes.
[13]   Q And is, Exhibit 39 is dated January 8, 2003 and [14] that
is assigning Ms.O'Donnell to her regular ISN duties, [15] right?
[16]   A That is correct.
[17]   Q And what are the hours of her new duties?
[18]   A 9:30 a.m. to 6:00 p.m.
[19]   Q And you testified that Ms.Swiderski was in your
[20] department at that time, is that right?
[21]   A Yes.
[22]   Q And do you recall whether Ms.Swiderski told you
[23] about a meeting with Ms.O'Donnell where she refused to sign
[24] that document?
[25]   A No, I don't recall.

## Page 63

[1]   Q Okay. Did you become aware that Colleen had sent [2] a
doctor's note indicating that she could not work in [3] January of
2003?
[4]   A Yes.
[5]   Q I am showing you what has been marked Exhibit 27 [6] in
Warden Winn's deposition and ask you whether that's the [7] note
that was received from Ms.O'Donnell from her doctor [8] indicating
her inability to work?
[9]   A Yes.
[10]   Q Can you tell me in substance what that note says?
[11]   A That she is totally disabled, unable to work her
[12] current job under the current circumstances. If her
[13] assailant was removed from the work premises, she would be
[14] able to work full-time without restrictions.
[15]   Q And does that note state that she was diagnosed
[16] with post traumatic stress disorder?
[17]   A Yes ma'am.
[18]   Q And does that note state that Ms.O'Donnell's
[19] condition is reversible?
[20]   A It doesn't say those words.
[21]   Q Well, it says she would be able to return to work
[22] without restrictions if Officer Reynoso was not on the
[23] premises, right?
[24]   A That is correct.
[25]   Q But it does not state that her post traumatic

## Page 64

[1] stress disorder is reversible, is that right?
[2]   A That is correct.
[3]   Q Does it say that Officer Reynoso should be [4] terminated?
[5]   A No.
[6]   Q What actions were taken as a result of the receipt [7] of
that doctor's note?
[8]   A Warden Winn wanted further clarification on her
[9] medical status.
[10]   Q And did he direct you to do anything in that [11] regard?
[12]   A Yes. I prepared a letter to Ms.O'Donnell to [13] request
information from her physician.
[14]   Q I am showing you what has been marked Exhibit 42
[15] in Colleen O'Donnell's deposition and ask you to review that
[16] and let me know if that is the letter that you prepared to
[17] Ms.O'Donnell?
[18]   A Yes it is.
[19]   Q And what is page 2 of that document?
[20]   A It's a release from Ms.O'Donnell to her physician [21] for
her physician to speak with one of our or to provide
[22] information to one of our agency reps.
[23]   Q Okay. And doesn't that release also ask her
[24] physician to provide any information concerning her medical
[25] history?

Deposition of Donna V Gonzales - 04-40190-FDS - Depo of Cynthia Lord - 09/16/05

## Page 65

[1]   A Yes.
[2]   Q And does it also state that she understands the
[3]   information may be disclosed to third parties as necessary?
[4]   A In fulfillment of official responsibilities, yes.
[5]   Q Okay. And is there also a release where she's
[6]   releasing individuals from liability?
[7]   A Yes.
[8]   Q Do you know what HIPPA is?
[9]   A Yes.
[10]   Q Do you believe this release to be HIPPA compliant?
[11]   A Unsure.
[12]   Q Do your releases still look like this?
[13]   MR. WILMOT: Objection.
[14]   MS. MCDONALD: Let's strike that question. Let me [15] ask
you another question.
[16]   BY MS. MCDONALD:
[17]   Q Was this release a standard form that you use?
[18]   A No.
[19]   Q You prepared it specifically for this occasion?
[20]   A Yes.
[21]   Q Do you currently have form releases to obtain
[22]   medical information on employees?
[23]   A No.
[24]   Q So you draft them as you go? As you need them?
[25]   A Yes ma'am.

## Page 66

[1]   Q Are you aware that the Warden sent Colleen's [2] medical
note to Dr.Fletcher for review?
[3]   A Yes.
[4]   Q I am going to show you a document that was marked
[5]   Exhibit 36 in Warden Winn's deposition and ask you to review
[6]   that and if you recognize it?
[7]   A Yes I recognize it.
[8]   Q And do you see in that note where Dr.Fletcher
[9]   speculates or rather states that Dr.Milowe speculates that
[10]   Colleen would experience a complete reversal of her
[11]   disability if certain environmental factors were modified?
[12]   A Yes I see that in the memo.
[13]   Q Do you have Exhibit 27 still in front of you? [14] Does it
say anywhere in that note that Colleen would [15] experience a
complete reversal of her disability if certain [16] environmental
factors were modified?
[17]   A In those exact words?
[18]   Q Or in substance?
[19]   (Pause)
[20]   Does the note say that Ms.O'Donnell's disability [21] is
reversible?
[22]   MR. WILMOT: Objection. You can answer.
[23]   THE WITNESS: For clarification of her disability, [24] that's
the post traumatic stress disorder?
[25]   MS. MCDONALD: Yes.

## Page 67

[1]   THE WITNESS: No.
[2]   BY MS. MCDONALD:
[3]   Q Now Colleen called you for information on applying [4] for
various types of leave.
[5]   Do you recall that?
[6]   A Yes.
[7]   Q And I'm showing you what has been marked as [8] Exhibit
8.
[9]   (Exhibit No. 8 marked for [10] identification.)
[11]   BY MS. MCDONALD:
[12]   Q Is that a record of the telephone call you had [13] with
Colleen?
[14]   A Yes.
[15]   Q And did she request an extension to return the
[16]   medical release?
[17]   A Yes.
[18]   Q And you gave her until January 17, 2003 to do [19] that,
right?
[20]   A That is correct.
[21]   Q And there is some reference of her allowing you to
[22]   give union officials access to her medical note.
[23]   Do you see that?
[24]   A Yes.
[25]   Q Do you recall her getting assistance from the

## Page 68

[1] union at this time?
[2]   A No.
[3]   Q Do -
[4]   A She -
[5]   Q Go ahead. Why don't you –
[6]   A Not assistance.
[7]   Q Okay. What was, why did you allow the union [8] officials
access to her medical note?
[9]   A I don't know.
[10]   Q Did you show it to them?
[11]   A I don't remember.
[12]   Q Okay. Had Colleen filed a grievance at this [13] point?
[14]   MR. WILMOT: Objection. You can answer.
[15]   MS. MCDONALD: If you know?
[16]   THE WITNESS: I don't remember a grievance.
[17]   BY MS. MCDONALD:
[18]   Q Now also during this telephone conversation, you
[19]   explained the procedures from the Voluntary Leave Transfer
[20]   Program, right?
[21]   A That is correct.
[22]   Q And can you just explain for the record what those
[23]   procedures are?
[24]   A Voluntary Leave Transfer Program, an employee who
[25]   is out of sick or annual leave, can apply for donations from

**Page 69**

[1] staff of their annual leave and it's based on medical
[2] documentation that the employee provides along with the
[3] request for consideration.
[4]    Q And were you on the Voluntary, strike that.
[5] There's a Voluntary Leave Transfer Committee, [6] right?
[7]    A That is correct.
[8]    Q And were you on that committee in January of 2003?
[9]    A I was on the committee. I don't remember the [10] date.
[11]    Q Were you on the committee that decided whether
[12] Ms.O'Donnell was eligible for the Voluntary Leave Transfer
[13] Program?
[14]    A I was on the committee to determine her for
[15] consideration, yes.
[16]    Q That's what I was trying to say. Let's go off for [17] a
minute.
[18] I'm showing you what has been marked Exhibit 48 to
[19] Colleen O'Donnell's deposition and is that Ms.O'Donnell's
[20] application for the Voluntary Leave Transfer Program?
[21]    A Yes.
[22]    Q And was Ms.O'Donnell granted or denied Voluntary
[23] Leave?
[24]    A She was not approved for voluntary leave?
[25]    Q And why was she not approved?

**Page 71**

[1]    A January 31, 2003.
[2]    Q And what was that note provided subsequent to
[3] Ms.O'Donnell's denial for Voluntary Leave?
[4]    A I don't know.
[5]    Q Does her application state the date that it was [6] denied?
[7]    A No.
[8]    Q Now Colleen also requested Advanced Sick Leave,
[9] right?
[10]    MR. WILMOT: Objection.
[11]    THE WITNESS: I believe so.
[12]    BY MS. MCDONALD:
[13]    Q I am going to show you what has been marked
[14] Colleen O'Donnell's deposition Exhibit 52.
[15] Was this Ms.O'Donnell's application for Advanced [16] Sick
Leave?
[17]    A It's a Request for Leave, yes.
[18]    Q And in Box No. 6, does it say Advanced Leave?
[19]    A Yes.
[20]    (Exhibit No. 9 marked for [21] identification.)
[22]    BY MS. MCDONALD:
[23]    Q And I'm going to show you Exhibit No. 9 and ask
[24] you if you recognize that document?
[25]    A Yes I recognize it.

**Page 70**

[1]    A I don't remember. I don't remember why. Votes [2] are
taken and majority rules.
[3]    Q How did you vote?
[4]    A No.
[5]    Q Why did you vote no?
[6]    A Not enough medical documentation. Anticipated
[7] recovery time, when she would be able to come back to work.
[8]    Q And what further medical documentation were you
[9] looking for?
[10]    A Specific recovery and/or anticipated recovery. If [11] she
could any type of limited light duty.
[12] That type of information.
[13]    Q Is it possible that those questions were, that
[14] Dr.Milowe was unable to answer those questions given the
[15] nature of Ms.O'Donnell's disability.
[16]    A I don't know.
[17]    MR. WILMOT: Objection.
[18]    BY MS. MCDONALD:
[19]    Q Okay. I am going to show you what has been marked
[20] as Exhibit 19 to Warden Winn's deposition and ask you if you
[21] have seen that document?
[22]    A Yes.
[23]    Q And what is that document?
[24]    A It's a medical note from Dr.Milowe.
[25]    Q And what is the date on that note?

**Page 72**

[1]    Q And what is that document?
[2]    A It's a letter to Colleen from Warden, or from [3] Steven
Gagnon.
[4]    Q And what is the date?
[5]    A January 23, 2003.
[6]    Q And this letter indicates that Ms.O'Donnell was [7] initially
granted 24 hours of Advanced Leave, is that right?
[8]    A It states that she would be granted 24 hours of
[9] Advanced Leave, yes.
[10]    Q And that was in order for her to obtain medical
[11] documentation?
[12]    A Sufficient time to obtain the requested medical
[13] documentation, yes.
[14]    Q And did Ms.O'Donnell provide further
[15] documentation for the requirements of this letter?
[16]    A I don't remember.
[17]    Q Okay, let me refer you back to, I don't remember [18] the
number, to Dr.Milowe's letter, yes, dated January 31, [19] 2003.
[20] Was that letter from Dr.Milowe provided [21] subsequent to
this January 23, 2003 letter from Steve [22] Gagnon?
[23]    A Yes. It was received by Warden Winn on February
[24] 10, 2002, 2003.
[25]    Q And is that letter on Dr.Milowe's letterhead?

