EXHIBIT 10

### LAW OFFICES
# SAMUEL M. RIZZITELLI, JR.

26 Prindle Avenue
Derby, CT 06418
Tel./Fax (203) 736-9800

Samuel M. Rizzitelli,

June 9, 2003

David L. Winn, Warden                                        Via: Facsimile
FMC Devens
P.O. Box 880
Ayer, Massachusetts 01432
Facsimile: (978) 796-1118

RE:    Colleen O'Donnell

Dear Mr. Winn:

    We haven't heard from you since we advised you that Colleen has been cleared to return to work.
If we don't hear from you early this week, Colleen will return to work on Wednesday, June 11, 2003.
Please advise exactly how she will be protected from the very dangerous David Reynoso.

Sincerely,

Samuel M. Rizzitelli, Jr., Esq.

EXHIBIT 11



U.S. Department of Justice

Federal Bureau of Prisons

*Federal Medical Center, Devens*

_____

*P.O. Box 880*
*Ayer, MA 01432*

Samuel M. Rizzitelli, Jr.
26 Prindle Avenue
Derby, CT 06418

Dear Mr. Rizzitelli:

We look forward to Ms. O'Donnell returning to her position at F.M.C. Devens on June 11, 2003. Medical documentation provided through you from Ms. O'Donnell's Physician states that she may resume her job duties including overtime.

The issues between your client and Mr. Reynoso have been resolved by the courts of the Commonwealth of Massachusetts. We are aware of the court's decision. In addition, we will be holding both employees accountable for their behavior in accordance with the Standards of Employee Conduct.

At this time it is expected that Ms. O'Donnell will report for her regular duty on Wednesday, June 11, 2003. She is to report to her supervisor, Anthony Amico, Assistant ISM, who will advise her as to her scheduled tour of duty in ISM.

If Ms. O'Donnell has any questions or concerns she may address them with the Steve Gagnon, Inmate System Manager.

Sincerely,

David L. Winn
Warden

# EXHIBIT 12

LAW OFFICES

## COOLEY, SHRAIR P.C.

1380 MAIN STREET – FIFTH FLOOR
SPRINGFIELD, MASSACHUSETTS 01103-1616

TELEPHONE (413) 781-0750    TELECOPIER (413) 733-3042

WRITERS DIRECT DIAL
(413) 735-8045

EMAIL: dmcdonald@cooleyshrair.com

DAWN D. McDONALD•                                                *ALSO ADMITTED IN CONNECTICUT

FILE NO. 24763

November 18, 2003

Kelly McDonald, Esq.                        **VIA FAX AND MAIL**
Federal Bureau of Prisons                   **(202) 307-6912**
320 First Street N.W., Room 818
Labor Law Branch
Washington, D.C. 20534

     Re:  Colleen O'Donnell

Dear Attorney McDonald:

Please be advised that I am in receipt of a letter from Warden Winn, of today's date, which indicates that my client may return to work on November 20, 2003. This letter also indicates that because of Mr. Reynoso's assault on my client, which led to him being subject to an Order of Protection, and to his pleading to sufficient facts for a finding of guilty for the assault, my client must be reassigned outside the facility in order to facilitate the effective running of the institution while still allowing Mr. Reynoso to comply with the terms of the Order of Protection.

Please be advised that, on behalf of my client, I find this completely unacceptable and it appears to be further evidence of the Warden's retaliation against my client for her filing complaints of discrimination and retaliation.

Mr. Reynoso should have been terminated long ago. His presence at the institution puts my client in fear for her safety. In addition to the assault on her person, while it has never been proven, it is highly likely that the spray-painting incident, wherein my client's name together with vulgar and derogatory comments was painted on the institution, was at the hands of Mr. Reynoso. Mr. Reynoso has recently violated both the Order of Protection and his Probation by firing a weapon, which is the subject of a Court proceeding tomorrow. It is incomprehensible to me that the Federal Bureau of Prisons is protecting this individual at the expense of a woman who has done nothing wrong, who was assaulted and who has since the assault suffered from Post Traumatic Stress Disorder. Since the time *of this assault, my client's job duties and hours have been changed, allegedly so that she would feel* safe. Why haven't Mr. Reynoso's job duties and hours been changed? Why should Ms. O'Donnell suffer further disruption to her life because of this man's criminal actions?

