# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| **COLLEEN O'DONNELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **04-40190-FDS** |
| | ) | |
| **ALBERTO R. GONZALES, Attorney** | ) | |
| **General,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

# AMENDED MEMORANDUM AND ORDER
# ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for alleged disability discrimination and unlawful retaliation. Plaintiff Colleen O'Donnell is an employee of the Federal Bureau of Prisons at the Federal Medical Center in Devens, Massachusetts. O'Donnell was involved in a romantic relationship with David Reynoso, another employee at the facility. According to O'Donnell, Reynoso physically assaulted her on April 8, 2002, and she developed Post-Traumatic Stress Disorder ("PTSD") and depression as a result.

Plaintiff alleges that her PTSD and depression constituted a disability, that BOP did not reasonably accommodate that disability, and that its failure to do so constituted unlawful discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). Specifically, plaintiff sought to have BOP transfer, suspend, or fire Reynoso, so that the two of them would not be at the same workplace. Instead, BOP changed their work schedules so that they would not come into contact at work, and reassigned plaintiff to perform her duties in the mail room.

Plaintiff also alleges that BOP unlawfully retaliated against her by disciplining her for absences caused by her condition, which constituted unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16, *et seq.*, and 42 U.S.C. § 1981a.

Defendant Alberto R. Gonzales, Attorney General of the United States, has moved for summary judgment on all counts. For the reasons set forth below, the motion will be denied as to the claim of disability discrimination and granted as to the claim of unlawful retaliation.

## I.    Statement of Facts

### A.    The April 8, 2002 Incident

On August 31, 1998, Colleen O'Donnell began working for the Bureau of Prisons as a correctional officer at the Federal Medical Center in Devens, Massachusetts ("FMC Devens"). At some point, she became an Inmate Systems Officer ("ISO") in the Inmate Systems Management ("ISM") Department at FMC Devens. As of April 2002, she had never been disciplined or reprimanded, and had always performed her job duties in a satisfactory manner.

David Reynoso was employed in the Special Investigative Supervisor ("SIS") Office at FMC Devens. As of the beginning of April 2002, plaintiff and Reynoso were romantically involved.

During lunch on April 8, 2002, the two left work together to discuss their relationship. They drove together to a nearby lake. There, they got into an argument, in the course of which Reynoso kicked her in the thigh with a steel-toed boot.

Reynoso had previously been arrested for a domestic assault and battery; in May 1991, he had admitted to facts sufficient for a finding of guilty and the matter had been continued without a finding. That matter had been disclosed by Reynoso to the BOP in his application for federal

employment.

**B.**     **The Criminal Prosecution, Restraining Order, and BOP Investigation**

Plaintiff reported the April 8 incident to BOP management, including the then-Warden, David Winn.  She also filed a criminal complaint against Reynoso in the Ayer District Court and obtained a restraining order against him in the Malden District Court.  The restraining order required Reynoso not to abuse plaintiff, not to contact her, and to stay at least 50 yards away from her.  The restraining order specifically permitted Reynoso to attend work, but ordered him to stay away from plaintiff while there.

On April 9, Warden Winn received a copy of the restraining order.  Winn decided to change Reynoso and plaintiff's schedules so that the two would not come into contact together while at work.  Effective Monday, April 15, Winn reassigned plaintiff to perform her duties in the mail room between the hours of 6:00 a.m. and 2:30 p.m., Monday through Friday.  Winn also reassigned Reynoso (whose previous work hours had been from 8:00 a.m. to 4:00 p.m.) to work only in the main facility from 4:00 p.m. to 12:00 midnight, Monday through Friday.

Winn also reported Reynoso's alleged off-duty misconduct to the BOP's Office of Internal Affairs.  Pursuant to Bureau policy, however, the Office of Internal Affairs did not begin its investigation of Reynoso until the Ayer District Court had adjudicated the criminal charges against Reynoso.

About nine months later, on January 3, 2003, the Ayer District Court held a hearing on the criminal charges.  The court entered a finding of sufficient facts for a conviction of assault and battery with a dangerous weapon, but continued the matter without a finding of guilt until April 2, 2004, and placed Reynoso on probation.  The court ordered Reynoso, as part of his probation, to

abide by the terms of the previously-entered restraining order and to avoid contact with plaintiff and her family.

The BOP then began an internal investigation of Reynoso's alleged off-duty misconduct. That investigation concluded on March 3, 2003; the BOP found the allegations of off-duty misconduct to be true and suspended Reynoso without pay from July 27 to August 16, 2003.[1] Reynoso was never fired.[2]

In the meantime, plaintiff and Reynoso both worked on separate shifts without incident from April 2002 until January 2003. On January 8, 2003, Winn changed plaintiff's work hours to 9:30 a.m. to 6:00 p.m., Monday through Friday. She remained assigned to the mail room. Winn also changed Reynoso's work hours to 12:00 midnight to 8:00 a.m., Sunday through Thursday.