Case 4:04-cv-40190-FDS   Document 24-5   Filed 04/18/2006   Page 21 of 43

Case 4:04-cv-40190-FDS   Document 24-5   Filed 04/18/2006   Page 21 of 43
Depo of Donnell V. Secretary, 04/06/2006 Cynthia Page 73 of 76   XMAX(19/19)
BSA

## Page 73

[1]   A It appears to be, yes.

[2]   Q And does it provide an assessment of [3] Ms.O'Donnell's current clinical status?

[4]   A It appears to.

[5]   Q And what does it state about Ms.O'Donnell's [6] expected at of full or partial recovery?

[7]   A Unlikely until the two are separated and [8] Ms.O'Donnell is allowed to go through a healing process. [9] Until then, she will remain totally isolated.

[10]  Q Now Exhibit 9 in the last paragraph also asks [11] Colleen to submit a Standard Form 71 application for leave [12] by January 31, 2003. [13] Is that right?

[14]  A That is correct.

[15]  Q And is Exhibit 52, is that the Standard Form 71?

[16]  A Yes it is.

[17]  Q And was that submitted by Colleen prior to January [18] 31, 2003?

[19]  A No.

[20]  Q It wasn't?

[21]  A No ma'am.

[22]  Q What's the date next to her signature?

[23]  A The date she signed it was January 27, 2003.

[24]  Q And that's not the date she submitted it?

[25]  A No ma'am.

## Page 74

[1]   Q What is the date that she submitted it?

[2]   A February 11, 2003.

[3]   Q And is that date on the fax line?

[4]   A Yes ma'am.

[5]   Q And her Request for Advanced Leave was denied. Is [6] that right?

[7]   A Warden disapproved it on February 19.

[8]   Q And do you know the reasons why he disapproved it?

[9]   A No ma'am.

[10]  Q Now in the meantime while all of this medical [11] documentation was going back and forth and Ms.O'Donnell is [12] applying for various leaves, did you become aware that she [13] had hired an attorney?

[14]  A Yes.

[15]  Q And who was that attorney?

[16]  A Sam Rizzitelli.

[17]  (Exhibit No. 10 marked for [18] identification.)

[19]  BY MS. MCDONALD:

[20]  Q I am going to show you what has been marked as [21] Exhibit 10 and ask you if you have seen that document [22] before?

[23]  A Yes I have.

[24]  Q And what is this document?

[25]  A A letter from Mr.Rizzitelli concerning, actually

## Page 75

[1]   warning Warden Winn that I am incapable or unwilling to [2] follow federal law.

[3]   Q And is this letter addressed to both the Warden [4] and you?

[5]   A Yes it is.

[6]   Q And would you agree that this letter is [7] antagonistic towards you?

[8]   A I have no opinion of this letter.

[9]   Q Do you know, did you know Attorney Rizzitelli [10] prior to his representation of Ms.O'Donnell?

[11]  A Yes.

[12]  Q And did you have a contentious relationship with [13] him?

[14]  A Not that I'm aware of.

[15]  Q In the past?

[16]  A No.

[17]  Q Do you see in the portion that's addressed to you, [18] where he demands that you retract the medical release and [19] cease this violation of law? [20] Do you see that?

[21]  A Yes.

[22]  Q Did you understand that to mean that he was asking [23] you to withdraw the medical release that you had asked [24] Ms.O'Donnell to sign?

[25]  A It was a request, it wasn't a demand.

## Page 76

[1]   Q Well, he says I demand, right?

[2]   A I mean, yes, I see that.

[3]   Q And why, the next line says, furthermore, you have [4] better not retaliate against her for asserting her rights. [5] Did Attorney Rizzitelli have some reason to [6] believe that you would retaliate against Ms.O'Donnell?

[7]   MR. WILMOT: Objection.

[8]   THE WITNESS: You would have to ask [9] Mr.Rizzitelli.

[10]  BY MS. MCDONALD:

[11]  Q Had there been a prior case or incident wherein he [12] accused you of retaliating against another of his clients?

[13]  A No.

[14]  Q And do you see where he's asking you that you [15] provide Ms.O'Donnell a reasonable accommodation for post [16] traumatic stress disorder?

[17]  A Yes.

[18]  Q To your knowledge, is the first time that a [19] request was made for a reasonable accommodation for [20] Ms.O'Donnell's post traumatic stress disorder?

[21]  MR. WILMOT: Objection. You can answer.

[22]  THE WITNESS: Request to me?

[23]  BY MS. MCDONALD:

[24]  Q Yes. Do you know if there was a request to [25] anybody else prior to this date?

## Page 77

[1]  A No.

[2]  Q Now in the portion that's addressed to Warden [3] Winn, the first line states this writing is to advise you [4] that this office has been retained by Ms.O'Donnell.

[5]  Do you see that?

[6]  A Yes.

[7]  Q So despite the fact that he's advising you that [8] Ms.O'Donnell has retained him, neither you or the Warden or [9] any supervisors would talk to Attorney Rizzitelli until you [10] had received some kind of written documentation from [11] Ms.O'Donnell.

[12]  Is that right?

[13]  MR. WILMOT: Objection. You can answer.

[14]  THE WITNESS: It's standard procedure.

[15]  BY MS. MCDONALD:

[16]  Q So this letter is insufficient. This is an [17] insufficient letter of representation from Attorney [18] Rizzitelli as far as BOP is concerned?

[19]  MR. WILMOT: Objection.

[20]  THE WITNESS: In my opinion, yes.

[21]  (Exhibit No. 11 marked for [22] identification.)

[23]  BY MS. MCDONALD:

[24]  `Q I am going to show you what has been marked as [25] Exhibit 11 and ask if you recognize that document?

## Page 78

[1]  A No.

[2]  Q You've never seen that document?

[3]  A I don't remember this document.

[4]  Q This is a document on my letterhead dated April [5] 23, 2004 addressed to the Warden.

[6]  Can you please read the first line?

[7]  A Please be advised that Colleen O'Donnell has [8] retained me to represent her in all matters she currently [9] has pending against the Federal Bureau of Prisons to include [10] the current AWOL investigation.

[11]  Q And was Ms.O'Donnell required to submit a written [12] release allowing you, the Warden or the Bureau of Prisons to [13] speak or deal with me?

[14]  A I don't know.

[15]  Q Is there any substantive difference between my [16] statement in my letter that I've been retained to represent [17] Ms.O'Donnell and Mr.Rizzitelli's statement that he's been [18] retained to represent Ms.O'Donnell?

[19]  MR. WILMOT: Objection. You can answer.

[20]  THE WITNESS: You give a reason as to what the [21] matters are. That you are representing her.

[22]  BY MS. MCDONALD:

[23]  Q Other than that, there is no difference, right?

[24]  A No.

[25]  Q And I would ask that if you do find that there is

## Page 79

[1]  some written authorization that Colleen had to sign in order [2] for me to represent her, that you would provide that to your [3] attorney and he will provide it to me.

[4]  I am going to show you what has been marked as [5] Exhibit 20 to the Warden's deposition and ask you to take a [6] look at that document.

[7]  Do you recognize that document?

[8]  A Yes.

[9]  Q And what is that document?

[10]  A It's a letter to Colleen from Warden Winn advising [11] her he is unable to grant her accommodation request that [12] another staff member be removed.

[13]  Q And what is the date of that letter?

[14]  A January 27, 2003.

[15]  Q And the Warden also offers to restrict Reynoso to [16] the camp as an accommodation.

[17]  Is that right?

[18]  A Yes.

[19]  Q And he asks Ms.O'Donnell to respond if that [20] accommodation is acceptable or not.

[21]  Is that right?

[22]  A Correct.

[23]  Q And did Ms.O'Donnell respond?

[24]  A No.

[25]  Q Did her attorney respond?

## Page 80

[1]  A Yes.

[2]  Q Let me show you what has been marked as Exhibits [3] 21 through 24 of Warden Winn's deposition. Take a look at [4] these and let me - the question I am going to ask you is, [5] are these MR. Rizzitelli's responses to the Warden's offer [6] of an accommodation?

[7]  MR. WILMOT: Did you say response? I'm sorry.

[8]  MS. MCDONALD: Yes I did.

[9]  MR. WILMOT: Okay.

[10]  (Pause)

[11]  THE WITNESS: Can you repeat the question. I'm [12] sorry.

[13]  BY MS. MCDONALD:

[14]  Q You testified a minute ago that Attorney [15] Rizzitelli had responded to the Warden's offer to put [16] Mr.Reynoso at the camp and my question was, are those [17] his responses to that offer?

[18]  A Yes.

[19]  Q Now the Warden testified yesterday that the reason [20] nobody responded to Attorney Rizzitelli was that he did not [21] have permission from Colleen and that that permission was [22] not received until March 4, 2003.

[23]  Do you believe that testimony to be true and [24] accurate?

[25]  A Yes.