The Warden's letter indicates that Mr. Reynoso's job duties require him to remain within the institution. If this is the case, and Mr. Reynoso cannot perform the essential functions of his job

Page of 2
November 18, 2003
Kelly McDonald, Esq.

because he has been ordered by a Court to stay away from Ms. O'Donnell, then obviously he should be terminated. Ms. O'Donnell should not be reassigned different hours, job duties and location, so that Mr. Reynoso can comply with a restraining order. It is not her responsibility. She is the victim. Mr. Reynoso committed the assault on my client and pled to sufficient facts for a finding of guilty. It is Mr. Reynoso whose job duties should be altered and he who should be reassigned outside the facility. My client should be immediately returned to her former duties; those duties, which she held prior to April 15, 2002, and those working hours which she held prior to that date. If the Bureau chooses not to terminate Mr. Reynoso's employment, then it is he who should suffer the consequences of his actions and it is his duties which should be altered. There is no reason why Mr. Reynoso cannot be assigned to the Camp. If he in fact cannot perform the essential functions of his job at the Camp, then he should be terminated.

Furthermore, while the Warden's letter indicates that my client is free to utilize the facility and go to any area of the institution necessary in the performance of her job duties, the reality of the situation in her being assigned to the camp is that she will not be relieved, that she will not be able to take a lunch hour, and that she will be working outside the areas of her job duties.

On behalf of my client I demand that she immediately be returned to the former position, hours, and job duties which she held prior to April 15, 2002. Similar to the Warden's allegations that Mr. Reynoso's duties require that he work inside the institution, my client's former job duties also require that she work inside the institution. I would reiterate that it is Mr. Reynoso who is subject to the Order of Protection, he who committed criminal acts, and he that should be reassigned and suffer the consequences of his actions. As long as the Order of Protection is in effect it is Mr. Reynoso who should be reassigned or terminated.

Additionally, my client finds it highly offensive that the Warden suggests that she has behaved irresponsibly and does not conduct herself in a professional manner while performing her job duties. It is abundantly clear that the Warden finds my client somehow responsible for Mr. Reynoso's assault on her and that he has been retaliating against her since she has reported the criminal conduct and filed her complaints of discrimination.

The final paragraph of Warden Winn's letter appears to threaten that some adverse job action will be taken because of my client's alleged AWOL status. Ms. O'Donnell should never have been placed on AWOL status and we assert that this was done in retaliation for her complaints with both the EEO and OSC.

Please call me at your earliest possible convenience to discuss this issue.

Very truly yours,

Dawn D. McDonald

cc: Colleen O'Donnell
    David Brooks, Esq.

Enclosure

{Document=X:\DOCS\24763\1\lettmemo\00054364.DOC;1}

# EXHIBIT 16

# CURRICULUM VITAE

**Victor J. Carbone, Ed.D., N.C.C., N.C.S.P., FABFE**
**Family Psychological Health Center**
**1188 Parker Street, Suite One**
**Springfield, MA 01129-1042**
**p (413) 782-7777    f (413) 426-9600**

## PROFESSIONAL PROFILE

Dr. Victor J. Carbone is a licensed practicing psychologist with court experience who maintains a clinical practice offering services in psychological testing; employee assistance (EAP), individual & family therapy; and consultation. He is a Health Services Provider in Psychology in Massachusetts and is on the panel of most major insurance carriers in Massachusetts, which requires peer review. He also accepts Medicare and Medicaid insurances. His wide range of experience includes psychiatric emergency, disability assessment, forensic psychology, custody disputes, trauma survivors, school interventions and program evaluation. He has been a consultant to many area attorneys and is well known for sensitive and objective evaluations of individuals. Dr. Carbone has testified multiple times in the Juvenile, Probate & Superior Courts in various roles including Guardian ad Litem, Court Investigator, Psychologist and Expert.