## C.     Plaintiff's Leave from Employment—January 2003 to June 2003

Plaintiff had begun seeing a psychiatrist, George Milowe, M.D., in February 2002, for depression. On January 8, 2003, plaintiff provided Winn with a note from Dr. Milowe stating the following: "This patient suffers from Post-Traumatic Stress Disorder [and] is now totally disabled [and] unable to work at her current job in the current circumstances. If the patient's assailant was not on her work premises at all, Ms. O'Donnell would be able to work full-time without

---

[1] At about the same time that the BOP was investigating Reynoso for the April 8 assault, he was also being investigated for another charge of off-duty misconduct, driving under the influence. He was eventually suspended for one day in connection with that charge.

[2] The restraining order obtained by the plaintiff prohibited Reynoso from using any kind of firearm, and his license to carry firearms was immediately suspended. However, the BOP subsequently scheduled, and Reynoso attended, firearms training. Furthermore, the ability to use firearms is a condition of any BOP correctional officer's employment. According to plaintiff, that fact alone should have led to Reynoso's termination.

restrictions."[3]  Winn forwarded Dr. Milowe's letter to James Fletcher, M.D., the Chief

Psychiatrist at FMC Devens, for review.

Steve Gagnon, the ISM Manager, also received Dr. Milowe's letter.  He called the

plaintiff on January 9 and informed her that the BOP needed a written release from her in order to

discuss her medical condition in detail with Dr. Milowe.  Gagnon also informed plaintiff that her

annual and sick leave were almost exhausted and she needed to apply for some sort of advance

leave.  Cynthia Lord, the Human Resource Manager, sent plaintiff an authorization form to sign

and give to Dr. Milowe allowing him to release information to the BOP.  After receiving no

response, Lord called plaintiff on January 14 and spoke with her about providing the BOP with

additional information concerning her medical condition and supporting her absence from work.

During that conversation, plaintiff informed Lord that she would sign the medical release.  Lord

also informed plaintiff about the procedures for applying for leave without pay, advance leave,

and the BOP's Voluntary Leave Program.

Plaintiff never provided an executed medical release form, and did not provide the BOP

with any additional medical documentation.

On January 21, 2003, Dr. Fletcher opined that Dr. Milowe's letter contained insufficient

information "to support any of the facts alleged in the letter" and that "the conclusion that such a

total disability is completely reversible owing to environmental factors is inconsistent with the

practice of psychiatry."  Dr. Fletcher suggested a formal review of plaintiff's medical records and

an evaluation by an independent psychiatrist for the purpose of determining her fitness for duty.

---

[3]  Plaintiff testified at her deposition that at this point, there was no accommodation BOP could have
provided her at that time that would have enabled her to return to work.

5

Also on January 21, plaintiff's counsel wrote to Winn and Lord asking that plaintiff be given a "reasonable accommodation for post traumatic stress disorder," or, alternatively, that she be placed on "administrative leave or authorized to receive donated leave until she could return to work."[4]

Also on January 21, plaintiff sent Winn an e-mail requesting advance leave with pay "due to [her] medical condition."  In response, Gagnon advised plaintiff on January 23 that BOP was granting her 24 hours of advance sick leave to allow her to obtain the necessary medical information to support Dr. Milowe's January 8 letter.  Gagnon advised her that Winn would reconsider her request for advance sick leave if she provided her physician's assessment of her current clinical status and an estimate of her expected date of full or partial recovery.  She was further advised that she needed to submit the proper form to request advance sick leave by January 31, or she would be placed on absent without leave ("AWOL") status beginning February 3.  Gagnon attached this form to his letter.

On January 27, Winn wrote to plaintiff, stating that he cannot "grant [her] accommodation request that another staff member be removed."  Winn also stated that he had been trying to accommodate plaintiff by placing her and Reynoso on different shifts.  Winn inquired whether plaintiff also wanted him to restrict Reynoso to the satellite camp area, which is a quarter of a mile from the main facility.

Also on January 27, plaintiff submitted an application for the BOP's Voluntary Leave Transfer Program.  Her application included a note from Dr. Milowe stating that plaintiff had

---

[4] In addition, on January 21, plaintiff called Gagnon.  Gagnon asked her in the course of that conversation what the BOP would have to do to get her to return to work.  Plaintiff responded that the BOP would have to remove Reynoso.

"work related" PTSD, severe anxiety, depression, recurrent nightmares, intrusive thoughts, flashbacks, and daily panic attacks. Dr. Milowe opined that plaintiff's condition would be lengthy and indefinite and could last for "many many years as long as [plaintiff] is forced to work with Mr. David Reynoso."