### Page 81

[1]    Q And if we can put aside for one moment the
[2] technicality of obtaining written permission from Colleen,
[3] who was out of work due to a mental disability, did you
[4] understand by all these letters that either Colleen or her
[5] attorney were attempting to get additional information
[6] regarding the offer to put Reynoso at the camp?
[7]    MR. WILMOT: Objection. You can answer.
[8]    THE WITNESS: I understand Mr.Rizzitelli was [9] attempting
to get information.
[10]    BY MS. MCDONALD:
[11]    Q Okay. Was there any reason at this time why [12] either
the Warden, you or Steve Gagnon could not have [13] responded
to those letters directly to Colleen?
[14]    A Well they're addressed to Warden Winn.
[15]    Q I understand but is there any reason why the
[16] Warden could not have responded to Colleen?
[17]    A I can't speak for the Warden.
[18]    Q I understand you can't speak for the Warden, but
[19] can you think of any reason why he would not be able to
[20] respond directly with Colleen in response to those letters?
[21]    MR. WILMOT: Objection.
[22]    THE WITNESS: I don't know if he didn't.
[23]    BY MS. MCDONALD:
[24]    Q Well he testified yesterday that he didn't and you
[25] already acknowledged that you believed -

### Page 82

[1]    A I'm sorry.
[2]    Q That testimony to be accurate.
[3]    MR. WILMOT: I'm sorry. He testified yesterday [4] that what?
[5]    MS. MCDONALD: He testified yesterday that nobody
[6] responded to his, Attorney Rizzitelli's letters because he
[7] didn't have permission.
[8]    MR. WILMOT: Right. Are you asking her whether or [9] not
he responded to Colleen?
[10]    MS. MCDONALD: No. She just stated she didn't [11] know
if the Warden didn't respond.
[12]    MR. WILMOT: Okay.
[13]    MS. MCDONALD: Which is inconsistent –
[14]    MR. WILMOT: When I followed the question, I [15] thought
- I'm sorry.
[16]    BY MS. MCDONALD:
[17]    Q Okay. The Warden further testified that as soon [18] as
he received Colleen's permission on March 4th, he [19] responded
to her attorney on March 6th.
[20] Do you believe that testimony to be true and accurate?
[21]    MR. WILMOT: Objection.
[22]    BY MS. MCDONALD:
[23]    Q If you know.
[24]    A Yes. I believe so.
[25]    Q I am going to show you what was marked as Exhibit

### Page 83

[1] 25 in the Warden's deposition and ask you to take a look at
[2] that and let me know if you recognize that document?
[3]    A I have seen this document. Yes.
[4]    Q And what is that document and what is the date on [5] that
document?
[6]    A It's March 6th to Mr.Rizzitelli in response to a [7] letter from
Mr.Rizzitelli dated February 10, 2003 in which [8] he requested
accommodation for Ms.O'Donnell.
[9]    Q And the Warden states in that letter he did not [10] believe
that Ms.O'Donnell was an individual with a [11] disability under the
ADA.
[12] Do you see that?
[13]    A Yes.
[14]    Q And did you assist the Warden in drafting that [15] letter?
[16]    A No I did not.
[17]    Q Did you give the Warden advice in drafting that
[18] letter?
[19]    A No I did not.
[20]    Q That letter, I'm sorry can I see that. This [21] letter also
states that Ms.O'Donnell was found not eligible [22] for the
Voluntary Leave Transfer Program. That she was not
[23] authorized for administrative leave. That she exhausted her
[24] annual and sick leave and it doesn't mention leave without
[25] pay but we've already discussed that she was denied leave

### Page 84

[1] without pay.
[2] Is that right?
[3]    MR. WILMOT: Objection.
[4]    MS. MCDONALD: I'm sorry.
[5]    THE WITNESS: I don't know which part to answer. [6] Sorry.
[7]    BY MS. MCDONALD:
[8]    Q Okay. Basically, Ms.O'Donnell had not leave
[9] opportunities available to her as of the date of that [10] letter.
[11] Is that accurate?
[12]    MR. WILMOT: Objection. You can answer.
[13]    THE WITNESS: Could you repeat the question. I'm
[14] sorry.
[15]    BY MS. MCDONALD:
[16]    Q Ms.O'Donnell had no leave opportunities available
[17] to her as of the date of that letter.
[18] Is that accurate?
[19]    MR. WILMOT: Objection.
[20]    THE WITNESS: No.
[21]    BY MS. MCDONALD:
[22]    Q That's not accurate?
[23]    A They were available to her.
[24]    Q Well, she was not authorized for administrative [25] leave
as of the date of that letter, right?

### Page 85

[1]     MR. WILMOT: Objection. You can answer.

[2]     THE WITNESS: She was not granted administrative

[3] leave.

[4]     BY MS. MCDONALD:

[5]     Q Okay. And she had been denied voluntary leave or

[6] found not eligible for the Voluntary Leave Transfer Program,

[7] right?

[8]     A Correct.

[9]     Q And we, you testified earlier that she had been [10] denied

leave without pay.

[11] Correct?

[12]     A Correct.

[13]     Q And she had exhausted her annual and sick leave.

[14] Is that right?

[15]     A I believe so. It states here, yes.

[16]     Q Is there any other leave that I am missing that [17] she

could have applied for?

[18]     A She could have applied for them again with proper

[19] documentation.

[20]     Q Okay. So Ms.O'Donnell was placed on AWOL status

[21] on February 3, 2003. Do you – if I represent that to you,

[22] does that purport with your memory?

[23]     A I don't remember the exact date.

[24]     Q Okay. Now this whole timeframe that we've

[25] discussing, is this the first time that Ms.O'Donnell was

### Page 86

[1] AWOL?

[2]     A I don't know.

[3]     Q Do you know whether she was absent without leave [4] on

two occasions?

[5]     A I have, I have no recollection.

[6]     MS. MCDONALD: Okay. Can we go off the record?

[7]     (Whereupon, a luncheon recess was taken at 1:14 p.m.)

### Page 87

[1] A F T E R N O O N S E S S I O N

[2]     (2:03 p.m.)

[3]     BY MS. MCDONALD:

[4]     Q At some point, did the BLP receive notice that [5] Colleen

wanted to return to work?

[6]     MR. WILMOT: Objection. You can answer.

[7]     MS. MCDONALD: Do you need some context to that

[8] question?

[9]     THE WITNESS: Yes, please.

[10]     BY MS. MCDONALD:

[11]     Q I'm sorry. It made sense if we hadn't stopped. [12] Okay,

prior to the lunch break, we were discussing [13] Ms.O'Donnell's

absence from work and the fact that she was [14] AWOL.

[15] Do you recall that?

[16]     A Yes.

[17]     Q And after some period of time which I will [18] represent

to you as February 3, 2003 through June 10 of [19] 2003, do you

recall that Ms.O'Donnell wanted to return to [20] work?

[21]     A Yes.

[22]     Q And did she provide a doctor's notice in order to

[23] facilitate her return?

[24]     A I don't remember.

[25] (Exhibits No. 12 and 13 marked for

### Page 88

[1]     identification.)

[2]     BY MS. MCDONALD:

[3]     Q I am going to show you two documents which have

[4] been marked Exhibits 12 and 13 and ask you take a look at

[5] them.

[6] Do you recognize those documents?

[7]     A Yes.

[8]     Q Can you describe them please?

[9]     A There's a letter from Sam Rizzitelli indicating [10] that

there's correspondence from Colleen's treating physician

[11] authorizing her to return to work and then him requesting

[12] pertinent information regarding Mr.Reynoso and a copy of

[13] the restraining order which is renewed and awaiting the

[14] reply.

[15]     Q Which exhibit were you just describing?

[16]     A 13.

[17]     Q And can you describe Exhibit 12 please?

[18]     A It's from Dr.Milowe, George Milowe, M.D. re: [19] Colleen

O'Donnell. Saw this patient today in the office. [20] She is now able

to resume her job duties, including [21] overtime.

[22]     Q Do you know if anyone responded to Attorney

[23] Rizzitelli's June 4, 2003 letter?

[24]     A I don't remember.

[25]     MS. MCDONALD: Let me show you what has been

Page 89

[1] marked Exhibit 14.

[2]    (Exhibit No. 14 marked for [3] identification.)

[4]    BY MS. MCDONALD:

[5]    Q Is that another letter from Attorney Rizzitelli to [6] the Warden dated June 9, 2003?

[7]    A Yes it is.

[8]    Q And does that indicate, does that letter state [9] Attorney Rizzitelli had not hear from the Warden since his [10] previous letter?

[11]    A As of June 9th, yes.

[12]    Q And this letter also indicates that Ms.O'Donnell [13] could return to work on June 11, 2003.

[14] Is that correct?

[15]    A That's correct.

[16]    Q And do you know if she did, in fact, return to [17] work on June 11, 2003?

[18]    A No I do not.

[19]    Q Do you have any reason to doubt that she returned [20] to work on June 11th?

[21]    A No.

[22]    Q do you recall an incident occurring on June 16, [23] 2003 where the mailroom was vandalized?

[24]    A Yes.

[25]    Q And can you tell me how the mailroom was

Page 90

[1] vandalized?

[2]    MR. WILMOT: Objection. You can answer.

[3]    THE WITNESS: The outside of the mailroom was [4] spray painted.

[5]    BY MS. MCDONALD:

[6]    Q And what was it spray painted with?

[7]    A I don't know.

[8]    Q Was it spray painted with obscenities regarding [9] Ms.O'Donnell?

[10]    A I believe so, yes.

[11]    Q Did you see Colleen on the day that vandalism was [12] discovered?

[13]    A No.

[14]    MR. WILMOT: Objection to the question.

[15]    BY MS. MCDONALD:

[16]    Q Do you know whether Ms.O'Donnell believed or [17] accused Officer Reynoso of having vandalized the mailroom?

[18]    MR. WILMOT: Objection. You can answer.

[19]    THE WITNESS: I don't know.

[20]    BY MS. MCDONALD:

[21]    Q You didn't hear any rumors to that effect?

[22]    A I'm sorry. Not that I remember. No.

[23]    MS. MCDONALD: Okay. I have to back up for a [24] minute and show you Exhibit 15 which is an undated letter [25] from the Warden to Mr.Rizzitelli.

Page 91

[1]    (Exhibit No. 15 marked for [2] identification.)

[3]    BY MS. MCDONALD:

[4]    Q Do you recognize that document?

[5]    A Yes. I have seen this before.

[6]    Q And does the document indicate that Ms.O'Donnell [7] was returned to work on June 11, 2003?

[8]    A Yes.

[9]    Q Okay. Do you know whether Ms.O'Donnell took time [10] off after the vandalism to the mailroom?

[11]    A Yes.

[12]    MS. MCDONALD: I am showing you what's dated as [13] June 18, 2003. A letter to Ms.O'Donnell from her [14] supervisor, Steve Gagnon.

[15]    (Exhibit No. 16 marked for [16] identification.)

[17]    BY MS. MCDONALD:

[18]    Q Do you recognize that document?

[19]    A Yes.

[20]    Q And what is that document?

[21]    A It's a letter from Mr.Gagnon advising [22] Ms.O'Donnell that the Warden has authorized administrative [23] leave for up to ten days.

[24]    Q And was that administrative leave as a result of [25] the vandalism on the mailroom?

Page 92

[1]    A Yes.

[2]    Q Let me call your attention to the second [3] paragraph. Do you see in the letter a requirement that [4] Ms.O'Donnell contact either Mr.Gagnon or Mr.Amico at 8:00 [5] and 3:00 p.m. daily?

[6] Do you see that?

[7]    A Yes.

[8]    Q Do you know why Ms.O'Donnell was ordered to [9] contact her supervisors daily at 8:00 and 3:00?

[10]    A No I do not.