## SPECIALTIES

Psychological Evaluation, Trauma Reactions, Childhood Abuse & Neglect, Parenting Assessments, ADHD, Learning Disability Assessment, Expert Witness, Consultation to Schools, Brief Therapies, and Applied Behavioral Analysis

## LICENSES & CERTIFICATIONS

- Massachusetts Licensed Psychologist #5097 since 1990
- Health Services Provider
- Massachusetts Licensed Educational Psychologist
- Massachusetts Certified School Psychologist #0265689
- Nationally Certified Counselor #21238
- Fellow American Board of Forensic Examiners

**PRESENT POSITIONS**

- **Family Psychological Health Center, Springfield, MA, 1989-Present, Private Practice**

    Provides psychological assessment; individual, group and family therapy; consultation to attorneys, schools, private companies, and State agencies; Employee Assistance Programs; and Court testimony.

- **Juvenile Court, Springfield, MA, 1988-Present, Court Investigator/Guardian Next Friend**

    Investigated well over 200 Care and Protection Petitions involving domestic violence, medical neglect, physical abuse, sexual abuse, emotional abuse and/or neglect. Conducts parent assessment and provides comprehensive written reports to the Court. Offers court testimony, consultation to juvenile court attorneys and the Department of Social Services as needed.

- **Commonwealth of Massachusetts, Trial Court, Probate & Family Court Department, Springfield, MA, 2002-Present, Guardian Ad Litem**

    Court appointed by presiding justice to investigate, gather, and report factual data to the Court. Serves as an impartial investigator and reporter in the best interest of the child (ren). Assists in determination of relevant witnesses and documents and investigates these sources of information as appropriate. Completes comprehensive report of findings. Testifies at trial as needed.

- **U Mass Medical School , Auburn, MA, 2003-Present, Disability Evaluation Services**

    Completed approximately 500 assessments for individuals to determine eligibility for State disability benefits. These assessments include clinical diagnostic interview, psychological examination including testing and/or learning disability assessment. Psychological report submitted on each case to the Evaluation Board at Umass Medical Center in Worcester, MA to determine eligibility for disability benefits.

- **Massachusetts Rehabilitation Commission, Worcester, MA, 2005-Present, Federal Disability Determination Services Under Social Security**

    Assess individuals applying for Federal disability benefits under Title II and for adults applying under Title XVI regarding alleged psychological impairment. Psychological evaluations range from clinical diagnostic interviews to comprehensive psychological batteries to assess mental disorders and the degree of limitation such impairments may pose on the individual's ability to work and whether these limitations

have lasted or are expected to last for a continuous period of time. Federal disability is assessed as the inability to engage in any substantial gainful activity by reason of any medical determinable physical or mental impairment. The severity is assessed in terms of functional limitations, activities of daily living, social functioning, concentration, and issues of deterioration or decompensation in work. A written report of findings is submitted.

- **Town of Warren, MA, 1992-Present, Psychologist**

    Completed over 750 psychological evaluations. Provide consultation to administration. Critical incidence debriefing of staff and students in situations such as abducted child, satanic cult worship, allegations of staff misconduct, drug/alcohol abuse, weapons, and sudden student deaths. Developed crisis management policy, wrote sexual harassment procedures, developed curriculum on behaviorally disturbed students, press relations, television appearance regarding child abduction and response. Outreach assessment to residential placements and out-of-district day program students. High risk assessments, clinical site supervision of graduate students, and grant writing. Conducted survey research on discipline strategies currently utilized by staff and presented findings.