According to BOP, plaintiff did not submit the proper form to BOP to request advance sick leave by January 31. Accordingly, the BOP placed plaintiff on AWOL status beginning February 3.

On February 10, the FMC Devens Voluntary Leave Program Screening Committee denied plaintiff's application. It explained to plaintiff its reasons as follows:

> Your medical emergency is based on another staff member's employment with the Bureau of Prisons, and you would be able to work if the other individual was no longer employed. Accommodation of your work site has been afforded so that you may return to work. In addition, on January 21, 2003, you contacted Ned LaClair, Safety Manager, for the forms necessary to file a stress related claim, you requested these form[s] again on February 10, 2003.

Also on February 10, plaintiff faxed Winn a letter from Dr. Milowe stating that plaintiff had PTSD as a result of being assaulted by Reynoso. Dr. Milowe further opined that plaintiff suffered from major depression and panic disorder. Dr. Milowe indicated that plaintiff would remain "totally disabled" until separated from Reynoso, stating:

> Working in the same environment as her assailant merely intensifies her symptoms and does not give her a chance to heal. Common sense and good will would dictate that Ms. O'Donnell not be required to work in the same facility at the same time as Mr. Reynoso. She receives pharmacotherapy from me and sees a psychotherapist as well. However, recovery is unlikely until the two are separated and Ms. O'Donnell is allowed to go through a healing process. Until then she will remain totally disabled.

No treatment notes or diagnostic test results were provided to support Dr. Milowe's opinion.

Plaintiff did not submit a request for advance sick leave acceptable to BOP until February 11, when she requested 216 hours of advance sick leave. On February 19, Winn disapproved the request. Based on documentation provided by plaintiff indicating that she was "totally disabled" and may not be returning to work, Winn informed her that she was not eligible for advance sick leave.

On June 4, the BOP received a handwritten note from Dr. Milowe stating as follows: "I saw this patient today in the office. She is now able to resume her job duties, including overtime." Accordingly, Winn contacted plaintiff's counsel and informed him that plaintiff could return to work on June 11.[5]

### D.    Plaintiff's Leave from Employment—June 2003 to November 2003

Plaintiff resumed work on June 11, 2003. On June 16, a security officer at FMC Devens discovered threats and derogatory statements directed at plaintiff spray-painted on the outside mail room walls. In response, the BOP contacted its Office of Internal Affairs, the Department of Justice Office of Inspector General, and the Massachusetts State Police to investigate the incident. Also on June 16, Winn convened a Workplace Violence Committee Meeting to discuss the incident. While the Committee concluded that the incident did not constitute workplace violence, it recommended allowing plaintiff to work somewhere other than the mail room.

On June 18, Winn authorized plaintiff to take administrative leave through June 27 as a result of the incident. Gagnon informed plaintiff that the BOP would grant her the leave on a daily basis; that is, she had to contact the BOP each day she wanted to take leave.

---

[5] When plaintiff returned to work on June 11, she submitted a request for two days of leave in order to attend a wedding on June 20. Winn denied the request.

8

On June 23, plaintiff provided Winn with a note from Dr. Milowe stating that "Due to retraumatization Monday 6-16-03 at work, Ms. O'Donnell is now totally disabled again."

In response, Gagnon informed plaintiff that Winn would continue to grant her administrative leave through June 27. He also advised her to apply for leave without pay before her expected return-to-work date of June 30. Gagnon informed plaintiff that if she failed to submit a request for leave without pay before her return-to-work date, the BOP would consider her AWOL.

On June 25, plaintiff submitted a request for leave without pay, which Winn granted through July 29. On July 28, plaintiff requested leave without pay starting on July 29 and continuing to an unspecified date. Winn granted the request through August 11 on the condition that plaintiff provide an updated physician note. On August 11, plaintiff again requested leave without pay beginning August 11 and continuing to an unspecified date. However, plaintiff did not provide Winn with an updated physician note. Winn denied the request, stating that "Ms. O'Donnell failed to follow my instructions on 7-29-03 by not providing an updated Dr.'s note."

Plaintiff remained absent from work for the next three months. On November 11, she informed Winn via facsimile that she wished to return to work "as soon as possible." She submitted with her facsimile a note from a new physician, Brian L. Ackerman, M.D., who stated that plaintiff was "able to return to work full-time without any restrictions."

On November 18, after discussions with new counsel for plaintiff, Winn offered to allow her to return to work at the satellite camp at FMC Devens. After further discussions with counsel, Winn agreed to reassign Reynoso to the satellite camp and to a different shift during the tenure of the restraining order. During the discussions between counsel and the BOP, Winn

granted plaintiff administrative leave from November 12 through November 14, and again from November 17 through November 19.  Plaintiff returned to work on November 20, 2003.