[11]    Q Are other employees required to, strike that, The [12] Warden testified yesterday that he placed the call in [13] restriction on Colleen because she had been out of work and [14] the facility had been unable to contact her and that she did [15] not return messages or respond to inquiries.

[16]    MR. WILMOT: I'm just going to object to your [17] recount of what the word testified to.

[18]    MS. MCDONALD: Okay. That is not the precise [19] language of his testimony. I believe that to be the [20] substance of his testimony, however.

[21]    BY MS. MCDONALD:

[22]    Q Does that refresh your recollection as to why that [23] restriction may have been put on Ms.O'Donnell?

[24]    A No.

[25]    MR. WILMOT: Objection.

BSA

Case 4:04-cv-40190-FDS  Document 24-5  Filed 04/18/2006  Page 26 of 43

## Page 93

[1] BY MS. MCDONALD:

[2] Q Okay. Following the mailroom incident, were you

[3] aware that Ms.O'Donnell required another medical leave of

[4] absence?

[5] A Yes.

[6] MS. MCDONALD: I'm showing you what's marked Exhibit

[7] 17.

[8] (Exhibit No. 17 marked for [9] identification.)

[10] BY MS. MCDONALD:

[11] Q And is that a note that the facility received from

[12] Ms.O'Donnell's doctor once again, taking her out of work?

[13] A Yes.

[14] Q And can you just read that note for the record?

[15] A Due to re-traumatization, Monday, June 16, 2003 at

[16] work, Ms.O'Donnell is now totally disabled again.

[17] Q Do you know if, did Ms.O'Donnell then apply for

[18] leave without pay?

[19] A I don't remember.

[20] (Exhibit No. 18 marked for [21] identification.)

[22] BY MS. MCDONALD:

[23] Q I'll show you a letter dated June 23, 2003 to

[24] Ms.O'Donnell from Steve Gagnon and ask you if you

recognize [25] that document?

## Page 94

[1] A Yes.

[2] Q And is Mr.Gagnon advising Colleen that she has to

[3] request leave without pay?

[4] A Yes.

[5] Q And do you know if she did?

[6] A No I do not.

[7] Q Okay. Let me show you what has been marked as

[8] Exhibit 69 of Colleen O'Donnell's deposition and if you can

[9] take a look at that and I'll ask you if that refreshes your

[10] memory as to whether Ms.O'Donnell applied for leave without

[11] pay?

[12] A Yes.

[13] Q And what was the date of that application?

[14] A July 28, 2003.

[15] Q And was that leave granted?

[16] A It was approved, yes.

[17] Q And was there a condition on the approval?

[18] A On August 11th, Ms.O'Donnell must provide an

[19] updated doctor's note to the Warden.

[20] (Exhibit No. 19 marked for [21] identification.)

[22] BY MS. MCDONALD:

[23] Q Okay. Let me show you a letter marked Exhibit 19

[24] dated June 30, 2003 and ask you if you recognize this

[25] letter?

## Page 95

[1] A Yes.

[2] Q And that's a letter from you to Ms.O'Donnell. Is [3] that

right?

[4] A Yes it is.

[5] Q And you mention in this letter that she was [6] authorized

for thirty days of without pay.

[7] And in the second paragraph, you mention that she [8] has

completed sufficient time with the federal service to be [9] eligible

for a disability retirement based on her medical [10] condition and

you enclosed some forms and information, I [11] think, for her.

[12] Is that accurate?

[13] A Yes.

[14] Q Can you explain the disability retirement plan to [15] me?

[16] A When individuals who are out with medical fixed in [17] a

period of time, they apply if they have eighteen months of

[18] service, they can apply to the Office of Personnel

[19] Management for disability retirement.

[20] Q And do you know what the requirements are for

[21] obtaining disability retirement?

[22] A No, they have to provide medical documentation to

[23] OPM and their doctors rule on it.

[24] Q And that's the only information they have to [25] provide?

## Page 96

[1] A Well, there's an application packet.

[2] Q Okay.

[3] A There's a part for the supervisor. There's leave

[4] balances. It's a pretty intensive, information intensive

[5] document.

[6] Q And you provided that packet to Ms.O'Donnell?

[7] A Yes.

[8] Q Do you know whether Ms.O'Donnell applied again [9] for

leave without pay?

[10] A I don't remember.

[11] Q Let me show you a document that was marked Exhibit

[12] 70 to Ms.O'Donnell's deposition and ask you if that

[13] refreshes your memory as to whether Ms.O'Donnell applied

[14] for a leave without pay again?

[15] A Yes she did.

[16] Q And was that granted?

[17] A No it was not.

[18] Q And why was it not granted?

[19] A Ms.O'Donnell failed to follow Warden's [20] instructions

by not providing an updated doctor's note.

[21] Q Do you know whether Ms.O'Donnell was then placed

[22] on AWOL status for a second time?

[23] A No I do not.

[24] MS. MCDONALD: Let me show you a letter from Steve

[25] Gagnon to Ms.O'Donnell dated August 13, 2003.

Page 97

[1]   (Exhibit No. 20 marked for [2] identification.)
[3]   BY MS. MCDONALD:
[4]   Q Does that refresh your memory as to whether
[5] Ms.O'Donnell was placed on AWOL status?
[6]   A Yes.
[7]   Q And what was the effective date of her AWOL [8] status?
[9]   A August 13, 2003.
[10]   Q Following, at some point after August 13, 2003, do
[11] you know whether the institution received notice from
[12] Ms.O'Donnell that she wanted to return to work?
[13]   A At some point, yes.
[14]   MS. MCDONALD: I'm showing you a document, Exhibit
[15] 21, dated November 11, 2003.
[16]   (Exhibit No. 21 marked for [17] identification.)
[18]   BY MS. MCDONALD:
[19]   Q Can you take a look at that and describe it for [20] the
record?
[21]   A It's a message to Warden Winn from Colleen
[22] O'Donnell dated November 11, 2003. The message is would
[23] like to return to work as soon as possible. Please call me
[24] and tell me when to report to work. Thank you. Colleen
[25] O'Donnell. And it indicates there's two pages.

Page 98

[1]   Q Okay. Do you know if Colleen provided the [2] doctor's
note?
[3]   A No I don't.
[4]   MS. MCDONALD: I am showing you a document marked
[5] as Exhibit 22 which is dated November 10, 2003.
[6]   (Exhibit No. 22 marked for [7] identification.)
[8]   BY MS. MCDONALD:
[9]   Q Can you state what that document is please?
[10]   A It appears to be a note from a Doctor Ackerman
[11] referencing Colleen O'Donnell. Colleen is now able to
[12] return to work full-time without any restrictions. Thank
[13] you.
[14]   Q So that indicates that Colleen had no [15] restrictions.
Correct?
[16]   A That is correct.
[17]   Q And where was her regular assignment when she was
[18] working?
[19]   A Inmate Services.
[20]   Q Let me show you a document that was marked Exhibit
[21] 28 at Warden Winn's deposition and ask if you recognize that
[22] document?
[23]   A Yes.
[24]   Q And where did the Warden assign Ms.O'Donnell on
[25] her return to work?

Page 99

[1]   MR. WILMOT: Objection. You can answer.
[2]   (Pause)
[3]   THE WITNESS: To the camp officer per an agreement.
[4]   BY MS. MCDONALD:
[5]   Q And camp was not Ms.O'Donnell's regular
[6] assignment, right?
[7]   A No it isn't.
[8]   Q Did Colleen object to being assigned to camp?
[9]   A I have no knowledge of that.
[10]   Q Do you know if when she returned to work she was
[11] actually assigned to the camp?
[12]   A I don't remember.
[13]   Q When she returned to work do you know if Colleen
[14] was investigated for being absent without leave?
[15]   A Yes.
[16]   MS. MCDONALD: I'll show you Exhibit 23 and ask [18] you
to look at that.
[19]   (Exhibit No. 23 marked for [20] identification.)
[21]   BY MS. MCDONALD:
[22]   Q Do you recognize that document?
[23]   A Yes.
[24]   Q And can you describe that document?
[25]   A It's a Notice of Investigation to an employee

Page 100

[1] required to provide information during an official
[2] investigation?
[3]   Q And is this the form that notifies Ms.O'Donnell [4] that
she's going to be investigated for being absent without [5] leave?
[6]   A Yes.
[7]   Q And what is the date on this document?
[8]   A December 10, 2003.
[9]   Q Do you know what the results of the investigation
[10] were?
[11]   A I believe they were sustained.
[12]   Q And do you know what discipline was recommended?
[13]   A I don't remember.
[14]   Q I am going to show you a document which was marked
[15] Exhibit 31 of Warden Winn's deposition. I'll ask you to
[16] review that.
[17] What is that document?
[18]   A It's a decision letter.
[19]   Q And does that document refresh your memory as to
[20] what discipline was recommended?
[21]   A Proposed was a thirty day suspension.
[22]   Q And what discipline did she receive?
[23]   A A letter of reprimand.
[24]   Q What factors are taken into consideration in [25] granting
promotions?

## Page 101

[1]    A Granting promotions?

[2]    Q Or giving somebody a promotion. Is it an [3] automatic thing or is there – I guess, is it just based on [4] seniority and the next person in line gets the promotion or [5] are there other factors considered?

[6]    A No. There's an announcement. The individuals [7] apply for the position. They prepare responses to different [8] knowledge, skills and abilities.

[9] They have to outline what knowledge, skill and [10] ability they have to perform a specific what we call, KSA's [11] –

[12]    Q What's a KSA?

[13]    A Which would be ability to communicate in writing.

[14] Ability to work with inmates. There's a variety of them for [15] specific jobs.

[16]    Q Okay.

[17]    A They are rated. Those KSA's are rated against a [18] scoring sheet and then they are rated in writing and they [19] are placed a BQ List. Well, their total skills are rated [20] and ranked with scores, points for their evaluation, points [21] for the KSA and points for awards.

[22]    Q And awards, what kind of awards?

[23]    A Cash awards for superior performance, QSI's?

[24]    Q What's a QSI?

[25]    A Quality step increase.

## Page 102

[1]    Q Okay.

[2]    A It goes with an outstanding evaluation. Special [3] act awards which are for specific acts. One time acts that [4] happen in the institution where somebody may have responded [5] to an emergency. Then they're placed on, with all their [6] scores, placed on a list, highest score to lowest and we [7] look, and if we have one vacancy, we look for a natural [8] break in the scores and refer the highest.

[9]    Q And who do you refer them to?

[10]    A The Warden.

[11]    Q Do does the Warden have to pick the highest score [12] or can he pick amongst the most highest?

[13]    A He doesn't see the score. He gets an alphabetical [14] list.