## PREVIOUS PROFESSIONAL EXPERIENCE

- **Children's Language Institute, Ludlow, MA, 1991-99, Psychological Evaluation & Consultation**

    Provided consultation to program director regarding behavior modification and psychological issues. Performed over 200 psychological evaluations of language impaired children. Presented on each child at team meetings.

- **CASA Program, Springfield, MA, 1996-99, Workshop Presenter on Interviewing & Report Writing**

    Provided workshops on interviewing techniques to CASA members regarding families involved with the court system. Taught report writing techniques and principles of a comprehensive presentation before the court in the best interest of the child. Presented before Justice overseeing the program. Consulted to individual program coordinators as requested on difficult cases.

- **Trinity Pre-School, Springfield, MA, 1998-99, Consultant**

    Private consultation to pre-school regarding staff relations. Conducted surveys and ran groups with staff and administration to improve school dynamics.

- **Duxbury Counseling Center, Duxbury, MA, 1991-97, Satellite Supervisor**

    Supervised staff of 6 therapists in outreach therapy to W. Massachusetts area.

3

Directed W. Mass operations for Duxbury Counseling Services. Consultation to program director. Nursing home consultation regarding psychologically, cognitively, or behaviorally involved patients.

- **Baystate Medical Center, Springfield, MA, 1986-94, Psychiatric Emergency Specialist**

    Emergency Room psychological evaluations for over 3500 cases involving suicidal or homicidal ideation, domestic violence, posttraumatic stress, psychotic process, organic brain syndromes, and other traumatic and/or emergent situations. Consultation to ER physicians, patients and families regarding trauma issues. Collaboration with psychiatrist regarding medication issues. Regular workshop presenter to 3rd year medical students, nursing staff, and presented at the Hospital's Grand Rounds Program regarding consultation process and issues.

- **Osborn Clinic, Agawam, MA, 1989-90, Director of Diagnostic Services**

    Supervisor of clinic psychologists. Performed forensic evaluations for the Department of Youth Services (DYS) at residential placement to determine release from facility and likelihood of re-offending. Provided individual and family therapy. Created and presented staff education programming in areas such as testing protocols, substance abuse evaluations, parenting assessments, interviewing techniques, vocational assessment, and presentation before the Court. Completed approximately 100 forensic psychological evaluations.

- **Town of Belchertown, MA, 1988-89, School Psychologist**

    Performed over 100 psycho educational evaluations. Wrote crisis intervention policy. Consulted to administration on difficult cases. Individual and group counseling. Provided family consultation.

- **Town of Westfield, MA, 1985-88, School Psychologist**

    Performed over 300 psycho educational evaluations. Developed and supervised the peer helper program. Provided individual and group counseling and family consultation.

- **Town of Agawam, MA, 1985, School Psychologist**

    Conducted approximately 100 psycho educational assessments. Provided individual therapy to students. Consulted to parents as needed.

4

- **Hogan Regional Center, Hawthorne, MA, 1984, Principal Psychologist**

    Behavioral interventions to severely medically and cognitively institutionalized children.

- **Arbor Hospital, Jamaica Plain, MA, 1981-2, Assistant Director-Inservice Education**

    Responsible to conduct in-service education to evening staff.   Provided orientation for evening employees on safety issues, staff responsibilities and treatment options such as ECT.

- **Beverly Hospital, Beverly, MA, 1980-81, Mental Health Counselor**

    Conducted individual, group, and family therapy for residents on the in-patient unit.


## FACULTY APPOINTMENTS

- **Tufts Medical School, Boston, MA, 1986-94, Clinical Instructor in Psychiatry**

    Responsibilities included preceptor for third year medical students regarding clinical interviewing, report writing, and issues related to their psychiatric rotation. Provided evaluation at end of rotation.