### E.    Subsequent Events

On December 10, during an investigation into plaintiff's absence for the period from August 13 through November 11, plaintiff gave a sworn statement indicating that she had declined on advice of counsel to provide the BOP with any further medical information or to contact her supervisor.  Plaintiff also admitted that she was aware that she was AWOL from August 13 through November 11.  Plaintiff further stated that she did not contact the BOP during that period because her counsel had advised her that he would make all further contact.

Winn asked plaintiff to provide further information about her medical condition.  In response, on December 18, plaintiff provided Winn with a memorandum from Dr. Ackerman stating that she suffers from PTSD and was currently taking medication for her condition.  Dr. Ackerman further stated that plaintiff "was suffering with PTSD at the time in question, July 2003 until present."

On April 20, 2004, Gagnon gave plaintiff notice that he was proposing to Winn that the BOP suspend plaintiff for thirty days due to her AWOL status for the period from August 13 through November 11, 2003.   Instead, on June 10, 2004, Winn issued her a letter of reprimand. Plaintiff was not discharged.

## II.    Procedural Background

Plaintiff filed a formal complaint of discrimination with BOP's Equal Employment Opportunities Office ("EEO") on March 31, 2003, alleging that BOP discriminated against her based upon sex and mental disability.  On July 7, 2003, EEO notified plaintiff that it was

10

dismissing her sex discrimination claims as untimely.[6]

Plaintiff filed this action on September 22, 2004.  The complaint alleges three claims:  (1) a claim for unlawful gender discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000-e, *et seq.*; (2) a claim for unlawful disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794(a); and (3) a claim for unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-16, *et seq*. and 42 U.S.C. § 1981(a).  Plaintiff stipulated to dismissal of the gender discrimination charges in October 2005. Defendant moved for summary judgment as to the remaining claims on March 16, 2006.

## III.    Analysis

### A.    Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### B.    The Failure to Accommodate Claim

Under federal law, an employer may not discriminate against a qualified individual with a disability.  Two sets of federal laws govern disability discrimination:  the Rehabilitation Act, 29

---

[6] More than 180 days passed after plaintiff filed her EEO complaint without a final action occurring.

U.S.C. § 794, which applies to federal agencies, contractors, and recipients of federal financial assistance, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12117, which applies to private employers with more than 15 employees and state and local governments. Because the same standards apply to claims filed under the ADA and the Rehabilitation Act, the case law construing the two statutes is essentially interchangeable. *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

Disability discrimination under federal law includes, among other things, failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation" of its business. 42 U.S.C. § 12112(b)(5)(A).[7] To recover under a "failure to accommodate" theory, plaintiff must show (1) that she has a disability; (2) that she was "qualified," in that she was able to perform the essential functions of her job, either with or without reasonable accommodation; and (3) that despite knowing of plaintiff's alleged disability, her employer did not provide a reasonable accommodation. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258-60 (1st Cir. 2001).[8]

## 1.    <u>First Element:  Disability</u>

The requirement that plaintiff establish a "disability" can be satisfied by demonstrating that plaintiff has a physical or mental impairment that substantially limits one or more of her major life

---

[7] Because a claim of disability discrimination based on a failure to provide reasonable accommodation typically involves direct, objective evidence, the burden-shifting method of proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny is not applicable. *Reed*, 244 F.3d at 259 n.3.

[8] The standard used to establish a reasonable accommodation claim is sometimes articulated as a five part test. However, the "[t]wo other elements, sometimes noted, require no discussion" because it is "undisputed that the defendants are covered by the Rehabilitation Act, and that plaintiff suffered in the terms and conditions of her employment." *Calero-Cerezo*, 355 F.3d at 20, n3.

activities.  42 U.S.C. § 12102(2)(a).  In making that determination, the Court must apply a three-part analysis.  *Carroll v. Xerox*, 294 F.3d 231, 238 (1st Cir. 2002).  First, it must consider whether plaintiff's alleged condition constitutes a mental or physical "impairment."  *See id.*  Next, it must ask whether the activities limited by plaintiff's impairment are "major life activities," in that they are "of central importance to daily life."  *See id.*  Finally, "tying the two statutory phrases together, [the Court asks] whether the impairment substantially limits the activity found to amount to be a major life activity."  *Id.*, (quoting *Lebron-Torres v. Whitehall Labs.*, 251 F.3d 236, 239-40 (1st Cir. 2001)).  Plaintiff has the burden of proving the three elements.  *Calero-Cerezo*, 355 F.3d at 20.

Plaintiff has submitted evidence that she was suffering from PTSD and depression during the relevant time period.[9]  She was diagnosed with PTSD by three physicians,[10] was prescribed anti-depressant and anti-anxiety medications, and saw both a psychiatrist and psychotherapist for treatment of both PTSD and depression.  Both depression and PTSD have been recognized as mental impairments that, in at least some circumstances, may constitute qualifying impairments under federal law.  *Criado v. IBM Corp.*, 145 F.3d 437, 442 (1st Cir. 1998) (depression); *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 274 (4th Cir. 2004) (PTSD).  Plaintiff therefore meets the first requirement.