[15]    Q Oh. So what does he base, do you know what he [16] bases his decision on in picking from that list if he [17] doesn't see the scores?

[18]    A The application that the employee submitted.

[19]    Q Do you know that there was a GSA promotion posted [20] while Ms.O'Donnell was AWOL?

[21]    A No.

[22]    Q You don't remember?

[23]    A I don't remember.

[24]    MS. MCDONALD: Okay. I have one more thing. Can [25] you explain this document to me after she marks it?

## Page 103

[1] I am showing you Exhibit 24 which is a daily [2] assignment roster.

[3]    (Exhibit No. 24 marked for [4] identification.)

[5]    BY MS. MCDONALD:

[6]    Q I'm asking you if you can explain it to me?

[7]    A How?

[8]    Q Yeah, well I don't know. Is this an assignment [9] roster for the entire facility/

[10]    A Correctional Services.

[11]    Q Okay. Is Ms.O'Donnell in that department/

[12]    A No she is not.

[13]    Q Okay. So this is just an assignment roster for [14] one department.

[15]    A That is correct.

[16]    Q Okay. I understand. I don't need any further [17] explanation. Thank you.

[18]    A You're welcome.

[19]    MS. MCDONALD: I don't think that I have any more.

[20]    MR. WILMOT: Okay. If we can have a two minute [21] break and we'll get through it. I don't have that much.

[22]    MS. MCDONALD: Okay.

[23]    (Off the record at 2:41 p.m.)

[24]    (On the record at 2:48 p.m.)

[25]    BY MR. WILMOT:

## Page 104

[1]    Q Ms.Lord, does the BOP have policies concerning [2] equal opportunity?

[3]    A Yes.

[4]    Q Does the BOP have policies concerning generally [5] anti-discrimination policies?

[6]    A Yes.

[7]    Q Does the BOP have policy on sexual harassment?

[8]    A Yes.

[9]    Q Does the Bureau train its employees on these [10] policies that you just identified?

[11]    A Yes.

[12]    Q Would Colleen O'Donnell have been trained on these [13] policies?

[14]    A Yes.

[15]    Q Would Mr.Reynoso have been trained on these [16] policies?

[17]    A Yes.

[18]    Q Would the Warden have been trained on these [19] policies?

[20]    A Yes.

[21]    Q Okay, well, let me say it another way. Are all [22] BOP employees trained on these policies?

[23]    A Yes they are.

[24]    Q Okay. Including management?

[25]    A Yes.

Case 4:04-cv-40190-FDS    Document 24-5    Filed 04/18/2006    Page 29 of 43

Case 4:04-cv-Deposition of Cynthia O'Donnell V. Gonzales 04/40190-FDS Document of Cynthia O'Donnell 09/18/05    XMAX(27/27)

**Page 105**

[1]    Q Are the BOP's policies posted within its [2] facilities?

[3]    A Yes they are.

[4]    Q what is posted?

[5]    A There's a posting in the office of special [6] counsel. It's posted. And there is the EEO process on [7] filing complaints that is posted, as well as sexual [8] harassment posting.

[9]    Q Okay. Now where are these policies posted?

[10]    A They're on the affirmative action bulletin board [11] by ISM and the sallyport area there, the staff lounge and [12] medical.

[13]    Do employees have access to these three areas that [14] you just identified?

[15]    A Yes.

[16]    Q Are the Bureau's policies, the ones you have [17] identified already, are they written any where?

[18]    A Yes.

[19]    Q Where could an employee find these policies in [20] written form?

[21]    A On sallyport, from my office.

[22]    Q When you say your office, the Employee Services?

[23]    A The Employee Services Department, yes. And they [24] are provided during annual refresher training on a yearly [25] basis.

**Page 106**

[1]    Q What is annual refresher training?

[2]    A Every year we have refresher training for a [3] variety of, well, we have forty hours of training that we [4] must attend which involves self-defense firearms, sexual [5] harassment training, EEO training, correctional services [6] training, disturbance control. And I'm sure I haven't - [7] inmate sentencing guidelines.

[8]    Q We're focusing on the policies that we were [9] talking about?

[10]    A Okay.

[11]    Q Are those provided during the annual refresher [12] training?

[13]    A Yes.

[14]    Q But the refresher training generally covers [15] or updates on various policies of the Bureau.

[16] Is that correct?

[17]    A Affirmative action, EEO, sexual harassment, and [18] the code of conduct, ethics.

[19]    Q Now when you say EEO, are the guidelines [20] concerning when an employee must file an EEO complaint, are [21] those discussed during the annual refresher training?

[22]    A Yes.

[23]    Q Are the guidelines concerning filing an EEO [24] complaint provided to employees in written form?

[25]    A Yes.

**Page 107**

[1]    Q Okay. And at what points are employees, [2] employment here at Devens, would those, the written form of [3] the covering EEO guidelines, when would that be provided?

[4]    A They're provided initially at hire, during [5] institutional familiarization and then annually in ART. [6] Annual Refresher Training.

[7]    Q Okay. Do you know whether the guidelines [8] concerning the filing of an EEO complaint were provided to [9] Ms.O'Donnell?

[10]    A Yes.

[11]    Q Okay. Yes they were?

[12]    A Yes they were.

[13]    MS. MCDONALD: Okay. Mark that please. I am going to [14] show you what is marked as Exhibit 25.

[15]    (Exhibit No. 25 marked for [16] identification.)

[17]    BY MS. MCDONALD:

[18]    Q Can you identify that document?

[19]    A It's an acknowledgement of receipt for program [20] statement entitled Sexual Harassment Prevention Program.

[21]    Q And who is that document executed by?

[22]    A Mr.Reynoso.

[23]    Q And it shows that Mr.Reynoso also received this [24] program statement on what date?

[25]    A September 28, 1998.

**Page 108**

[1]    Q Okay. Now at the onset of your deposition today, [2] you gave some testimony as to the background investigation [3] of Mr.Reynoso.

[4] Do you remember that testimony?

[5]    A Yes.

[6]    Q Okay. I believe Attorney McDonald asked you some [7] questions about whether it was possible that something [8] slipped past you concerning Mr.Reynoso's background.

[9] Do you remember that testimony?

[10]    A Yes.

[11]    Q If I can bring your attention to Exhibit, Winn [12] Exhibit No. 3. If you can turn to the second page of this [13] document. Second page. Winn Exhibit No. 3 is the [14] declaration for federal employment for Mr.Reynoso which you [15] identified earlier.

[16] And Ms.O'Donnell's question about whether [17] something could have slipped by concerned the arrest that [18] Mr.Reynoso identifies on this document.

[19] Do you see that?

[20]    MS. MCDONALD: Ms.McDonald's question.

[21]    THE WITNESS: McDonald.

[22]    MR. WILMOT: I'm sorry. Let me strike the whole [23] thing. Let's start from the beginning. All right.

[24]    BY MR. WILMOT:

[25]    Q Exhibit 3 from Mr.Winn's deposition is the

## Page 109

[1] declaration for federal employment executed by Mr.Reynoso.

[2] Correct?

[3]    A That is correct.

[4]    Q Do you remember that Ms.McDonald asked you

[5] whether or not it was possible that the information

[6] contained on page 2 of that exhibit specifically, that

[7] Mr.Reynoso was arrested for assault and battery in May of

[8] 1991, if it was possible that information slipped by you.

[9] Do you remember that line of questioning?

[10]    A Yes I do.

[11]    MS. MCDONALD: Let me show you what is marked as

[12] Exhibit 26.

[13]    (Exhibit No. 26 marked for [14] identification.)

[15]    MS. MCDONALD: If you could just review that [16] exhibit

and let me know when you're finished please.

[17] You know, are we off the –can we go off?

[18]    MR. WILMOT: Sure.

[19]    (Off the record at 2:57 p.m.)

[20]    (On the record at 2:59 p.m.)

[21]    MR. WILMOT: Back on.

[22]    BY MR. WILMOT:

[23]    Q Can you identify what is marked as Exhibit 26?

[24]    A It's a memorandum to our security and background

[25] investigation section concerning issues that arose during

## Page 110

[1] the OPM investigation for Mr.Reynoso's background.

[2]    Q And who is that memorandum prepared by?

[3]    A Milly Sheridan.

[4]    Q Who executed the memorandum?

[5]    A I did.

[6]    Q Okay. So you did review this before?

[7]    A Yes.

[8]    Q And was it sent again to?

[9]    A Security and background investigations section in

[10] Dallas, Texas.

[11]    Q And what is the date of this memorandum?

[12]    A February 24, 1999.

[13]    Q If you flip to the second page or third page. I'm

[14] sorry. Actually, we can just stay of the first page for a

[15] moment.

[16] If you could just read for the record the third [17] paragraph

on that document? The first page of the document?

[18]    A Issue Code 06A, 06B violent behavior in connection

[19] with Mr.Reynoso's arrest in May of 1991 for assault and

[20] battery charges which were dismissed as revealed by

[21] Mr.Reynoso during his pre-employment interview in May of

[22] 1998 and should not be considered outside the Bureau of

[23] Prison's guidelines.

[24]    Q Okay. Why don't we flip to the third page? On [25] the

third page of this document - can you identify what

## Page 111

[1] this page is, the third page in Exhibit 26?

[2]    A It's a page marked pre-employment interview [3] process

that we, standardized, specific questions that we [4] use for all

employees.

[5]    Q Paragraph 7, can you just summarize what the

[6] substance of the question is.

[7]    A The question asks the employee if they've been

[8] involved in any disruptive or forceful behavior, disorderly

[9] conduct, resisting arrest, assault and battery, threatening

[10] an official or spouse abuse or excessive use of force.

[11]    Q And what is the response to that question?

[12]    A Yes.

[13]    Q And what does 7A ask and what is the response?

[14]    A If the response is yes, it requests specific, or [15] just

specify the acts and circumstances and the dates of the [16] event.

[17]    Q And what is your response. Did you read your

[18] response?

[19]    A ON May 3, 1991, applicant states that he was

[20] charged with assault and battery. Applicant states that on

[21] the morning of May 3, 1991, he and his girlfriend were

[22] arguing and he grabbed her at the chest area, windbreaker

[23] and she had a scratch on her chest.

[24] Applicant states he was then arrested when he was [25] in

school that morning.

## Page 112

[1]    Q I can stop you there. I just wanted to - If you [2] can flip on

this - what's the next page of this document?

[3]    A The next –

[4]    Q This page that you're looking at now. Page 11 of

[5] Exhibit 26.

[6]    A It continues on. It talks about, it's a page from [7] our

pre-employment interview.

[8]    Q Okay. What does paragraph or question 6 ask?