- **Asnuntuck Community College, Enfield, CT, 1986-89, Adjunct Professor in Psychology & Human Development**

    Taught college credit courses :  Introduction to Psychology, Human Development, Child Development, Marriage and Family, Behavior Modification, Abnormal Psychology and Health Psychology.  Taught psychology courses within the Somers, CT maximum security prison and the Enfield, CT Medium Security prison.

- **University of Maine at Orono, Orono, ME, 1982-84, Teaching Assistant**

    Taught Counseling Theory and Practice, Educational Psychology, and the Freshman Early Experience Program.

## FORENSIC EXPERIENCE

- Testified multiple times in the Juvenile, Probate & Superior Courts in various roles including Guardian ad Litem, Court Investigator, Psychologist and Expert. Licensed Psychologist since 1990 in private practice.

## EDUCATION

- University of Maine at Orono, Orono, ME, 1982-89, Doctorate of Education in Counseling
- Institute for Reality Therapy, Canoga Park, CA, 1985-86, Primary & Intermediate Certification
- University of Massachusetts, Boston, MA, 1981-82, CAGS in School Psychology
- Suffolk University, Boston, MA, 1979-80, MS in Counseling
- Suffolk University, Boston, MA, 1975-79, BS in Sociology/Social Work

## DOCTORAL INTERNSHIPS

- Osborn Clinic, Agawam, MA, 1989, post-doctoral internship in Clinical/Forensic Psychology
- Baystate Medical Center, Springfield, MA, 1988, pre-doctoral internship in Clinical Psychology
- University of Maine at Orono, Orono, ME, 1984, pre-doctoral internship in Counseling Psychology and Group Work

## PROFESSIONAL ORGANIZATIONS

- American Psychological Association
- American Counseling Association
- National Association of School Psychologists
- American College of Forensic Examiners
- American Board of Prescribing Psychologists

## KEY PRESENTATIONS & ACTIVITIES

- Competitive Grant Award, MA Safer Schools, Committee Chair, Warren, MA 1995
- Competitive Grant Award, Student-to-Student Peer Program, Westfield, MA, 1986-7
- Children's Language Institute, Keynote Speaker, Stress Management, 12/1996
- Town of Lunenburg, MA, Keynote Speaker, "Stress Causes & Cures", 11/1995
- Town of Warren, MA, conducted research on discipline & presented research findings, 5/1995
- Baystate Medical Center, Springfield, MA, Grand Rounds, Psychological Consultation, 1/1994
- NewsWatch 40, Springfield, MA, Television Interview regarding Violence in our Community, 04/1997
- Federation for Children, Boston, MA, Mainstreaming in the Public Schools, 06/1986

6

# EXHIBIT 18

ynthia A. Lord - Reynoso                      Page



From:        Marcy Sandum
To:           Lord, Cynthia A.
Date:       4/30/03 12:14PM
Subject:    Reynoso

Holy, moly, I totally forgot. We do not agree with termination on this one. Please review your other files for employees on probation (like your DUIs) and see what has been done as far as disciplinary on them. I would suggest going along those lines. Also, I don't know if you should spell out what the "dangerous weapon" was. With just saying that, someone might think that it was a gun or knife or something really horrific. Who would think that a boot is a dangerous weapon?



Therrien - off duty misconduct DUI - lic. suspen / prob 1yr.
Santiago - off duty misconduct DUI - lic suspen / prob 1yr.

6.3.03.

# EXHIBIT 19

## U.S. DEPARTMENT OF JUSTICE
## Equal Opportunity Program

### AFFIDAVIT

**NAME OF COMPLAINANT:**      Colleen O'Donnell

**CASE NO:**      P-2003-0165

### PERSON MAKING STATEMENT

     **NAME:**  Cynthia Lord      **DATE:**    October 2, 2003

     **POSITION AND GRADE:**   Human Resource Manager, GS-13

     **EMPLOYER:**   Federal Bureau of Prisons

**I, Cynthia Lord, hereby solemnly (swear) (affirm):**

Q    My name is Warner Coffman and I am an EEO investigator and I have been appointed to investigate an allegation of discrimination filed by Colleen O'Donnell against the Federal Bureau of Prisons, specifically the Federal Medical Center, Devens, Massachusetts.