Next, plaintiff has submitted evidence that various life activities—including sleeping,

---

[9]  The record also indicates that plaintiff may have suffered from panic disorder, although she does not discuss this disorder in her opposition to defendant's summary judgment motion.

[10]  Dr. Milowe, Dr. Ackerman, and Dr. Barbara Wissner, plaintiff's current physician, diagnosed plaintiff with PTSD.  Dr. Victor Carbone also concluded that it was "clear" that plaintiff suffered from PTSD, although during his deposition, he stated that he could not state to a "reasonable medical degree" that she met the criteria for having this disorder.

eating, thinking, concentrating, working, remembering, and doing housework—have been limited

by her impairment.  At least the first four of these functions have been recognized as "major life

activities."  *See Criado*, 145 F.3d at 442-43 ("sleeping"); *Lawson v. CSX Transp. Inc.*, 245 F.3d

916, 923 (7th Cir. 2001) ("eating"); *Whitney v. Greenburg, Rosenblatt, Kull & Bitsoli, P.C.*, 258

F.3d 30, 33. n. 4 (1st Cir. 2001) ("thinking" and "concentrating").[11]

Finally, there is evidence that plaintiff's mental impairment "substantially limited" those

activities.  The term "substantially limits" is not defined under the statute, but "suggests

'considerable' or 'specified to a large degree.'"  *Sutton*, 527 U.S. at 491.  Dr. Milowe's letters

and plaintiff's medical records suggest that she suffered from intrusive thoughts, flashbacks,

nightmares, feelings of hopelessness, and daily panic attacks that disrupted her thinking, sleeping,

eating, and concentrating.  Dr. Milowe characterized these symptoms as "severe."

Accordingly, for summary judgment purposes, plaintiff has produced sufficient evidence to

show that she suffered from a mental impairment that substantially limited one or more major life

activities.

## 2.    Second Element:  Qualification

The second element of a reasonable accommodation claim is that plaintiff must establish

that she is a "qualified individual"—that is, that she can show "first[,] that she possesses the

requisite skill, experience, education and other job-related requirements for the position and,

second, that she is able to perform the essential functions of the position with or without a

---

[11] Both the Supreme Court and the First Circuit have assumed, without deciding, that "working" may be considered a major life activity.  *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 492 (1999 ); *Carroll*, 294 F.3d at 239.  Because plaintiff is required to show only that at least one major life activity is affected by her impairment, the Court does not need to decide whether "working" qualifies as such an activity.  For the same reason, the Court does not need to decide whether "remembering" or "doing housework" also qualify.

reasonable accommodation." *Calero-Cerezo*, 355 F.3d at 22.  The parties have offered little

evidence establishing the essential job functions of an ISO; apparently plaintiff's duties included

receiving and discharging inmates and screening inmates' mail.  Plaintiff contends, and defendant

does not dispute, that until she was placed on AWOL status, she always performed her job duties

in an acceptable and satisfactory fashion, even though she suffered from depression beginning in

at least February 2002.  Therefore, for purposes of opposing defendant's summary judgment

motion, plaintiff can show that she possessed the requisite skill, experience, education and other

job-related requirements for the ISO position.

     The second question is whether plaintiff could have performed the essential functions of

her position with a reasonable accommodation.[12]  Plaintiff contends that she could have performed

her job functions with one of two accommodations:  (1) authorized leave from work or (2)

removal of Reynoso from her place of employment.

     Plaintiff's contention that she could have performed the functions of her position had she

been given leave is troublesome.  It is true that, under some circumstances, a leave of absence or a

leave extension can be a reasonable accommodation.  *See, e.g., Criado*, 145 F.3d at 443-44.

Here, however, plaintiff requested a lengthy and indefinite leave, without any apparent prospect of

a return to work as long as Reynoso continued to work at the facility.[13]  It is one thing for an

employee to request temporary leave (to recover from a disability) or occasional leave (to

---

[12] For these purposes, the Court will assume that the accommodations plaintiff requested were reasonable.
*See Criado*, 145 F.3d at 443.

[13] While defendant provided plaintiff with several periods of leave, it did not permit her to enroll in the
voluntary leave program or provide her with all of the leave without pay and advance leave she requested.  The
Court assumes that, to the extent that plaintiff's failure to accommodate claim is based on defendant's failure to
provide leave, it relates only to the periods of leave that defendant did not grant.

ameliorate the effects of a disability); it is quite another for an employee to leave work for an unknown and indefinite period of time. At the very least, it is unclear how plaintiff could have performed the essential functions of her job if she were never there.