[9]    A The state says that the applicant never committed [10] a

misdemeanor or felony.

[11]    Q What's the response to that question?

[12]    A Yes.

[13]    Q What does question 6A ask?

[14]    A If yes to question 6, for each offense, the type [15] of

offense and the date committed and the legal disposition?

[16]    Q And what is the response?

[17]    A Assault and battery on May 3, 1991. Continued

[18] without a finding. One year later, charges were dismissed.

[19]    Q Well, we can stop there but let me ask you this

[20] question.

[21] Again, having reviewed the information here as [22] contained

in Exhibit 26, did the fact that Mr.Reynoso was [23] arrested in

1991 for assault and battery, did that slip by [24] you?

[25]    A No.

617-426-3077

**APEX Reporting**

## Page 113

[1]    Q Did you bring that to the attention of the proper
[2] officials within the agency?
[3]    A Yes.
[4]    Q But as you stated earlier, the guidelines did not [5] permit
you to consider that arrest.
[6] Is that correct?
[7]    A That is correct.
[8]    Q If you look at your pile of exhibits. Lord [9] Exhibit No. 2.
You, I guess we identified this earlier as a [10] handwritten note
from Ms.O'Donnell. It doesn't appear to [11] be dated but there's a
fax line at the top that says April [12] 29, 2003.
[13] When Warden Winn receives a document, does he have
[14] a practice that he follows to indicate whether or not he in
[15] fact received the document or had seen it?
[16]    A Yes.
[17]    Q And what does he typically do?
[18]    A He puts the date and his initials noted.
[19]    Q Looking at Exhibit No. 2, do you see Warden Winn's
[20] signature or date or initials as you described?
[21]    A No.
[22]    MS. MCDONALD: Okay. If you flip to Lord Exhibit [23] No.
3. You identified that document earlier as the April [24] 12, 2002
letter to Ms.O'Donnell which changes her work day [25] to the 6
a.m. to 2:30 p.m.

## Page 114

[1] Can you mark this document please?
[2]    (Exhibit No. 27 marked for [3] identification.)
[4]    BY MS. MCDONALD:
[5]    Q Do you recognize the document that has been marked
[6] as Exhibit 27?
[7]    A Yes.
[8]    Q Can you identify what it is please?
[9]    A It's a letter to David Reynoso from Warden Winn
[10] providing him information upon his return to duty.
[11]    Q If you could place that document, Exhibit 27, side [12] by
side with Exhibit No. 3. You can put the other papers [13] down in
your hand.
[14]    A Okay.
[15]    Q In comparing those two documents, other than the
[16] change to the times that Mr.Reynoso and Ms.O'Donnell had
[17] to work and the location, the physical location where they
[18] were to work, what are the differences between these two
[19] letters?
[20]    MS. MCDONALD: Objection. You can answer.
[21]    THE WITNESS: Mr.Reynoso is advising that he will [22] not
be able to work an armed post until the resolution of [23] the
pending criminal charges against him.
[24] This line, he is not to contact Colleen and she is [25] not
allowed to contact him. And then the signatures.

## Page 115

[1]    BY MR. WILMOT:
[2]    Q Now, would you agree with me that both letters,
[3] there's a sentence that says if you plan to work outside
[4] these hours (this overtime) you must notify your supervisor
[5] prior to the shift?
[6]    A Yes.
[7]    Q On either of these letters, is there any language [8] that
states Ms.O'Donnell or Mr.Reynoso was not permitted [9] to work
overtime?
[10]    A No.
[11]    Q Okay. Attorney McDonald asked you a question
[12] earlier whether you thought Ms.O'Donnell had an obligation
[13] to enforce the training order she had against Mr.Reynoso.
[14] Do you remember that testimony?
[15]    A Yes.
[16]    Q Can you elaborate on that? Why did you - what
[17] obligations did you believe Ms.O'Donnell had with regards
[18] to the restraining order?
[19]    A I believe she has an obligation to herself to not [20] go
where she knows he frequents or contact him since she [21] does
have the restraining order against him and if he [22] violates the
restraining order, that she report that.
[23]    Q Bring your attention to Winn Exhibits 4 and 5. [24] And
these are the memorandum, memoranda, from the Workplace
[25] Violence Committee that met on April 8 and April 9, 2002

## Page 116

[1] which you testified about earlier.
[2] You testified earlier that the second Workplace [3] Violence
Committee convened at 9 a.m. on April 9, 2002.
[4] Do you remember that testimony?
[5]    A Yes.
[6]    Q Do you know whether or not the Workplace Violence
[7] Committee had in its possession the protective order against
[8] Mr.Reynoso at the time that it issues its recommendation to
[9] the Warden on April 9, 2002?
[10]    A No I don't, I don't recall.
[11]    Q Let me show you Winn Exhibit No. 8. And this [12] again,
is the protective order that was issued against [13] Mr.Reynoso on
April 9, 2002.
[14] Can you flip to the second page of the document [15] please?
[16] The line that says date of order, is there a time [17] indicated
there of when the order was issued?
[18]    A Yes.
[19]    Q What is the time?
[20]    A 10:20 a.m.
[21]    Q And what is the date?
[22]    A April 9, 2002.
[23]    Q So again, if the Workplace Violence Committee met
[24] at 9:00 that morning and this order was issued at 10:20 that
[25] morning, does that refresh your memory whether or not the

BSA

## Page 117

[1] Workplace Violence Committee had this order in its
[2] possession when it made the recommendations to the Warden
on [3] April 9, 2002?
[4]    A I wouldn't think we had it.
[5]    Q Now is Warden Winn bound to follow the
[6] recommendations of the Workplace Violence Committee?
[7]    A No.
[8]    Q Are you aware whether the Warden received the
[9] protective order for making the decision to change
[10] Ms.O'Donnell and Mr.Reynoso's work here at Devens?
[11]    A I'm sorry, can you repeat that?
[12]    Q Are you aware whether or not the Warden had
[13] received the protective order which is marked as Winn
[14] Exhibit No. 8 before making the decision to change
[15] Ms.O'Donnell and Mr.Reynoso's work schedules here at the
[16] prison?
[17]    A I don't remember.
[18]    Q Okay. Are you aware whether or not Mr.Reynoso
[19] was found guilty of the assault and battery with regard to
[20] the incident that occurred on April 8, 2002?
[21]    A Could you repeat that again, I'm sorry.
[22]    Q Are you aware whether or not Mr.Reynoso was found
[23] guilty for assault and battery against Ms.O'Donnell for the
[24] events that took place on April 8, 2002?
[25]    A Yes.

## Page 118

[1]    Q What were you aware of?
[2]    A He wasn't - it was continued without a finding.
[3]    Q The question is, was he found guilty?
[4]    A No.
[5]    Q Okay. Are you aware whether Ms.O'Donnell ever
[6] complained to any member of management at Devens after
April [7] 8, 2002 that Officer Reynoso caused her harm either on
[8] Devens property or elsewhere?
[9]    A After the April 8th date?
[10]    Q Right.
[11]    A No.
[12]    Q You're not aware whether she did or not?
[13]    A I'm not aware of anything.
[14]    Q Let me ask you another way.
[15]    A Okay.
[16]    Q Did Ms.O'Donnell complain to any member of
[17] management here at the prison after April 8, 2002 that
[18] Officer Reynoso caused her harm either on Devens property
or [19] elsewhere?
[20]    A I'm sorry. I'm not understanding.
[21]    Q After April 8, 2002. April 8th is the incident at [22] Mirror
Lake?
[23]    A Yes.
[24]    Q Okay. After that date, April 8, 2002, did
[25] Ms.O'Donnell complain, Ms.O'Donnell complain to anyone,

## Page 119

[1] any member of management here at Devens, that Officer
[2] Reynoso caused her harm either on the agency's property or
[3] elsewhere?
[4]    A No. I don't remember. No.
[5]    MS. MCDONALD: This is what happens after lunch.
[6]    BY MR. WILMOT:
[7]    Q After April 8, 2002, did Ms.O'Donnell complain to [8] any
member of management here at Devens that Mr.Reynoso was
[9] currently engaging in behavior that caused her concern for
[10] her safety?
[11]    A Current behavior?
[12]    Q Yes.
[13]    A No, not that I'm aware of. No.
[14]    Q Okay. If you can flip to Exhibit No. 8, Lord [15] Exhibit
No. 8.
[16] Now you previously identified this. Well, we have [17] to go
through it a little bit actually.
[18]    A Okay.
[19]    Q What is Exhibit No. 8?
[20]    A It's a record of conversation or a telephone call [21] that I
had with Colleen O'Donnell on January 14th?
[22]    Q is this your handwriting?
[23]    A Yes it is.
[24]    Q And is that your signature on Exhibit No. 8?
[25]    A Yes it is.

## Page 120

[1]    Q And what is the date of this document?
[2]    A January 14, 2003.
[3]    Q Did you prepare this document while you were on [4] the
phone with Colleen or strike that.
[5] When did you prepare this note?
[6]    A While I was conversing with Ms.O'Donnell.
[7]    Q Okay. When you were speaking with Ms.O'Donnell [8] in
this conversation, did she complain to you about [9] providing the
agency additional information?
[10] Additional medical information?
[11]    MS. MCDONALD: Objection.
[12]    THE WITNESS: No.
[13]    BY MR. WILMOT:
[14]    Q In fact, she indicated to you that she would [15] provide
the information, is that correct?
[16]    A She requested an extension to provide it so she
[17] could get the documentation.
[18]    Q Okay. Let me show you what has been previously
[19] identified in Ms.O'Donnell's deposition. This is marked as
[20] Exhibit 51.
[21] It's a memo dated February 10, 2003.
[22] Do you recognize that document?
[23]    A Yes I do.
[24]    Q What is it?
[25]    A It's a response to, a memorandum to Colleen

### Page 121

[1] O'Donnell in response to or the findings of the Voluntary
[2] Leave Transfer Program Screening Committee.
[3]     Q Okay. You testified earlier you didn't remember [4] what
the reasons were why the Committee denied Colleen's
[5] application for the Voluntary Leave Transfer Program?
[6] Can you just take a moment to read that memo to [7] yourself?
[8]     A Sure.
[9]     Q Have you read it?
[10]     A Mm Hmm.
[11]     Q Does that refresh your memory as to why the
[12] Voluntary Leave Transfer Program Committee denied
[13] Ms.O'Donnell's application to the program?
[14]     A Yes.
[15]     Q And what was the reason?
[16]     A The medical emergency was based on another staff
[17] member's employment with the Bureau of Prisons and she
would [18] be able to return to work if the other individual was no
[19] longer employed.
[20] Accommodations of her work site had been afforded [21] so
that she may return to work.
[22] In addition on February 21, 2003 you contacted Ned
[23] LeClair, Safety Manager, for the forms necessary to file a
[24] stress-related claim. A request of these forms again on
[25] February 10, 2003.