     Today's date is October the 2nd, 2003.

     Will you state your name?

A    Cynthia Lord.

Q    Will you spell your last and first name?

A    First name Cynthia, C-y-n-t-h-i-a. Last name is Lord, L-o-r-d.

Q    Where do you work, Ms. Lord?

A    At the Federal Medical Center in Devens, Massachusetts.

Q    What position do you hold?

A    I'm the Human Resource Manager.

**Page 1 of 10. Affiant's Initials:**

Q   What grade level is the position?

A   A GS-13.

Q   How long have you been in that position?

A   I've been here at Devens since January of 1998.

Q   What is your sex?

A   Female.

Q   Do you possess a disability?

A   No.

Q   Will you explain your role as the Human Resource Manager at Devens?

A   I'm responsible for ensuring that all personnel policies and procedures that affect staff are effectuated properly and enforced. I'm responsible for advising management officials on those policies and procedures on all personnel-related actions.

Q   Ms. O'Donnell has filed an EEO complaint alleging she's been discriminated against on the bases of her sex, sexual harassment and disability.

She alleges that the Bureau of Prisons discriminated against her when on January the 8th, 2003, she was diagnosed with posttraumatic stress disorder, rendered unable and Management failed to provide a reasonable accommodation.

Will you explain your personal knowledge what occurred?

A   I do know that the – I believe it was the Warden that receives the medical documentation from her – from Ms. O'Donnell. And in it it indicated that she was totally disabled unless her assailant – I believe it is – was removed from the work premises. And then she could work – return to work full time without restrictions.

Q   I'm not clear on what you were saying. You said that she was disabled?

A   Yeah. The doctor's note indicated that she suffered from posttraumatic stress disorder and was totally disabled and unable to work in her current position in the current circumstances.   That's if the patients or Ms. O'Donnell's assailant, Mr. Reynoso (phonetic), who also works here because this all goes way back, that if he did not – no longer worked here, if we removed him, she would be able to return to work full-duty status.



Page 2 of 10.  Affiant's Initials: [signature]

Q    I understand what you're saying.

A    Does that help you?

Q    Yes.

A    That's how the doctor's note read.

Q    What was the Agency's response to that?

A    Well, the Warden is not able to remove a staff member to accommodate another staff member. Since, I think it was April or May of 2002, he had been accommodating Ms. O'Donnell's personal situation. An incident happened with her and an old boyfriend off-duty and she had a restraining order against him, so it goes way – it goes back to 2002. So the Warden – because the restraining order also stated that Mr. Reynoso lawfully could work and they knew they worked in the same facility. The Warden adjusted Mr. Reynoso's work hours.

Ms. O'Donnell worked during the day. There was a half-hour period where Mr. – Ms. O'Donnell had to leave, you know. At the end of her day she had a half-hour period before Mr. Reynoso could show up to work.

Q    I understand.

A    And then he worked in the evenings.

Q    I understand.

A    So the Warden had been accommodating that personal situation since April of 2004 [sic]. And I believe her supervisor called to get clarification that – what exactly she was asking for accommodation and that would be to have him removed from the institution. The Warden doesn't – could not do that. That's not a reasonable accommodation to have somebody –

Q    Generally, when did this occur?

A    Which is –

Q    Was this before or after January the 8th of 2003 when she responded about the other employee, Mr. Reynoso, being removed?

A    I think it was – it was after the 8th because the doctor's note was dated the 8th, I believe.

Page 3 of 10.  Affiant's Initials: [signature]

Q    Could you explain to me your personal knowledge about a graffiti incident that occurred in the institution or in close proximity to the institution?