It is a different issue, however, whether she could have performed those duties if Reynoso had been removed.[14] There is evidence that plaintiff's psychiatrist suggested that Reynoso's presence at the facility both intensified her PTSD and depression and prevented her from overcoming those conditions. Her psychiatrist also indicated on several occasions that plaintiff could work full-time without any restrictions if Reynoso were removed from the facility. Therefore, the record "is adequate to generate an issue for consideration by a fact finder regarding plaintiff's capacity to perform her job . . . at least with an appropriate accommodation." *Calero-Cerezo*, 355 F.3d at 23.

### 3.    Third Element:  Provision of Reasonable Accommodations

The third element that plaintiff must establish is that, despite knowing of her disability, the employer failed to provide a reasonable accommodation. A "reasonable accommodation" is a modification to the work environment, or to the way in which the job is performed, that would enable the person to perform the essential functions of the job or to enjoy equal benefits and privileges of employment. 29 C.F.R. § 1630(o). In general, an employer need only accommodate the limitations that flow from the disability that affect the employee in the workplace. *See* 42

---

[14] The parties disagree as to what plaintiff requested the BOP to do concerning Reynoso's employment. Defendant contends that she insisted that BOP fire him, whereas plaintiff says she wanted him "removed" from the facility. During her deposition, plaintiff testified that she told her supervisor that if she returned to the facility, she needed Reynoso "not to be there." It is unclear what plaintiff meant by requesting that Reynoso "not be" at the facility and whether she in fact wanted him fired or was suggesting that he be placed on administrative leave, be transferred to a different facility within the federal prison system, or be prohibited from working at FMC Devens in some other way.

U.S.C. § 12112(b)(5);  *Peebles v. Potter*, 354 F.3d 761, 768-69 (8th Cir. 2004).  To prove

"reasonable accommodation," a plaintiff must "show not only that the proposed accommodation

would enable her to perform the essential functions of her job, but also that, at least on the face of

things, it is feasible for the employer under the circumstances."  *Reed*, 244 F.3d at 259.

Defendant contends that it did not have knowledge of plaintiff's disability and that even if it did, it

offered plaintiff a reasonable accommodation.  The Court will consider each of defendant's

contentions in turn.

### a.       Knowledge of Disability

It is axiomatic that an employer cannot be held liable for failing to accommodate the

limitations flowing from a disability where the employer is not aware of the disability.  *See* 42

U.S.C. § 12112(b)(5)(A); *Estades-Negroni v. Associates Corp. of North America*, 377 F.3d 58,

64 (1st Cir. 2004).  Here, a genuine issue of material fact exists both as to whether defendant

knew of plaintiff's medical condition and whether plaintiff made a request for accommodation that

would trigger her employer's obligations under the law.

Plaintiff has submitted evidence that Dr. Milowe sent multiple letters to the BOP

explaining plaintiff's diagnoses of PTSD and depression; that plaintiff had conversations about her

medical issues with her manager and the human resource manager; and that plaintiff's former

counsel sent letters to Winn and Lord requesting that she be provided with a reasonable

accommodation for her PTSD.  Defendant contends, however, that it did not know about

plaintiff's disability because she did not submit the additional medical information it requested in

order to substantiate her diagnosis.  It appears that defendant knew she claimed to suffer from

PTSD, but disputes whether there was sufficient information to confirm the diagnosis.

Regardless, there is clearly a disputed issue of material fact as to whether the information Dr. Milowe, plaintiff, and her counsel provided the BOP was sufficient to alert defendant that plaintiff was suffering from a mental impairment.[15]

### b.    Reasonableness of Accommodation

There is also an issue of material fact as to whether the accommodation requested by plaintiff was reasonable. As noted above, although plaintiff also requested accommodation in the form of leave, the principal issue concerns her request that Reynoso be "removed" from FMC Devens.

Whether a request for accommodation is reasonable turns "in part on the particular circumstances of the workplace." *Reed*, 244 F.3d at 260. In support of her position that it would have been reasonable to remove Reynoso, plaintiff points to evidence that defendant knew Reynoso had a criminal history involving domestic violence; that Reynoso admitted to BOP that he assaulted her; that he admitted to sufficient facts for a finding of guilt in the district court as to that assault; and that BOP knew he had engaged in other off-duty misconduct (driving under the influence). Plaintiff also contends that by participating in defendant's firearms training program,

---

[15] The cases defendant cites to support its contention that it was not required to offer plaintiff an accommodation without additional medical information are distinguishable. Those cases involve situations where the plaintiff clearly caused the interactive process envisioned by the ADA to break down. *See Allen v. Pacific Bell*, 348 F.3d 1113 (9th Cir. 2003); *Templeton v. Neodata Serv., Inc.*, 162 F.3d 617 (10th Cir. 1998); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996). Here, even assuming that the interactive process did in fact break down, there remains a question of material fact as to whether the breakdown was the result of plaintiff's or defendant's behavior. Plaintiff has produced evidence suggesting that defendant did not respond to requests made by plaintiff's counsel concerning potential accommodations; indeed, defendant admits that it did not respond in part because it viewed the requests of plaintiff's counsel as "disingenuous." Furthermore, a psychologist who assessed plaintiff also opined that plaintiff's extremely fragile emotional state may have rendered her unable to produce the exact medical documentation defendant requested.