### Page 122

[1]     Q Okay. Was the fact that Ms.O'Donnell is a woman [2] a
factor, strike that.
[3] Was the fact that Ms.O'Donnell's gender, that of [4] a female,
woman, a factor in the Committee's decision to [5] deny her
application for the Voluntary Leave Transfer [6] Program?
[7]     A No.
[8]     Q Was the fact that Ms.O'Donnell was involved in [9] EEP
activities at the agency a factor in the Committee's [10] decision to
deny her application for the Voluntary Leave [11] Transfer
Program?
[12]     A No.
[13]     Q Was the fact that Ms.O'Donnell had requested an
[14] accommodation a factor in the Committee's decision to deny
[15] her application for the Voluntary Leave Transfer Program?
[16]     A No.
[17]     Q Show you again what was marked as Colleen Exhibit
[18] No. 52 and I'm showing you now what is marked as Exhibit 54
[19] out of Ms.O'Donnell's, out of her deposition.
[20] And if you can take a moment to review Exhibit 54 [21] and let
me know when you're finished please.
[22]     A Mm Hmm.
[23]     Q You testified earlier that you could not remember
[24] why the Warden denied the request for leave which is marked
[25] as Exhibit 52.

### Page 123

[1] Having read Exhibit 54, does that refresh your [2] memory as
to why the request for leave marked Exhibit 52, [3] was denied?
[4]     A Yes.
[5]     Q And what is that reason?
[6]     A Request for Advance Leave, DOJ Order, outlines
[7] several things and one of them is the employee's ability to
[8] or whether or not they're going to return to work and then
[9] remaining totally disabled which indicated an inability to
[10] return to work and filing with the Workman's Comp.
[11]     Q Let me see that for a second. Do you know who
[12] drafted Exhibit 54?
[13]     A I believe I did.
[14]     Q So did you discuss the content of this letter to [15] the
Warden prior to drafting the letter?
[16]     A Oh yes.
[17]     Q In that discussion, strike that. At whose [18] direction, did
you draft this letter?
[19]     A Warden Winn.
[20]     Q Whose decision was it to deny the leave request [21] that
is marked Exhibit 52?
[22]     A Warden Winn.
[23]     Q In that discussion with Warden Winn, did you talk
[24] about that, strike that.
[25] In the discussion with Warden Winn about the

### Page 124

[1] request that is marked Exhibit 52, did you discuss
[2] Ms.O'Donnell's gender in that conversation?
[3]     A No.
[4]     Q Did you discuss at all that she was involved in [5] EEO
activities at the agency?
[6]     A No.
[7]     Q Did Warden Winn indicate that his reasons for [8] denying
the request was because she had previously requested [9] an
accommodation?
[10]     A No.
[11]     Q Okay. If you could, I'm sorry.
[12]     A That's okay.
[13]     Q I'll try not to mix all this together. But if you [14] could
look to Exhibit 10 and 11 in your deposition today.
[15]     A Okay.
[16]     Q And first, sorry. First, drawing your attention [17] to
Exhibit 10 which you previously identified as a letter [18] from
Attorney Samuel Rizzitelli to Warden Winn and yourself [19] dated
January 21, 2003.
[20] At the time of that letter, marked as Exhibit 10, [21] had
Colleen O'Donnell filed any type of grievance or [22] complaint
against the agency?
[23]     A No.
[24]     Q And turning your attention to Exhibit 11 which you
[25] previously identified as a letter from Attorney Dawn

## Page 125

[1] McDonald to Warden Winn dated April 23, 2004.
[2] At the time of Ms.O'Donnell's letter marked as [3] Exhibit 11, had Colleen filed any grievance or complaint [4] against the agency?
[5]    A Yes.
[6]    Q Okay. Turn your attention to Winn Exhibit 21. [7] This is the letter you testified about previously. It's a [8] letter from Rizzitelli to Winn dated February 10, 2003.
[9] I also want to show you Exhibits 22 and 23 from [10] Warden Winn's deposition, both of which you testified to.
[11] Would you agree with me that other than the [12] watermarks that appear on Exhibits 22 and 23, that Exhibits [13] 23, 22 and 21 are identical letters?
[14]    A Yes.
[15]    Q And referring just to Exhibit 21 for now.
[16]    A Okay.
[17]    Q Can you identify for me in this letter whether or [18] not Mr.Rizzitelli states that his client, Ms.O'Donnell, [19] would accept the Warden's proposed accommodation of placing
[20] Mr.Reynoso at the camp?
[21]    A I'm sorry. Could you repeat your question?
[22]    Q In the letter dated February 10, 2003 which is
[23] marked as Exhibit 21, does Mr.Rizzitelli state that his
[24] client, Ms.O'Donnell, would accept Warden Winn's proposal
[25] of placing Mr.Reynoso at the camp?

## Page 126

[1]    A No.
[2]    Q Okay. Let me show you what has been marked as
[3] Exhibit 25. You testified about this document earlier.
[4] It's a letter from Warden Winn to Mr.Rizzitelli [5] dated March 6, 2003 and if you could, read the second [6] sentence of the second paragraph?
[7]    A This –
[8]    Q Second sentence.
[9]    A Second sentence, second paragraph?
[10]    Q Exactly.
[11]    A I have offered to continue to accommodate this
[12] situation by ensuring that the work schedules are for
[13] different shifts and I have offered to change the other [14] staff member's duty location to the camp which is [15] approximately a quarter mile from the main institution.
[16]    Q Okay.
[17]    A The main facility.
[18]    Q Do you know whether or not Mr.Rizzitelli [19] indicated after the date of this letter, whether or not [20] Ms.O'Donnell would accept that accommodation?
[21] That of placing Mr.Reynoso at the camp which he [22] says is a quarter of mile away from the facility?
[23]    A Did he accept it on her behalf?
[24]    Q Yes.
[25]    A I don't remember.

## Page 127

[1]    Q Okay. Now also in testifying about this document,
[2] Attorney McDonald asked you whether or not at the date of
[3] this letter, whether or not it was true that there was no [4] leave available to Ms.O'Donnell.
[5] Do you remember that line of questioning?
[6]    A Yes.
[7]    Q With regards to the Voluntary Transfer Program,
[8] Voluntary Leave Transfer Program, could Ms.O'Donnell
[9] reapply to that program?
[10]    A Yes.
[11]    Q And if she had provided new information, would the
[12] Voluntary Leave Transfer Program Committee had considered
[13] that information?
[14]    A Yes.
[15]    Q Did she ever do that?
[16]    A No.
[17]    Q Reapply or submit new information?
[18]    A No.
[19]    Q Could Ms.O'Donnell reapply requesting leave?
[20]    A Yes.
[21]    Q And if she had provided new information with that
[22] request, would that information had been considered?
[23]    A Yes.
[24]    Q Did she ever do that?
[25]    A No.

## Page 128

[1]    Q I think that's all I have. But let me take two [2] seconds. Go off the record for a moment.
[3]    (Recess.)
[4]    MR. WILMOT: Can I go ahead or do you want to [5] wait? Dawn? All right.
[6]    BY MR. WILMOT:
[7]    Q Winn Exhibit 19 which you provided some testimony
[8] on. This is the January 31, 2003 letter from Dr.Milowe.
[9] Turning your attention to the second paragraph, it [10] says there that common sense and good will dictate that
[11] Ms.O'Donnell not be required to work in the same facility
[12] at the same time as Mr.Reynoso.
[13] Do you see that?
[14]    A Yes.
[15]    Q And the sentence before that says working in the
[16] same environment as her assailant merely intensifies her
[17] symptoms and does not give her a chance to heal.
[18] Would you agree with me that this letter seems to [19] indicate that Ms.O'Donnell's ability to work was [20] conditioned on whether or not she would be in Mr.Reynoso's [21] presence?
[22]    A Yes.
[23]    MR. WILMOT: That's all I have.
[24]    MS. MCDONALD: Okay. We're done.
[25]    MR. WILMOT: Okay.

## Page 129

[1]    (Off the record at 3:35 p.m.)

## Page 131

[1] CORRECTION SHEET
[2] DEPOSITION OF CYNTHIA LORD [3] PAGE NO. LINE NO.
SUGGESTED CORRECTION [4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

## Page 130

[1] C E R T I F I C A T E [2] COMMONWEALTH OF
MASSACHUSETTS )
) SS. [3] COUNTY OF SUFFOLK )
[4] I, Marilyn D. Franklin, a Court Reporter and [5] Notary Public,
within and for the Commonwealth of [6] Massachusetts, do hereby
certify that there came before me [7] on this 16th day of
September, 2005, the person hereinbefore [8] named, who was by
me duly sworn to tell the truth, the whole [9] truth, and nothing but
the truth, concerning and touching [10] the matter in controversy in
this cause; that she was [11] thereupon examined upon her oath,
and her examination [12] reduced to typewriting, under my
direction, and that this [13] deposition transcript is a true and
accurate record of the [14] testimony given by the witness.
[15] I further certify that I am not related to any of [16] the parties
hereto or their counsel, and that I am in no way [17] interested in
the outcome of said cause.
[18] Dated at Boston, Massachusetts, this 4th day of [19] day of
October, 2005.
[21]
Marilyn D. Franklin
[22] NOTARY PUBLIC
My Commission Expires:
[23] August 18, 2011

## Page 132

[1]    SIGNATURE OF WITNESS:
[2] I have read the foregoing transcript and the same [3] contains
a true and accurate recording of my answers to the [4] questions
therein set forth, subject to the change and/or [5] correction
sheet(s) attached.
[8]
[9] Deponent

# EXHIBIT 7

LAW OFFICES

## COOLEY, SHRAIR P.C.

1380 MAIN STREET - FIFTH FLOOR
SPRINGFIELD, MASSACHUSETTS 01103-1616

TELEPHONE (413) 781-0750    TELECOPIER (413) 733-3042

WRITER'S DIRECT DIAL
(413) 735-8045

EMAIL: dmcdonald@cooleyshrair.com

DAWN D. McDONALD*                                              *ALSO ADMITTED IN CONNECTICUT

FILE NO. 24763.1

EXHIBIT
_Lord_ 11
_ADE_ 9-16-05

COPY

April 23, 2004

David L. Winn, Warden
FMC Devens
P.O. Box 880
Ayer, MA 01432

> RE:  *Colleen O'Donnell v. Federal Bureau of Prisons*
> EEO Complaint #P-2003-0165;  OSC File # MA-03-1067

Dear Warden:

Please be advised that Colleen O'Donnell has retained me to represent her in all matters she currently has pending against the Federal Bureau of Prisons including the current AWOL investigation. Please be advised that I am in receipt of a letter to Ms. O'Donnell from her supervisor, Steve Gagnon, Inmate Systems Manager, with regard to suggested discipline to be instituted against Ms. O'Donnell for the charges of being absent without leave. Please be further advised that I intend to respond to this proposal on behalf of Colleen.