A    Well, I can tell you what I – I wasn't involved in any of the investigation or anything. It took place out at our mailroom, which is maybe a quarter of a mile from the main facility. On, I think it was a Sunday night, because I came to work Monday morning and I noticed one of our perimeter vehicles at the entrance to the mailroom area.

But what response did she have or what happened subsequent to the graffiti being on the wall?

I didn't really think anything about it other than maybe they were observing camp activity or, you know, in our environment we always have vehicles around. And then I was later told that someone during the night or early morning had scribbled graffiti with red paint on the mailroom – on the outside walls.

Q    Ma'am, can you express the general nature of what was –

A    They were derogatory comments about Ms. O'Donnell. I – I don't know – you know, I don't know the specifics. I never saw it or anything.

Q    I understand.

But what response did she have or what happened subsequent to the graffiti being on the wall?

A    From what I –

Q    Working at the –

A    No. She worked days and evidently this, the graffiti, occurred I don't know if it was over the weekend – you know, Sunday night, Saturday, I mean, yeah, Sunday night, over the weekend. I don't – I don't know when it actually took place. I don't think they ever discovered that or could make a determination.

Q    Did she continue to work after this incident?

A    She – when she arrived at work, from what I have been told, and I – I only know this from secondhand is that she was interviewed by the State Police who have jurisdiction on our property right now and I believe she went home after that incident.

Q    Has she returned to work since?

A    No, not that I'm aware of.

Q    What is her leave status currently?

Page 4 of 10. Affiant's Initials:

Case 4:04-cv-40190-FDS    Document 24-2    Filed 04/18/2006    Page 110 of 115    P.06

A    From what I understand, she's on AWOL status right now.

Q    Explain your personal knowledge regarding her being in AWOL.

A    At this time?

Q    At this time.

A    Okay. I wish I could remember. Warden – when the incident initially occurred, the Warden granted her administrative leave.

Q    What incident are we discussing now?

A    When – I'm sorry. When the incident in the mailroom, the graffiti incident in June.

Q    Okay.

A    When that occurred, he granted her administrative leave, I believe, up to – I think he granted her the full ten days. He's authorized to grant ten days. I believe he granted her the full ten days and he requested from her that she would have to put in a leave request prior to the end of that administrative leave time.

Q    I understand.

A    And failure to provide that – obviously because she hasn't been granted any additional leave – failure to request additional leave would place her in an AWOL status because she would no have any approved leave to be on.

Q    I'm understanding you to say that she – after the administrative leave she did or did not request additional leave?

A    Okay. Well, he requested that she request additional leave. I believe she did request additional leave and he granted leave without pay for another two weeks and requested additional medical documentation --

Q    I understand.

A    – from Ms. O'Donnell. And when no medical documentation was forthcoming he denied the leave without pay. And that was back in August sometime, I believe.

Q    Of what year?

A    Of 2003.

Page 5 of 10.  Affiant's Initials: 

Q    And that's the status she remains in now?

A    As far as I know, yes.

Q    Ma'am, did you see the documents where it indicated that she had been diagnosed with posttraumatic stress disorder?

A    Yes.

Q    You did?

How did you review that request? Did you review that as an accommodation?

A    I'm not sure I understand the question.

Q    Okay. An accommodation for her posttraumatic stress disorder, her request for AWOL – not AWOL, I'm sorry – her request for advanced leave.

A    Is this the initial back in January?

Q    Of 2003?

A    Yeah, or is this the one in August, in the June incident?

Q    The August and June incident.

A    Okay.

Q    I understand. We've got a lot of dates.

A    Yeah. I don't remember. I don't remember her submitting any addition – she submitted. I'm trying to remember.

She submitted the initial – after the June incident happened, she submitted, I believe, a doctor's note concerning that she was not totally re-traumatized and totally disabled again. I don't – I know she requested advanced sick leave, admin leave, because she typically requested sick leave, admin leave or leave without pay; so, I would imagine she did that request again.

Q    Did you view these requests as an accommodation?