Reynoso violated the terms of the restraining order plaintiff had obtained against him.[16]

Defendant contends that plaintiff's requested accommodation was not feasible because it was against BOP policy to fire an employee without an internal investigation, and that it could not investigate plaintiff's claims against Reynoso until his criminal case was resolved.  As a preliminary matter, viewing the record in the light most favorable to plaintiff, it appears that plaintiff merely requested that defendant "remove" Reynoso from FMC Devens.  While "removing" could mean firing, it also could include suspending him, transferring him to another BOP facility, or making some other arrangement to preclude Reynoso from working on the premises.[17]  BOP also may have been able to suspend Reynoso indefinitely pending the outcome of his criminal case; indeed, the Workplace Violence Committee that Winn assembled on April 8, 2002, recommended this very solution.[18]  Furthermore, it is unclear why, after conducting its investigation and concluding that plaintiff had been assaulted by Reynoso, defendant could not have either terminated Reynoso then or taken some other action to remove him from FMC Devens.

Defendant notes that plaintiff is not entitled to the accommodation of her choice.  *See, e.g, Bryant v. Caritas Norwood Hosp.*, 345 F. Supp. 2d 155, 168-69 (D. Mass. 2004).  Defendant also contends that the accommodations it provided plaintiff—changing her schedule and Reynoso's,

---

[16] Defendant contends that the restraining order required it to permit Reynoso to return work.  However, the order merely says that Reynoso "may" return to work.  It is not clear whether the court issuing the restraining order even realized what Reynoso's job was, or whether it required him to use and train with firearms.

[17] The record indicates that Winn could grant administrative leave to any employee for any reason he considered "reasonable."

[18] Winn testified that he did not think he had the authority to indefinitely suspend Reynoso because the BOP Regional Director instructed him that Reynoso's case did not qualify for a "home duty" assignment.  Winn explained that, in his opinion, he thought indefinite suspension and home duty were the same thing.

and changing her workplace to the mail room— complied with Dr. Milowe's original January 2003 recommendation.  As a preliminary matter, even assuming that the accommodation did comply with Dr. Milowe's suggestion, this alone does not mean that the accommodation was reasonable or that it remained reasonable as time passed.  *See Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 171-72 (1st Cir. 1998) (rejecting employer's argument that by giving employee leave with pay and changing his schedule it already made a reasonable accommodation because the "duty to provide reasonable accommodation is a continuing one . . . and not exhausted by one effort.").  Plaintiff contends that she was denied the opportunity to rotate between the mail room and main building, and the change made overtime work difficult.  Therefore, there is a material dispute of fact as to whether defendant offered plaintiff a reasonable accommodation.

In short, plaintiff has established a genuine issue of material fact as to whether the accommodations she requested, or that defendant provided, were reasonable.  Accordingly, summary judgment will be denied on plaintiff's failure to accommodate claim.

### C.   Retaliation Claim

Plaintiff alleges that defendant unlawfully retaliated against her because she requested an accommodation for her disability and filed a complaint with the EEO.[19]

In order to prove a claim of retaliation under Title VII, "a plaintiff must establish that (1)

---

[19] As a preliminary matter, defendant contends that plaintiff did not exhaust her administrative remedies to the extent that her retaliation claim is based on actions that occurred after she filed her EEO complaint on March 31, 2003.  *See Roman-Martinez v. Runyon*, 100 F.3d 213, 216 (1st Cir. 1996).  Plaintiff asserts that after March 31, 2003, defendant retaliated against her by denying her requests for leave on July 11, 2003 and August 11, 2003, placing her on AWOL status on August 13, 2003, and issuing a letter of reprimand on June 10, 2004.  However, when a plaintiff seeks judicial relief for actions not listed in the EEO complaint, the judicial complaint nevertheless may encompass any discrimination "like or reasonably related" to that complaint.  *Maldonado-Cordero v. AT & T*, 73 F. Supp. 2d 177, 187 (D. P.R. 1999).  In the context of a retaliation claim, the "like or reasonably related" standard "has been broadly construed to include 'most retaliatory acts arising subsequent to an EEOC filing.'"  *Id.* (internal quotations omitted).  Because summary judgment will be granted as to the retaliation claim on other grounds, the Court need not decide the issue.