I see from this letter which I only received yesterday, April 22, 2004, that Ms. O'Donnell has fifteen days with which to respond from the date she received the letter which was on April 20. Please consider this a written request for an extension of time for Ms. O'Donnell to respond to this proposal. I make this request on her behalf because I am beginning a trial in Federal District Court on Monday, April 26, 2004 which is expected to last through May 7, 2004. By my calculations, Colleen's response is due May 5, 2004. On her behalf, I request an additional two weeks in which to respond to this proposal, therefore, I would have Ms. O'Donnell's response to you on or before May 21, 2004. In the meantime, I would appreciate it if you could provide me with any and all documents relied upon by the Institution in arriving at its suggested proposal.

Thank you for your consideration in this matter. If you have any questions or concerns, please feel free to contact me.

Very truly yours,

Dawn D. McDonald

DDM/as
cc:    Colleen O'Donnell
       Kelly McDonald, Esq.
       David Brooks, Esq.

{Document=X:\DOCS\24763\1\lettmemo\00061330.DOC:1}

# EXHIBIT 8

Feb-10-03 10:44A Samuel M. Rizzitelli Jr.    203-736-9800

# LAW OFFICES
# SAMUEL M.
# RIZZITELLI, JR.

26 Prindle Avenue
Derby, CT 06418
Tel/Fax (203) 736-9800



**CONFIDENTIAL**

Samuel M. Rizzitelli, Jr.

February 10, 2003

Via: Facsimile

David L. Winn, Warden
FMC Devens
P.O. Box 880
Ayer, Massachusetts 01432
Facsimile: (978) 796-1118

**EXHIBIT**
Winn 21
MDP        9·15·05

RE:    Representation of Colleen O'Donnell

Dear Mr. Winn:

By now you should have received a statement from Colleen that I am representing her. As you should know, there is no standard government form to be used to advise you of this legal representation. Actually, according to the standards of every bar in every jurisdiction in this country as well as every federal agency, my letter of January 23, 2003 should suffice for recognition of legal representation. Trusting that you're not trying to make this any more difficult or litigious than necessary, I assume you're just receiving bad advise from your human resource manager.

From now on, please correspond directly with me and provide a copy to Colleen. First, we haven't been advised that Cindy's January 9, 2003 request for a full medical release from Colleen has been retracted. Please advise whether this request is still outstanding or retracted.

Second, we are reasserting our request that your agency provide Colleen with a reasonable accommodation for post traumatic stress disorder. You have advised Colleen that you would be willing to restrict Officer Reynoso to the camp. This may be a responsive accommodation and we thank you for such. Please elaborate on this proposed resolution so that we may fully understand any impact on Colleen.

In lieu of an accommodation, Colleen should be placed on administrative leave or authorized to receive leave from the donated leave bank/pool until she can return to work. Lastly, Colleen did not receive any pay for the last pay period. Please return her to a pay status immediately. Thanks.

Sincerely,

Samuel M. Rizzitelli, Jr., Esq.

**BOP5642**

Feb-18-03 12:05P Samuel M. Rizzitelli Jr.    203-736-9800                P.01

LAW OFFICES
# SAMUEL M.
# RIZZITELLI, JR.



26 Prindle Avenue
Derby, CT 06418
Tel./Fax (203) 736-9800

Samuel M. Rizzitelli, Jr.

CONFIDENTIAL

February 10, 2003

Via: Facsimile

David L. Winn, Warden
FMC Devens
P.O. Box 880
Ayer, Massachusetts 01432
Facsimile: (978) 796-1118

EXHIBIT
Winn 22
9/15/05

RE:    Representation of Colleen O'Donnell

## No response received

Dear Mr. Winn:

## Re-Sent: February 18, 2003

By now, you should have received information indicating that I am representing her. As you
should know, there is no standard government form to be used to advise you of this legal
representation. Actually, according to the standards of every bar in every jurisdiction in this
country as well as every federal agency, my letter of January 23, 2003 should suffice for
recognition of legal representation. Trusting that you're not trying to make this any more
difficult or litigious than necessary, I assume you're just receiving bad advise from your human
resource manager.

From now on, please correspond directly with me and provide a copy to Colleen. First, we
haven't been advised that Cindy's January 9, 2003 request for a full medical release from Colleen
has been retracted. Please advise whether this request is still outstanding or retracted.

Second, we are reasserting our request that your agency provide Colleen with a reasonable
accommodation for post traumatic stress disorder. You have advised Colleen that you would be
willing to restrict Officer Reynoso to the camp. This may be a responsive accommodation and
we thank you for such. Please elaborate on this proposed resolution so that we may fully
understand any impact on Colleen.

In lieu of an accommodation, Colleen should be placed on administrative leave or authorized to
receive leave from the donated leave bank/pool until she can return to work. Lastly, Colleen did
not receive any pay for the last pay period. Please return her to a pay status immediately.
Thanks.

Sincerely,

Samuel M. Rizzitelli, Jr., Esq.

BOP5641



CONFIDENTIAL

# LAW OFFICES
# SAMUEL M. RIZZITELLI, JR.

26 Prindle Avenue
Derby, CT 06418
Tel./Fax (203) 736-9800

Samuel M. Rizzitelli, Jr.

February 10, 2003

Via: Facsimile/U.S. Certified Mail

David L. Winn, Warden
FMC Devens
P.O. Box 880
Ayer, Massachusetts 01432
Facsimile: (978) 796-1118

**EXHIBIT**
Winn 23
UDF 9-15-05

RE:    Representation of Colleen O'Donnell

**No response received**

Dear Mr. Winn:

**Re-Sent: March 3, 2003**

By now you should have received a statement from Colleen that I am representing her. As you should know, there is no standard government form to be used to advise you of this legal representation. Actually, according to the standards of every bar in every jurisdiction in this country as well as every federal agency, my letter of January 23, 2003 should suffice for recognition of legal representation. Trusting that you're not trying to make this any more difficult or litigious than necessary, I assume you're just receiving bad advise from your human resource manager.

From now on, please correspond directly with me and provide a copy to Colleen. First, we haven't been advised that Cindy's January 9, 2003 request for a full medical release from Colleen has been retracted. Please advise whether this request is still outstanding or retracted.

Second, we are reasserting our request that your agency provide Colleen with a reasonable accommodation for post traumatic stress disorder. You have advised Colleen that you would be willing to restrict Officer Reynoso to the camp. This may be a responsive accommodation and we thank you for such. Please elaborate on this proposed resolution so that we may fully understand any impact on Colleen.

In lieu of an accommodation, Colleen should be placed on administrative leave or authorized to receive leave from the donated leave bank/pool until she can return to work. Lastly, Colleen did not receive any pay for the last pay period. Please return her to a pay status immediately. Thanks.

Sincerely,

Samuel M. Rizzitelli, Jr., Esq.

BOP5638

Case 4:04-cv-40190-FDS    Document 24-2    Filed 04/18/2006    Page 87 of 115

LAW OFFICES
**SAMUEL M.
RIZZITELLI, JR.**

CONFIDENTIAL



26 Prindle Avenue
Derby, CT 06418
Tel./Fax (203) 736-9800

Samuel M. Rizzitelli, Jr.

March 10, 2003

David L. Winn, Warden
FMC Devens
P.O. Box 880
Ayer, Massachusetts 01432
Facsimile: (978) 796-1118

Via: Facsimile

EXHIBIT
Winn 24
ADF    9-15-05

RE:    Colleen O'Donnell

Dear Mr. Winn:

    Your letter to Colleen dated February 19, 2003 was based on broken communication due to the delay in recognition of this office as Colleen's attorney. Therefore, if any of the reasons for that letter require us to address any matter contained therein, please readdress such to me.

    According to your March 6, 2003 correspondence, you have determined that Colleen is not covered by the Americans with Disability Act. We do not agree. At the very least, we should clarify that she cannot work while she is exposed to Officer Reynoso. Hence, the need for a reasonable accommodation. You have advised us that you would be willing to restrict Officer Reynoso to the camp. This may be a responsive accommodation and we thank you for such. Please elaborate on this proposed resolution so that we may fully understand any impact on Colleen.

    You have also advised that Colleen is currently considered AWOL. This is an inappropriate employment status which is causing her to suffer damages. Please have Colleen placed on Administrative Leave (authorized leave with pay) retroactive the date that she was first considered AWOL. Once we fully understand the terms of your proposed accommodation, she may be able to return to work at the institution without any interruption in pay. Inflicting these unnecessary pecuniary damages upon Colleen will greatly increase the probability of very adversarial litigation.

    You have not responded to my request for advise on whether Cindy's January 9, 2003 request for a full medical release from Colleen has been retracted. At this time, we will consider it retracted unless advised otherwise. I look forward to meeting you soon and thanks for your response of March 6th.

Sincerely,

Samuel M. Rizzitelli, Jr., Esq.

cc: Colleen O'Donnell, 56 Chester Street, Malden, MA 02148

CONFIDENTIAL

LAW OFFICES

# SAMUEL M. RIZZITELLI, JR.

Samuel M. Rizzitelli, Jr.

36 Prindle Avenue
Derby, CT 06418
Tel./Fax (203) 736-9800

March 24, 2003



David L. Winn, Warden                    Via: Facsimile
FMC Devens
P.O. Box 880
Ayer, Massachusetts 01432
Facsimile: (978) 796-1118

EXHIBIT
Winn 26
MDF  9-15-05

RE:    Colleen O'Donnell

Dear Mr. Winn:

You are not corresponding responsively.  Please address this very important question that has been posed to you in earlier letters:

"...You have advised us that you would be willing to restrict Officer Reynoso to the camp.  This may be a responsive accommodation and we thank you for such.  **Please elaborate on this proposed resolution so that we may fully understand any impact on Colleen.**"

Your March 6, 2003 correspondence does not outline anything as you state in your March 21, 2003.  You are causing unnecessary damages upon Colleen and future litigation of this matter with your refusal or inability to communicate effectively.

Sincerely,

Samuel M. Rizzitelli, Jr., Esq.

cc: Colleen O'Donnell, 56 Chester Street, Malden, MA. 02148.

BOP5617