A    No.

Page 6 of 10.  Affiant's Initials:

Q    Okay. She had a situation here in February of 2003 where she claims she was denied local voluntary leave bank donation solicitation.

A    Yes.

Q    Will you explain that process for the record –

A    Okay.

Q    – and what happened to your knowledge?

A    When – when we receive a request for the voluntary leave transfer program, the supporting medical documentation and the request go before the committee. The committee consists of the Associate Warden over Operations, a medical officer, myself and a Personnel Assistant who does the recording.

I know the committee – I know we met on two separate occasions. Initially, we met and they were not comfortable with her medical documentation. Then the second time we met we added the psychiatrist, our chief psychiatrist, because it was a – the posttraumatic stress disorder.

Q    What is his name or her name?

A    Dr. Fletcher (phonetic).

Q    Is that a male or female?

A    James Fletcher.

Q    Okay. James?

A    Uh-huh.

Q    Okay.

A    So Mr. Fletcher was asked to sit on the committee to – to explain to the committee posttraumatic stress disorder. And from his explanation that it appeared this – Ms. O'Donnell's psychiatrist had only seen her on one occasion and to come up with that diagnosis, in his professional opinion, was not possible and the committee disapproved her request. She was advised of that.

And she was told that if she wanted to submit additional medical documentation that the committee would reconvene and consider her request again.

Page 7 of 10. Affiant's Initials: 

Q    Did she make another request?

A    No.

Q    At the time when the committee was meeting on the two occasions, did they consider this, her request, as a request for an accommodation?

A    I don't believe so.

Q    There was another situation that she documents on February the 10th, 2003, where she claims that she was denied advanced sick leave.

Do you have any personal knowledge regarding that situation?

A    Yes, I believe the Warden denied her advanced sick leave. He – he – he approved part of it. He approved 24 hours an requested additional medical documentation.

Q    I see. Now, who is in possession of all this documentation we're talking about now?

A    I have it.

Q    You have it?

A    Uh-huh.

Q    How do you suggest that I request it from you? Can I make a global request –

A    Sure.

Q    – for anything or should I be specific about it?

A    No, you can make a global request on, you know, if you want to use timelines or time frames that you need information on or –

Q    Okay. Well, just the documentation relative to these things that we discussed about her request and the responses to her request –

A    Sure.

Q    – and things of that nature.    I will take and – and request it from you.

A    Okay.

Page 8 of 10.  Affiant's Initials: [signature]

Q    To, you know, document the file.

A    In addition to her attorney's, because she did hire an attorney in there and at one point we were only supposed to contact him in reference to anything for her.

Q    He has correspondence there, too?

A    Uh-huh.

Q    Okay. I request that also.

A    Okay.

Q    Do you have other information or statements that might assist me in this investigation?

A    Most of what I have is correspondence either from her supervisor to her, from the Warden to her, requests from her to the Warden or her supervisor. That's what I have on file.

Q    Okay. And you have that file?

A    Yes, sir.

Q    What information does the Warden have in his office? Does he have information?

A    He may have some of the same documents I have.

Q    But you're the holder of the official documents?

A    I – I am the holder of the official documents, yes, sir.

Q    All right. Do you have other information or statements to make that might assist me?

A    Not that I can think of right now, no.

Q    Do you affirm the statements you have made on this 2nd day of October 2003 are true and correct to the best of your knowledge?

A    Yes, sir.

Q    That concludes the interview.

(Conclusion of interview.)

Page 9 of 10. Affiant's Initials: ____

--oOo--

Pursuant to 28 U.S.C. 1746, I have read the above statements consisting of ___10___ pages and it is true and complete to the best of my knowledge and belief.

_Cynthia A. Ross_                     _11.19.03_
Affiant                                         Date

Interviewed by Warner Coffman, EEO Investigator

WC/fm

Page 10 of 10.  Affiant's Initials: CA

TOTAL P.11