she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero-Cerezo*, 355 F.3d at 25. Plaintiff alleges that defendant retaliated against her in the following ways: (1) by failing to grant her accommodations for her disability; (2) by denying her "any and all forms of leave" for which she applied; (3) by requiring her to work under restrictions "in order to accommodate Reynoso"; (4) by classifying her as AWOL despite defendant's alleged knowledge of "all of the facts and circumstances surrounding her situation"; (5) by assigning her to a work site where she could not perform her job; (6) by failing to recognize her attorney and communicate with him about a possible accommodation; and (7) by disciplining plaintiff for being AWOL. Plaintiff contends that there is a causal link between these actions and her requests for accommodation and filing of an EEO complaint because all of the events took place within a short span of time.

In retaliation cases, where there is no direct evidence of retaliation, a plaintiff may employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Coluburn v. Parker Hannifin/Nicholas Portland Division*, 429 F.3d 325, 335 (1st Cir. 2005). Under this framework, the plaintiff must first establish a prima facie case of retaliation. *Id.* Once the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 336. If the employer articulates such a reason, the burden shifts back to the employee to show that the employer's stated reason for the adverse action was in fact a pretext for retaliation. *Id.*

Although it is far from clear, the Court will assume for these purposes that plaintiff can establish a prima facie case of retaliation. Defendant has offered legitimate, non-discriminatory

21

reasons for taking each of the actions plaintiff labels "retaliatory." Specifically, defendant

contends that while it granted plaintiff leave on multiple occasions,[20] it denied two of plaintiff's

leave requests because she failed to submit the required documentation and denied other requests

because plaintiff had just returned to work after being on AWOL status.[21] Defendant also

contends that her work schedule and assignment were altered in order to prevent Reynoso and

plaintiff from coming into contact with one another while at work.[22] Furthermore, defendant

contends that it placed plaintiff on AWOL status in February 2003 and again in August 2003

because she failed to submit the proper paperwork it requested. Finally, defendant contends that

it delayed communicating with plaintiff's original counsel about her medical condition because she

did not expressly authorize the communication.

 The burden therefore shifts back to plaintiff to show that defendant's proffered reasons are

a pretext for unlawful retaliation. *Mesnick*, 950 F.2d at 823. While plaintiff contends that

defendant's reasons are pretextual, she makes no attempt to explain how or why. In order to

show pretext, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's

justification"; rather, plaintiff is required to "'elucidate facts which would enable a jury to find

---

[20] Specifically, BOP granted her (1) 24 hours of advance sick leave on January 23, 2003; (2) approximately one month of leave without pay from June 27, 2003, until July 29, 2003; (3) two weeks of leave without pay from July 29, 2003, through August 11, 2003; and (4) one week of administrative leave from June 18, 2003, through June 27, 2003.

[21] Defendant explains that it denied her request for leave to attend a wedding on June 11, 2003, because she had exhausted her accrued leave and had just returned back to work after being AWOL since February 2003. Defendant also denied plaintiff's August 11, 2003 request for an indefinite period of leave because she failed to provide Winn with the updated medical documentation he had requested in order to grant her the leave. Defendant denied plaintiff's request for advance sick and voluntary leave because she did not submit the necessary paperwork.

[22] In recognizing that defendant has articulated legitimate, non-discriminatory reasons for changing plaintiff's schedule and work location, the Court is not suggesting that these changes were a reasonable accommodation for plaintiff's alleged impairment.

that the reason given is not only a sham, but a sham intended to cover up the employer's real motive.'" *Id.* at 824, (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)). Because plaintiff provides no facts suggesting that defendant's reasons are a sham, the claim cannot survive summary judgment. *See Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988) (recognizing that a party cannot survive summary judgment with unsupported allegations and speculations, but rather must "point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus.").

The Court notes that the same evidence that supports her discrimination claim is not enough to make out a claim of retaliation. As the First Circuit observed in *Calero-Cerezo*:

> That plaintiff may point to this same evidence in support of her Rehabilitation Act claim does not diminish the significance of these shortcomings as legitimate bases for discipline. The analytical matrix is different for the two statutes, and evidence that may assist a plaintiff's case from one vantage may damage it from another. Since [plaintiff] has failed to point to specific facts that would demonstrate any sham or pretext intended to cover up defendants' retaliatory motive, we will affirm the dismissal of her retaliation claim under Title VII.

355 F.3d at 26. A similar analysis is applicable here.

## IV.    Conclusion

For the reasons set forth above,

1.    Defendant's motion for summary judgment as to Count 2, the claim under the Rehabilitation Act, is DENIED; and

2.    Defendant's motion for summary judgment as to Count 3, the claim for unlawful retaliation claim, GRANTED.

**So Ordered.**

23

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: April 2, 2007